CHARLES HOEFER,
AND HOEFER GROUP, LLC,

    *Plaintiffs,*

v.

JOSHUA TEIGEN,
SHAYDEN AKASON,
RICHARD GARMAN,
DAVID LEHMAN,
AND JAMES ALBRECHT,

    *Defendants.*

UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil Action No.: _____

COMPLAINT FOR:

**Violation of Rights**
**Under 42 U.S.C. § 1983**

**Conspiracy to Cause Violation of Rights**
**Under 42 U.S.C. § 1985**

**Violation of Rights Under**
**18 U.S.C. § 1589 and § 1595**

**JURY TRIAL DEMANDED**

---

### (1) – RECITALS, VENUE, PERSONAL CAPACITY ACTION, AND PARTIES:

    1.  Plaintiffs Charles Hoefer ("Mr. Hoefer") and Hoefer Group, LLC ("Hoefer Group") bring this action for deprivation of rights afforded by the Constitution and laws of the United States against Defendant Joshua "Josh" Teigen, Defendant Shayden Akason, Defendant Richard "Rich" Garman, Defendant David "Dave" Lehman, and Defendant James "Jim" Albrecht (collectively, "Defendants") (every reference herein to "Defendants" which does not specify a subset of them is a reference to all). Plaintiffs allege as follows:

    2.  This complaint addresses a multi-year scheme involving deception, concealment, retaliation, and abuse of state power, all surrounding circumstances relating to Mr. Hoefer's and Hoefer Group's purchase and renovation of their Dunseith, North Dakota factory, what transpired there, and what the Defendants did to them.

### (1)(i) – JURISDICTION AND VENUE:

    3.  This court has jurisdiction over all claims and parties identified herein under 28

U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3), in that this case presents federal questions and civil rights causes arising under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 as to both Plaintiffs, and under 18 U.S.C. §§ 1589 and 1595 as to Plaintiff Charles Hoefer.

4.   Venue in this court is appropriate under 28 U.S.C. § 1391(b) because (i) Defendants are residents of North Dakota; and (ii) a substantial part of the events giving rise to these claims occurred in this district.

## (1)(ii) – PERSONAL CAPACITY ACTION:

5.   Each Defendant, acting under color of state law, caused the deprivation of Plaintiffs' federal rights.

6.   All Defendants are being sued in their personal capacity.

7.   There are no claims asserted herein against the State Government of North Dakota ("State of ND").

## 1(iii) – BACKGROUND AND OVERVIEW OF COMPLAINT:

8.   Defendants are an assortment of current and former officials and appointees vested with authority and influence by the State of ND by virtue of their positions.

9.   In all manner of their acts in relation to the Plaintiffs or others shown below, Defendants acted under color of state law, unless specifically alleged otherwise.

10. In 2021 the State of ND, acting through Defendants and others, enticed the Plaintiffs to North Dakota to buy a vacant 100,000 square-foot factory in Dunseith, North Dakota (the "Factory," "Site," or "Dunseith Site") with State of ND sponsorship and promotion by then-Governor Doug Burgum and his subordinates, including Defendants.

11. The Defendants conspired together and acted both individually and in concert to make Mr. Hoefer and Hoefer Group their clean-up crew and scapegoat for concealed aerospace

parts fraud, national security violations, ITAR and AECA violations, Espionage Act violations, and bloody violence – all arising from past illicit State of ND projects that went awry at this Factory.

12. This Factory is a sprawling maze-like complex that had operated for decades in the Turtle Mountain region, employing over 200 at its peak, and manufacturing electronics circuitry, namely printed board and circuit card assemblies, and related components, for commercial, defense, aerospace and other sensitive applications. The Factory was tightly federally regulated and controlled. Operations began under Turtle Mountain Corporation, and then Pemstar, Inc., and then Benchmark Electronics, Inc. In 2015, Benchmark closed the Site and left North Dakota.

13. The Factory today has been beautifully renovated by Hoefer Group. It is comprised of seven interconnected buildings which appear in aerial maps as two side-by-side structures. The front entrance and a Google 3D satellite image of the Factory are depicted in photographs below:

 

14. A coalition of local, federal, and high-ranking State of ND officials and Lehman had discretely facilitated, funded, and managed activities of the shuttered Factory after 2015, some of which were nefarious and illicit and in violation of many federal laws and regulations.

15. The Defendants went to great lengths to keep this information concealed from Mr.

Hoefer – that a delegation of public officials ran herd at the Site after Benchmark's exit and their activities were illicit – until Mr. Hoefer independently uncovered this information in July 2023.

16. Mr. Hoefer had no idea that the Defendants who were making friends with him, and promising to cause the State of ND to publicly promote Hoefer Group, and promising many State of ND incentives to him, were actually laundering crimes and dumping upon him the unfinished cleanup of the Dunseith Site Factory that had been grossly misused for State of ND government-affiliated insider ("State Insider" or "State Insiders") funding schemes and the commission of crimes concerning (a) the U.S. military, (b) defense and aviation supply chains, and (c) federal export controls.

17. Teigen, Akason, and Lehman had told Mr. Hoefer that there would be more State of ND money available to him for his business if the Plaintiffs selected the Dunseith Site over other locations in North Dakota. These Defendants said the Dunseith Site was a State of ND priority.

18. This seemed good to Mr. Hoefer, but these Defendants had an ulterior purpose then unknown to him.

19. Lehman knowingly lied to induce Mr. Hoefer to buy the Site. He told Mr. Hoefer that, after Benchmark, there were no federally controlled Site activities of the sort that Benchmark used to undertake, and that Benchmark had "scrubbed" the Site of sensitive materials in 2015.

20. Other third parties, who were still profiting from the illicit things which they had done with State of ND officials and with Lehman, had concealed approximately a trailer load of evidence throughout the Factory when Hoefer Group acquired it. This evidence represented many past and ongoing schemes that involved some Defendants and also other State of ND officials.

21. During renovations Mr. Hoefer realized that his North Dakota dream Factory was an

4

encumbered federal crime scene and he let Teigen, Akason, and Lehman know he knew that – at that time, Mr. Hoefer innocently believed the Defendants were his allies who would be equally as surprised as he was by what he found.

22. Items Plaintiffs found concealed within the Site included guidance system circuitry assemblies of the Lockheed Martin Corporation Guided Multiple Launch Rocket System (aka "GMLRS"), apparent nuclear electronics-related technical records, troves of important stuff to the U.S. military, B-52 electronics work records, and more, plus records of sales of some sort to "China" mixed among Honeywell International Inc. and Lockheed work records. Thousands of records, digital media, parts, and electronic circuitry devices were labeled as controlled under the ITAR and/or the AECA. There was also evidence of a past and then still-ongoing global aerospace parts fraud scheme. The mere presence of some materials at the Factory violated the Espionage Act. Clearing out one of the Factory rooms revealed a large, dried pool of blood hidden on its floor.

23. Despite pretending to be Plaintiffs' allies and promising to support remediating this mess with the authorities, Teigen, Akason, Garman, and Lehman conspired together and acted immediately – and then for a prolonged time including with Albrecht – to protect themselves and to deprive the Plaintiffs' federal rights.

24. Some North Dakota law enforcement officials then also threatened Mr. Hoefer and he began to experience stalking.

25. Other officials, including an FBI special agent, a U.S. Air Force General, and local police officers then warned Mr. Hoefer that his life was in danger.

26. All Defendants had expected and intended that the Plaintiffs would not understand this mess if Plaintiffs found it at the Factory, and that Plaintiffs would unknowingly throw the

5

evidence away, and then Plaintiffs would become federally liable for any consequences that might arise from all that had been done and remained ongoing.

27. But much of this evidence was too clearly marked as being subject to federal defense-related controls such that Plaintiffs realized its nature once found. Later, other third-party witnesses to Factory-related occurrences came forward and assisted the Plaintiffs.

28. As the Plaintiffs began to report to federal authorities what was sitting at the Factory, the Defendants acted against Plaintiffs' federal rights in dozens of ways seeking to further their cover-up and concealment of their and their cronies' Factory-related misconduct.

29. And when it became obvious to all Defendants that Plaintiffs had discovered and had begun reporting to federal authorities that Defendants and their cronies had a hand in how some of the Site's mess came to be, the Defendants turned against the Plaintiffs rights' and sought to silence, and then punish, and then destroy the Plaintiffs.

30. This whole situation – the Factory evidence the Plaintiffs found, what was still going on within the community, the federal criminal investigations that ensued, and the Defendants' extreme and wholly unjustified retaliation against the Plaintiffs' rights – followed by Plaintiffs going public about it all – has become one of the biggest scandals in recent State of ND history.

31. The North Dakota public and much of the State of ND's legislature were upset and shocked when Mr. Hoefer went public about all of this. Legislators have begun to take action with votes and investigations, because of the way the Defendants targeted the Plaintiffs to 'get' Mr. Hoefer.

32. Although no verdict in this civil case can undo the trauma, threats, safety risks, worldwide ridicule, or humiliation that the Defendants have caused Mr. Hoefer to be subjected to, or unwind the financial damages and other professional harm that the Defendants have caused to

Mr. Hoefer and his business Hoefer Group, the Plaintiffs have filed this action to hold

Defendants responsible for their outrageous violations of the laws that governed their work.

### (1)(iv) – PARTIES:

#### (1)(iv)(a) – THE PLAINTIFFS:

33. Plaintiff Charles Hoefer, also known as Charles D. Hoefer, Jr., is an entrepreneur and

inventor who resides in North Dakota and owns 100% of Plaintiff Hoefer Group, LLC.

34. Plaintiff Hoefer Group, LLC, a North Dakota limited liability company, is a

recreational vehicle ("RV") manufacturing business based at the Dunseith Site it acquired in

April 2022.

35. Hoefer Group purchased the Factory from the Dunseith municipality in a transaction

facilitated by the State of ND through the Defendants and others.

36. Mr. Hoefer had never stepped foot in North Dakota and had never knowingly met a

resident of North Dakota prior to his being recruited to North Dakota by the Defendants who

worked under then-Governor Burgum (he is now U.S. Interior Secretary).

37. Mr. Hoefer is a widely known RV designer, and he spent years developing new RV

technologies to manufacture for Hoefer Group in an industry known for high flying startups.

38. Burgum promoted recruiting Hoefer Group to the Dunseith Site as a major year-end

achievement of his administration in 2022.

#### (1)(iv)(b) – THE DEFENDANTS:

39. Defendant Joshua Teigen was Commissioner for the North Dakota Department of

Commerce ("ND Commerce") under then-Gov. Burgum from 2022-2024. Previously, Teigen

was ND Commerce's Economic Development & Finance ("ED&F") Director from 2020-2022.

He joined ND Commerce in 2019. While Commissioner and before, he served as a board

member of the North Dakota Development Fund, Inc. ("NDDF", a ND Commerce sub-entity).

40. ND Commerce resides within the State of ND executive branch, and its leadership reports directly to the Governor. The Governor's office controls and oversees the agency.

41. Governor Kelly Armstrong fired Teigen on taking office. Teigen ran for office against Armstrong in the 2024 primary. Teigen's ND Commerce employment ended in December 2024.

42. Teigen or his family benefited from millions of dollars in multiple ND Commerce loans to startups tied to his family while he was employed by ND Commerce. At least one of those startups has already failed and left the state, and yet all these loans either remain in an active listing status on State of ND books or they have been forgiven in some way.

43. Defendant Shayden Akason has been ND Commerce's Head of Investments and Innovation since 2021. He oversees State of ND investment programs, including, among others, Kevin O'Leary's Wonder Fund, Legacy Innovation for Technology ("LIFT") Loan Fund, Innovate ND, and NDDF.

44. Akason and Teigen have been friends since youth.

45. Defendant Richard Garman has worked for ND Commerce since 2021. He became ED&F Director following Teigen's promotion to ND Commerce Commissioner.

46. Defendant David Lehman has been ND Commerce's Advanced Manufacturing Manager since at least 2018.

47. Lehman led ND Commerce's 2021 recruitment of the Plaintiffs to the State of ND and to the Dunseith Site, and he introduced the Plaintiffs to public and private lenders.

48. Lehman was the lead coordinator setting up the Factory sale to Hoefer Group.

49. Defendant James Albrecht was appointed by then-Gov. Burgum to NDDF's board, on which he has served since at least 2017. He has chaired it since at least 2021. Albrecht is

President of ComDel Innovation, LLC.

50. While on NDDF's board, Albrecht has sourced ND Commerce and State of ND funds to benefit ComDel, including monies directly from NDDF.

51. Albrecht has overseen millions of dollars in non-performing NDDF loans benefiting its board members, including loans that have already been forgiven or impaired in some way.

52. From September 2022 to present:

    i.  Teigen directed ND Commerce, and he served as a board member of NDDF and directed NDDF executives, until fired. Teigen reported to Gov. Burgum.

    ii.  Garman reported to Teigen, and he now reports to Gov. Armstrong's current ND Commerce Commissioner, Chris Schilken, who replaced Teigen in that role.

    iii.  Garman attends NDDF board meetings in the Commissioner's absence.

    iv.  Akason and Lehman report to Garman, and also to the Commissioner.

    v.  Akason reports to Albrecht for NDDF activities.

    vi.  Albrecht works and liaises closely with all Defendants for NDDF activities.

    vii.  Each Defendant has facilitated or received incentives and funding from the Bank of North Dakota ("BND"), which is the nation's only state-owned bank.

### (1)(v) – NO ROUTE FOR DEFENDANTS TO CLAIM QUALIFIED IMMUNITY:

53. In depriving and in conspiring to deprive the Plaintiffs' federal rights each Defendant, while acting under color of law, violated clearly established federal law, as shown throughout this complaint, and each Defendant engaged in retaliatory and malicious behavior against the Plaintiffs which shocks the conscience.

54. Qualified immunity does not apply to Plaintiffs' claims against these individually-

liable Defendants.

55. The Defendants united against the Plaintiffs' rights under a conspiratorial objective when the Defendants violated clearly established federal laws in depriving the Plaintiffs' rights.

56. The Defendants act as if the laws of the United States do not apply to them.

57. The Defendants deprived the Plaintiffs' federal rights in so many shocking ways, that to accomplish their ends, besides violating many clearly established laws for which the Plaintiffs are asserting this 42 U.S.C. § 1983 and 42 U.S.C. § 1985 action, the Defendants also violated *many* federal laws, including without limitation some of the following federal laws:

i. Garman and Akason, and on information and belief, all Defendants, conspired to entrap Mr. Hoefer and to deprive Plaintiffs' First, Fifth, and Fourteenth Amendment rights and in doing so violated 18 U.S.C. § 371 – which prohibits conspiracy to violate a federal law – in attempting to cause violation of 18 U.S.C. § 1622 – which prohibits subornation of perjury – by seeking in multiple acts to compel Plaintiffs to sign a false acknowledgment under oath. Had Defendants succeeded, they would have (a) taken from Plaintiffs' a property insured for approximately $10 million, (b) created civil and criminal liabilities for Plaintiffs to third party financiers, and (c) set Mr. Hoefer up for an indictment under multiple violations of state and federal law.

ii. All Defendants retaliated against Plaintiffs using a bombardment strategy in which they conspired and acted to deprive Plaintiffs' First, Fourth, Fifth, and Fourteenth Amendment rights with lasting effect, and in so doing repeatedly violated 18 U.S.C. § 1513(e) which law protects the livelihood of a federal victim, witness, or informant from retaliation.

iii. Teigen, Garman, Akason, and Lehman conspired and acted to deprive Plaintiffs' First, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C. § 1519 – causing Plaintiffs to suffer financial harm and loss of property use and enjoyment, to be threatened, and to place and to keep Mr. Hoefer and his family in physical danger – by concealing and covering up records and documents with the intent to impede, obstruct, and influence federal investigations concerning what Plaintiffs found and reported.

iv. Teigen, Garman, Akason, and Lehman conspired and acted to deprive Plaintiffs' First, Fifth, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C. § 1001 – causing Plaintiffs to suffer financial harm and loss of property use and enjoyment, to be threatened, and to place and to keep Mr. Hoefer and his family in physical danger – by concealing, covering up, and hiding material facts from federal authorities who were investigating what Plaintiffs found and reported.

v. Lehman, Garman, Teigen, Akason, and, on information and belief, Albrecht conspired and acted to deprive Plaintiffs' First, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C. § 371 to attempt to cause Plaintiffs to violate – and, in so doing, also themselves violated – 18 U.S.C § 793(e) (the Espionage Act) – governing unauthorized possession or transfer of information important to U.S. national defense. Through deceit these Defendants caused transfer of this information to Plaintiffs, and through coercion, legal threats, and concealment Teigen, Akason, Garman, and Lehman caused the unwanted and prolonged possession of this information by

11

Plaintiffs. This information altered Plaintiffs' business and Mr. Hoefer's life until the matter was resolved.

vi. All Defendants conspired and acted to deprive Plaintiffs' First, Fifth, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C. § 1505 – causing Plaintiffs to suffer financial harm and loss of property use and enjoyment, to be threatened, and to place and to keep Mr. Hoefer and his family in physical danger – by providing false answers, concealing material documents and information, or using threats to impede, influence, or obstruct the actions of federal departments and agencies conducting investigatory proceedings concerning what Plaintiffs found and reported.

vii. All Defendants conspired and acted to deprive Plaintiffs' First, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C. § 1512(b)(2)(B) – causing Plaintiffs to suffer financial harm and loss of property use and enjoyment, to be threatened, and to place and to keep Mr. Hoefer and his family in physical danger – by using intimidation, threats, corrupt persuasion, or misleading conduct toward Plaintiffs with an intent to, and to attempt to cause Plaintiffs to, alter, destroy, mutilate, or conceal objects with intent to impair their integrity or availability for use in official federal investigations concerning what Plaintiffs found and reported.

viii. All Defendants conspired and acted to deprive Plaintiffs' First, Fifth, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C. § 1512(b)(3) – causing Plaintiffs to suffer financial harm and loss of property use and enjoyment, to be threatened, to restrict the parties to whom Plaintiffs

could speak and report to, to restrict the manner in which Plaintiffs could speak, and to place and to keep Mr. Hoefer and his family in physical danger – by using intimidation, threats, corrupt persuasion, or misleading conduct toward Plaintiffs with an intent to, and to attempt to cause Plaintiffs to hinder, delay or prevent the communication to a law enforcement officer of information relating to the commission or possible commission of a federal offense concerning what Plaintiffs found and reported.

ix. All Defendants conspired and acted to deprive Plaintiffs' First, Fifth, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C. § 371 through multiple attempts to violate 18 U.S.C. § 1512(d)(2) – causing Plaintiffs to suffer worldwide humiliation and financial harm, to be threatened, to fear for Mr. Hoefer a false and malicious indictment or civil procedure, to restrict the parties to whom Plaintiffs could speak and report to, to restrict the manner in which Plaintiffs could speak, and to place and to keep Mr. Hoefer and his family in physical danger – by harassing Plaintiffs in ways designed to hinder, delay, prevent, or dissuade Plaintiffs from reporting the commission or possible commission of a federal offense.

x. Teigen, Akason, Garman, and on information and belief, Lehman conspired and acted to deprive Plaintiffs' First, Fifth, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C. § 1589 by knowingly benefiting from and by knowingly coercing and obtaining the labor and services of Mr. Hoefer – by means of (a) threatened abuse of law or legal process, and (b) threats of serious harm to Mr. Hoefer, and (c) a scheme, plan, or pattern

intended to cause Mr. Hoefer to believe that, if Mr. Hoefer did not perform such labor or services, he or another would suffer serious harm – so as to control the situation of what Plaintiffs found and reported.

xi. Akason, Garman, and, on information and belief, all Defendants conspired and acted to deprive Plaintiffs' First, Fifth, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C. § 1014 by making false statements to influence Plaintiffs' financial matters covered by § 1014. This caused a financier defined under § 1014 to refuse lending to Plaintiffs and prevented Plaintiffs from approaching other similar financiers.

xii. Akason, Garman, and, on information and belief, all Defendants conspired and acted to deprive Plaintiffs' First, Fifth, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C. § 371 by attempting to cause Plaintiffs to make false statements to influence financial matters covered by 18 U.S.C. § 1014. This would have caused financiers defined under § 1014 to refuse lending to Plaintiffs, among other civil and criminal penalties the Plaintiffs might have faced.

xiii.   Teigen, Akason, Garman, and Lehman conspired and acted to deprive Plaintiffs' First, Fifth, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C. § 371 by attempting to frame Plaintiffs for successor liability of ongoing third-party violations of 18 U.S.C. § 38 (aerospace parts fraud), which Defendants' acts furthered risk of Plaintiffs being entrapped and indicted for these violations of others. Defendants in their attempts to frame the Plaintiffs created a physically dangerous situation for Mr.

14

Hoefer and his family. As Plaintiffs resolved the mess with federal authorities and discovered that Defendants had some concealed connections to it, Defendants became more retaliatory.

xiv.    Teigen, Akason, Garman, and Lehman conspired and acted to deprive Plaintiffs' First, Fifth, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C. § 371 by attempting to frame Plaintiffs for successor liability of ongoing third-party violations of 22 U.S.C. § 2778 (Arms Export Control Act), which Defendants' acts furthered risk of Plaintiffs being entrapped and indicted for these violations of others. Defendants in their attempts to frame the Plaintiffs created a physically dangerous situation for Mr. Hoefer and his family. As Plaintiffs resolved the mess with federal authorities and discovered that Defendants had some concealed connections to it, Defendants became more retaliatory.

xv.    Teigen, Akason, Garman, and Lehman conspired and acted to deprive Plaintiffs' First, Fifth, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C. § 371 by attempting to frame Plaintiffs for successor liability of ongoing third-party violations of 22 C.F.R. § 127 (International Traffic in Arms Regulations), which Defendants' acts furthered risk of Plaintiffs being entrapped and indicted for these violations of others. Defendants in their attempts to frame the Plaintiffs created a physically dangerous situation for Mr. Hoefer and his family. As Plaintiffs resolved the mess with federal authorities and discovered that Defendants had some concealed connections to it, Defendants became more retaliatory.

xvi.    In multiple acts, on information and belief, one or more of the Defendants conspired and acted to deprive Plaintiffs' First, Fourth, Fifth, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C § 1030 by knowingly accessing Plaintiffs' computer systems and data without authorization, and in other manners covered by § 1030. In each applicable circumstance, this allowed Defendants to unlawfully inform themselves of Plaintiffs' communications so as to further their efforts and their conspiracy to keep Plaintiffs deprived of rights.

xvii.    Garman, Akason, and, on information and belief, all Defendants conspired and acted to deprive Plaintiffs' First, Fifth, and Fourteenth Amendment rights and through their agent committed wire fraud covered by 18 U.S.C. § 1343 in attempting to complete a scheme where Defendants sought to unlawfully capture a property owned by Plaintiffs.

xviii.    Akason, Garman and, on information and belief, all Defendants conspired and acted to deprive Plaintiffs' First, Fifth, and Fourteenth Amendment rights and in so doing repeatedly violated 18 U.S.C. § 1832 by knowingly converting, transmitting, communicating, misappropriating, and publicizing Plaintiffs' trade secrets without authorization and in a manner designed to cause Plaintiffs harm and to deprive Plaintiffs of their property and liberty rights. This occurred multiple times even after Plaintiffs pleaded for the acts to stop.

## (1)(vi) – PLAINTIFFS SEEK PUNITIVE DAMAGES FROM EACH DEFENDANT:

58. Plaintiffs are entitled to punitive damages from each Defendant, in addition to

compensatory damages, because (i) Defendants acted with evil motive or demonstrated reckless indifference to the constitutional rights of the Plaintiffs; (ii) Defendants evidenced malicious or evil intent in callous disregard of the Plaintiffs' federally protected rights; and (iii) Defendants' conduct was oppressive and each Defendant misused authority or exploited the Plaintiffs' weakness.

59. Each Defendant, acting under color of state law and using his official State of ND position, powers, authority, and influence, exposed and exploited weaknesses in the Plaintiffs to protect and advance the Defendants' self-interests.

### (1)(vi)(a) – DEFENDANTS ARE PERSONALLY LIABLE FOR PUNITIVE DAMAGES. STATE OF ND DAMAGE LIMITS DO NOT APPLY:

60. The State of ND is not a defendant and there are no claims against it herein.

61. North Dakota law permits or in some circumstances requires the State of ND to indemnify its agents, employees, and officials against compensatory damages of the types sought against the Defendants herein.

62. State of ND-imposed limitations on these damages do not apply in this federal 42 U.S.C. § 1983 and 42 U.S.C. § 1985 action.

63. North Dakota law does not permit the State of ND to indemnify against punitive damage liability without a new act of the legislature.

64. Thus, Defendants are at personal financial risk to the Plaintiffs for punitive damages.

### (1)(vii) NON-PARTY AGENTS AND 'UNWITTING DUPES' WHOM THE DEFENDANTS DIRECTED IN THE MANNERS DESCRIBED HEREIN:

### (1)(vii)(a) – DEFENDANTS' AGENT JESSICA TOOKE, NDDF CEO:

65. Former State of ND employee Jessica Tooke was the Defendants' agent in all her actions pertaining to Plaintiffs concerning the events and acts described herein. Tooke's actions

in relation to the Plaintiffs as described herein were under the direction and the authorization of Teigen, Akason, Garman, and Albrecht in the manners stated below.

66. Tooke lacked authority to take any official action concerning Plaintiffs without one or more of these Defendants directing and authorizing it.

67. Teigen, Akason, Garman, and Albrecht were Tooke's State of ND superiors whom she answered to and who each held powers to direct Tooke or to cause Tooke to be directed in her official State of ND position as NDDF CEO.

68. These Defendants used Tooke as their puppet and agent against the Plaintiffs.

69. Tooke repeatedly told Mr. Hoefer that she needed direction and authorization from Akason and/or Garman and/or Teigen in causing NDDF to direct and instruct the Plaintiffs in the manners described herein.

70. Akason told Mr. Hoefer that he and Teigen were directing Tooke's acts in relation to the Plaintiffs, which acts Akason said were known to him. "Do whatever she [Tooke] tells you to do," Akason told Mr. Hoefer.

71. Garman told Mr. Hoefer that he had organized weekly planning meetings between October 2022 and August 2023 with the Defendants and others, in part to direct Tooke's acts and other State of ND responses involving the Plaintiffs.

72. Akason directed Tooke to meet with Albrecht and to take instructions from him for some of her acts as described herein in relation to the Plaintiffs. Records confirm this.

73. Lehman influenced Tooke and steered Garman and other Defendants so as to exert his own influence upon Tooke's acts involving the Plaintiffs' rights.

74. In all ways that mattered, Defendants used Tooke as their tool to infringe upon or attack and deprive the Plaintiffs' rights.

75. Akason, Albrecht, Garman, and Teigen each agreed to Tooke's firing, and one or more of these Defendants fired her. Lehman approved of this move.

76. Tooke was fired through a consensus of the Defendants because the Defendants' plan to keep their torment of Mr. Hoefer a secret did not go as planned.

77. Mr. Hoefer had carefully documented Tooke's interactions with him, including with audio recordings, to preserve a factual record.

78. Defendants were very unhappy to learn that Mr. Hoefer had done so, and they fired Tooke because she had become a serious career liability to them.

79. Tooke was caught off-guard by her firing and suffered difficulties as a result of it.

80. Tooke was fired because of the Plaintiffs' situation in Dunseith.

81. Tooke acknowledged to a State of ND legislator she was fired because of "Dunseith."

(1)(vii)(b) – THE DEFENDANTS' OTHER 'UNWITTING DUPES' AND AGENTS:

82. As shown throughout this Complaint, the Defendants have at times utilized other 'unwitting dupes' and agents, such as members of the media and officials from other agencies to further their schemes to deprive the Plaintiffs' federal rights.

83. Tooke faced great risk of imminent career retaliation for *not* following these Defendants' orders.

84. The Defendants have many other means available to themselves, shown herein, with which to coerce and compel other third parties, or call upon their favors or quid pro quo acts.

85. In other ways, Defendants misled third parties by abusing the high trust that others place in the Defendants owing to their State of ND positions.

## (2) – DEFENDANTS HAVE, AND HAVE MISUSED, GREAT STATE POWERS:

## (2)(i) – DEFENDANTS HAVE EXPLOITED UNIQUE STATE FINANCIAL POWERS:

86. Defendants exploited the structure of North Dakota's financial system in ways they were able to influence or control in furtherance of their self-interests and against the Plaintiffs.

87. Multiple North Dakotans who would otherwise be in a position to help the Plaintiffs financially, or in other ways, told Plaintiffs they could not. They reported being threatened by the Defendants, and they claimed the Defendants would exploit these individuals' own reliance upon the State of ND, and even financially ruin them, if they tried to help Plaintiffs.

88. North Dakota is a sparsely populated state, and it is the only state with a state-controlled central bank that props up private banks and businesses. Defendants wield substantial influence and control over North Dakota's private sector in this unique financial landscape.

89. Multiple media outlets warned Mr. Hoefer that their reporters or entities would be targeted by the Defendants with serious adverse financial consequences if they helped expose that the Plaintiffs were being targeted maliciously by the Defendants.

90. A prominent businessman in-state said his family assets are subject to State of ND influence and that the Defendants would cause him to lose them if he is seen publicly helping the Plaintiffs.

91. A representative of a private bank told Mr. Hoefer that the bank could not lend to Hoefer Group because the Bank's top leadership said BND would remove State of ND assets from that private bank if it did so. This banker implied that the Defendants could exert enough influence within BND to leverage such a maneuver.

92. These individuals comprising North Dakota's private sectors of banking, business, and media, had quietly voiced support to the Plaintiffs, but were threatened by the powers of the Defendants to negatively impact their entities and/or livelihoods, and so they avoided helping.

20

93. In addition to those examples above, many third parties have been threatened or felt threatened or experienced acts of intimidation by the Defendants to cause them to stay away from the Plaintiffs, to not help the Plaintiffs, and to not speak up for the Plaintiffs.

94. The Defendants ran State of ND departments under their control and/or influence in a manner akin to an organized crime family, causing great harm to the Plaintiffs' rights and safety.

95. The Plaintiffs just came to North Dakota to build RVs, but the Defendants misused the vast State of ND resources available to them to seek unlawfully to stop that from happening and to sabotage the Plaintiffs' business and spitefully 'get' Mr. Hoefer.

## (2)(ii) – DEFENDANTS' STATE FINANCIAL POWERS ARE GREAT:

96. Some State of ND officials, including Defendants, abuse the State of ND's many unique financial generosities to the private sector, expecting quid pro quo acts or threatening loss of benefits over increasingly reliant private banks and citizenry, to get what they want.

97. The Defendants, by virtue of their positions, possess unique State of ND powers that other State of ND officials do not possess, and that public officials in other states do not possess.

98. Defendants enjoy public trust as they oversee financial agencies and taxpayer funds.

99. The Defendants possess the capability to directly influence North Dakota's financial sector and private business capital access.

100. The Defendants control or influence the state's nexus of business capital sources.

101. Defendants possess the capability to exert leverage and/or control and/or influence over many private banks, businesses, the media, and other professionals in North Dakota.

102. North Dakota's financial system is unique, differing from all other U.S. states, in that much of the private financial sector is reliant upon the State of ND, which controls a sovereign wealth fund from oil and operates the only state-owned bank in the U.S. – BND.

103.    BND offers an array of financial and information technology services and wealth transfer to the private sector.

104.    ND Commerce is mandated to operate as a State of ND financial networks gatekeeper to the private sector, including through facilitation of private sector BND programs.

105.    BND, ND Commerce, and other State of ND funds are advertised as 'available' to all North Dakotans.

106.    Despite their powers and capabilities, Defendants also have legal obligations to respect rights and law and to not misuse their State of ND powers and influence to exploit a citizen or further their own self-interests.

### (2)(iii) – BND GIVES DEFENDANTS LEVERAGE OVER THE PRIVATE SECTOR:

107.    Defendants' collaboration and influence with BND and control over some of BND's private sector programs is notable because:

    i.   BND is (a) an agency with billions of dollars at State of ND officials' disposal and at the Defendants' influence; (b) notably exempt from the usual federal financial oversight and regulatory constraints which other U.S. banks face; (c) neither an FDIC member – its deposits are instead guaranteed by the State of ND and state taxpayers – nor a member of the Federal Reserve system; (d) governed only by a two-thirds majority of three people who serve on its oversight agency the Industrial Commission: North Dakota's Governor, its Attorney General, and its Agriculture Commissioner; and (e) regulated by the North Dakota Department of Financial Institutions, which reports to the Governor.

    ii.   BND acts as a central bank for a majority of in-state private banks.

iii. BND's financial tools function as band-aids for over-aggressive private banks – keeping those banks solvent and stable.

iv. BND's financial transactions with the private sector offer remarkably flexible terms, with its deals typically featuring many of the following: low closing costs, lower-than-market interest rates, reduced collateral requirements, reduced equity requirements, and higher appetite for risk. Many North Dakota banks get better deals from BND and rarely need to tap into federal small business loan guarantee programs through the Small Business Administration or United States Department of Agriculture to get financing to their customers.

v. BND (a) has recently taken indirect State of ND positions in private banks by issuing over $390 million in loans to buy private North Dakota banks' stock, including $70+ million where its customers' loans "exhibit the earliest signs of potential problems" or "require close monitoring as deterioration remains a strong possibility" and where such loans secure BND against the stock itself; (b) props up private banks, deploying billions of dollars in State of ND assets as deposits to private banks; (c) lends $6+ billion to North Dakotans through co-participation notes with private banks, through direct lending, through equity investments, and commits $2.8+ billion through off-balance sheet activities including providing third-parties with State of ND guarantees; (d) builds out and affordably maintains private banks' technology systems; and (e) keeps many in-state private banks federally compliant by offering federal reporting services.

108. Many in-state private banks and entities would suffer or fold if BND, ND

Commerce, and other State of ND funding programs were wound up and ended. These private parties would lack alternate subsidized funds and services on which they have become operationally reliant.

109.    BND very gratuitously purchases delinquent or defaulted customer loans from the books of multiple in-state private banks who work with BND. At other times, BND modifies its customer loan terms, including for BND's co-participation loans originated by private banks, so that these non-performing loans instead appear on everyone's books as current.

110.    BND can 'slow roll' impaired loans and equity off its books or 'forever' extend these funds in creative ways since the federal government is not looking at BND's books, and since the Industrial Commission does not provide meaningful insight on BND's transactions to taxpayers who BND is accountable to.

111.    What little information BND has released in recent years shows that BND is quietly losing hundreds of millions of dollars from its higher risk practices every year, and:

     i.   BND has a few billion dollars of loans outstanding that are poorly secured and are factually unstable or partly or fully uncollectable.

     ii.   BND recently hired a private consultant who reported that keeping BND 'as is' will cost the State of ND's taxpayers $9.5 billion over 20 years through its behavior.

     iii.   In recent years, BND has charged off hundreds of millions of dollars in equity losses, and has reflected in its annual reports tens to hundreds of millions in unrealized equity losses.

     iv.   Most of BND's equity assets amounting to nearly $2 billion are currently held as mortgage-backed securities, which some experts warn may become volatile.

      v.   BND appears to be playing in higher return, higher risk securities to offset its

losses from its practices within North Dakota, and neither approach is

delivering for taxpayers.

112.    In some ways, BND's high-risk approach supports aggressive entrepreneurship.

113.    But BND's approach closes the door to market-rate private competitors with non-State of ND products, and creates a private sector dependency from among the state's sparse population on the State of ND.

114.    Defendants and other State of ND officials leverage and exploit this dependency.

115.    The in-state private sector has few viable alternatives to the sweet deals that BND, ND Commerce, and other state agencies offer to banks and businesses.

### (2)(iv) – DEFENDANTS HAVE WEAPONIZED NDDF AGAINST PLAINTIFFS:

116.    The State of ND touted NDDF as North Dakota's most flexible source of capital when the Defendants facilitated issuance of an NDDF credit line facility to Hoefer Group.

117.    NDDF functions primarily as a State of ND-funds gifting agency disguised as an investment fund and the Defendants attacked the Plaintiffs with it.

118.    Defendants and other NDDF officials cause NDDF to write off millions of dollars in loans or equity awarded to private entities – often writing off funds provided to private entities in which State Insiders or their immediate family has an ownership interest – without checks and balances. The State Auditor confirmed NDDF's improper write-off habits in a recent report.

119.    Defendants and other NDDF officials have written off or impaired a majority of State of ND funds that NDDF has awarded to private entities, essentially either converting those funds to grants or keeping them on NDDF's books as a tax free 'forever yours' gift to the recipient. For example:

    i.   NDDF's write-offs, however disguised, exceeded 70% of its loan portfolio in some recent years. The State Auditor confirmed this in a meeting with State of ND legislators.

    ii.   Some NDDF board members have enjoyed the use of NDDF funds provided to private entities in which they or someone in their immediate family has an ownership interest, for up to 10 years or more without reducing the initially awarded loan or equity balance, and at times without the recipient entity even making a loan service payment or principal repayment to NDDF for those funds.

    iii.   NDDF almost always gives private entities, including those entities whose ownership and/or contract(s) are with State Insiders, the entire balance of an NDDF loan or equity award upfront.

120.    NDDF's philosophy as stated in its 2023 annual audit report is to provide North Dakota businesses with the most flexible financial tool in North Dakota.

121.    Plaintiffs were not the beneficiaries of such 'flexible' treatment. Rather, the Defendants have since weaponized NDDF against the Plaintiffs.

122.    In retaliation for Plaintiffs' federal factory clean up, for Plaintiffs' independent discovery of some copies of ND Commerce public records the Defendants had been concealing, and for Plaintiffs' truthful reporting of the commission and possible commission of federal crimes to federal authorities from Plaintiffs' understanding of the Factory mess and of those public records – all which may implicate or embarrass Defendants – and for other self-serving reasons, Defendants misused their authority of NDDF as its representatives in order to terrorize and silence the Plaintiffs.

26

<u>(2)(iv)(a) – WAYS DEFENDANTS MISUSED NDDF TO DEPRIVE PLAINTIFFS' RIGHTS:</u>

123.    Defendants repeatedly coerced and extorted Mr. Hoefer, endangered Mr. Hoefer

and his family, and harmed Plaintiffs financially and in other ways. Teigen and Akason, acting in

conspiracy with and assisted by Garman and Lehman held hostage Plaintiffs' NDDF funding and

other State of ND incentives, and directed Tooke to threaten Plaintiffs' finances and reputation,

which Akason confirmed included legal action threats, so as to compel Plaintiffs into acts which

harmed Plaintiffs and furthered Defendants' self-interests. Tooke also assured Plaintiffs that

Defendants would reimburse the Plaintiffs for the harms Defendants were inflicting upon them if

Plaintiffs did as they were told to do, which they did.

124.    From August 2022 and until August 2023, Teigen and Akason, conspiring with

and being assisted by Garman and Lehman as to this, abused their authority of NDDF and other

State of ND incentives to extort and coerce Mr. Hoefer in order to control, slow down, and

narrow the scope of Plaintiffs' reporting of the Factory mess, of crimes against the Plaintiffs, and

of the commission or possible commission of federal crimes in ways that suited Defendants' self-

interests, while harming Plaintiffs' finances and putting Mr. Hoefer and his family in danger.

These Defendants, through Teigen and Akason and through their agent Tooke, told Mr. Hoefer

whom to talk to and whom he may not talk to at State of ND, local, and federal levels about all

this.

125.    Teigen, Garman, Akason, and Albrecht in controlling NDDF with Lehman's

assistance, caused NDDF to preemptively freeze Plaintiffs' access to contractually-obligated

NDDF funds in September 2022 and again in September 2023 – which freeze continues as of this

filing – thereby blocking Plaintiffs' access to financiers who had relied upon prior NDDF and

State of ND commitments made by Defendants that these NDDF funds would be available to

Plaintiffs' business. Each freeze was an immediate retaliation as Mr. Hoefer began to report

27

about the commission or possible commission of crimes to federal authorities in ways

Defendants *knew* could embarrass and/or incriminate them and their cronies. Defendants

furthered their self-interests to harm the Plaintiffs, and abandoned NDDF's mission, mandate,

and usual practices.

126.    From October 2022 until June 2023 Teigen and Akason, assisted by Garman and

Lehman, abused their authority over NDDF and other State of ND incentives to extort and coerce

Mr. Hoefer and cause legal threats to be made against him, directing Mr. Hoefer through their

agent Tooke that Plaintiffs were not to inform Plaintiffs' private lenders or business associates

about the Factory mess, the federal violations, or the Defendants' close workings and dealings

with the Plaintiffs in relation to all that. This isolated the Plaintiffs and allowed Defendants to

gaslight Mr. Hoefer and his family and keep Plaintiffs under control as they furthered their own

self-interests in ways harmful to Plaintiffs.

127.    From October 2022 until June 2023 Teigen and Akason, assisted by Garman and

Lehman, abused their authority over NDDF and other State of ND incentives to extort and coerce

Mr. Hoefer and cause legal threats to be made against him, directing Mr. Hoefer through their

agent Tooke that Plaintiffs were not to complete a third-party mortgage of the Factory. Tooke

promised that the Defendants would act to restore this necessary business capital with an earlier-

promised low-interest BND co-participation mortgage once the federal Factory clean-up was

completed – which promise Defendants abandoned. These acts furthered Defendants' self-

interests in that they prevented a third-party lender from deploying significant capital to Hoefer

Group, which capital would have disrupted Defendants' oppression, extortion, control, and

coercion of the Plaintiffs.

128.    From October 2022 until June 2023 Teigen and Akason, assisted by Garman and

Lehman, abused their authority over NDDF and other State of ND incentives to extort and coerce Mr. Hoefer and cause legal threats to be made against him, directing Plaintiffs through their agent Tooke to change Hoefer Group's operations in ways which furthered Defendants' self-interests and harmed the Plaintiffs. There was no provision in Plaintiffs' contract with NDDF that even dealt with the topic of conferring control over Plaintiffs' business to NDDF, because such actions are not the purpose of the agency, nor of any similarly situated public lender to a business. As an enticement, Defendants through Tooke promised to reimburse Plaintiffs for the hardships they caused, which promise was never fulfilled. Defendants were simply seeking to keep a lid on the Factory mess and their and their cronies' associations to it.

129.    All Defendants later blamed the Plaintiffs for making the very same business operations changes they had required of Plaintiffs and claimed falsely that such changes were not "approved" by NDDF. This came even though there was no provision in any contract with NDDF that would require or address the need for an NDDF approval if Plaintiffs should choose to make operational changes, and even though Defendants were who caused NDDF to direct Plaintiffs to make these changes. Defendants subjected Plaintiffs to special treatment by switching NDDF from passive to active management of the Plaintiffs' business so as to further their own self-interests to conceal the Factory mess and their associations to it. This was an abuse of their authority under state law, and they knew it and later sought to conceal it:

> i.    Akason, with Albrecht, Garman, and Lehman supporting him, denied in a December 2024 meeting with State of ND legislators who were inquiring about Defendants' acts towards Plaintiffs that NDDF has ever actively directed or interfered in a business. As to Plaintiffs, that was certainly a false statement.

ii.  Defendants knew they could not admit to what they had done, because it had never been done by NDDF before and it would reflect poorly on the State of ND if borrowers and prospective borrowers learned that NDDF was actively interfering in a business.

130.    From January 2023 until June 2023 Teigen and Akason, assisted by Garman and Lehman, abused their authority over NDDF and other State of ND incentives to extort and coerce Mr. Hoefer and cause legal threats to be made against him, directing Mr. Hoefer through their agent Tooke that Plaintiffs were not to inform the media about the Factory mess, the federal violations, or the Defendants' close workings and dealings with the Plaintiffs in relation to all of that. This kept the situation quiet and prevented relief to Plaintiffs as Defendants furthered their own self-interests in ways harmful to Plaintiffs.

131.    In March 2023 Teigen and Akason, assisted by Garman and Lehman, abused their authority over NDDF and other State of ND incentives to extort and coerce Mr. Hoefer and cause legal threats to be made against him, directing Mr. Hoefer through their agent Tooke that Plaintiffs were not to make an open records request about the Dunseith Site to ND Commerce:

i.  Before that, Lehman falsely claimed to Mr. Hoefer and to criminal investigators that Lehman had no knowledge of State of ND Factory dealings after 2015.

ii.  To further Defendants' concealment scheme, Tooke visited the Factory and had with her a State of ND laptop computer, which she claimed held ND Commerce's public records database. Tooke showed Mr. Hoefer that no Factory-related records existed after 2015.

132.    But hundreds if not thousands of pages of ND Commerce Factory-related records

do exist and did exist when Tooke showed Mr. Hoefer that false 'no-records-after-2015' database.

133.    Defendants were actively hiding those public records because the Defendants' history with the Factory would have been apparent to Mr. Hoefer if he were to obtain them.

134.    In March 2023 Teigen and Akason, assisted by Garman and Lehman, abused their authority over NDDF and other State of ND incentives to extort and coerce Mr. Hoefer and cause legal threats to be made against him, directing Mr. Hoefer through their agent Tooke that Plaintiffs should file a civil lawsuit, which became North Dakota case no. 40-2023-CV-00048 in Rolette County, against Benchmark as the Site's former occupant and its local henchman. The suit's purpose was to try to compel those third parties to clean up the Site by removing the illicit items they'd left behind there and to attend to any civil or criminal penalties which might be associated with the presence of those illicit items and their prior activities.

135.    Plaintiffs protested at the work, time, distraction, and expense of the Benchmark civil lawsuit and wanted instead to inform the media about the Factory mess and federal violations to compel relief, but Tooke promised financial reimbursement and full State of ND and NDDF support if Plaintiffs brought suit. Tooke also threatened Plaintiffs with retaliation, consequences, and legal threats by Defendants if Mr. Hoefer instead reported the situation to media. Mr. Hoefer was forced to labor for at least 1,600 hours of his time in complying with that compelled litigation process and in complying with Defendants' other remediation instructions and demands, all made at Defendants' insistence through their agent Tooke and coupled with legal threats, threats of serious harm, and false promises of reimbursement, all of which diverted Mr. Hoefer from spending that time on Plaintiffs' business while furthering Defendants' own self-interests and depriving other rights of the Plaintiffs.

136.    That Benchmark suit was later voluntarily dismissed after all Defendants (to this

matter) targeted Plaintiffs through NDDF with financial retaliation because Plaintiffs had

independently obtained public records which showed that the Defendants had a hand in the

Factory mess and its cover-up.

137.    In April 2023 a local man, William "Bill" Tuttle, threatened physical violence

against Mr. Hoefer, and Tuttle incited his family and allies to help him plot a forced "physical

removal" of Mr. Hoefer from Dunseith. Tooke, representing NDDF as an agent of Teigen,

Akason, Garman, and Lehman, agreed and approved that Tuttle should be named in the civil

lawsuit above, which Defendants coerced and forced Plaintiffs to file, as Tuttle was a central

party to the Factory mess:

> i.    This incensed Tuttle, who was a close crony to Lehman and Albrecht and had
>
>     worked on Factory projects with them and with other State of ND and federal
>
>     officials after 2015, which facts Defendants were then concealing from
>
>     Plaintiffs.
>
> ii.    A North Dakota Bureau of Criminal Investigations ("ND BCI") special agent
>
>     then warned Mr. Hoefer that, to stay safe, he should avoid entering any local
>
>     school system properties that Tuttle's family and allies controlled.

138.    Representing NDDF and acting as Defendants' agent, Tooke directed the Plaintiffs

in April 2023 to end a technical training partnership with Dunseith Public Schools that Plaintiffs

and the RV Industry Association ("RVIA") had promoted nationally with the State of ND.

139.    Tuttle was helping the school run this RV training program. As Tuttle incited his

family and allies who were employed by the local school system to threaten and plot violence

against Mr. Hoefer, the Defendants, through their self-serving acts, had caused for Mr. Hoefer an

untenable and dangerous situation.

140.    Tooke said NDDF would support the Plaintiffs' added business costs of this RV training program's cancellation, and that Plaintiffs would enjoy State of ND support to overcome reputation injury and other harm from this cancellation.

141.    Tooke praised Mr. Hoefer in August 2023, and Tooke said that all the Defendants were impressed by his progress in relation to the NDDF credit line from what they saw in their July 2023 visit to the Factory for an event organized by ND Commerce that was televised on a local *CBS* network affiliate.

142.    Although not publicly promoted as such, this "Soft Opening" event was organized by Defendants for them to celebrate after federal investigators had removed the most sensitive U.S. military evidence from the Factory, allowing it to finally fully open up.

143.    Mr. Hoefer protested with Tooke and Akason that Plaintiffs did not want to host this event, because he and his family were so distressed, but Tooke and Akason said the 'soft opening' was going to happen then at the Plaintiffs' factory, notwithstanding Plaintiffs' concerns.

144.    While preparing for the 'soft opening' event, Mr. Hoefer and his family were still being stalked, and Plaintiffs were still suffering from electronics interference and hacking.

145.    On August 14, 2023, Tooke, on behalf of NDDF, praised Mr. Hoefer told him:

> Shayden called me afterwards and said that he thought that it went really great, you know, that the board seemed to enjoy it, that the, even the community discussion, the, um, the soft opening was good, you know, like I heard nothing but good from that, and from everyone. Not even just Shayden, but like the whole ED&F team all reached out and said that it was a great experience and that they were happy to have gone, and that they all were amazed by how the, the place looked and things like that and I was like, yeah, that uh, a tremendous amount of work and time has gone into it, and, and that you and your team have done amazing.

146.    But behind the scenes, Defendants were retaliating for Plaintiffs' reporting to

federal investigators – who had open Site investigations premised in part upon the contents of copies of ND Commerce public records the Plaintiffs had independently obtained and given those investigators, and upon the commission or possible commission of federal Factory crimes which those records supported and elaborated upon – and so all Defendants conspired and caused NDDF to immediately advance false allegations of criminal misconduct against the Plaintiffs, and they began to enact a plan of wide-ranging harms against Plaintiffs beginning in September 2023 and still continuing and causing Plaintiffs unmitigated harm.

147.    In October 2023 or earlier, all Defendants conspired and took collective action to falsely accuse Mr. Hoefer of criminal misconduct – of blackmailing them and ND Commerce – to the State of ND Attorney General, the Governor, Auditor, to media, and to third parties.

148.    In October 2023 or earlier, all Defendants conspired and took collective action to falsely accuse Mr. Hoefer of criminal misconduct – of extorting them and ND Commerce – to the State of ND Attorney General, the Governor, Auditor, to media, and to third parties.

149.    In October 2023 or earlier, all Defendants conspired and took collective action to falsely accuse Mr. Hoefer of criminal misconduct – misuse of State of ND funds – to third parties, including to the State of ND Attorney General, the Governor, Auditor, to media, and to third parties.

150.    Defendants' message was clear: 'We don't like Mr. Hoefer anymore [for all reasons shown in this complaint and others], so he shall become a criminal, and we'll find a way to make him one.'

151.    Defendants *knew* that their allegations of criminal misconduct against Mr. Hoefer were false and retaliatory when they caused NDDF to begin promoting them.

152.    Lehman celebrated with ND Commerce employees as the media promoted false

34

criminal allegations of misconduct against Mr. Hoefer and his business.

153.    Lehman wrote in an email: "Better late than never I guess… lol" in January 2024 when he discovered that the *Bismarck Tribune* had joined in to publish a story to advance Defendants' false criminal allegations of misconduct against the Plaintiffs.

154.    Akason, conspiring and furthering his acts with Teigen, Garman, and Albrecht in controlling NDDF, and with Lehman's assistance, wrongly hijacked NDDF as their own platform and caused NDDF to subject the Plaintiffs to worldwide harm, humiliation, defamation, ruin of reputation, deprivation of property, shame, public scorn, emotional distress and other harm, and Defendants caused State of ND agencies and officials to show public hostilities to Mr. Hoefer – all unprecedented acts against an NDDF borrower.

155.    These Defendants did this in retaliation for Mr. Hoefer's federal reporting of the public records and the commission and possible commission of federal crimes those records evidenced, and for other self-serving reasons which deprived Plaintiffs' rights including without limitation relating to the Factory mess and Plaintiffs' clean-up of it, and Defendants' desire to keep all of that quiet and concealed.

156.    From September 2023 and continuing as of this filing, Akason, in conspiracy and in cooperation with Teigen, Garman, and Albrecht, repeatedly blocked Plaintiffs' requests to attend NDDF board meetings. They did this to prevent the Plaintiffs from informing the full board about the Defendants' illicit behavior in relation to the Dunseith Site and as to the Defendants' acts against Plaintiffs.

157.    In contrast, whenever any other of NDDF's private entity borrowers and funding recipients need or desire to provide updates to or negotiate terms with the board, those parties are usually given access to such a meeting within 30-60 days of a request.

158.     Beginning September or October 2023, Teigen, Garman, Akason, and Albrecht in controlling NDDF, with Lehman's assistance, caused NDDF to launch baseless, retaliatory, and unending criminal and administrative investigations into the Plaintiffs for which the Defendants had created the pretext and then prompted with their worldwide false accusations.

159.     The Defendants' mission was to sully the Plaintiffs' reputation and ruin Plaintiffs' business by announcing to third-parties, financiers, and the public that Plaintiffs were under State of ND investigations for Defendants' false criminal misconduct allegations, and also to scrape about for something in which they might try for an indictment of Mr. Hoefer.

160.     But *all Defendants knew before they began* to investigate the Plaintiffs that there never was anything criminal or untoward to find against Mr. Hoefer or his business, because his business was one of NDDF's best borrowers.

161.     Defendants *knew that* the outcome/conclusions of their investigations against the Plaintiffs was *predetermined* and was absent facts and reality.

162.     Beginning October 2023 and until December 2023, Akason and Garman, assisted by Teigen and Albrecht in controlling NDDF, and with, on information and belief, Lehman's assistance, caused NDDF to falsely proclaim to third parties that it held "first position" to Hoefer Group's assets. Discovery will reveal the Defendants did this at other times. They did this to take away Plaintiffs' property and liberty rights, and to intimidate and scare away prospective third-party lenders to Hoefer Group who required a first position to assets.

163.     NDDF's welcoming third-party lenders to Hoefer Group in first/superior security position to NDDF was promised by NDDF as the agreed Hoefer Group financial structure.

164.     Internal ND Commerce records show Akason schemed with Albrecht to ignore terms of the Hoefer Group/NNDF subordination agreement.

165.    Akason and other Defendants went about trying to figure out how to obtain "first position," including through attempting subornation of perjury, and by trying to recruit Hoefer Group's third-party lenders to falsely accuse Mr. Hoefer of criminal misbehavior.

166.    Akason directed Tooke to hunt through old video recordings of NDDF board meeting presentations by Mr. Hoefer, seeking to find something to use against Mr. Hoefer so as to maliciously cause NDDF to seek to invalidate prior agreements.

167.    None of this behavior by Defendants arose under any contract dispute.

168.    All Defendants *knew* NDDF's asset position was written as "Subordinate lien on all business assets of Hoefer Group, LLC," and that all relevant contract language referred back to this subordination agreement, and that NDDF's UCC filing to Hoefer Group personal property fell behind other lenders.

169.    Rather, Akason and other Defendants were breaking many federal laws in the deprivation of Plaintiffs' constitutional rights and were subjecting Plaintiffs to singular treatment to 'get' Mr. Hoefer and to destroy his business.

170.    Two of Hoefer Group's community lenders – the lenders NDDF is mandated to support and work alongside – wrote to NDDF in support of Hoefer Group in November 2023, reminding NDDF of its promise to them to subordinate and that its contract requires it.

171.    Teigen, Garman, Akason, and Albrecht in controlling NDDF, with Lehman's assistance, caused NDDF to subject the Plaintiffs to an unprecedented and extreme forensic 'forever performance audit' starting October 2023, which 'audit' process remains open as of this filing after nearly two years without a written report, finding, or conclusion, and with Defendants who opened it refusing to finish it.

172.    Internal ND Commerce records show Defendants long ago abandoned this audit.

173.    Despite abandoning this 'forever audit,' Defendants maintained and continued to spread their false criminal allegations of misconduct against the Plaintiffs.

174.    After Defendants abandoned their 'forever audit,' they devised and utilized other ways and means with which to sabotage and ruin the Plaintiffs.

175.    Akason, in conspiracy and cooperation with Teigen, Garman, Albrecht, and on information and belief, Lehman, falsely told the other six NDDF non-Defendant board members on October 10, 2023, that Mr. Hoefer was threatening to sue ND Commerce.

176.    Yet Akason knew on October 10, 2023, that Mr. Hoefer had recently sent him an email in which Mr. Hoefer assured Akason that Mr. Hoefer would never sue ND Commerce.

177.    Akason also told a reporter just days or weeks after October 10, 2023, that he *knew* Mr. Hoefer would not sue ND Commerce.

178.    But Akason did not inform the NDDF board after October 10, 2023, that Akason was wrong about his alleging that Mr. Hoefer was threatening to sue ND Commerce.

179.    The Defendants' motive in falsely informing the other NDDF board members that Mr. Hoefer was going to sue ND Commerce was to maliciously and deceptively cause the NDDF board to withdraw its support from the Plaintiffs.

180.    Starting in October 2023 and still continuing, all Defendants maliciously and falsely informed non-Defendant members of the NDDF board that the Plaintiffs had "misused" NDDF's loan funds so as to cause NDDF's board to withdraw its support of Hoefer Group.

181.    Defendants *knew* their "misuse" allegation was false.

182.    Defendants invented their "misuse" allegation against the Plaintiffs and then spread it everywhere they could as a pretext for disabling the Plaintiffs' NDDF contract and freezing Plaintiffs' access to NDDF, State of ND, and third-party funds, partnerships, incentives,

and for effecting other harm and deprivations against the Plaintiffs.

183.    Defendants *knew* they had no legitimate basis for their advancing criminal allegations of misconduct against the Plaintiffs and they repeatedly invented and then abandoned new ideas which they tested in public and to third parties to form a basis of their allegations, as State of ND public records and other evidence shows.

184.    Defendants' false allegations included, among others, false claims that Mr. Hoefer was engaged in "blackmail" and "extortion" against NDDF in some unspecified way.

185.    Defendants' false allegations – which Akason made publicly in cooperation and conspiracy with each Defendant – of "blackmail," "extortion," and "misuse" of State of ND funds remain published and searchable worldwide online through multiple media outlets and are causing unmitigated harm and rights deprivations to Plaintiffs.

186.    In many online searches relating to the Plaintiffs, these allegations appear and often they appear prominently.

187.    In the first year after Defendants caused false allegations of criminal misconduct against Plaintiffs to be published, and while Plaintiffs needed to secure funding apart from the funding Defendants had promised to provide and to coordinate, online searches relating to the Plaintiffs were flooded – on the first page of a Google search – with Defendants' false "misuse" of State of ND funds allegation.

188.    Frequently Defendants falsified facts about the Plaintiffs' business which they communicated to third parties when advancing and furthering their false allegations.

189.    In November and December 2023, the Defendants were desperate to incriminate Mr. Hoefer, to silence him, and to steal Hoefer Group's prized asset from Hoefer Group's other lenders: the renovated Dunseith Site which was then-insured for approximately $10 million, and

to accomplish other nefarious ends against the Plaintiffs.

190.    With ownership of the Factory for the State of ND, Defendants could begin to rewrite its history and conceal trails of Mr. Hoefer's reporting by kicking the Plaintiffs out and branding Mr. Hoefer a criminal.

191.    Akason, acting in conspiracy with Garman, Albrecht, and, on information and belief Teigen and Lehman, directed multiple NDDF subordinates to email instructions to Mr. Hoefer – and they did so in violation of 18 U.S.C. § 1343 – that he must sign over his Factory to the State of ND via a mortgage agreement for "forever" as their concocted NDDF contract stated after which "NDDF" would consider providing more funds to Hoefer Group.

192.    However, this 'mortgage' was a criminal trap set by the Defendants for them to then seek an indictment against Mr. Hoefer as:

    i.   The mortgage 'contract' document contained extreme backdating, purporting a February 2022 start date – also the date on which Plaintiffs were to declare they had turned over title to the Factory to the State of ND.

    ii.   Mr. Hoefer was told he must sign it 'as is' but the 'contract' had a backdated notary acknowledgment section which, if signed, would have had Mr. Hoefer swearing falsely that he had signed the document almost 2 years earlier, in February 2022, which the Defendants directed their subordinates to instruct Mr. Hoefer to sign bearing that as the date of his signature.

    iii.   The 'contract' required Plaintiffs to make other false declarations, such as that Hoefer Group owned 6.88 acres of land it has never owned, and that Hoefer Group owned the Factory before the date of Hoefer Group's purchase of it.

    iv.   The Defendants sought to make Mr. Hoefer perjure himself in violation of 18

U.S.C. § 1622 and State law, and the Defendants were seeking to cause Mr. Hoefer to enable NDDF in committing a 'taking' against Hoefer Group and theft against its other lenders.

v.   None of the Defendants or their agents needed to sign this document, so only Mr. Hoefer would be the 'perjurer.'

193.   In recruiting Plaintiffs and setting up original NDDF contracts, Defendants caused NDDF to represent to Plaintiffs and Plaintiffs' lenders that the Factory would be Plaintiffs to own outright and to use, including as a security for Plaintiffs' seeking millions of dollars in additional third-party financing.

194.   In mid-November 2023 Defendants also became aware that Plaintiffs were listing the Factory with a renowned broker on a 'sale-leaseback' transaction to recapitalize and get out from under Defendants' thumbs and out from under their oppression, coercion, and control, and Defendants inserted language in their scheming backdated mortgage document that would have allowed them through NDDF to prevent that sale from happening – and all such opportunities of which they later deliberately wrecked in 2024 anyway through abusing and misusing other state powers, influence, and authority available to them.

195.   There were other provisions in the Defendants perjurious document which had the effect, if signed, of giving more control and leverage over Plaintiffs' business to Defendants, and giving Defendants almost total control over the Factory as if Plaintiffs were merely its tenant and were reporting to an oppressive landlord. The Defendants' intent here was clear – to create a retroactive mechanism whereby perhaps at least *a few* of their past actions against the Plaintiffs might become at least partially justified in some manner.

196.   With their late 2023 'bag of perjury tricks,' the Defendants illicitly sought to gain

many advantages and 'upper hands' over the Plaintiffs to further their self-serving ends.

197.    When Mr. Hoefer and his family saw that the Defendants were brazenly working to cause Mr. Hoefer to commit perjury, and that the Defendants seemed to have no problems or concerns about being held accountable for doing so, they were terrified.

198.    Mr. Hoefer's family began to question whether the Plaintiffs had gotten involved in business with a state government or with an organized criminal enterprise?

199.    Teigen, Garman, Akason, and Albrecht in controlling NDDF, with Lehman's assistance, and in furtherance of Defendants' 'silence and revenge' strategy, caused NDDF to spitefully, irrationally, and arbitrarily default Plaintiffs' NDDF credit line starting February 2024 in treatment that was specially reserved for Plaintiffs who had three years of credit line term then still-available and pre-approved by NDDF's board.

200.    Defendants' spiteful and arbitrary 'default' act abruptly crippled Hoefer Group's and Charles Hoefer's borrowing abilities and blocked Plaintiffs' access to third party financiers who had relied upon prior NDDF and State of ND commitments made by Defendants that these funds would be available to Plaintiffs' business.

201.    Plaintiffs had made regular payments to NDDF up until the Defendants caused the default. Plaintiffs paid NDDF with greater consistency than most NDDF borrowers.

202.    Before Defendants caused the default, Plaintiffs still had over $200,000 not disbursed under the then-existing NDDF credit line that Defendants kept frozen in retaliation and for other self-serving reasons which deprived Plaintiffs' rights.

203.    Before Defendants declared a default, Teigen, Akason, Garman, and Lehman through their agent Tooke had promised reimbursements to Plaintiffs of approximately $750,000 through NDDF over and above the existing credit line arising from acts above where Defendants

coerced, extorted, threatened, and controlled Plaintiffs to serve Defendants' own self-interests.

204. Two of Hoefer Group's community lenders – the lenders NDDF is mandated to support and work alongside – wrote to NDDF in strong support of Hoefer Group in November 2023 and requested the continuance of the loan plus an "amicable resolution" to Defendants' misuse of NDDF. These lenders described Hoefer Group's third-party fundraising as "challenged by the external environment" Defendants created and imposed upon Plaintiffs.

205. In January 2024, Akason and, on information and belief, Teigen, Garman, and Albrecht directed Tooke to call two of Plaintiffs' third-party lenders to seek support for the Defendants' false "misuse" allegation of criminal misconduct against Plaintiffs.

206. These two third-party lenders of Plaintiffs told NDDF in January 2024 they did not agree with the false accusations and that Hoefer Group was performing well. And then these third-party lenders told Mr. Hoefer about Tooke's calls, which had upset them greatly.

207. Akason, with Garman present and both representing NDDF, made especially false, harmful, and malicious statements on a video call – which Akason recorded for NDDF – with a broker in a third-party $5,475,000 transaction that was weeks away from deal closing for new investment into Hoefer Group.

208. The new investor was willing to move forward and ignore the public harm that the Defendants had caused, so long as Defendants would not interfere further in Hoefer Group.

209. Before the call, Akason had promised to be nice, and he asked to attend this call to show NDDF's renewed cooperation.

210. But instead, Akason told the broker and other lenders to Hoefer Group that NDDF had defaulted its contract with Hoefer Group and that NDDF was maintaining that default because the Defendants and NDDF's Board were asserting – without any evidence – that Mr.

Hoefer had "misused" State of ND funds. Akason forcefully declared NDDF's allegation of criminal misconduct against Plaintiffs as "final" and "decided" and not open to discussion.

211.    The $5,475,000 third-party investment deal for Plaintiffs fell apart as a result of the Defendants' deceit, malicious behavior, and false allegations. Further:

    i.  This retaliatory bait-and-switch act by Akason and Garman humiliated the Plaintiffs and caused great challenges for new financing for Plaintiffs.

    ii.  Plaintiffs' broker who represented a globally renowned firm could no longer represent in good faith that NDDF was a cooperative party to a new Hoefer Group transaction with any prospective financier.

    iii.  The Plaintiffs' broker who represented a globally renowned firm said, "We're never talking to them [NDDF] again," and then this broker, based upon his experience with Garman and Akason, began telling Plaintiffs' potential investors to steer far away from ND Commerce and described his experience with Akason and Garman as like "dealing with a royal family." The Defendants were deliberately causing harm the Plaintiffs could not salvage.

    iv.  Full or partial payoff to NDDF by Plaintiffs would have been possible with this $5,475,000 investment and Plaintiffs and Plaintiffs' lenders offered as much so as to unwind NDDF and the conflicted Defendants from Hoefer Group.

    v.  But the Defendants did not want NDDF to be repaid and to exit Hoefer Group, being that Defendants' only interest was in protecting themselves, furthering their retaliation against Plaintiffs, and sabotaging the Plaintiffs' business, all while wasting State of ND funds in the process.

212.    Akason's and Garman's trick shown above which ruined that ready-to-consummate $5+ million investment and which destroyed future investment opportunities from the broker of that transaction had the effect of angering State of ND legislators who were beginning to actively monitor the situation.

213.    Beginning in March 2024, the Defendants began to concoct a false trail of public records which implied that the Defendants were supporting Hoefer Group and working hard for the Plaintiffs' success, and the Defendants again deceived the Plaintiffs with false pledges of NDDF's and the State of ND's new financial support to gain an inside track on Plaintiffs' upcoming investments so as to destroy them.

214.    Without notifying the Plaintiffs, Teigen, Akason, Garman and Albrecht in controlling NDDF, with Lehman's assistance, conspired to create an internal NDDF agenda using NDDF emails to its board members for planning an April 2024 "ribbon cutting" event at Hoefer Group that was never intended to occur. This 'proposed' event to promote Hoefer Group was published on a State of ND website under NDDF's board meeting minutes.

215.    Akason wrote to Mr. Hoefer and a State of ND legislator in April 2024 and claimed that he was advocating for Hoefer Group with NDDF's board to make things right, but he was not.

216.    Akason and Garman held a call with Mr. Hoefer and a State of ND legislator in May 2024 and these Defendants promised new State of ND funds to Hoefer Group to make up for some of the past harms the Defendants caused, outlining a plan to advance cash for the full upfront price of multiple Hoefer Group RVs through purchases from the State of ND Parks Department, which Garman said he could facilitate through his son, but this never happened.

217.    Akason and Garman held a call with Mr. Hoefer and a State of ND legislator in

May 2024 and these Defendants promised new NDDF cooperation to Hoefer Group to make up for some of the past harms the Defendants caused, outlining a plan to reset the NDDF contract, to waive all interest and payments for a year, and then create an extended long-term payoff plan, but this never happened.

218.    Akason visited the Dunseith Site in mid-2024 along with nearly all of Hoefer Group's financial partners and a prospective lender who offered $4 million to Hoefer Group. Akason said that "we [NDDF] want to put the past in the rearview mirror and look forward," and he promised renewed NDDF cooperation with this lender. Then Defendants moved their 'goal posts' multiple times in ways not done with other NDDF borrowers and made their requirements impossible for the lender to complete the deal.

219.    Plaintiffs received other third-party contracts and financing commitments near the middle of 2024 based upon the representations of Akason and Garman from May 2024, but those deals all fell apart as Akason refused to effect Defendants' promises for NDDF and the State of ND, which made the Plaintiffs appear as lacking in credibility with new financiers.

220.    Shown above, Albrecht, Garman, Akason, and Lehman abused the high trust that State of ND legislators placed in them to make over 70 false statements, material omissions, and misrepresentations about the Plaintiffs in a December 2024 meeting with legislators.

221.    In that December 2024 legislator meeting Akason said, "Um, we've been engaged in a handful of conversations throughout the course of the year that different parties have expressed interest in different financial packages, um, for the business [Hoefer Group]. Uh, none of those have materialized to my knowledge in uh, um, commitment letter or terms sheet."

222.    In that December 2024 legislator meeting Akason and Albrecht said NDDF would have supported the Plaintiffs in closing such a third-party transaction if a deal was serious.

223.    In that December 2024 legislator meeting Akason concealed that he *knew* of multiple potential third-party transactions which were formalized in commitment letters and terms sheets.

224.    In that December 2024 legislator meeting, Garman, Albrecht, Akason, and Lehman concealed that Defendants had deliberately and deceptively sabotaged all such third-party multi-million-dollar transactions to Plaintiffs to prevent them from reaching a closing.

225.    Also in the above December 2024 legislator meeting, Albrecht flatly lied to the legislators, and his statements prove that Defendants had been deceiving other State of ND agencies, including State of ND attorneys, in order to paint Mr. Hoefer in a false, defamatory light and to falsely portray Mr. Hoefer as an aggressor or a threat rather than a victim, so as to prevent Mr. Hoefer from receiving the relief he so desperately sought from the crimes that the Defendants and others were committing against him.

226.    Albrecht said to legislators in this December 2024 meeting:

> Some of the challenges have been, Charles' approach to the, to this group, and I've seen written documents, and heard the conversations, comes with, "Or I'll take action," "Or I'll do this."

> So the guidance that our own legal department from the state is giving to this group is, "Be careful how you engage, because, litigation is a potential outcome."

> And that's probably part of the reason that Charles isn't part of this conversation right now. I, I don't know that, but it's probably part of it.

> It's so that everyone can get grounded on where things are at, and then, 'How do we move this forward?'

> Again, support in this room for Charles is universal.

227.    Mr. Hoefer had never said, "Or I'll take action," or "Or I'll do this," to NDDF or

to any Defendants before Albrecht said that he did.

228.    Mr. Hoefer had always expressed his desire for cooperation with the Defendants in his meetings with them before that December 2024 meeting.

229.    Albrecht sought to scare away State of ND legislators from assisting Plaintiffs by advancing the false allegation that there was a threat of litigation by Mr. Hoefer against the State of ND, when Mr. Hoefer had never made that threat when Albrecht said that he had.

230.    In December 2024, Akason told Plaintiffs as well as both current and prospective third-party lenders to Plaintiffs that NDDF could consider supporting a transaction from the $4 million lender which Akason and Defendants had previously sabotaged.

231.    When Mr. Hoefer shared this with the prospective lender, that lender immediately re-engaged and made a multi-million-dollar investment offer, being still interested in the Hoefer Group project and eager to finance it.

232.    Under pressure from State of ND legislators after his meeting with them, Akason held two meetings in December 2024 about this new deal for the Plaintiffs – legislators attended and observed these meetings.

233.    And then the Defendants blew it all up again.

234.    Akason told Hoefer Group's prospective lender that NDDF would need the lender's underwriting package on Hoefer Group before presenting the deal to the NDDF board so as to allow the board to make an informed decision on supporting the transaction in the manner requested by this lender. The lender agreed to supply its underwriting package to NDDF in order to motivate NDDF's cooperation.

235.    Then legislators and a current Hoefer Group lender requested to present this financial package to the NDDF board at NDDF's December monthly meeting, which was set to

48

take place less than two hours after the second meeting ended. Both legislators and Plaintiffs' current and prospective lenders offered to present to NDDF's board to show support. Akason and his subordinate under his direction said that such was not possible, as they said NDDF's board was overloaded with year-end funding applicants so it could not be considered that day.

236.    That 'no time for it today' statement was a lie. Less than two hours later, Akason, in conspiracy with Albrecht, Teigen, and Garman presented Hoefer Group's transaction to the non-Defendant NDDF board members anyway, while painting it in a false light – and without any parties present in representation and support of Hoefer Group who had requested to present to NDDF's board.

237.    These Defendants caused NDDF's board to issue a non-cooperation statement, which statement was later published to a State of ND website. This was done to publicly humiliate the Plaintiffs, to deprive Plaintiffs' rights, and to paint the Plaintiffs publicly in a false light as if Hoefer Group had somehow failed to meet NDDF's requirements.

238.    According to those NDDF board meeting minutes from that monthly meeting, Hoefer Group was the only borrower discussed in which the board voted on an action.

239.    This act of overt deceit by Defendants in December 2024 to destroy a third-party investment in plain sight of State of ND legislators was the last straw for the legislators and it incensed even legislators who had been on the fence about whom to believe as between Mr. Hoefer's claims and Defendants' emphatic denials of wrongdoing and their false and malicious counter-allegations against Mr. Hoefer.

240.    Shortly after, in early 2025, the State of ND's legislature overwhelmingly passed SB 2396, which legislation launched a first-of-its kind independent, out-of-state performance audit of NDDF and its practices.

241.    Then in early 2025, under guidance from State of ND legislators who had told Mr.

Hoefer that 'enough is enough,' Mr. Hoefer followed legislators' advice and sent Defendants

formal notice of planned intended personal capacity claims litigation for their civil rights

violations, instructing them that they should preserve any relevant materials on litigation hold.

242.    In retaliation for this litigation hold, Akason, on information and belief assisted by

Garman and Albrecht in controlling NDDF with, on information and belief, Lehman's assistance,

caused the State of ND through NDDF to make at least one false law enforcement report in

another state about Plaintiffs which caused two investigators from an out-of-state prosecutors'

office to unwittingly intimidate members of Mr. Hoefer's family. Further:

    i.    This was an administrative form of 'swatting' and it occurred days after the

        Plaintiffs notified Defendants of a litigation hold as to Plaintiffs' plans to bring

        this action.

    ii.    Those out-of-state investigators were stunned to realize how false the report

        that they had received was, and, after interviewing Mr. Hoefer's family said,

        "Open and shut case" (meaning it was baseless) and then walked away and

        closed the case.

    iii.    Defendants' effort was clearly designed to cause the State of ND to intimidate

        Mr. Hoefer and his family and break apart Mr. Hoefer's sources of capital

        which had been sustaining him through the Defendants' onslaught of attacks

        in Defendants' seeking to chase Mr. Hoefer out of North Dakota in retaliation

        for his federal reporting of the commission and of the possible commission of

        crime and to prevent this action from commencing and for other self-serving

        reasons which deprived Plaintiffs' rights.

iv.  Defendants involved in this scheme harmed Mr. Hoefer and his family, and they sought to cause law enforcement to indict Mr. Hoefer through their false reporting.

243.    Above is only a short summary of the Defendants' more appalling and illicit acts in deprivation of the Plaintiffs' federal rights in which Defendants misused and abused NDDF of which the Plaintiffs are aware.

244.    Discovery will show that the Defendants acted to violate the Plaintiffs' rights in other ways, all of which are shocking and which collectively show Defendants bombarded Mr. Hoefer in order to terrorize him and seek to destroy his business, his family, and his career, and even seeking to incite other third-parties to physically harm Mr. Hoefer and his family.

245.    In other words, the Defendants misused NDDF and their own authority, acting under color of law, to use and threaten use of the law and legal processes in manners and for purposes for which the law was not designed, in order to exert pressure on Plaintiffs and others to cause them to take actions, and to not act in various ways, in order to bend Plaintiffs to their will. They sought to force the Plaintiffs to act against Plaintiffs' will, at times through obtaining Mr. Hoefer's forced labor, and at times making Plaintiffs to go sit in a corner, by trying to bleed out Mr. Hoefer's business, silence him, scare him into leaving North Dakota, and to protect, to further, and advance Defendants' other self-serving interests.

246.    Mr. Hoefer faced repeated threats to his own safety, and he and his family endured stalking incidents and other frightening and oppressive incidents as Defendants held him under threats and coercion and controlled him.

(2)(iv)(b) – DEFENDANTS SUBJECTED PLAINTIFFS TO SINGULAR TREATMENT:

247.    NDDF has never treated other recipients of its funds in the manners above. Doing

so, as with Plaintiffs, would arise to multiple violations of a recipient's federal civil rights.

248.    Audio records, past media reports in which Defendants participated in interviews, and public records confirm Plaintiffs' business was striding along to Defendants' and NDDF's satisfaction and that Plaintiffs' startup was doing better than most NDDF-funded projects in spite of the extraordinary Factory mess and the need for its cleanup and Defendants' unlawful control of Mr. Hoefer until when the Defendants began to retaliate and to sabotage the business.

249.    The reason some potential financiers continued making multi-million dollar offers to the Plaintiffs in the face of all the Defendants' hostilities is because the Plaintiffs' work results at the Dunseith Site reveal excellence in RV products, in technology, and in project execution despite that Defendants caused Plaintiffs to operate with below minimum resources.

250.    When the Defendants' self-serving sabotage and blackballing efforts against the Plaintiffs began, and up until the Defendants defaulted the Hoefer Group/NDDF contract to retaliate against Plaintiffs, Hoefer Group was making regular payments to NDDF, and Hoefer Group had only partially received its approved NDDF financing.

251.    In contrast, many other similarly-situated NDDF recipients take all their NDDF funding upfront and then fail to make regular payments, or are not required to do so – sometimes for years.

252.    The Defendants made ruining Mr. Hoefer a personal self-serving mission, in that, if they could get rid of Mr. Hoefer, they would not need to worry about having to explain to others their other acts of official misconduct, misdeeds, and unethical behavior which the Factory evidence and Plaintiffs' truthful informing and federal reporting about it might expose.

253.    When ND Commerce and NDDF have in the past found themselves embroiled in other actual scandals by questionable uses of funds and questionable choices the State of ND has

made, the ND Commerce and Governor's office response has always been muted. ND Commerce and the Governor's office have refrained from publishing to media any allegation against a private entity or individual of potential impropriety, coupled often with an expression of satisfaction with how things played out, or a statement that things remain in good standing.

254.    Government officials outside of the State of ND bubble, such as federal officials, have taken a harsher view of ND Commerce and presumably of those who steer it. For example, U.S. Senator Kevin Cramer, speaking to a media representative about ND Commerce in September 2024, described the agency and its actions as "sketchy."

255.    There are many instances of scandal-ridden State of ND-financed projects involving ND Commerce that received no public criticism by Defendants or the Governor's office or ND Commerce. Recent examples have included:

     i.    An ND Commerce filmmaking grant the State Auditor has criticized, and even joined in a podcast series entitled "The Department of Incompetence" – a reference to ND Commerce. This grant was awarded to utilize a property that Lehman owned for a film in an alleged shady set of dealings. Neither the Governor's office nor ND Commerce has publicly criticized this grant, and ND Commerce has even moved to express support for the recipient.

    ii.    Industrial Commission funding granted to Packet Digital, then run by an NDDF board member, which was promoted by ND Commerce to attain the financing. Packet Digital even claimed to be partnered with Chiptronics at the Dunseith Site, and made multiple false statements about that opportunity. The Governor's office remained silent about it when the facts came to light through in-state media, and ND Commerce did not wade into the matter.

iii.  LIFT loans to a business from which Teigen was deriving financial benefits

that quickly abandoned North Dakota, yet ND Commerce stated publicly –

*after* the project failed *and left* North Dakota – that the loans remained in good

standing, and ND Commerce did not criticize the project for taking State of

ND money and leaving the state.

256.  With Mr. Hoefer, Defendants broke from their long-standing tradition of staying

publicly silent or showing support by ND Commerce to its funding recipients. Defendants caused

ND Commerce's usual apathy to turn to aggression.

257.  Defendants invented fake scandals and false allegations about Mr. Hoefer, so as to

cause ND Commerce to vilify Mr. Hoefer worldwide and take his property and for other self-

serving reasons which deprived the Plaintiffs' rights and are causing continuing harm.

258.  Under the false pretext Defendants had maliciously contrived that Mr. Hoefer was

a 'criminal,' the Defendants went to work on Mr. Hoefer, trying anything within their great state

powers, influence, and authority to 'get' and get rid of Mr. Hoefer.

259.  Mr. Hoefer's cries for help to officials outside of ND Commerce were squelched

by Defendants' active efforts to interfere with and suppress them. Others in positions of authority

who would be able to assist in Plaintiffs' relief were influenced by the false impressions and false

allegations the Defendants had created and were spreading, which caused those others to

wrongly believe that Mr. Hoefer was in fact the real 'bad guy' and he should not be trusted.

260.  For Defendants, a 'bad person' is someone with evidence of State Insider dealings

whom they cannot control and keep in line, as this jeopardizes insider schemes.

261.  The Defendants misused NDDF to manipulate the State of ND into taking the

false position that Mr. Hoefer was engaged in criminal misbehavior. The Defendants repeatedly

falsely promoted suspicions that Mr. Hoefer was engaged in criminal misbehavior when he was not, that the Hoefer Group business was failing when it was going well, and that there was something more unsavory lurking beneath the surface about Mr. Hoefer when there never was.

262.    Defendants' malice and deliberate and unprecedented acts to 'get' Mr. Hoefer and destroy Plaintiffs' business was revealed in a terse exchange between State of ND Senator Bob Paulson and Akason during the Defendants' December 2024 meeting with legislators.

263.    Akason effectively blamed the victim. He claimed then – wrongly – that Mr. Hoefer's then having recently gone public to the media with evidence and audio recordings about Defendants' mistreatment of him – which Mr. Hoefer had done at the urging of several influential legislators – had harmed Plaintiffs' financing efforts, when in fact it helped.

264.    Senator Paulson quickly redirected Akason to address the legislators' concern: that it was the Defendants who were causing irreparable harm to Plaintiffs. Their exchange follows:

> [Senator Paulson:] The article where Commerce accuses him of misuse of funds is still out there and any potential financier can just do a Google search, find that article, and that's gonna tank the deal, it seems to me.
>
> [Akason:] Being completely blunt, all the podcasts and articles in the last three months, any financial partner is gonna look those up and not wanna touch the deal. Respectfully, I, I think, If I'm a financial institution and I look up all of the things that's happened with that site I'm probably not entertaining any finance for it.
>
> [Senator Paulson:] And I hear that, I get tha- I'm most concerned with the comments that came from the North Dakota Department of Commerce…
>
> [Akason:] Yea, and I, I think…
>
> [Senator Paulson:] accusing someone of misusing funds.
>
> [Akason:] I think we need to put that into context with respect to that reporter's engagement with Mr. Hoefer prior to ever

coming to the Development Fund, and asking specific lines of questioning, and trying to prod and do certain open records requests to glean, and try to create a narrative and a certain story, um, with respect to how we've processed and supported the business. And, the, any response was in direct response to a line of questioning, uh with respect to, "He has existing funds available under this line. Why isn't it being drawn?" And, we didn't say specifically misuses, that, we think that there's potentially misuse. And I understand the, the consequences that can have, um, with respect to the financial partners, which, again, is why we've not collected, not taken collection action.

265.    In his extraordinary admission, Akason admitted that Defendants had caused NDDF to cripple the Plaintiffs' ability to secure financing because the Defendants conspired and acted to publicly assert allegations of criminal misconduct against Plaintiffs based upon Defendants' mere *belief* that such "potentially" misconduct might have occurred, which they never believed that anyway.

### (2)(iv)(c) – DEFENDANTS RIGGED AN NDDF AUDIT AGAINST PLAINTIFFS:

266.    The Defendants' malicious official misconduct towards the Plaintiffs is shown in many additional ways. For example, as noted above, Defendants conspired and acted to initiate NDDF to toss Plaintiffs into 'administrative limbo' by subjecting them to a never-ending forensic audit of Hoefer Group so as to 'take' and deprive rights and chill Mr. Hoefer's speech and his petitioning and for other self-serving reasons which deprived Plaintiffs' rights. In doing so, Defendants have misused NDDF and ND Commerce administrative and civil processes in ways they were not designed to exert pressure on Plaintiffs and to control them.

267.    In undertaking this sham audit process, Defendants have refused to visit the Factory, refused to permit NDDF subordinates to visit the Factory, and refused to permit Mr. Hoefer to physically bring Hoefer Group's books and records to NDDF for NDDF to use in moving this audit forward.

268.    Defendants sought to cause this NDDF audit to be impossible for Plaintiffs to answer within the original timeframe they caused NDDF to require.

269.    For this 'audit,' Defendants demanded Mr. Hoefer produce for NDDF all digitized records of requested documents and to email digital copies of Hoefer Group's books and records to NDDF.

270.    The Hoefer Group accounting system was not digitized in this manner, which Mr. Hoefer informed Akason and Garman that this was the case, and which Tooke already knew as she had seen the system, but Defendants refused to permit NDDF to offer an accommodation.

271.    For this 'audit,' Defendants caused NDDF to demand digitized copies of the entirety of Hoefer Group's books and records dating back to January 1, 2022. They also demanded that the accounting system be date-ordered, when Hoefer Group's existing system was based upon vendor category. Plaintiffs labored for at least four days to re-organize the accounting system so that all the books and records would be ready for review. Yet that review never came.

272.    Yet their agent Tooke had already viewed and approved Hoefer Group's books and records through June 2023, even disbursing additional NDDF funds to Hoefer Group in June 2023; she told Mr. Hoefer then that Hoefer Group was doing a wonderful job with its finances, especially when compared to most of NDDF's borrowers.

273.    For this 'audit,' Defendants shockingly caused NDDF to make open-ended, all-encompassing interrogatories of Plaintiffs, demanding that a written statement of justification be attached with a digital upload of every single Hoefer Group receipt since January 1, 2022 – which there were 1,000+ receipts – and this was impossible for a small business to quickly accomplish, and:

274.    Defendants demanding 1,000+ interrogatories be answered by Plaintiffs – which

57

were not part of NDDF contract requirements – with an unrealistic notice, made under the threat

that Plaintiffs would be subjected to automatic presumption of criminal guilt *and* loan default

*and* a State of ND legal process if not answered, amounted to the Defendants depriving many

rights *and* obtaining State-imposed forced labor of Mr. Hoefer in violation of 18 U.S.C. § 1589.

275.    In contrast, when the State of ND's Auditor conducted his performance audit of

ND Commerce for the biennium ended June 30, 2023, the Auditor merely spot-checked receipts.

And in that 'spot check' the Auditor claimed NDDF's officials had misspent $916,000 in State of

ND credit cards after reviewing just 34 such transactions, which transactions the Auditor claimed

to reveal egregious misconduct. ND Commerce did not deny the Auditor's finding.

276.    Defendants – who are affiliated with NDDF, which agency the State Auditor has

recently accused in an official report that its officials misused nearly a million dollars of State of

ND credit card expenditures – conspired to send NDDF on a 'witch-hunt' against Plaintiffs so as

to overwhelm, intimidate, and scare Mr. Hoefer into giving up and leaving North Dakota, and for

other self-serving reasons to deprive Plaintiffs' rights, including without limitation to silence and

'get' Mr. Hoefer.

277.    Defendants directed their agent Tooke to initiate notice of this NDDF 'forever

audit' in an emailed letter to Plaintiffs on October 2, 2023. Akason told Tooke to send Mr. Hoefer

the letter which Akason had already caused to be prepared for Tooke's signature.

278.    Before Plaintiffs could respond to Defendants' contrived NDDF 'audit' demands,

Defendants alleged criminal misconduct against Plaintiffs to third parties and to the media. Then

Plaintiffs quickly provided evidence disproving all the allegations, but Defendants simply

ignored or summarily dismissed Plaintiffs' exculpatory evidence, and were just using the 'audit'

process itself as a mechanism to inflict as much harm and damage to Plaintiffs' as possible.

279.    The Defendants rigged the NDDF 'audit' process against the Plaintiffs.

280.    On October 3, 2023, Akason, Garman, and Albrecht met with State of ND Senators Kent Weston, Bob Paulson, and Keith Boehm. Akason told the senators that Defendants through this NDDF 'audit' hunt were "going to find misuse" of funds by Mr. Hoefer.

281.    On October 6, 2023, Mr. Hoefer emailed exculpatory public records to Akason which rebutted and disproved Defendants' 'blackmail,' 'extortion,' and 'misuse' allegations. Mr. Hoefer pointed out Defendants' Factory conflicts and their instructions Plaintiffs had faithfully followed. Mr. Hoefer asked Akason to confirm the authenticity of ND Commerce public records in which Mr. Hoefer was an original party to them. Later, all Defendants concealed this email and records identified within it from third party media requestors.

282.    On October 13, 2023, Akason refused Mr. Hoefer's request that he confirm the authenticity of many public records reflecting communications between ND Commerce and Plaintiffs. Instead of confirming that Mr. Hoefer possessed exculpatory ND Commerce public records which would immediately clear Plaintiffs' name, Akason responded by writing to Plaintiffs and to three State of ND legislators: "For the avoidance of doubt, NDDF does not agree with many of the assertions Mr. Hoefer presents in the correspondence."

283.    Such acts as those above represent an unprecedented misuse of state powers and authority against a private citizen's federal rights.

284.    Defendants believed Plaintiffs would run out of funds and would then be unable to even respond to Defendants' NDDF audit demand, which would allow them to claim a win for themselves and brand Mr. Hoefer a criminal, then silence him, chase him away, and then 'send the lawyers' after him in their cover-up and retaliation effort against the Plaintiffs.

285.    While Mr. Hoefer was focused on trying to operate his RV business in the face of

all this hostility, Akason emailed Mr. Hoefer on November 3, 2023 – in which Akason conspired and cooperated with each Defendant – and copied Garman. Akason directly – for the first time – accused Mr. Hoefer of misusing NDDF loan funds. Akason then demanded Mr. Hoefer deliver to NDDF all the Plaintiffs' records in the manners the Defendants demanded, within seven days. Akason wrote to Mr. Hoefer

> Please provide the requested documentation and information by 11/10/23.
>
> If I have not received the requested information by that time, I will need to turn this over to our legal team to determine next steps as we will have to presume that you've defaulted on the loan agreement due to the unauthorized expenditure of funds.

286.    Such a statement as above is unlawful, unprecedented, arbitrary, and it deprives a citizen of federal rights.

287.    In accusing Plaintiffs of 'misuse,' in his November 3, 2023 email Akason told Mr. Hoefer that Hoefer Group's "facility projects, legal, and reporting" costs were a 'misuse,' despite that the Hoefer Group/NDDF contract permitted it, and despite that Akason, himself a party who threatened, controlled, and coerced Plaintiffs, had directed Plaintiffs to make those expenditures. Defendants were angry that Plaintiffs' "reporting" blew up Defendants' concealment plan.

288.    Akason and Garman, conspiring and coordinating with all Defendants, threatened to default Hoefer Group's NDDF contract and 'send the lawyers' after the Plaintiffs under the automatic presumption of Plaintiffs' guilt due to "unauthorized expenditure of funds" if Mr. Hoefer failed to immediately respond with answers to more than 1,000 interrogatories, provide well over a thousand pages of other records, and create a new Hoefer Group accounting system adapted to the inflexible procedure in which information was demanded.

289.    On November 7, 2023, Defendants misled and/or pressured and/or coerced and/or

enticed reporter Michael Standaert – who had picked up a prominent media post in North Dakota – into publishing and distributing their false criminal allegations of "blackmail," "extortion," and "misuse" of State of ND funds against Mr. Hoefer and Hoefer Group, which allegations went public on this day in newspapers across North Dakota and online. As soon as this news became public, Plaintiffs lost a $2.5 million private mortgage deal that was promised to close in weeks, and Plaintiffs became stigmatized as pariahs in North Dakota and worldwide.

290.    Plaintiffs nonetheless answered the Defendants' oppressive audit information demands just days after Akason's November 3, 2023, email, being also a few days *after* many media outlets published online the Defendants' multiple false allegations of criminal misconduct against Plaintiffs.

291.    On November 10-13, 2023, Plaintiffs answered Defendants' request and Plaintiffs provided NDDF with more business and financial information relating to Hoefer Group and Mr. Hoefer than the State of ND's Auditor obtains when subjecting ND Commerce or its sub-entities to a performance audit. And Plaintiffs did so in the inflexible, burdensome, and onerous manner Defendants caused NDDF to demand.

292.    On November 12, 2023, Mr. Hoefer emailed Garman and Akason and provided more exculpatory evidence which demonstrated the baselessness of the entire process and procedure Defendants were purporting to undertake, as Defendants' allegations were undone with this evidence. Plaintiffs let Defendants know that Plaintiffs were in possession of exculpatory audio recordings, and Mr. Hoefer provided some audio copies and transcripts as email attachments, which proved that Defendants had been promising reimbursements and praising Plaintiffs' work. Defendants later concealed the existence of these audio recordings and transcripts when causing the release of an almost entirely redacted version of this email to a

third-party media requestor in 2025.

293.    On November 14, 2023, Akason with Teigen on email copy wrote to State of ND Senator Paulson and changed his 'misuse' argument:

      i.  Akason complained to the senator that Mr. Hoefer had proven Plaintiffs had not misused NDDF funds when buying RV towing vehicles – something Akason was suddenly eager to investigate, and then Akason said he was investigating "legal fees" for Site remediation, which he falsely said Tooke refused to authorize legal fees.

      ii.  The Hoefer Group/NDDF contract permitted legal fees and Tooke, acting as an agent of Teigen, Akason, Garman, and on information and belief, Lehman, had directed Plaintiffs to hire lawyers, and she promised reimbursements through NDDF for the legal fees.

      iii.  In 2025, Defendants caused this email to be released to a third-party media requestor with the entire text body redacted, so as steer the media away from the Defendants' schemes against the Plaintiffs.

      iv.  Audio recordings and ND Commerce public records Mr. Hoefer had released through media in December 2024 proved Akason's claims maliciously false.

294.    On November 20, 2023, as shown above Defendants began directing that Mr. Hoefer be instructed to commit perjury with a surprise mortgage agreement whose sworn acknowledgment was backdated almost two years and which would 'take' for the State of ND the Plaintiffs' Factory "forever."

295.    On November 21, 2023, also detailed above, Plaintiffs' third-party lenders wrote to NDDF asking politely for the Defendants' hostilities to stop.

296.    November 22, 2023: Defendants sought to compel Mr. Hoefer to commit perjury with another instruction that he sign their concocted backdated mortgage.

297.    In early December 2023, Akason and Teigen said to State of ND legislators, "Did you know he paid his brother-in-law?"

298.    Akason and Teigen, and on information and belief all Defendants, created this misleading narrative and spread it to sully Mr. Hoefer's reputation as a man who "misused" and pilfered State of ND funds to undeserving family.

299.    Teigen and Akason withheld a critical fact pattern from State of ND legislators: (a) Hoefer Group is a family business, (b) the 'brother-in-law' is its Chief Operating Officer and Engineering Director and himself a skilled engineer, (c) NDDF and Defendants knew this when recruiting Plaintiffs, and (d) NDDF's financing approval was based upon this plan.

300.    By December 15, 2023, Plaintiffs had answered a small smattering of Defendants' accusatory financial questions, which showed Defendants were grabbing for anything and which had nothing to do with "facility projects, legal, and reporting" costs. Sometimes Plaintiffs were forced to answer the same question two or three times in and different ways and with multiple supporting documents.

301.    Defendants had engaged help from other State of ND agencies to pour through nearly two years of Plaintiffs' ledgers, private bank statements, contracts, loan agreements, and more. Had Defendants' 'experts' been briefed on Plaintiffs' business information which NDDF possessed, the few questions the 'experts' had would have been seen as wholly irrelevant.

302.    On December 15, 2023, Mr. Hoefer notified Akason and Garman that their effort at the backdated mortgage was unlawful, and that NDDF had no contract rights to seek it even absent the Defendants' perjury plan. Mr. Hoefer also invited Defendants to the Factory to review

any other 'records' that may concern them about Hoefer Group's finances.

303.    On December 18, 2023, Akason said he would not visit the Factory to view any more records until the Plaintiffs answered more questions, which neither Defendants nor NDDF ever asked the Plaintiffs anything further as to this 'forever audit' investigation.

304.    Defendants gave up in less than six weeks from receipt of Plaintiffs' records in trying to find any "misuse" in their 'audit' of Hoefer Group's financial transactions. But, nearly two years onward, the 'forever audit' remains open and unresolved.

305.    Discovery will reveal that Defendants concocted and spread false allegations against the Plaintiffs to enlist the unwitting assistance in their scheme of the State of ND Auditor and Attorney General, to devote state resources and experts to review Hoefer Group's digital records – which is why Defendants demanded this data be sent to NDDF in digital format.

306.    By December 2023, Defendants were looking for other ways to support their false criminal allegations against the Plaintiffs, as records and witnesses show.

307.    On December 21, 2023, expanding on details above, Akason instructed Tooke to meet with Albrecht about Plaintiffs, and to go looking through old NDDF video presentations where Mr. Hoefer presented to see if Mr. Hoefer made any statements in those videos about his third-party business lenders which could be used to accuse Plaintiffs of a misrepresentation(s). Then Akason directed Tooke to call some of Hoefer Group's third-party lenders, seeking to drum up support for Defendants' "misuse" allegations against Plaintiffs.

308.    As noted above, at a February 29, 2024, investment meeting, Garman and Akason ruined the Plaintiffs' $5.475 million private investment transaction, as was all Defendants' intent.

309.    On February 29, 2024, Garman and Akason made clear to the Plaintiffs *and to third parties* with existing and proposed financial relationships to Plaintiffs that the Defendants'

'forever audit' had a predetermined outcome: "Misuse."

310.    In mid-2024, a State of ND legislator called Akason and demanded that Akason publicly retract the Defendants' public false allegations of criminal misconduct against the Plaintiffs which Akason had made, so as to restore the Plaintiffs' image, reputation, and third-party financing access and other rights.

311.    Akason refused to retract his "misuse" allegation against the Plaintiffs and stated to this legislator in reply: "I can't, because he [Mr. Hoefer] will sue me."

### (2)(v) – DEFENDANTS DUMPED FACTORY AND SET UP PASSIVE STATE OF ND FINANCING FOR PLAINTIFFS WITH A FIVE-YEAR EXPECTANCY WHICH THEY LATER REPEATEDLY EXPLOITED AND ABUSED.

#### (2)(v)(a) – DEFENDANTS RECRUITED PLAINTIFFS AND MADE PROMISES:

312.    Before the Plaintiffs bought it, the Factory was (a) heavily corroded, (b) vacant and without any tenants except for a local hardware store and a local housing authority who were both storing inventory in the northeast section where an electronics 'clean room' used to be, (c) leaking from the roof and walls, (d) full of mold, (e) in complete disrepair, and (f) suffering from years of neglect, broken plumbing, faulty building environmental systems, and a failure to mitigate the effects of short bursts of humidity and sewer backflow flooding issues.

313.    But the Factory had major benefits suited to the Plaintiffs' RV manufacturing after a tear-out of its maze-like rooms and after major renovations, which are complete, including:

  i.    The Factory has well-insulated roofs and exterior walls and is environmentally efficient – when compared to similar U.S. sites – with low operational utility costs.

  ii.    Lehman facilitated the municipality to offer equipment already at the Factory – albeit mostly non-functional and in instances fully destroyed – to Hoefer

Group with the Site's sale, including (a) a forklift, (b) extensive steel racking, (c) office and production furniture, (d) air compressors and associated systems and full Site air line plumbing, (e) an advanced industrial water filtration system, (f) two high capacity industrial vacuum pumps for machinery, (g) maintenance rooms stocked with building supplies, (h) an assortment of useful tools and machines, (i) and extensive heating, ventilating, and cooling systems. The good bits of this have since been repaired, refurbished, and/or brought back into service for the Plaintiffs' RV business.

iii. The Site sits in a high unemployment, low-income county with no competing industry or any other manufacturers that might vie for the same workforce.

iv. The Site is geographically central in North America, making it ideal for RV freight.

v. The Site sits among hills with recreation and RV campsites, making the area an RV customer attraction.

314.    Teigen, Akason, and Lehman promised Mr. Hoefer he would get many State of ND incentives and grants and other State of ND assistance for the Dunseith Site, including:

i. An NDDF credit line of $2,250,000 for two years with three one-year contract renewals embedded in the base contract. The renewals were written so as to be assured as nearly automatic without need for another NDDF board approval. Plaintiffs easily met those conditions, which were only two and are detailed above. Teigen, Akason, and Lehman told Plaintiffs' other lenders that this contract was "five years."

ii. Grants of at least $250,000 through a Community Development Block Grant

66

("CDBG") program, which they said the funds would come later as the State of ND's CDBG was under a federal audit and the funds were frozen for about a year.

iii. LIFT awards, which they said $500,000 could be applied for by Hoefer Group in a near-future round because they had already fully allocated a $5,000,000 current round.

iv. A Factory mortgage loan subsidized through co-participation by BND with a special BND incentive called "PACE" facilitated through ND Commerce and Defendants. PACE would reduce the Plaintiffs' mortgage loan interest rate by five percentage points.

v. A five-year company income tax abatement.

vi. To deliver a skilled workforce to Hoefer Group, Lehman helped to secure State of ND commitments, and he helped push State of ND in-state and national promotion to commit to certify and then to open – at a new Career and Technical Education ("CTE") center in Dunseith – the first high school RV Technician Level II training program in the United States. This is an advanced technical curriculum from the RV Technical Institute ("RVTI") under RVIA, the national trade group for the Plaintiffs' industry.

vii. Promotion to Plaintiffs' prospective financiers that the State of ND's unique financial resources were being made available to and were suited for the Plaintiffs' RV business.

viii.    Extensive State of ND public promotion of the Plaintiffs' RV business.

315.    Teigen and Akason introduced a BND commercial lending manager to Mr. Hoefer

via a video call. This BND man was assigned to complete BND transactions for ND Commerce projects. This BND man told Mr. Hoefer that BND's lending to Hoefer Group was a done deal.

      i.    This BND man said that Mr. Hoefer would need only to find a private "lead" bank who would "co-participate" with BND by initiating an independent underwriting package.

     ii.    Lehman introduced Mr. Hoefer to a BND "lead bank" commercial banker who was Lehman's friend, and PACE loan underwriting was just beginning as Hoefer Group acquired the Factory, with some studies on the property needed to complete the "lead bank" process.

316.    Lehman introduced Mr. Hoefer to five third-party lenders who made attractive loan offers to Hoefer Group, which Mr. Hoefer accepted.

317.    Interest rates for four of these third-party notes were below the commercial market.

318.    All these third-party lenders offered five-year contracts or longer to match Defendants' NDDF lending promises.

319.    Teigen and Akason and their NDDF subordinates asked Plaintiffs' third-party lenders to at least match NDDF's lending term commitment with five-year loan terms of their own in order for NDDF to participate in Hoefer Group.

320.    Mr. Hoefer believed then that North Dakota would be a good fit with a welcoming environment, and Teigen, Akason, Lehman, and Albrecht were 'rolling out the red carpet' for Mr. Hoefer. These Defendants even hosted Mr. Hoefer as an honored guest to welcome him to North Dakota at a State of ND-funded evening party at Teigen's house with NDDF board members and NDDF staff and other ND Commerce officials including its Commissioner.

321.    Lehman hosted Mr. Hoefer at his Bismarck-area farm – one which is now the subject of public controversy regarding an ND Commerce film-making grant which indirectly benefited Lehman through payments the grant recipient made to him, including rent and home improvements, and from promotional exposure of his property.

322.    Lehman built trust with Mr. Hoefer, offering to be Mr. Hoefer's eyes and ears on who to trust and do business within North Dakota.

323.    Because of how welcoming the Defendants were promising North Dakota to be for the Plaintiffs, and how they promoted the Dunseith Site, Mr. Hoefer turned down the pursuit of locating his project in other States who were recruiting him, including one state that offered an upfront public package which offered millions of dollars more in incentives.

(2)(v)(b) – LEHMAN BEGAN PROCESS OF DUMPING THE SITE ONTO PLAINTIFFS:

324.    When introducing the Dunseith Site to Mr. Hoefer in January 2021, Lehman sent Mr. Hoefer a letter which introduced the Factory and which identified, falsely, Benchmark as being the last Factory tenant.

325.    Lehman knew that Benchmark was not the last Factory tenant when he sent that letter to Mr. Hoefer.

326.    Lehman made Mr. Hoefer believe that the factory had sat vacant and abandoned for years except for storage space use and a smattering of innocuous non-federal local projects that fizzled before starting.

327.    In conducting his own diligence to acquire the Site, Mr. Hoefer found that the Site had a history until Benchmark's exit of manufacturing electronics circuitry for missiles and aerospace. Local newspapers had reported this in 2015 and had reported that Benchmark's main Factory aerospace and defense work was moved to Rochester, Minnesota.

328.    Mr. Hoefer told Lehman that Mr. Hoefer would need to conduct additional Factory diligence *before* selecting the Dunseith Site for his RV operation *if there had been* any aerospace or defense or any continuing Benchmark work that occurred onsite after 2015.

329.    In viewing the Site with Lehman, Mr. Hoefer observed and asked about signs that said things like "ITAR" and "Restricted." Lehman lied, saying this was just old signage from Benchmark's 2015 exit that never got removed, and that no such work occurred after 2015.

330.    International Traffic in Arms Regulations – "ITAR" – controls the export, import, and many manufacturing practices and procedures of U.S. defense-related articles and services.

331.    Often, ITAR work must comply with other strict federal laws and regulations, especially for manufacturing involving weaponry and aerospace and defense electronics.

332.    ITAR violations, in certain circumstances, can create federal liabilities for the owner of a property where the violation occurred, which liabilities can transfer with new ownership if the property contains residual ITAR violations or other similar federally controlled items or data, the presence of which could lead to ongoing or new violations.

333.    Mr. Hoefer knew from conducting RV materials research with U.S. aerospace suppliers through the years that 'ITAR' signs in a Factory meant federal government-controlled activity. Mr. Hoefer had twice before been denied access to sections of his suppliers' facilities because of sensitive federal aerospace and ITAR work occurring there. While such work strictly prohibits foreign national access to it in most circumstances, there are frequently additional federal compliance safeguards in place and access becomes more restricted. For example, ITAR work could also be classified or might be subject to the Arms Export Control Act – AECA.

334.    Lehman misled Mr. Hoefer multiple times so that Mr. Hoefer would not look further into the property beyond a customary due diligence process.

335. Before Plaintiffs bought the factory, Lehman repeatedly made misrepresentations about the Factory to Mr. Hoefer that Lehman *knew* to be misleading or false, including:

    i. That "Benchmark" was the Site's last tenant and there were no manufacturer tenants at the site after 2015. He said there had been just a smattering of "failed local projects" from small community efforts, which he made sound as related to construction, storage, plumbing, and the like.

    ii. That no Benchmark-related electronics work took place at the Site after 2015, nor any aerospace or defense work of any kind. Lehman said that a small commercial electronics work effort of an innocuous sort was briefly undertaken and fizzled out, and that this work was not regulated beyond ordinary commercial practices.

    iii. That an armored vehicle company who left some signage and paperwork onsite was selling only into the commercial market, and never actually set its operations onsite. Lehman called them a "fly-by-night operation," and "grant-hunting shysters."

    iv. That there was no ITAR work that took place at the site after 2015 and that the factory was fully "scrubbed" of sensitive and federally regulated materials by Benchmark in 2015, including all items under the ITAR.

336. Lehman lied as shown above as to the facts that Lehman *knew* to be true about all of what had gone on at the Factory.

    (2)(v)(c) – DEFENDANTS BEGAN PASSIVE STATE OF ND FINANCE TO PLAINTIFFS:

337. In early 2022, the Defendants began to implement their State of ND incentive promises made to the Plaintiffs by starting Hoefer Group with an NDDF credit line contract that:

i.    Permitted disbursed line proceeds to be used without restriction for Hoefer
      Group's working capital and other business needs,

ii.   Put the State of ND in a subordinated security position behind other lenders to
      Hoefer Group's personal property with no mortgage of the Factory required,
      and

iii.  Permitted no active role in the Plaintiffs' business operations for the State of
      ND or for the Defendants.

338.    In other words, in those earlier, seemingly friendlier times, Defendants facilitated
what was supposed to be a State of ND-funded line of credit for Plaintiffs' use with virtually no
restrictions and with NDDF having no active control over Plaintiffs' regular business operations.

 (2)(v)(d) – DEFENDANTS ENABLED THE STATE OF ND TO CASH IN ON MR. HOEFER:

339.    Defendants also caused the State of ND to take out a $2.25 million life insurance
policy on Mr. Hoefer – meaning the State of ND would get paid if Mr. Hoefer got killed.

340.    Mr. Hoefer protested against the State of ND holding a life insurance policy on
him, but Teigen, Akason, and Albrecht said it was required for his loan.

341.    On information and belief, obtaining multi-million-dollar life insurance policies
on owner/CEOs is not a typical NDDF practice.

342.    No other Hoefer Group lenders required or even suggested such a policy.

343.    Albrecht, Lehman, and Teigen knew of State of ND officials' past misconduct at
this Factory, which they concealed from Plaintiffs.

344.    Lehman knew of, and concealed from Plaintiffs, past violence at the Factory
involving the Factory's last tenant, as well as other potential dangers Plaintiffs faced.

345.    Lehman – discovery will reveal other Defendants also did this – *knowingly* placed

Mr. Hoefer in danger, then sought for Defendants to cover the State of ND's risk and exposure as to that through NDDF taking out this huge life insurance policy.

346.    Moments after Hoefer Group closed on the factory purchase, when Lehman was congratulating Mr. Hoefer on completing the acquisition, Lehman told Mr. Hoefer something Mr. Hoefer found mysteriously curious then and alarming later: "Be careful what you wish for."

(2)(v)(e) – ALBRECHT AND TEIGEN WERE PART OF THE INITIAL DUMPING SCHEME:

347.    Albrecht met with Mr. Hoefer multiple times before the Plaintiffs purchased the Factory. Albrecht never made mention then of any of his knowledge of the Factory, or what went on there before, including anything involving himself and other ND Commerce officials.

348.    Teigen had been working closely with State Insiders who had been pumping State of ND money into Factory-related projects, and he was with knowledge of prior ND Commerce happenings at the Dunseith Site, but he never made mention of that in several meetings with Mr. Hoefer before his inducements caused Mr. Hoefer to purchase the factory via Hoefer Group.

349.    Later, Garman and Akason went 'all-in' with the other Defendants to dump and to try and keep dumped all the federal Factory liabilities and its clean-up upon the Plaintiffs.

**(2)(vi) – DEFENDANTS WERE TRYING TO CONCEAL STATE INSIDER DEALS:**

(2)(vi)(a) – PLAINTIFFS' FEDERAL REPORTING RISKED EXPOSING A MONEY RING:

350.    Defendants are influential State Insiders.

351.    Mr. Hoefer is not a State Insider.

352.    After Mr. Hoefer went public with ways the Defendants were harming the Plaintiffs, some from among North Dakota's private citizenry and its media began to privately inform Mr. Hoefer about State Insider dealings, including at his Factory.

353.    These dealings were things the Defendants sought desperately to conceal from Mr.

Hoefer so that he would not report them as federal violations to the federal authorities.

354.    Public records Plaintiffs independently obtained from a backup source in July 2023 contained copies of ND Commerce's public records relating to the Factory.

355.    Learning this touched a nerve with the Defendants as the records held references – some specific, some vague and obscured – which pointed to the Defendants' concealed schemes.

356.    Since 2022, after Plaintiffs did not simply dump the Factory evidence in the trash as the Defendants had planned, the Defendants have been terrified that Mr. Hoefer's federal and other reporting about the Factory mess might expose their secret State Insider 'apple cart.'

357.    The bad loans BND purchases from or restructures with private banks as noted above includes the riskier lending that State of ND officials and Defendants encourage banks to undertake. This furthers money-getting schemes for Defendants and State Insiders.

358.    State Insiders live like 'fat cats' off benefits derived from taxpayers' dollars and they don't want the public or the State of ND's fiscally conservative politicians to know about it.

359.    BND's and ND Commerce's lack of transactional transparency to state taxpayers permits State Insiders to keep a 'bounty' for themselves every year from the State of ND's cash.

360.    As the State of ND grows richer on oil, this insider 'bounty' has been growing.

361.    Defendants and other State Insiders work hard to keep North Dakota's citizenry happy and ignorant about all of this so that they continue to enjoy their 'bounty.'

 (2)(vi)(b) – THE DEFENDANTS AND INSIDERS HAVE A 'HAPPY GOVERNMENT CLUB'

362.    For many years, State Insiders, including Defendants and related persons and businesses, have passed no less than hundreds of millions of taxpayer dollars to each other and to their family members and affiliated businesses and entities, using agencies such as BND, ND Commerce, and other State of ND agencies that promote ostensibly 'competitive' public access

to taxpayer funds doled out as grants, discounted or forgivable loans, and other handouts.

363.    The Defendants are influential members of this 'happy government club' where State Insiders scratch each other's backs with favors and line their pockets with largesse.

364.    Shown above, Defendants in their State of ND positions are the gatekeepers of several large State of ND taxpayer cash stashes and are responsible for passing out many millions of dollars of 'happy government club member benefits' to State Insiders.

365.    This State of ND money passed to the benefit of State Insiders has few strings attached, is rarely monitored for performance, and often is given out to insiders with 'forever yours' terms treatment – using clever bookkeeping to keep citizens from meddling and asking questions about where their tax dollars have gone.

366.    State Insiders control who gets and who reaps the benefits of these available taxpayer funds through:

    i.   Back-scratching among insiders;

    ii.   Registration of new insider 'start-up' entities including some which never materialize with North Dakota operations or employment;

    iii.   Inter-agency favor-trading;

    iv.   Repeat recapitalization of under-performing or failing insider entities;

    v.   Fund-giving to insider businesses that are nothing more than money-getting fronts;

    vi.   Feigned university partnerships with insiders used to cash in on public 'grab bag' insider funds;

    vii. And other tricks.

367.    These State Insider schemes are not a result of poor public policy decision-making,

but rather of intent, done through crafty concealment and back-door deals.

<u>(2)(vi)(c) – PLAINTIFFS' FEDERAL REPORTING RISKED TRIPPING UP A SCHEME:</u>

368.    The Defendants worked extra hard to ensure that any acts by meddling members of the public (like the Plaintiffs' federal reporting and other informing) would not get in the way of this State Insider 'happy government club' so that there would be no interference and its 'members' could continue with their lavish enjoyment of the State of ND's cash.

369.    Upon taking control of the Dunseith Site in 2015, State of ND officials, including Lehman, wove the Factory like a tapestry into multiple State of ND insider taxpayer money-making strategies, including funding some deals to prominent State Insiders.

370.    As Lehman and other State of ND officials including Albrecht did this, sensitive and federally regulated defense materials remained unlawfully present at the Factory and other illicit schemes relating to that remained ongoing.

371.    After 2015, millions of State of ND-facilitated taxpayer dollars were awarded, deployed, or underwritten to Dunseith Site-related projects.

372.    State of ND and federal officials, including Lehman, held near-monthly Factory meetings starting in 2015 and lasting until at least 2019, when an incident(s) led to a partial Factory cover-up of all the activities that had been going on.

373.    One project example: Packet Digital – run by a long-time former NDDF board member and close ally to Teigen, Lehman, and Albrecht – when getting Factory-related funding had been in a sort of startup phase since the mid-2000s, attempting or promoting various business strategies in aerospace and defense work. It operated until recent years with less than 30 full-time employees. However, Packet Digital has raised more than $70 million in State of ND and federal taxpayer funds deployed or committed as contracts, grants, research awards, loans,

and equity during its legal existence.

374.    Packet Digital is one of the projects Defendants were determined to conceal from Plaintiffs, as this now-retired NDDF board member had promoted sketchy partnerships multiple times with the Factory and with long-time Factory tenant TMC, Inc. (dba "Chiptronics, Inc." or "Chiptronics"), seeking millions of State of ND and federal dollars after Benchmark's exit.

375.    An in-state media investigation about Packet Digital and the Site was published in 2025. It revealed public records showing NDDF's then-board member had falsely claimed, when raising State of ND grants, that the Site had an electronics 'clean room' and assembly lines and equipment. But those things were dismantled and removed from the building years before.

376.    This then-NDDF board member wrote to the Industrial Commission in late 2020 or early 2021 about an open Packet Digital grant: "Our discussions continue with Chiptronics, Inc., a certified HubZone Business in Dunseith, ND, adjacent to the Turtle Mountain Indian Reservation and this product development effort could employ and promote highly technical job skills in one of the state disadvantaged areas."

377.    This statement was especially problematic, because "Chiptronics, Inc." (a dba of TMC, Inc.) no longer existed. TMC, Inc. was involuntarily dissolved in March 2020.

378.    In 2019, TMC had been declared to be in default by the local municipality and was evicted from the Factory by local public officials, and TMC was subjected to several judgments and defaults which led to the termination of its operations and its legal existence.

379.    An Industrial Commission grant to Packet Digital in 2019 that was supposed to create 93 jobs at the Dunseith Site, according to ND Commerce records, was still open in 2021 as Lehman recruited Mr. Hoefer to the Factory. But those jobs were never at the Factory.

380.    Other State Insiders benefit from the State of ND's aerospace funding system,

providing other insider project examples.

381.    Albrecht's ComDel was the co-beneficiary of a Factory-related grant award with Chiptronics in 2017.

382.    And a current University of North Dakota ("UND") aviation professor James Higgins has raised over $20 million in funds for his startup entities since 2019, millions of which have come from the State of ND and various ND Commerce programs, $2.5 million alone which has come from the LIFT program that Teigen also tapped.

(2)(vi)(d) – STATE INSIDERS' ENTITIES GET LOADS OF STATE OF ND CASH:

383.    State Insiders appear to have disproportionate skillsets when compared to other North Dakotans in proving their projects worthy of the State of ND's taxpayer money.

384.    Or, in the alternative, some or many State Insiders liberally dole out State of ND money to each other and stiff the public, as to whom State of ND officials and Defendants promote that State of ND funds are actually supposed to be benefiting, and they don't want the public to figure out the full extent of their 'club member benefits.'

385.    Plaintiffs' realistic job creation plans, which were on pace until being deliberately derailed multiple times by the Defendants' malicious, arbitrary, and oppressive actions, exceed many State Insiders' and Defendants' State of ND-funded project hiring targets *combined*.

386.    At least several State Insider projects – including projects affiliated with one or more Defendants, and/or with the Dunseith Site, and/or with NDDF board members – failed or hovered for years near mediocrity but were still awarded millions or tens of millions of dollars more in State of ND funding compared Hoefer Group, and sometimes State Insider sponsors made false statements to induce an award.

387.    Packet Digital was recently awarded $17 million in State of ND money from the

Industrial Commission. Yet two of the Commission's three technical reviewers for that loan voicing strongly worded concerns in their reports and ranked the application as "questionable" or "fair" at best, and one recommended against using the Industrial Commission to source the loan, while the other needed "more detail" to be convinced "of a sound plan for utilizing state funding to achieve the stated goals." Those concerns were buried in an Industrial Commission document dated January 16, 2024, starting at 470 pages in.

388.    In contrast to many ND Commerce projects, some as noted above, including many State Insider handouts and projects which received more State of ND funding, Mr. Hoefer brings the prospect of high impact manufacturing job growth to the state.

389.    Mr. Hoefer's father created well over 1,000 enduring manufacturing jobs in Indiana, including starting three manufacturers which each grew into best-selling U.S. brands in towable RVs, motorhomes, and housing, and all are now subsidiaries on the New York Stock Exchange. Mr. Hoefer has similar aims for his North Dakota venture. His father taught him the ropes of the new RV industry he is bringing to the state.

390.    The RVIA helped promote the Plaintiffs' North Dakota launch nationally, which is a rare thing for the RVIA to do.

391.    Hoefer Group's RVs have the potential to change the national industry, in that no other existing manufacturer is near to Mr. Hoefer's materials and applications advancements.

392.    RVIA had offered to lead recurrent national promotion of Plaintiffs' business until Defendants interfered in the manners described herein to frighten Plaintiffs' industry partners and for other self-serving reasons which deprived Plaintiffs' rights.

393.    The Defendants and ND Commerce have never publicly criticized insiders' deals, no matter how rotten or fishy they became, but the Defendants were hell-bent to ruin Mr. Hoefer.

<u>(2)(vi)(e) – DEFENDANTS MISLED MR. HOEFER ABOUT AVAILABLE STATE OF ND</u>
<u>CASH, AS THEY DO OTHER NORTH DAKOTANS, TO KEEP A STASH FOR INSIDERS:</u>

394.    The Defendants had falsely told Plaintiffs that the Plaintiffs were funded with a 'large' State of ND incentive package, which was only $2.25 million from NDDF as a credit line that was never fully disbursed, plus promises of smaller grants and a BND co-participation loan that were never fulfilled. Plaintiffs received less than $2.05 million in State of ND funds.

395.    Failed business startups which financially or beneficially benefited Teigen and his family have collected more State of ND funds than that.

396.    Teigen, Akason, Lehman, and Albrecht told Mr. Hoefer that Defendants' $2.25 million NDDF credit line offer to Hoefer Group was the largest award that NDDF had ever made.

397.    Plaintiffs later learned that all Defendants have used NDDF to make massive awards to benefit others and State Insiders and to share among themselves, including multiple awards in smaller doses to insiders' entities that add up over time.

398.    After Plaintiffs' NDDF award, Defendants caused NDDF to make a $3 million loan for oil well improvements with no job creation target, a $32 million loan to a startup entity that keeps its office in Canada and is not operating in North Dakota as of this filing, millions in awards to NDDF board members' companies which are mostly uncollectable for the State of ND, and a $3 million loan to a water park idea that went bankrupt months later.

399.    None of these deals, nor the financing recipient entities and owners, have been publicly criticized by any of the Defendants or by ND Commerce.

400.    Some of NDDF's loans and equity investments to intended North Dakota projects have sat on the books for 10 years or more without any repayment by the recipient, and many NDDF investments in failed projects have been converted to State of ND donations.

401.    Yet, the Defendants tortured Mr. Hoefer with their repeated threat of 'sending

lawyers' to collect against him personally to recover NDDF's funds after they deliberately sabotaged his business.

402.    Then the Defendants became more upset as Mr. Hoefer found ways to continue, and they kept 'throwing sticks in the spokes' of the 'wheels' of his business to 'get' and get rid of Mr. Hoefer. They figuratively flattened his tires and broke his chain and demanded he still win the bicycle race or face more of their oppressive, controlling, and evil retaliatory behavior. They terrorized Mr. Hoefer. The longer he lasted, the more they threatened more terror and harm.

(2)(vi)(e) – TO CLEAN UP THE FEDERAL LIABILITIES OF THE FACTORY, MR. HOEFER UNKNOWINGLY REPORTED ON DEFENDANTS' SCHEMES:

403.    The above insider situations are just some of many relevant examples to explain why the Defendants work so hard to keep what happened in Dunseith quiet, and why top State of ND officials seem so eager to forget the Plaintiffs and the Factory, even as the Defendants attack the Plaintiffs' federal rights before other State of ND officials' very [tightly shut] eyes.

404.    'Happy Government Club' membership comes with access to sweet deals obtained as a result of a 'self-licking ice cream cone' that the Defendants and State Insiders have created for themselves. It is a self-perpetuating system whose purpose is to sustain itself and bring taxpayer-funded benefits to State Insiders. Discovery will reveal that the full extent of the problem is enormous, that this insider 'ice cream cone' is in large ways managed and coordinated by the Defendants, and that the Plaintiffs' Dunseith Site was one of the 'scoops' in this 'cone' that gave out millions of dollars in taxpayer-funded financial benefits to public officials.

405.    When the Plaintiffs began to report violations of federal laws from the Dunseith Site, they could not have known that they had just trod into a lions' den of State Insider money schemes and misconduct run in key ways by the Defendants like an organized crime family to ensure no news or reporting ever too seriously endangers insider 'club member benefits.'

81

406.    It is difficult for State of ND officials to open their eyes to acknowledge any misconduct from the Plaintiffs' reporting of what happened at the Dunseith Site, because too many of those officials are reaping unethical and at times outright illicit benefits together, and no one wants to be the 'rat' who tells. There will inevitably be severe consequences for the 'rat.'

## (2)(vii) THE PERSONAL CONFLICTS OF INTEREST OF ALBRECHT, TEIGEN, AND LEHMAN:

407.    Albrecht has serious personal conflicts of interest in relation to the Plaintiffs.

408.    Lehman has serious personal conflicts of interest in relation to the Plaintiffs.

409.    Teigen has conflicts of interest in relation to his helping other State Insiders and ND Commerce colleagues – who have created parts of the federal Factory mess – collect State of ND largesse. And in return, those insiders and colleagues have brought great benefits to Teigen.

410.    All have refused to recuse themselves from State of ND matters relating to the Plaintiffs.

411.    All have instead centrally inserted themselves into matters involving the Plaintiffs' State of ND affairs.

412.    All remained involved in the Plaintiffs' State of ND affairs to maliciously and arbitrarily target and harm the Plaintiffs and 'get' Mr. Hoefer. Except for Teigen, who has been fired, Albrecht and Lehman still remain involved in this.

413.    Plaintiffs are federal whistleblowers, witnesses, and victims who uncovered serious federal fraud and other crimes associated with U.S. aerospace and defense violations relating to the Dunseith Site.

414.    Those crimes involve State of ND officials' Factory activities.

415.    In response to the Plaintiffs' reporting to federal authorities detailed herein:

    i.    At least eight federal criminal special agents visited the Dunseith Site and

more federal investigators interviewed Mr. Hoefer and Hoefer Group

personnel;

ii. The Federal Aviation Administration's ("FAA") national security incident

response unit opened an investigation;

iii. Three federal Site evidence collections were completed with multiple federal

agencies; and

iv. The U.S. Department of Defense opened a multi-agency criminal

investigation coordinated through the Defense Criminal Investigative Service

Office of the Inspector General ("DCIS OIG").

416.    Many federal criminal special agents who visited the Site proceeded to open

investigations.

417.    To be clear, Plaintiffs were neither the focus nor the subject of those investigations

and were recognized as being whistleblowing witnesses and victims.

418.    Rather, the federal agencies were investigating the illicit items of prior or ongoing

third-party activities that Plaintiffs had found and reported, and those persons who might be

complicit in such things.

419.    The federal agents who visited the Site included representatives from the

following criminal investigative agencies:

i. DCIS OIG (Department of Defense's law enforcement inspector general);

ii. Internal Revenue Service Criminal Investigations ("IRS CI");

iii. Air Force Office of Special Investigations ("OSI");

iv. Army Criminal Investigative Division Major Fraud Unit ("CID");

v. Federal Bureau of Investigation ("FBI");

vi.  HSI (a Department of Homeland Security law enforcement agency).

420.    Plaintiffs discovered and reported federal crimes which were committed by third parties – including some crimes in which third parties and Defendants had targeted the Plaintiffs and had been setting them up to take the fall, if necessary, for others' federal violations.

421.    All Defendants took steps to frame the Plaintiffs, and then Defendants made and publicized false criminal allegations against the Plaintiffs in retaliation for the Plaintiffs' federal reporting and necessary federal Factory clean up, and for other self-serving reasons which deprived Plaintiffs' rights.

422.    From at latest 2016 until at least 2019, as a State of ND official, Lehman facilitated aerospace and defense work occurring at and associated with the Dunseith Site for TMC, Inc. (dba Chiptronics) involving the supply chains of The Boeing Corporation, Honeywell's Aerospace business unit, Benchmark, and Lockheed Martin.

423.    From 2016 until at least 2019, as a State of ND official, Lehman facilitated Site-related contracts and State of ND awards financially or beneficially benefiting NDDF board members' companies such as Packet Digital, LLC and Albrecht's ComDel, which awards include work with Chiptronics.

424.    When federal investigators interviewed Mr. Hoefer and Hoefer Group personnel, the investigators disclosed that their investigative targets included: Boeing, Honeywell's Aerospace unit, Benchmark, and whoever was behind Chiptronics.

425.    Plaintiffs later independently discovered and obtained backup copies of public and other records that the Defendants tried, unsuccessfully, to conceal from the Plaintiffs and from federal investigators. Many State of ND officials and Lehman had facilitated and enabled Chiptronics to commit many of these federal violations that the Plaintiffs needed to report to

federal investigators to clean up the Factory's federal liabilities, as these records show.

426.    Packet Digital is also named in multiple Factory-related records obtained by the Plaintiffs, copies of which federal criminal agents collected for their investigations.

427.    Packet Digital is seemingly wrapped up in multiple State of ND and federal conflicts relating to the Dunseith Site.

428.    Albrecht and/or Lehman and/or Teigen at least tangentially benefited or received some 'quid pro quo' State of ND benefits in return in relation to those Site and other Packet Digital State of ND financial deals.

429.    Shown above, a State of ND aerospace grant that was awarded in 2017 named Chiptronics and ComDel as contractors. That grant is also mentioned in records that federal law enforcement special agents collected for their investigations.

430.    Albrecht's ComDel is a contract manufacturer in Wahpeton, North Dakota, which Albrecht co-founded and built from the assets and customers of the former 3M/Imation operations in Wahpeton.

431.    Albrecht diversified ComDel to serve aerospace and defense supply chains.

432.    Albrecht's ComDel work has in recent years included contracts within the supply chains of Benchmark and Honeywell.

433.    Shown above, Albrecht has a history with the Factory and Chiptronics.

434.    Albrecht regularly raises State of ND money for ComDel, including grants and research money.

435.    Albrecht's State of ND board roles are important to his fundraising.

436.    Albrecht serves on the UND College of Engineering and Mines executive board alongside Honeywell Aerospace's recently retired engineering director Lisa Barnes.

437.    For all reasons above, if Albrecht were to be seen publicly supporting the Plaintiffs as the Plaintiffs reported and continue to report findings of third-party federal crimes in order to clean up the Factory's liabilities, then Albrecht would risk upsetting the 'apple cart' where his and ComDel's 'cheese' – juicy State of ND financing, federal contracts – comes from.

438.    Should Albrecht be seen to publicly validate or even simply to stand behind the Plaintiffs' brave reporting actions, Albrecht's ComDel contracts associated with the supply chains of parties adverse to the Plaintiffs' reporting would be at risk.

439.    In validating the Plaintiffs' reporting, Albrecht might also upset his State of ND friends and jeopardize his State of ND board roles such as the one at UND – where UND has a habit of promoting him in ways that help him secure additional funds, including State of ND grants and research contracts.

440.    Lehman is an actual 'cog in the wheel' of the conspiracy that was unjustly enriching federal contractors with at least hundreds of millions of dollars through Site-related aerospace and defense fraud.

441.    If Lehman were to give any credence to the truthful things Mr. Hoefer says, Lehman risks personal career liability, and he potentially faces other problems.

442.    The right thing for Albrecht, Teigen, and Lehman to do would have been to recuse themselves from any decisions or influence involving the Plaintiffs affairs with the State of ND.

443.    But, as this complaint reveals in great detail, they did not do that.

### (2)(viii) – DEFENDANTS' AEROSPACE AND DEFENSE MAN:

444.    Turtle Mountain Corporation, Pemstar, and Benchmark all co-wrote many aerospace and defense Site contracts with an independent Native American-owned sales entity TMC, Inc. (shown above, dba "Chiptronics, Inc." or just "Chiptronics").

445.    Up through 2015, Chiptronics leased two offices, an inventory area, and a logistics bay at the Factory. Chiptronics passed along purchased orders, coordinated inventory shipments, facilitated warranty and repair returns, and stuck shipping labels on sealed inventory boxes and shipped those boxes to customers.

446.    At the end of 2015, Benchmark ended its Factory contracts with Chiptronics, ceased its Site operations, and laid off or relocated its entire Factory workforce, and Benchmark left North Dakota.

447.    Benchmarks' Factory aerospace and defense work for Honeywell International Inc. – the bulk of its aerospace and defense work – was moved to Benchmark's Rochester, Minnesota factory.

448.    Benchmark conveyed full ownership of the Site to the City of Dunseith upon leaving.

449.    Immediately upon its exit, Benchmark removed critical equipment from the Site, such as a 'clean room' facility, humidity controls, production lines, and test stations.

450.    When Benchmark left North Dakota, the Factory lost its only entity with the federal qualifications, certifications, and regulatory approval to work on U.S. aerospace or airborne defense or other defense electronics. A new manufacturer or repair facility in that field at the Factory would need to go through these certification, approval, and qualification processes all over again (many which are site and station-specific) and then re-equip the Factory for that sensitive work.

451.    By disabling the Factory's federal aerospace and defense electronics manufacturing setup, Benchmark prevented its laid off workforce from quickly becoming its competitor.

452.    A coalition of local, federal, and high-ranking State of ND officials then took control of the shuttered Factory and facilitated, funded, and managed its activities starting in 2016.

453.    Then things quickly got out of hand.

454.    Upon taking control of the Factory, public officials vested William "Bill" Tuttle ("Tuttle") with authority to manage Factory projects and to facilitate use of site. Tuttle had previously helped manage the Site's aerospace and defense projects. And Tuttle ran Chiptronics.

455.    Tuttle, himself an expert in aerospace and defense electronics work, had warned officials during a Starion Bank-hosted meeting that took place in early 2016, and at other times, that Chiptronics should not take on aerospace electronics work at the Dunseith Site because it and the Factory lacked the necessary federal credentials for U.S. Government compliance.

456.    Public officials, including Lehman, nonetheless sponsored Tuttle's Chiptronics to do the sort of work – aerospace and defense electronics – anyway, despite Tuttle's warning.

457.    This work was performed in the shadows and outside the prying eyes of federal regulators. Dunseith is a remote outpost, even by North Dakota standards.

458.    Benchmark, facing manufacturing problems of its own after moving some of its previous Dunseith work out-of-state, facilitated 'off-the-books' transfers of parts of thousands of units of aerospace and defense electronics circuitry assemblies (from within Honeywell Aerospace's supply chain) to the Site and into the local community. It did so out of apparent necessity, to reach former members of its team who were skilled in highly complex manual circuitry tasks for an assortment of rework, repairs, and inspections that Rochester couldn't do.

459.    Other federally regulated electronics work was also sent to this federally non-compliant electronics worksite by other entities for years, during which the Factory did not even

contain a functional 'wash station' to decontaminate such circuitry parts, all occurring under the oversight and facilitation of North Dakota's top public officials or their delegates.

460.    A former Benchmark employee was invited to the Factory in 2017. While there, he saw Honeywell GG1320 Ring Laser Gyro part manual rework being undertaken in a *loading dock*, and he told Tuttle *then* that Tuttle needed to stop, saying, "You can't be doing this," because what he saw taking place was in violation of federal law. But the work continued.

461.    Eventually, many NDDF board members – more than those named above – were pursuing aerospace and/or defense electronics projects in connection with the Site.

462.    Tuttle and his comrades pursued their financially lucrative and certainly illicit aerospace and defense work in close collaboration with top North Dakota officials and Lehman, as the Site fell into disrepair.

463.    Shown above, the TMC, Inc. corporation under which Tuttle's Factory aerospace and defense work was ostensibly operating was involuntarily dissolved by the North Dakota Secretary of State in the midst of their scheme, but that did not stop Tuttle or his comrades (who included some public officials) from continuing anyway.

464.    This federally non-compliant work was known in part or in full to Lehman and Albrecht at the onset of their recruiting Mr. Hoefer to the Factory – and on information and belief it was known to Teigen and other Defendants – and this work remained ongoing as Lehman, Albrecht, and Teigen *knowingly* dumped their Factory mess and as Lehman dumped Tuttle upon the Plaintiffs. Each Defendant quickly came to know the full extent of these violations and concealed them.

465.    Some of the officials involved in or connected to Dunseith Site activities, including project facilitation, and/or public funding benefiting the Site, and/or Site-related work

or oversight during the Benchmark transition to public control or after 2015 included:

    i.  For ND Commerce: Lehman, Paul Lucy, Laura Willard, Brian Opp, and Michelle Kommer (ND Commerce officials prominently associated with the Site);

    ii.  For State of ND Indian Affairs Department: Director Scott Davis (he was also on NDDF's board, and he directed Indian Affairs and worked on Factory projects when Wrigley was Lt. Governor and then again under Burgum), and Erin Shanley;

    iii.  Then-U.S. Representative Kevin Cramer's State Director Lisa Gibbens (she is currently Cramer's State Director for his role in the U.S. Senate), and his staffer Rick Collins;

    iv.  U.S. Senator John Hoeven (he is previously Governor and BND CEO) and his then-Regional Director Kristen Hamman;

    v.  For United States Department of Agriculture ("USDA"): State Director Bill Davis, Denise Sundeen, Harvey VanSciver (USDA works closely with Hoeven, and coordinated a grant to the Site that Hoeven promoted and which was later recalled);

    vi.  NDDF board members (these positions are Governor appointed): Albrecht and Davis (noted above), Terri Zimmerman (CEO of Packet Digital, and she was Great Plains Software CFO when Burgum was its CEO), and then-ND Commerce Commissioner Kommer (at one point, at least 50% of NDDF board members were involved with the Site).

466.   State of ND Senate Majority Leader David Hogue's law firm was retained to

assist in transitioning the Factory from Benchmark and into public control.

467.    Current BND CEO Don Morgan was a Bismarck executive of Starion Bank from 2015-2019 when Starion's Bismarck branches hosted many of public officials' near-monthly meetings for the Factory (shown above, records from those meetings show wide-ranging Factory pursuits: from nuclear and defense to aerospace, drones, armored vehicles, plumbing, metal artwork, a Chinese company, and more).

### (3) – BASIS OF COMPLAINT AND THE FACTORY EVIDENCE:
### (3)(i) – PLAINTIFFS' FEDERAL REPORTING AND DEFENDANTS' INTERFERENCE:

468.    Plaintiffs found illicit aerospace and defense things at the Dunseith Site starting in August 2022 that were sensitive and federally controlled, and Plaintiffs contacted federal authorities to clean it up. For several reasons – maliciously caused by Defendants' deceit and also caused by Teigen's, Akason's, Garman's, interference which deprived Plaintiffs' rights – that cleanup took some time.

469.    Teigen, Akason, and Lehman became alarmed after Plaintiffs innocently disclosed to them what Plaintiffs were uncovering at the Factory – these Defendants *knew* why that mess was there, and that it tied to shady dealings that concerned at least Teigen, Albrecht, and Lehman, other top State of ND officials, and their state agencies.

470.    Teigen and Akason, assisted by Garman and Lehman, used their State of ND positions, authority, and influence to try to force Mr. Hoefer and Hoefer Group away from the Factory, in order to keep a lid on officials' past misconduct which the evidence might expose, and to chill Plaintiffs' speech, and for other self-serving reasons which deprived Plaintiffs' rights.

471.    These Defendants' first cover-up plan backfired because Mr. Hoefer frantically called federal authorities and then found help before they could contain his efforts.

91

472.    An enforcement division chief from the U.S. State Department Directorate of Defense and Trade Controls ("DDTC") – DDTC enforces the Arms Export Control Act and International Traffic in Arms Regulations – instructed Mr. Hoefer to preserve evidence and report to DDTC. This official warned Mr. Hoefer, "I think you're being subjected to a political and military cover-up."

473.    In the days that followed, Teigen and Akason, assisted by Garman and Lehman, sent their agent Tooke to tell Mr. Hoefer these Defendants made a mistake in cutting off his funding and trying to chase him out of North Dakota. To explain away this 'mistake,' Tooke said that Teigen and Akason thought he had "gone crazy" and had "made up" the Factory evidence.

474.    All Defendants knew more about this Factory evidence than Mr. Hoefer knew then, because they were concealing knowledge of hidden away ND Commerce public records which concerned it.

475.    All Defendants concealed from the Plaintiffs that the Defendants were implicated in various ways in what Plaintiffs had discovered and were reporting to federal authorities.

476.    Teigen, Akason, Garman, and Lehman then used their State of ND authority, powers, and influence, including their control and influence over the Plaintiffs' incentives and financing, to direct and control the Plaintiffs' actions in quietly and slowly cleaning up the Site.

477.    Teigen, Akason, Garman, and Lehman, began to actively control Hoefer Group and Mr. Hoefer, but in complete disregard of (a) the terms of the State of ND's financing and incentives contracts with Plaintiffs and (b) the State of ND's established practices as to all other similarly situated, state-incentivized business contracting parties. Aspects of this violated 18 U.S.C. § 1589, in that these Defendants forced Plaintiffs to provide labor and services for the benefit of all Defendants through means which included abuse and threats of abuse of law or

legal process and a scheme, plan, or pattern intended to cause Plaintiffs to believe that Plaintiffs would suffer serious harm if they did not comply. Defendants did so to exert pressure on Plaintiffs to cause Plaintiffs to take action at times and to refrain from action at times, and under circumstances as to which a reasonable person of the same background and in the same circumstances as Plaintiffs would perform or continue performing such labor or services in order to avoid incurring the serious harm Defendants threatened.

478.    Akason and Lehman tried to make Mr. Hoefer sign a carefully edited, broad and ambiguous 'nondisclosure agreement' concerning Plaintiffs' relationship with the State of ND. It was nothing more than a disguised 'gag-order' which would have forbidden either Plaintiff from disclosing to any third party what was happening with Defendants. Mr. Hoefer refused that demand, and all Defendants made life harder for him, and made business more difficult for Plaintiffs, as a result.

479.    Teigen, Akason, Garman, and Lehman leveraged their control over other aspects of all of the Plaintiffs' financing and State of ND incentives in their exerting this active control over the Plaintiffs.

480.    These Defendants' actions bore no relationship to any implementation of any Hoefer Group/State of ND contract terms. They acted in their own interests, using state power.

481.    Rather, these Defendants demanded many personally self-serving things from Mr. Hoefer and from Hoefer Group – things which changed the Plaintiffs' operations, planning, partnerships, and financing, and dictated Mr. Hoefer's professional and personal actions, which led to threats to Mr. Hoefer and his family and caused them to live in fear.

482.    What these Defendants demanded of the Plaintiffs were things the Plaintiffs did not want to do, and things which harmed the Plaintiffs.

483. These Defendants coerced and extorted the Plaintiffs by promising – *if* Plaintiffs behaved as Defendants instructed:

     i. To keep Plaintiffs' State of ND credit line they controlled active,

     ii. To keep Hoefer Group's cash draws on this line flowing,

     iii. To deploy, in the imminent future, State of ND tax incentives and grants that had already been promised to Mr. Hoefer during his recruitment,

     iv. To use State of ND resources under their control and influence to reimburse the Plaintiffs for the financial harm the Defendants were inflicting upon the Plaintiffs, and

     v. To induce BND to lend Plaintiffs funds secured by a mortgage of the Factory, as had already earlier been promised to Mr. Hoefer during his recruitment.

484. To compel the Plaintiffs to acquiesce and do as told and comply with their demands, these Defendants threatened that they could cause NDDF to terminate the Plaintiffs' State of ND credit line and rescind other promised State of ND incentives, and they threatened that they could cause other serious professional and financial harm to the Plaintiffs, including legal threats.

485. Having tied Mr. Hoefer, his image and reputation, and his finances to ND Commerce, Teigen, Akason, Garman, and Lehman told the Plaintiffs – at times themselves and at times using Tooke – in minute detail how to go about quietly cleaning up the federal Factory violations and crime scene and who to talk to – and not talk to – about that and much more.

486. The Plaintiffs faithfully did all the things that these Defendants instructed and directed the Plaintiffs to do. Records and witnesses prove this.

## (3)(ii) – PLAINTIFFS' FOUND DEFENDANTS' CONCEALED PUBLIC RECORDS:

487.    The Plaintiffs independently obtained a trove of backup copies of public records which the Defendants had been concealing – even claiming that such records *did not exist* – relating to some Defendants, State of ND officials', and others' past Factory-related misconduct.

488.    Plaintiffs reported this new public records evidence to federal criminal investigators and other federal agencies. And Defendants then went into self-preservation mode and targeted the Plaintiffs with a malicious revenge scheme.

489.    These public records were important to the Site's evidence and to the Plaintiffs' relief, for reasons shown throughout this complaint. The records show shocking recklessness as to State of ND and federal officials' disregard of federal regulations relating to aerospace and defense electronics Factory work. The records are all unclassified because those State of ND records were part of discussions from meetings at a bank and via unsecured phone lines and video feeds with many people from North Dakota where nothing discussed could be classified. Part of these records, among other things, report:

    i.    Pursuit of nuclear electronics work;

    ii.   Discussion of missile silo re-tooling;

    iii.  Routine Lockheed Martin Corporation work;

    iv.   Tapping into the State of ND's unmanned aerial systems ("UAS") funding pipeline for the Site;

    v.    Extensive work involving Honeywell International, Inc.'s Aerospace division Navigation and Sensors unit's GG1320 Digital Ring Laser Gyroscope;

    vi.   Recurrent references to "R30" which code coincides with the warehouse code of the U.S. Navy's electronics stockpile for its jets, ships, and missiles;

    vii.  Pursuit of U.S. Defense Logistics Agency ("DLA") "setaside" contracts –

contracts for small, disadvantaged businesses – for millions of dollars of electronics circuitry work, including reference to U.S. Senator Hoeven as to some of that; and

viii.    The recruitment of a Chinese state-owned company to the Site.

490.    IRS CI Special Agents Thomas Larson and Wesly Loughman were among many federal criminal law enforcement agents and investigators who visited the Factory, collected evidence relating to third parties, and then later sought copies of these public records when they were uncovered by the Plaintiffs. On August 21, 2023, Loughman wrote:

> Mr. Hoefer,
>
> I appreciate the update. I am glad to hear the ITAR items have been removed from your site.
>
> Can you please provide me with the Economic Agency Documents you acquired? Electronic copies sent via email would be sufficient.
>
> Also, can you provide me with the contact information for the other agents you have been dealing with; FAA, OSI, CID & DOD OIG? I would like to contact them to ensure we don't conflict with each other.

### (3)(iii) – THE SHOCKING SCOPE OF FEDERAL CRIMES AT THE FACTORY:

491.    These were serious federal crimes – *not* small crimes – the Plaintiffs discovered and reported, and as to which the Plaintiffs had to get federal authorities to collect the evidence, and to remove then still-active fraudulent registrations from the Site in federal defense and aerospace contracting systems, so as to steer Plaintiffs clear of any federal liabilities from the mess.

492.    The sprawling, maze-like Factory was laden in concealed federal military and aerospace evidence demonstrating serious federal fraud and false claims, and public safety risks

– including risks to commercial aviation – arising from projects involving Lehman, State of ND officials, and others.

493.    Teigen and Albrecht facilitated, and they at least tangentially derived financial benefits – including quid pro quo benefits – from, some Factory activities or projects named in the evidence that federal authorities have collected for investigations.

494.    There was even a small Factory room stuffed with boxes that, once emptied for remodeling, was found by Plaintiffs to have a large pool of dried blood on the floor.

495.    Much of what Plaintiffs found at the Factory and subsequently learned includes:

i.    The preceding State of ND-facilitated Factory tenant suddenly mysteriously disappeared and left valuable assets and personal possessions behind in 2019. Those assets had been removed from the Site and the possessions concealed within it before Mr. Hoefer was given a Site tour in 2021.

ii.    The Factory was the hub of a then-ongoing and possibly still-ongoing – through fraud and deception – previously State of ND-sponsored, 'off-the-books' aerospace and defense electronics parts rework, inspection, and repair scheme occurring in squalid conditions and involving thousands of units of one of the Western world's most sensitive, complex to manufacture, and widely used inertial sensors: the Honeywell GG1320 Ring Laser Gyro.

iii.    The Factory location was central to a web of State of ND-funded projects that had used the Site as the basis or hub for millions of dollars of State Insider public money deals.

iv.    Items Plaintiffs found concealed within the Site included guidance system electronics circuitry assemblies of the Lockheed Martin GMLRS missile,

apparent nuclear electronics-related technical records, troves of important stuff to the U.S. military, B-52 electronics work records, and more, plus records of sales of some sort to "China" throughout 2019 and mixed among Honeywell and Lockheed records. Thousands of records, media, and electronic circuitry devices were labeled as controlled under the ITAR and/or the AECA.

v.   Some of the items were things which federal law did not permit the Plaintiffs to remove or destroy themselves due to their sensitive nature and/or use as evidence, nor could Plaintiffs even lawfully possess them without U.S. government permission. As one example, some items comprised national defense information controlled by 18 U.S.C. § 793(e) (a part of the Espionage Act) whose mere unauthorized presence at the Site after the Site's sale to the Plaintiffs (and before that) created federal violations. The Plaintiffs, who are civilians and are not affiliated with federal government contracts, were instructed by multiple federal authorities the Plaintiffs had contacted to hold and preserve this evidence for collection by federal authorities. The collections proved to be frustratingly slow in coming, and in material ways this was caused by Defendants.

vi.   On information and belief, an incomplete State of ND and federal cover-up of past Site activities, which activities involved at least Lehman from among the Defendants, occurred in 2019 and something violent occurred onsite in that year, which circumstances and witnesses indicate that this violence most probably related to that cover-up.

496.    The sensitive U.S. national defense information collected from the Factory by federal criminal, aviation, and military investigators was similar or perhaps greater in quantity to the sensitive items found in the Joe Biden and Donald Trump personal residences in recent years. A photograph, partly redacted to obscure non-parties and sensitive parts, of some of this Factory evidence from one of multiple locations where it was stored when it remained onsite is depicted below. Many folders visible in the photograph contained ITAR or AECA-controlled circuitry:



497.    President Trump, between his terms, endured a long legal battle to clear himself of a criminal indictment for the unauthorized possession of items subject to 18 U.S.C. § 793(e).

498.    One senior federal criminal special agent who was recovering materials from the Factory actually refused to view some items there during his visit upon learning of their nature, because he said he realized that seeing such items without further authorization would jeopardize

his 'Top Secret' clearance since the items likely exceeded it.

499.    The Site's concealed federal evidence found by the Plaintiffs held extra significance: records revealed an illicit racketeering scheme where the scheme's participants misused some of this evidence and conducted activities which posed imminent concerns as to U.S. national defense and public safety. Further:

  i.    Federal investigators confirmed these concerns to Plaintiffs during and after their evidence collection visits to the Site.

  ii.    Prominent aviation industry experts also publicly expressed such concerns.

500.    Site records and other records, some of which Defendants made unsuccessful efforts to conceal from the Plaintiffs and from federal investigators, evidenced violations – not by Plaintiffs, but by others – of 18 U.S.C. § 38 (aerospace parts fraud), 22 U.S.C. § 2778 (AECA), and 22 C.F.R. § 127 (ITAR).

### (3)(iv) – DEFENDANTS ACTED TO LAUNDER CRIMES UPON PLAINTIFFS:

501.    In short, Defendants Lehman, Teigen, and Albrecht, later joined by all Defendants, had arranged to launder Site evidence upon the Plaintiffs for Plaintiffs to then unknowingly dispose of it during the Factory's remodeling, while leaving Plaintiffs effectively framed to take the fall for the past misdeeds of State of ND officials and their cronies if the presence of the illicit items or their unsanctioned disposal were later discovered and pursued by authorities.

502.    Defendants anticipated that Plaintiffs would unwittingly destroy the remaining evidence from prior State of ND Site activities, thinking it to be nothing but trash and junk. And then, should federal law enforcement ever move in to stop the continuing Honeywell Ring Laser Gyro fraud within the local community, all of that project's history – aspects of which were being fraudulently kept in U.S. Government paper trails and logistics records under the name

"Chiptronics, Inc." as traceable to the Plaintiffs' Factory – would be blamed on the Plaintiffs. And so, with Site evidence destroyed as to the Gyro scheme's history, and with the Defendants concealing their records relating to that, only Mr. Hoefer would get 'knicked' – arrested and/or charged and/or indicted – instead of those who were truly complicit.

503.    This 'Chiptronics, Inc.' or 'Chiptronics' was the dba of TMC, Inc., which entity dissolved in March 2020, but its business enterprise continued secretively and fraudulently at the Site and nearby. When Benchmark operated the Site and before that, TMC was the Site's Native American-owned sales partner, a DLA "non-manufacturer" which never manufactured anything, and which only employed a few people to assist with shipping and ordering.

504.    The public records the Plaintiffs later obtained showed that Chiptronics' projects comprised the thrust of State of ND officials' Factory work pursuits after 2015, including work on U.S. defense and aerospace electronics parts at the Factory on a monthly basis. Benchmark had manufacturing problems after closing its North Dakota operations, and Benchmark personnel enabled some of this work. So did Honeywell and Lockheed Martin, according to the records.

505.    The Factory's aerospace, airborne and other highly sensitive defense electronics work officially had been closed and removed from the Factory by Benchmark in 2015.

506.    Any work of that sort after 2015 was illicit because the Site was no longer federally compliant and no efforts were made to bring back the Site's compliance. The Site no longer held the necessary qualified workstations, or compliance for the Site's operator, or certifications for those things, and Benchmark had also removed critical Site equipment for static-safe work. But Benchmark kept its Site address registration within the federal Commercial and Government Entity (CAGE) system active and updated into 2023. The phantom "Benchmark Electronics, Inc. Dunseith Division" was listed as an active manufacturer under code 4UFU6.

507.    Honeywell GG1320 Ring Laser Gyro work astonishingly continued to occur locally after the Plaintiffs bought the Factory. Benchmark's attorney confirmed to Hoefer Group that Benchmark was facilitating this. Its personnel placed alternate "Ship To" instructions on its parcels – which were officially labeled as intended for delivery to the Factory – to seek to divert those parcels to *a tavern on North Main Street*. Photographs of one such parcel, which contained a "Static-Sensitive" warning, are shown below, taken by Hoefer Group personnel in September 2022. A UPS driver brought this parcel to the Factory, and he was surprised that the Plaintiffs did not know about the scheme that was going on and which had been ongoing for years. The UPS driver then explained how the scheme's logistics operated, in that he would find Benchmark's local contact Tuttle somewhere about town, often at the Garden Tap Tavern. Package photos:





508.    Benchmark or its suppliers have attempted to ship sensitive parcels of electronics circuitry parts to the Site in 2022, 2023, 2024, and 2025, and these parcels were labeled to the Factory address, but were clearly indicated by other labeling as intended for other locations. Multiple North Dakota entities, one with a U.S. defense acronym, have also made use of the Plaintiffs' Site address in ways that cause their mail to be delivered occasionally to Hoefer Group.

509.    An FAA national security incident response team investigator, upon arriving at the Site in May 2023 to collect evidence for an FAA flight safety investigation, reported that his records showed Hoefer Group had acquired "Chiptronics, Inc." No such acquisition ever happened. His FAA records also showed that Chiptronics was then-currently authorized by Honeywell to perform GG1320 Ring Laser Gyro work at the Site, and that it was doing so then. In fact, it was not.

510.    Defendants caused Plaintiffs to be framed for successor liability of these serious federal violations.

511.    The FAA's investigator was visibly shocked as he learned the real facts of the Plaintiffs' situation, and saw what was going on, and he then warned Mr. Hoefer to "be careful" and said that Mr. Hoefer should watch out for his own safety.

### (3)(v) – DEFENDANTS WON'T STOP HARMING THE PLAINTIFFS:

512.    The Plaintiffs' rights were and are continuing to be violated, and Plaintiffs suffered serious damages at Defendants' hands.

513.    Since when the Plaintiffs discovered what was really going on with the Factory and before, the Defendants have misused their official positions at every turn to make Mr. Hoefer and Hoefer Group the scapegoats for their and their cronies' misconduct at this Factory.

514.    Plaintiffs are now federal victims, witnesses, and whistleblowers who have reported this evidence to the federal government and who have been sought by U.S. government agencies for interviews in both criminal and national security investigations.

515.    Plaintiffs were not a party to the illicit activities which occurred at the Site.

516.    Illicit activities at or concerning the Site by parties other than Plaintiffs may have, in ways anticipated to be developed through discovery:

      i.    Contributed to multiple civil and military aviation accidents and deaths and many serious injuries and places U.S. and Western aerospace and other assets at risk;

      ii.    Caused a bloody scene of past violence at the site that several Defendants and their cronies are eager to forget; and

      iii.  Led to the transfer of U.S. military technology to U.S. adversaries.

517.    There is reason to believe illicit activities at or concerning the Site may also have played a part in events surrounding the more recent incarceration and murder charge against a United States Homeland Security Investigations ("HSI") special agent Daniel Breijo for the sensational execution-style shooting death of Master Sergeant Nicholas Van Pelt, who was a supervising officer for Minot Air Force Base nuclear security. HSI's Breijo also shot State of ND court clerk Jenni Babcock that same night.

518.    Babcock survived and she has claimed publicly that these shootings and the mess of crimes surrounding the Plaintiffs' reporting in Dunseith may all link together. Discovery in this suit may well bear out some connection.

519.    Breijo and the Ward County prosecutor entered into a plea agreement on August 11, 2025, under which, if the court approves, he will enter guilty pleas to manslaughter and other charges and then serve 20 years.

520.    No motive for why Breijo killed Van Pelt has been released publicly by the prosecutor.

521.    HSI's agent Breijo had earlier threatened Mr. Hoefer and tried – along with OSI special agent Richard "Gene" Brown and ND BCI special agent Craig Zachmeier – to induce Mr. Hoefer to destroy the Factory evidence himself. Multiple Defendants made false statements or acted deceitfully to cause the frightening events between Mr. Hoefer and those agents.

522.    IRS CI's special agent Larson – he is a supervisory agent – was among multiple federal investigators who warned Mr. Hoefer to "be careful" – in that Mr. Hoefer should look out for his own safety – after Larson visited the Site and saw what was really going on.

523.    As the Plaintiffs slowly obtained federal Site relief, and then started providing to federal agents such as Larson and Loughman and other federal authorities – who seemed to be more decent people eager to give the Plaintiffs relief and investigate what the Plaintiffs found at the Factory – some of the public records that the Defendants had been concealing, the Defendants were unhappy given those records' embarrassing and potentially incriminating nature and what else those records might begin to expose about State Insiders' dealings in public funds. Thus, the Defendants' cover-up and retaliation efforts against the Plaintiffs went into 'overdrive.'

524.    In retaliation for the Plaintiffs' truthful reporting to federal authorities and for

other self-serving reasons which deprived Plaintiffs' rights, the Defendants conspired together and cooperated together to further their conspiracy and they misused State of ND offices to falsely smear, defame, humiliate, and to seek to falsely incriminate and financially ruin the Plaintiffs – just *anything* to silence Mr. Hoefer and chase the Plaintiffs out of North Dakota or cause Mr. Hoefer to be torn from his family and hauled off in handcuffs.

525.    The Defendants acted brazenly and in total disregard of Plaintiffs' civil rights.

526.    To shield insider schemes and avoid self-incrimination, the Defendants are still hiding or have possibly destroyed troves of public records relating to the Plaintiffs and Factory despite years of partly unfulfilled records requests made by third party media requesters.

527.    The Defendants have also released to third party requesters other cherry-picked records relating to the Plaintiffs and Factory with deceptive selective redactions, with the goal being to paint Mr. Hoefer and their own relationship with the Plaintiffs in a false light.

528.    Defendants released Plaintiffs' protected trade secrets multiple times to third parties, even after Plaintiffs asked them to stop that, so as to scare investors away from Plaintiffs by making investors fear that the Plaintiffs' trade secrets would not remain safe, and to 'chill' Mr. Hoefer's speech, and for other self-serving reasons which deprived Plaintiffs' rights.

529.    Some law enforcement authorities in North Dakota reacted to Plaintiffs' reporting on occasion in ways that went frightfully beyond inaction, including a few instances of witness tampering, intimidation, and obstruction, some situations as described herein.

530.    But it was Defendants in particular who uniquely conspired and campaigned to destroy the Plaintiffs' business and livelihood and who repeatedly assaulted the Plaintiffs' federal rights, and who tried – repeatedly – to falsely incriminate and indict Mr. Hoefer.

531.    Defendants kept Mr. Hoefer under their thumbs, staying abreast of all his federal

reporting in order to harm him while trying to minimize any potential harm or risk to themselves.

532.    The Defendants made unprecedented and aggressive use of public platforms to broadcast false allegations of criminal misconduct against the Plaintiffs, which allegations Defendants knew were wildly false. Their intent was self-serving to deprive Plaintiffs' rights, including without limitation to seek revenge, to silence Mr. Hoefer, to ruin the Plaintiffs in the court of public opinion, and to send a clear message to scare others – who know Defendants are capable to retaliate against them, too – from helping the Plaintiffs.

533.    The Defendants' plans to launder the federal evidence and crimes upon the Plaintiffs backfired.

534.    The Defendants' multiple cover-up attempts and efforts to entrap and incriminate Mr. Hoefer also backfired.

535.    The Defendants backed themselves into a desperate corner.

536.    The Defendants were left with no option but to either capitulate at great risk to their careers or double down and keep attacking the Plaintiffs' rights. They chose the latter.

### (3)(vi) – THE PUBLIC, MEDIA, AND STATE LEGISLATORS ARE SHOCKED AT THE TREATMENT DEFENDANTS SUBJECTED PLAINTIFFS TO ENDURE:

537.    Defendants' acts against Plaintiffs' federal rights shocked North Dakota's citizenry as Mr. Hoefer began to speak about all of this and publicly release evidence starting in late 2024.

538.    Defendants' sustained campaign to deprive Plaintiffs' federally protected rights has become a hot topic of public discussion in North Dakota.

539.    The whole situation became a subject of newspaper articles, investigative reports, radio shows, podcasts, national media coverage, and a television series – even prompting recent legislative action to bring accountability to the State of ND agency whose authority Defendants have misused in violating the Plaintiffs' rights in the manners described herein.

540.    The Defendants overwhelmed the Plaintiffs through abuses of their State of ND positions, testing every level of Mr. Hoefer's faith and his family's ability to persevere.

541.    Current and former law enforcement officials have said it appears that the Defendants were designing further pitfalls for Mr. Hoefer by their public actions: seeking to incite another third party (not a Defendant) implicated by Plaintiffs' reporting to physically harm Mr. Hoefer so as to rid themselves of him another way through violence, as was their intent.

542.    Prominent State of ND legislators have told Mr. Hoefer and third parties that Mr. Hoefer's standing strong through all of this abuse is remarkable. And it is.

### (3)(vii) – UNCONSCIONABLE VIOLATIONS OF HONEYWELL GG1320 RING LASER GYRO SUPPLY CHAIN:

543.    The GG1320 Ring Laser Gyro is nearly monopolized in use in commercial Boeing jets, and the GG1320 is also used for flight critical operations in Airbus jets. There has been a rash of incidents lately of alarming in-air incidents affecting those passenger jets, causing serious injuries to the flying public and to flight crews, and attributed to turbulence. But there is reason to believe some of the incidents are due to a different, Site-related manufacturing cause.

544.    Messing around with Honeywell's GG1320 Digital Ring Laser Gyroscope supply chain and deviating heavily from approved federal GG1320 manufacturing standards and federal GG1320 compliance regulations is just bad – as bad as it gets. GG1320s' software components, some which are embedded within Gyro circuitry the Plaintiffs found, carry "catastrophic" safety risks according to FAA, meaning a fault or failure can cause many fatalities.

545.    A National Aeronautics and Space Administration ("NASA") scholarly research article has warned in the past that GG1320 parts failures can cause big commercial jets to experience sudden in-flight upset events. And in March 2025 the National Transportation Safety Board ("NTSB") released its preliminary safety report of United Flight 613 where a Boeing 787

Dreamliner jolted passengers into the ceiling, causing injuries and mimicking the effects of turbulence, but actually owing to two "IRU" failures – IRUs (Inertial Reference Units) are inertial sensor systems within 787 aircraft (and others) containing accelerometers and GG1320s.

546.    The Plaintiffs have reported serious crimes and events with public safety and national security implications. Defendants, who are angry that Mr. Hoefer made federal reports about the Site evidence which may implicate them, have sought repeatedly to sabotage Plaintiffs' business and subject Mr. Hoefer to danger, including in publicly humiliating and terrifying ways.

547.    Based upon the Plaintiffs' truthful reporting of violations of federal law to federal authorities, and following earlier visits and collections by FAA and other agencies, special agents from the U.S. Defense Department Defense Criminal Investigative Service Office of the Inspector General (DCIS OIG) and the U.S. Army Criminal Investigative Division Major Procurement Fraud Unit (CID) visited the Site in June 2023 to take custody of a trove of items and documents found at the site. They provided records of their visit to Plaintiffs, documenting Plaintiffs' consent to their collection and reflecting that the Dunseith Site criminal evidence was part of federal False Claims and False Statements investigations regarding potential violations of federal law opened within the Department of Defense. CID provided a case number and collection receipts to the Plaintiffs, which graded the Factory a federal crime scene. A partly redacted copy of one of the collection record documents from this federal criminal inquiry is shown below:

| Date 22 Jun 23 | **CONSENT TO SEARCH**<br>USACIDC SUPPLEMENT 1 TO AR 190-22 | Time 14:59 | ▮ |
|---|---|---|---|

| 1. Name of person consenting to search<br>CHARLES HOEFER | 2. Organization and location<br>HOEFER GROUP, LLC  19 2nd ST SE Dunseim, ND |
|---|---|

3. I have been informed by the undersigned USACIDC Special Agent that an inquiry is being conducted in connection with the following possible violations of law:

18 U.S.C. 287 : FALSE CLAIMS

18 U.S.C. 1001 : FALSE STATEMENTS

4. I have been requested by the undersigned USACIDC Special Agent to give my consent to a search of my person, premises, or property as indicated below. I have been advised of my right to refuse a search of my person, premises, or property. (If you do not give your consent, do not sign this form.)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
I hereby authorize the undersigned USACIDC Special Agent and/or other Authorized Law Enforcement Officials assisting the undersigned USACIDC Special Agent to conduct a seach of: (Initial and sign applicable blocks)

| a. | **My Person** | Initials: | Signature: |
|---|---|---|---|
| b. | **My Quarters** | Initials: | Signature: |

**Located At:**

| c. | **My Vehicle** | Initials: | Signature: |
|---|---|---|---|

**Located At:**

**Described As:**

| d. | **Other** | Initials: ▮ | Signature: ▮ |
|---|---|---|---|

**Located At:** 19 2nd ST SE Dunseint, ND

**Described As:** 100,000 SQ FT MANUFACTURING FACILITY

5. I am authorizing the above search(es) for the following general types of property which may be removed by the authorized law enforcement personnel and retained as evidence under the provisions of Army Regulation 195-5 or other applicable laws or regulations:

DOCUMENTS, PHYSICAL COMPONENTS, and HARD DISK DRIVES BELIEVED TO BE ASSOCIATED WITH DEPARTMENT OF DEFENSE CONTRACTS.

6. This written permission is given to the undersigned USACIDC Special Agent freely, voluntarily and without threats or promises of any kind.

▮

Signature of Person Granting Consent

▮

Signature of USACIDC Special Agent

Signature of Witness (if available) ▮

CID Form 87-R-E, Augn 00 (Rev)   PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE

**For Official Use Only - Law Enforcement Sensitive**

548.    Plaintiffs' security surveillance cameras captured images of the DCIS OIG, CID, and OSI federal criminal agents making the third evidence collection by law enforcement from the Factory, four of which from June 22, 2023, are shown below. Jessica Tooke, NDDF's then-CEO who was the Defendants' agent, was present and she appears in two of the photos. Teigen, Garman, Akason, and Lehman, conspiring together and assisting one another, had directed Tooke to meet with federal agents multiple times to "assist" as the Plaintiffs sought relief, but these Defendants were actively scheming to deceive federal authorities and to conceal facts critical to Plaintiffs' relief and essential to the federal Factory liability cleanup:



549.    In recent years, U.S. authorities stopped an Air Force flight suit fraud scandal and

enforced criminal penalties (including prison time) for a North Dakota citizen after catching a $20,000,000 supply chain fraud. U.S. authorities created a multi-agency task group on this flight suit fraud case, and the U.S. Department of Justice ("DOJ") brought criminal charges against multiple parties and brokers in the U.S. Many of these same federal criminal agencies have been involved in helping the Plaintiffs to remediate the Dunseith Site and they opened investigations. In the flight suit fraud scandal, the DOJ waited several years to announce federal indictments.

550.    Many officials from the same federal agencies that coordinated to pursue arrests and federal indictments relating to that flight suit fraud scandal also coordinated to open federal investigations into the much larger Factory evidence scandal and Honeywell GG1320. Federal investigators opened flight safety investigations which arose out of the Plaintiffs' federal reporting and their site visits. In a July 2023 federal interview of Mr. Hoefer, where the U.S. Navy Criminal Investigative Service ("NCIS") participated, DCIS OIG Special Agent Ana Brown told Mr. Hoefer that there was a federal flight safety investigation ensuing from Mr. Hoefer's reporting. Brown said:

> [Mr. Hoefer:] I understand and I believe they've [GG1320 fraudsters] put the Government in a gigantic pickle, um, but the biggest concern I have is I think they've tied up commercial aviation in the mess as well.
>
> [DCIS OIG Special Agent Brown:] Yes, and, like you said, the FAA is looking into that component [of commercial flight safety], and Marlene [NCIS special agent] and I and the other DoD components [multiple federal military law enforcement agencies] are looking into DoD flight safety of our aircraft and missiles. So, we definitely appreciate you taking the time when we went up there, um, to show us everything and allow us to collect that evidence and again, taking the time today, um, to sit down with us, and walk us through, um, because we definitely wanted t- to hear it from you, you know, start-to-finish how this happened, and it's, it's uh, it's been illuminating.

551.    Eventually, the aviation parts fraud scheme and its implications became state and

national news, and public awareness of the issue continues to grow. Prominent Boeing 737 MAX Ethiopian Airlines and Lionair crash U.S. Congress whistleblowers Ed Pierson and Joe Jacobsen – both held expert positions at Boeing and FAA, respectively – have begun publicly flagging serious risks to global aviation supply chains and commercial flight safety from the Honeywell Ring Laser Gyro scheme the Plaintiffs were reporting.

552.    In April 2025, the Foundation for Aviation Safety – comprising Pierson, Jacobsen, and other aviation experts who are routinely interviewed by national media outlets when a major aviation accident occurs or when faulty manufacturing is suspected – notified NTSB's Chair, Jennifer Homendy, about the serious aviation safety implications of the Plaintiffs' discoveries in relation to midair turbulence-like flight accidents. The Foundation for Aviation Safety has published its full NTSB Gyro letter at https://www.foundationforaviationsafety.org/reports/letter-to-ntsb-ref-ring-laser-gyros-april-2-2025.

### (3)(viii) – PLAINTIFFS' REPORTING CAUSED STATE LEGISLATORS TO ACT:

553.    And recently, the State of ND's legislature overwhelmingly passed the State of ND Senate bill SB 2396, which bill was expedited with emergency powers, to look into the State of ND agency NDDF that these Defendants have leveraged to target the Plaintiffs.

554.    Defendants leveraged the vast State of ND resources and influence at their disposal against the Plaintiffs' federal rights, not only in violation of federal laws, but also in violation of their own State of ND mandates and directives in ways which even severely harmed and impacted local communities, actively hindering job creation and recovery in one of North Dakota's most economically disadvantaged areas.

555.    The Defendants have tried to make doing business in North Dakota or anywhere else impossible for the Plaintiffs.

556.    In the December 2024 meeting described above, Albrecht, Garman, Lehman, and Akason met with thirteen State of ND legislators, seeking in the meeting to maliciously discredit Mr. Hoefer with the State of ND's legislature.

557.    Mr. Hoefer learned afterward that one of the legislators recorded this meeting.

558.    That legislator shared with Mr. Hoefer that these Defendants had painted Mr. Hoefer out as a "shyster," and gave Mr. Hoefer a copy and asked him to analyze this recording to fact-check these Defendants' claims.

559.    Several of these legislators, including State of ND Senate Majority Leader David Hogue, introduced and co-sponsored SB 2396 after Mr. Hoefer produced a report identifying that these Defendants had misled the legislators more than 70 times concerning the Plaintiffs in less than two hours. Mr. Hoefer's report cited existing public records to prove that these Defendants acted deceitfully towards the legislators, and he offered copies of public records that the Defendants had withheld in part or whole from the legislators; he was an original party to the written communications comprising those records and had his own copies of them.

560.    In a rare act, 18 State of ND legislators signed an open letter by them to Governor Kelly Armstrong in January 2025 to both confirm and decry the Defendants' mistreatment of the Plaintiffs. State of ND Senator Kent Weston included his investigative findings in the letter, in which Senator Weston stated to Gov. Armstrong:

> i.   That the Senator found the Plaintiffs' claims credible.
>
> ii.  That the Senator had conducted an independent financial investigation into the Plaintiffs and the Defendants' allegations against the Plaintiffs were rubbish.
>
> iii. That the Defendants had materially misled the Senator multiple times about the Plaintiffs during the Senator's investigation.

iv. That the Senator had carefully reviewed the Plaintiffs' entire business, and it seemed to be a great business and with greater community potential than other NDDF projects.

v. The Senator said, "It is never appropriate for our State to publicly humiliate an entrepreneur we recruit. That act fell below the standard of everything we stand for in North Dakota."

## (3)(ix) – THE DEFENDANTS REPEATEDLY TERRORIZED THE PLAINTIFFS:

561.    Defendants' 'class-of-one' treatment of Plaintiffs in violation of Mr. Hoefer's and Hoefer Group's federal constitutional rights is clearly established throughout this complaint. The Defendants' abuse of Mr. Hoefer's life is abhorrent.

562.    Albrecht has challenged or threatened that Mr. Hoefer should abandon the Factory and skip out on repaying the Plaintiffs' NDDF credit line if he is scared.

563.    Albrecht worked to sow doubt with State of ND legislators about Mr. Hoefer's claims that Mr. Hoefer has endured threats, stalking, and harassment.

564.    Albrecht told legislators:

> And that's kinda the pause that I have, is, if I'm scared for a year-and-a-half I'd probably took my family and gotten the heck out of there and said 'I'm gonna walk away from everything.'

565.    Yet it is the Defendants who have acted to scare Mr. Hoefer the most.

566.    Before making his remark above to State of ND legislators, Albrecht had viewed federal criminal collection receipts from the Factory, photographs of stalking incidents facing Mr. Hoefer, and photographs of federal Factory evidence.

567.    Tooke *knew* Mr. Hoefer was in danger, and the Defendants *knew* this. Tooke told Mr. Hoefer in March 2023:

[Tooke:] I mean, cause, there's just no way, you know. I mean, it's, how you've come across it, there's no way that no one else didn't, I mean, you know. So, I'm guessing that a lot of people either came across and walked away before anything more could have come from it – I'm not sure. But, like I said, it, it takes a very strong person to go through what you're, you're going through. And, you know, like I said, it's not only you, it's also your family, and, you know, that plays a huge role in it, so…

[Mr. Hoefer:] Yep…

[Tooke:] I don't know if I could have stood there as long as you are, um, and tried to work through this, especially with my family on the back end of it, so…

[Mr. Hoefer:] Yeah, last night was the seventh or eighth stalking incident and my wife and daughter were in the car with me, and it was unnerving.

568.    Akason has at times threatened to ruin Mr. Hoefer financially and send the State of ND's 'lawyers' after Mr. Hoefer if he should abandon the Factory to silence Mr. Hoefer and for other self-serving reasons and ends which deprived Plaintiffs' rights.

569.    Yet the Defendants have also tried to chase Mr. Hoefer away from the Factory, and the Defendants are all angry, and Albrecht is astonished, that Mr. Hoefer still remains there.

570.    Akason's worldwide allegations of criminal misconduct against the Plaintiffs have uniquely crippled the Plaintiffs' access to third party financing. Akason admits this.

571.    Akason's worldwide allegations of criminal misconduct against the Plaintiffs have seriously harmed the Plaintiffs' business. Akason admits this.

572.    Defendants all conspired and planned together to advance these public allegations against the Plaintiffs, which all Defendants knew were false and absolutely preposterous.

573.    Defendants targeted the Plaintiffs with a barrage of false, public allegations of criminal misconduct – which they advanced in the media to many third parties – to retaliate over

the Plaintiffs' federal reporting.

574.    State of ND legislators investigating Mr. Hoefer's claims about the Defendants' misconduct found Mr. Hoefer credible.

### (3)(x) – MANY CONFLICTS OF INTEREST REQUIRE A JUDICIAL REMEDY:

575.    Plaintiffs have suffered lifelong harm. Each Defendant must be held accountable for his actions which have changed Mr. Hoefer's life, severely impacted the Plaintiffs' business, and which have shocked North Dakotans.

576.    This court must remedy this situation, because top State of ND officials who might have the legal authority and ability to fix the situation are with serious conflicts as to Plaintiffs, the Factory, and Plaintiffs' reporting and they keep themselves ignorant about all of this – so there is no help coming from the State of ND.

577.    A confluence of public officials had unsavory histories with the Dunseith Site and an interest in keeping ignorant about what had occurred there to avoid embarrassment or liabilities for what had happened, which worked to the Defendants' advantage:

    i.   Federal people sought to stay ignorant to protect higher level federal people.

    ii.   State of ND people sought to stay ignorant to protect higher level State of ND people.

    iii.   These Defendants were working to protect themselves and/or their agency and their colleagues and higher-level State of ND people.

578.    All these parties' individual interests converged to motivate officials to stay blissfully ignorant as the Plaintiffs requested help, thereby allowing the Defendants to freely target the Plaintiffs and to terrorize Mr. Hoefer and his family.

579.    The Plaintiffs suffered harm after harm at the Defendants' hands.

580.    Defendants freely wielded all the great State of ND powers and authority at their disposal and used their influence to leverage resources from multiple State of ND agencies to target the Plaintiffs, and they could do as they wished because there was no one to help the Plaintiffs – the Defendants worked to make sure of that.

581.    Attorney General Wrigley and his office are full of embarrassing conflicts beyond those above, and the Defendants went to Wrigley's agency and to other State of ND agencies and departments often – to peddle lies about the Plaintiffs, and seeking to influence and control the narrative so that no one should look deeper from the State of ND into the Plaintiffs' claims.

582.    According to news reports, the North Dakota Attorney General's office has a recent history of ignoring crime and scandals involving high level officials.

583.    Since 2022, Wrigley's two State of ND Attorney General predecessors have died, neither with a publicly released autopsy, and both men died mired in controversy. One authorized the deletion of all the Attorney General's electronic records, and the other was questioned by federal law enforcement – about a powerful State of ND legislator and child sex predator whom he was acquainted with – just before he died. For years, the Attorney General office's prior occupants failed to act on reports that a child sex predator was on the loose and was serving as one of the State of ND's top legislators.

584.    Wrigley has publicly opined on a television show that the Plaintiffs' claims about the Dunseith Site 'may not *all* be true.' He stays ignorant by taking Defendants at their words.

585.    Wrigley has a long history with Hoeven and other political insiders in-state as a fixer and political ally. They work for each other and help one another, and Wrigley owes much of his political career to U.S. Senators Hoeven and Cramer.

586.    Hoeven and Cramer have been proactive in publicly disclaiming knowledge about

the Dunseith Site since when Plaintiffs' story became widely known. Yet their staffers interacted closely with State of ND officials once the Factory went to public control from Benchmark.

587.     Hoeven toured the Site, and he was requested to send defense electronics there.

588.     Law enforcement in North Dakota under Wrigley remained ignorant about, and indifferent to, Plaintiffs' reporting and the Factory, and Defendants just kept targeting Plaintiffs.

589.     A State of ND legislator had organized a meeting between Wrigley, the Plaintiffs, and three State of ND legislators for October 3, 2023. The purpose of that meeting was for Mr. Hoefer to report misconduct by the Defendants, as well as other matters concerning the Factory and its history. On October 2, 2023, Wrigley learned that Mr. Hoefer was to attend this meeting, which was set for the next morning, and he quickly directed his executive assistant to cancel it. After canceling it, Wrigley's executive assistant called one of the State of ND legislators, and, parroting what Wrigley had told her, said, "*Be careful*, he [Mr. Hoefer] might be a lunatic,"

590.     On information and belief, Wrigley bought himself into a false report about Mr. Hoefer by one or more Defendants, and he has chosen to believe the bad 'team government' guys at the expense of their victim.

591.     Wrigley was not the only top State of ND official to run away from Mr. Hoefer when Mr. Hoefer had information to report about the Defendants' mistreatment of the Plaintiffs.

592.     As another example, shown above, in January 2025, eighteen State of ND legislators sent a letter to Gov. Armstrong alerting him to Defendants' misconduct against Plaintiffs. Days earlier, Armstrong had bailed on a previously scheduled meeting and left the State of ND capital building because he feared that a State of ND legislator was bringing Mr. Hoefer to meet him. The Governor's attorney told this legislator that the Governor was persuaded after this attorney's meeting with several Defendants that there was no reason for the

Governor to pay any attention to Mr. Hoefer's grievances, and so he would not.

593.    Then, on March 20, 2025, *The Dakotan* published a video interview with Gov. Armstrong, where Armstrong surprisingly specifically addressed Mr. Hoefer before the North Dakota public, and the Governor said:

> When you [Mr. Hoefer] threaten to sue, or when you actually instigate a letter to sue, then we're [Armstrong and Mr. Hoefer] gonna talk to the lawyers. We're no longer talking to the Governor anymore about the issue. Um, with the-, like-, it-, that's the way it works. So I think moving forward on that project [Hoefer Group], my answer is, uh, the businessman [Mr. Hoefer] has now, um, insti-, at least initiated the process of initiating a lawsuit. And, that's where we're at looking forward on that.

594.    Mr. Hoefer was hopeful to meet with Armstrong in January 2025 because former Governor Ed Schafer had told Mr. Hoefer that he expected Armstrong to engage in the situation.

595.    Although Mr. Hoefer had not threatened any claim against the State of ND – and Mr. Hoefer had even recently notified the State of ND in writing that he had no such intention to ever file suit against the state – Gov. Armstrong was possibly trying to appear clever in public, to justify wading himself away from Mr. Hoefer without having to answer questions about it.

596.    The Defendants have misled many State of ND officials about what Mr. Hoefer has said and done, including falsely asserting multiple times to third parties that Mr. Hoefer had already threatened to sue the State of ND; on information and belief, one or more of them misled the Governor on this.

597.    Because of top level State of ND officials' ignorance, Defendants continued to behave as though they would never be held accountable for their actions. Defendants kept up and kept increasing their own self-serving hostilities and aggressive tactics against the Plaintiffs in violation of the Plaintiffs' rights, and others in 'team government' turned a blind eye, creating the

need for this federal action.

598.    Former Governor Schafer, known as a reputable statesman and great State of ND mediator who fixed major issues at UND within the past decade, has privately lamented to a reporter who is influential in-state and who was looking into the Plaintiffs' claims, "It's all true. I just don't know what to do about it." Schafer was referencing Mr. Hoefer's claims about the Factory evidence and the way Defendants have harmed the Plaintiffs.

### (4) – ADDITIONAL FACTS AS TO THE WAYS DEFENDANTS DEPRIVED PLAINTIFFS OF THEIR FEDERAL RIGHTS:

599.    To conceal their and their cronies' misconduct, to silence the Plaintiffs, and to enact a malicious and humiliating retaliation against the Plaintiffs' livelihood for Plaintiffs' truthful reporting to federal authorities, the Defendants flexed all of their 'great State of ND muscles' against the Plaintiffs in order deprive the Plaintiffs' federal rights.

600.    Each Defendant acted in conspiracy and coordinated his actions with the other.

601.    The Defendants worked together to target the Plaintiffs, first as Defendants' forcible servants under threat to accomplish a cleanup of the Factory-related mess, then later for financial and professional ruin and other harm once Mr. Hoefer learned the full story, seeking to silence Mr. Hoefer and to achieve other self-serving ends which deprived Plaintiffs' rights.

602.    Some of the many shocking ways each Defendant, acting under color of state law, has deprived the Plaintiffs' federal rights and harmed the Plaintiffs are shown above.

603.    Shown below, in close chronological order, are yet more examples.

### (4)(i) – DEFENDANTS SET UP ATYPICAL STATE OF ND INCENTIVES FOR PLAINTIFFS AS THEY EXPECTED PLAINTIFFS TO LEAVE THE SITE:

604.    Shown above, Defendants give for themselves and their cronies and State Insiders much sweeter deals than unconnected individuals or entities might enjoy, with longer NDDF

finance terms, lower interest rates, and more ND Commerce largesse from its various programs.

605.    However, the reason Defendants withheld these sweeter incentives from Mr. Hoefer and have treated Plaintiffs differently was not because they wanted to keep more 'bounty' for themselves or even because they doubted the Plaintiffs' business plans or capabilities.

606.    In fact, Defendants had caused the State of ND and ND Commerce to promote the Plaintiffs' RV business as a major State of ND project and a major State of ND achievement.

607.    The Defendants treated Mr. Hoefer and Hoefer Group atypically, and caused the State of ND to take out a multi-million dollar life insurance policy on Mr. Hoefer, because they did not expect the Plaintiffs *could* remain long at the Factory, and they thought Mr. Hoefer might even be killed because of their sending him there.

608.    For the Defendants this could work well in two ways:

  i.    By promoting the Plaintiffs across North Dakota as a major ND Commerce project, the Defendants could score a win for themselves and their careers if somehow Plaintiffs managed to succeed there, and, in the alternative, Defendants could pinpoint the microscope of an early unplanned exit from the Factory by Plaintiffs as an example of an 'outsider failure,' so as to distract the public from their own incredibly nefarious State of ND money-getting schemes.

  ii.    As shown above and herein, Defendants were using Mr. Hoefer as their own personal 'laundry service' to heap upon Plaintiffs the federal liabilities from their own misdeeds, and because they had successfully deceived Mr. Hoefer as to the types of incentives that *could or should* have been available to him from the State of ND, they would keep for themselves more of the 'bounty'

regardless of what happened to Mr. Hoefer as a result of their scheme against him.

iii.   On information and belief, the Defendants required the $2.25 million State of ND life insurance policy on Mr. Hoefer so that, *if* Mr. Hoefer *was killed*, then the 'bounty' could be returned to the State of ND for more State Insider deals. The Defendants' many brazen acts to deprive the Plaintiffs' rights and harm Mr. Hoefer suggest such a motive is not beneath them.

## (4)(ii) – LEHMAN DUMPED HIS COMRADE IN CRIME TUTTLE UPON PLAINTIFFS:

609.   Lehman caused and pushed Hoefer Group to hire Tuttle, as:

i.   Lehman surrounded Plaintiffs with Tuttle's former lenders who then strongly recommended Plaintiffs to hire Tuttle.

ii.   When Mr. Hoefer sought Lehman's guidance on hiring Tuttle, Lehman offered no caution or warning and said it should be fine.

iii.   Lehman had by this time built up trust with Mr. Hoefer so as to deceive Mr. Hoefer about the Factory, its history, and Tuttle.

610.   Lehman *knew* Tuttle was a serious liability to the Plaintiffs' success, and that the Plaintiffs working with Tuttle could increase risks of physical danger for Mr. Hoefer.

611.   Lehman and Tuttle had been involved in promoting illicit activities together.

612.   Lehman was part of a State of ND team of officials who, along with federal officials, abruptly cut off all public-facing work with Tuttle in 2019, and then some officials took the things they were doing with Tuttle and the rewards they were reaping 'underground.'

613.   Lehman *knew* the municipality had hired Tuttle to represent the Factory so as to sell the Factory to the Plaintiffs.

614.    Lehman *knew* that Tuttle had falsified to Mr. Hoefer the history of what went on, and what was still going on at the Factory, and as shown above Lehman played his own part to further that.

615.    When Lehman caused Plaintiffs to hire Tuttle, Tuttle was secretly accessing the Dunseith Site for GG1320 work with the municipality's and other officials' knowledge.

616.    On information and belief, Lehman and one or more other Defendants *knew* what Tuttle was up to as to that, because Tuttle had been providing updates to ND Commerce about it.

617.    Tuttle and his comrades were scuttling about the Dunseith Site and hiding from the Plaintiffs the equivalent of a trailer load of serious detritus from Benchmark's former operations and later activities, including dedicated U.S. guided missile electronics circuitry assemblies and apparent nuclear electronics records and records of illicit schemes Tuttle had run with public officials and with Lehman.

618.    During the Plaintiffs' viewings of the Dunseith Site in 2021, the property held the remnants or signs of a garden variety of failed local projects, including a metal cutting art operation, a flooring solutions project, a plumbing parts assembly operation, a commercial vehicle armor upfitter's documents, writings of plans to grow or process cannabis onsite, and the Site was then used for local community storage for the local housing authority, the volunteer fire department's city ambulance, and the hardware store.

619.    Prior to the Plaintiffs purchasing the Dunseith Site, Tuttle, Lehman and others made sure that nothing was observable to the Plaintiffs there that would uncover their secretive aviation and federal government fraud schemes. After its purchase, their hiding efforts continued.

620.    Within the first weeks of Hoefer Group's Dunseith Site operations, which began in April 2022 and after Tuttle began Hoefer Group employment, Lehman's comrade Tuttle started

to cause trouble.

621.    Within a few months Plaintiffs realized that Tuttle had been working as a saboteur to disable the Hoefer Group operation and get Mr. Hoefer out of the Factory so as to keep up the illicit federal schemes, but with the work occurring under the Plaintiffs' name and liability instead of heaping up those liabilities upon public officials. Plaintiffs discovered that:

     i.   Tuttle had been stealing from Hoefer Group, and he discarded employment resumes, sabotaged and caused great expense to the Dunseith Site's security system so he or others could access the Factory undetected by Plaintiffs, facilitated serious property disruptions and access blockades to a primary loading dock to cripple renovation work, chased away potential workforce, deliberately failed in meeting company deliverables, and more.

    ii.   Tuttle had paid himself and his family members, at least one who was also on Hoefer Group's payroll, for ongoing Honeywell GG1320 Gyro work with Benchmark.

   iii.   Tuttle made false writings and false statements to others claiming that the legally dissolved TMC/Chiptronics had control and/or authorized use of the Dunseith Site.

   iv.   Tuttle operated at least one bank account nominally belonging to "Chiptronics, Inc." and on the aerospace and defense check payments he issued he fraudulently claimed the Plaintiffs' Factory address as Chiptronics' business location for his illicit work.

    v.   Tuttle stole mail from Hoefer Group, and Tuttle worked with the U.S. Post Office and parcel couriers with whom he had a longstanding local relationship

to secretly divert and receive his aerospace and defense electronics parcels about the small town of Dunseith.

vi. Tuttle was protected by authorities so he could continue his schemes even after the Plaintiffs began reporting the scheme and after State of ND and federal law enforcement agents stationed in North Dakota knew that Mr. Hoefer could prove Tuttle was doing this.

## (4)(iii) – LEHMAN CONCEALED FACTS ABOUT THE BLOODY FACTORY ROOM AND CAUSED PLAINTIFFS TO DESTROY PART OF THE FACTORY CRIME SCENE:

622.    Within weeks of factory purchase, Mr. Hoefer was alerted by an employee to an unsettling discovery: a large, concealed blood stain on a Factory room floor (discussed above).

623.    The room had been piled high with boxes and trash, and Hoefer Group employees were clearing it out to remodel it.

624.    Lehman portrayed this shocking find as nothing to worry about – something the Plaintiffs later learned was a dodge.

625.    When Mr. Hoefer saw the large, dried pool of blood – about 4 foot in diameter – Mr. Hoefer exclaimed, "Did somebody gut a deer?" It was the first thought that came to his mind because of how rotted, deteriorated, and junked the Factory was, and because Tuttle had previously given Mr. Hoefer a tearful and wildly false story of Tuttle's having "went into depression" after being "unable to save jobs" at the Factory, which Tuttle said was what began the Site's deterioration and its conversion to general community use.

626.    Lehman then told Mr. Hoefer that the previous factory tenant's shareholders were "grant-hunting shysters" and a "fly-by-night operation" just looking for State of ND money.

627.    Lehman echoed a statement by Tuttle, and Lehman misused Mr. Hoefer's trust in him, to cause Mr. Hoefer to believe that this very blood-stained room was the result of a serious,

126

but harmless fight between those shareholders – messy, but not sinister.

628.    Lehman asserted knowledge of the property's history, and he caused the Plaintiffs to renovate and remodel the blood-stained room and destroy a crime scene.

629.    Lehman thus deceptively caused Mr. Hoefer to sanitize, renovate, and remodel the blood-stained part of the Factory crime scene, which a forensic DNA crime-scene investigation could have revealed what happened there.

630.    Had that room been preserved in the condition Plaintiffs found it, this would have caused law enforcement authorities to need to take all the Plaintiffs' reporting seriously, whether those authorities who were stationed inside North Dakota were wanting to do so or not.

631.    Later, as Mr. Hoefer realized this room was part of stranger events from 2019 which indicate a past cover-up effort then, he tried unsuccessfully to locate one of the previous Factory tenant's shareholders, whose deeply personal possessions were hidden at the Factory.

632.    Lehman concealed from Mr. Hoefer the likely cause of this violent scene, which Lehman knew about – the federal crimes Mr. Hoefer would later uncover and report.

633.    Lehman concealed critical facts from Mr. Hoefer, including that Lehman and other State of ND and federal officials had facilitated, and then abruptly ditched their sponsorship and facilitation and oversight of, illicit work that was occurring at the Site in 2019.

634.    Lehman knowingly put Mr. Hoefer in grave physical danger.

### (4)(iv) – AFTER PLAINTIFFS DISCOVERED THE SCHEME, FACTORY EVIDENCE SEEMINGLY POURED OUT OF THE WALLS:

635.    Defendants' concealment of GG1320 and other federal fraud began to unravel in August 2022, when the Plaintiffs discovered that Tuttle was paying himself and another Hoefer Group employee on Hoefer Group time from a "Chiptronics, Inc." bank account using the Dunseith Site as its address.

636.    A subject matter expert identified that notations on the check records found at the Factory indicated Gyro work and Tuttle was barred from the Site.

637.    Then a trove of criminal evidence of illicit schemes and activities the Plaintiffs had begun to report to authorities as witnesses and victims seemingly poured out of the Factory walls in the days, weeks, and months that followed during Factory renovations.

638.    This was evidence the Defendants had intended for Plaintiffs to throw away unknowingly as junk and trash, or to not be around long enough at the Site to even find it.

639.    Some of what Tuttle and his comrades kept hidden at the Dunseith Site was shocking and head-scratching as to its mere presence.

640.    As one example, Plaintiffs discovered Power Conditioning Unit circuitry assemblies and extensive related technical data including CD-Rs (with apparent related work records following TMC's legal dissolution) for Lockheed's Guided Multiple Launch Rocket System ("GMLRS") – a top missile for the U.S. military by procured dollar value. Those parts were critical technology for U.S. military missile guidance.

641.    These sensitive federally-regulated materials and other federal criminal evidence – all unwanted detritus that had been unlawfully and fraudulently concealed on the Dunseith Site during the Site's transfer to the Plaintiffs – were well-hidden throughout the site, shoved deep inside closets, stuffed in cabinets with furniture placed and piled up in front of them, and buried among factory junk hidden within the maintenance rooms. Tuttle had even stashed records in plastic Walmart bags and hidden them, and some of his records were in a box next to feminine hygiene products on the top shelf of a maintenance storage closet.

### (4)(v) – TEIGEN, AKASON, LEHMAN AND GARMAN BEGAN TO ACTIVELY MISLEAD AND CONTROL PLAINTIFFS AFTER FACTORY DISCOVERIES:

642.    Shown above, beginning in August 2022, Teigen and Akason, assisted in their

conspiracy and acts by Garman and Lehman, began to control and direct Plaintiffs' reporting efforts.

643.    Teigen and Akason initially said things to Mr. Hoefer to make him feel safe.

644.    But Mr. Hoefer also was left to feel that he *must* do what they say or face possible serious harm, including financial and reputational harm and abusive legal consequences.

645.    Teigen promised Mr. Hoefer the "full support of the State of ND to the end" of Plaintiffs' reporting and Factory cleanup.

646.    Akason told Mr. Hoefer, "You should trust me, because I was a lawyer before I joined ND Commerce and I can help you through this."

647.    Mr. Hoefer told Teigen, Akason, and Lehman that Mr. Hoefer worried there might have been past State of ND activities tied to some of the Factory mess, based on a few hints in some Site records as to that possibility.

648.    These Defendants said they would manage any of the State of ND's 'political repercussions' from the Factory discoveries and that Mr. Hoefer need not worry about that.

649.    Teigen and Akason sent Mr. Hoefer to ND BCI's special agent Zachmeier (he is described above during Mr. Hoefer's frightening encounters with HSI special agent Breijo).

650.    In mid-August 2022, Zachmeier took from the Site a file containing 10 or more pages of apparent sensitive nuclear industry electronics-related logistics information, and:

     i.    Zachmeier told the Plaintiffs he was taking this file to the Minot, North Dakota FBI office for further instructions.

     ii.    Weeks later, in Mr. Hoefer's presence, Zachmeier denied to Air Force OSI's Brown and to HSI's Breijo on September 16, 2022, that he ever removed such a file from the Site.

iii. Plaintiffs do not know what Zachmeier has done with that file.

651.    Teigen and Akason told Mr. Hoefer in August 2022 that they would coordinate and pass along Mr. Hoefer's criminal reports to the State of ND's Attorney General on Mr. Hoefer's behalf.

652.    Instead, all Defendants have conspired together and have repeatedly taken actions to mislead the Attorney General's office and to mislead many State of ND agencies and to mislead many public officials and others about the Plaintiffs, about Mr. Hoefer's reporting to federal authorities, and about his RV business and finances.

653.    All Defendants misused public trust in their State of ND positions and misused their unique State of ND access to other public officials and public authorities to run active interference between Plaintiffs and those other officials who might provide relief to Plaintiffs. This has had a chilling effect on Plaintiffs' speech and deprived many other rights.

654.    This caused harm to Mr. Hoefer and delayed relief to the Plaintiffs and poisoned the Plaintiffs' opportunity to obtain an audience with the Attorney General – all of which the Defendants did to further their self-interests so as to conceal what was really going on, and for other self-serving reasons that helped Defendants and deprived Plaintiffs' rights, and later, even to try and get Mr. Hoefer incriminated, and them not.

### (4)(vi) – LEHMAN MISLED CRIMINAL AGENTS AND MADE FALSE REPORTS TO CAUSE A COVER-UP EFFORT AGAINST THE PLAINTIFFS:

655.    On September 16, 2022, Lehman spoke with HSI's Breijo, OSI's Brown, and ND BCI's Zachmeier in Mr. Hoefer's presence and Lehman confirmed part of the Honeywell GG1320 Factory scheme, which shocked Mr. Hoefer and seemed to shock the agents.

656.    But Lehman withheld many key facts and misreported what he did disclose, so as to downplay all that had happened at the Site under Lehman's facilitation, but neither Mr. Hoefer

nor the criminal agents could have known that then that Lehman was not truthful, as:

      i.    Lehman falsely claimed to Zachmeier, Brown, and Breijo that there was never any defense work to Lehman's knowledge which occurred at the Site after 2015, even though Lehman had actually helped to facilitate and sponsor such work for the State of ND.

      ii.    Lehman falsely claimed that the GG1320 project was "commercial" to his knowledge, and Lehman said he didn't know anything about it except that the Factory "reworked cans for Benchmark" – 'cans' are an industry reference to GG1320s.

      iii.    Lehman falsely claimed that he held no further knowledge of any potential aerospace or defense work that might have occurred at the Factory, when in fact Lehman was concealing knowledge that ND Commerce, which employed him, held extensive records as to that, and that many of those records had Lehman's name in them.

657.    Then Lehman quickly informed Garman about Lehman's reporting to these agents.

658.    Garman began immediately organizing weekly meetings with most Defendants and with Garman's other subordinates to instruct them in deceiving, oppressing, controlling, and coercing Mr. Hoefer.

659.    Garman directed his subordinates to conceal facts of the Factory and evidence from Plaintiffs – which were essential to compelling faster federal relief for Plaintiffs – and to gaslight Mr. Hoefer and Mr. Hoefer's family and deliberately downplay the risks and dangers to what Mr. Hoefer and his family were going through. For example:

      i.    Lehman kept insisting to Mr. Hoefer that Lehman knew nothing beyond what

Lehman reported to the agents about the Factory and its recent years of history. That was false.

ii. Garman and his team kept telling Mr. Hoefer and his family that these were "local issues" and, "Every small town has them!"

660.   In August 2023, Garman confessed to Mr. Hoefer that he had done these things, and that Garman was authorizing Tooke's activities which furthered the Defendants' schemes.

## (4)(vii) – NORTH DAKOTA-BASED CRIMINAL LAW ENFORCEMENT AGENTS FRIGHTENED MR. HOEFER BECAUSE OF FALSE STATEMENTS BY LEHMAN:

661.   OSI's Brown initially instructed Mr. Hoefer that Plaintiffs would need to hand over the Dunseith Site to the Air Force temporarily. Brown told Mr. Hoefer that before end of that day (September 16, 2022), Air Force was going to take control of all keys to the Factory, and that Air Force would give the Factory back to the Plaintiffs once Air Force 'scrubbed' the Site, which Brown said would take up to a week.

662.   ND BCI's Zachmeier witnessed Brown instructing Mr. Hoefer to turn over all Site keys to Brown and to Air Force custody. An audio recording exists of Zachmeier confirming to Mr. Hoefer that this event occurred.

663.   Brown told Mr. Hoefer and Zachmeier that the Dunseith Site *was supposed* to have been closed and 'scrubbed' of all of its federal defense electronics activities in 2015, and that it was clear to him (Brown) from what he saw that day that such had not happened.

664.   To Mr. Hoefer, Brown appeared upset on September 16, 2022, first when Brown saw some of the Site's evidence, and then Brown appeared even more upset after Brown spoke with his Minot Air Force Base superiors by phone in calls which lasted more than an hour.

665.   Zachmeier later told Mr. Hoefer that Brown's Air Force calls went 'up the chain' as Brown discussed with Air Force superiors what to do about the federal Site violations.

132

666.     Brown then said that his Air Force "bosses want one more guy with eyes on" to see what was at the Site, and then the Air Force sent HSI's Breijo to the Site that day.

667.     At that time, HSI's Breijo was working full-time for Homeland Security, part-time for Air Force, and also serving on an ND BCI drug task force. Breijo was then a 'linking agent' who liaises with ND BCI and federal law enforcement agencies (but at present, he is incarcerated for a sensational homicide as to which he recently agreed to plead guilty).

668.     Oddly, after Brown made his initial grave concerns about Site's evidence clearly known to Mr. Hoefer and to Zachmeier that day, Brown later seemed to have no problem lying to other federal agents and also to allowing Breijo to tamper with Mr. Hoefer.

669.     After Breijo and Brown visited the Site, high level Minot Air Force Base officials held regular internal discussions at the Base about the unresolved Dunseith Site situation, and the Base refused to take responsibility for the Site cleanup, as the FBI later told the Plaintiffs.

670.     When Zachmeier visited the Site with Breijo and Brown he collected a large red bin of documents from the Site. Zachmeier gave this evidence to IRS CI, and Zachmeier left Mr. Hoefer with a North Dakota Attorney General's office receipt for all of the evidence he gave to IRS CI, which Zachmeier labeled as "Multiple financial documents Chiptronics, William Tuttle, Benchmark, Pemstar." Many of those documents represented illicit aerospace and defense work at the Site after 2015 and also related to Honeywell Ring Laser Gyros.

671.     Then Zachmeier began warning multiple local law enforcement officers to stay away from the Plaintiffs and the Site.

672.     Zachmeier told a group of law enforcement officers who pressed him for more information about Mr. Hoefer's reporting and the Site, "My boss told me to stop looking into it. It's a career killer. Stay away."

673.    Zachmeier laughed at Mr. Hoefer's being afraid after Mr. Hoefer reported stalking incidents and threats. Zachmeier called Mr. Hoefer "crazy" to some law enforcement officers.

674.    The false information Lehman gave HSI's Breijo as a misdirect – Lehman told the agents that more recent prior Site work was NOT defense-related when they asked him that, but he had personal knowledge that it actually was defense-related – led Breijo to then email Mr. Hoefer to suggest that Mr. Hoefer should just destroy all of the illicit items himself "to prevent any further issues" after Mr. Hoefer reported that a break-in alarm went off at the Factory and after local officers told Mr. Hoefer that those officers' jobs were being threatened should they help the Plaintiffs.

675.    When Brejio emailed Mr. Hoefer on September 18, 2022, Breijo copied agents Brown and Zachmeier, and he wrote to Mr. Hoefer:

> My boss has said it is your property and you are in you right to destroy it. That seems best to prevent any further issues.

676.    Just two days earlier, Breijo had viewed electronics missile circuitry parts at the Site and told Mr. Hoefer that the presence of those parts was a federal violation.

677.    And just days after his email to Mr. Hoefer above, in a phone conversation, Breijo yelled at Mr. Hoefer: "My boss says to destroy – that's an order!" Then Breijo calmed himself down, and he reassured Mr. Hoefer that Breijo and Zachmeier were doing their best, that there wasn't much else Breijo could do unless Mr. Hoefer found "shipping logs, like from UPS" that would serve to validate the Site evidence and trigger a "full federal investigation."

678.    Shortly after, Mr. Hoefer did find printouts of UPS shipment logs among the records at the Factory that related to the Honeywell Ring Laser Gyro scheme and to other aerospace and defense electronics transactions – which all appeared to be illicit. Upon learning this, Breijo became aggressive and threatening to Mr. Hoefer. He instilled terror in Mr. Hoefer.

679.    Shown above, Defendants Teigen, Akason, Garman, and Lehman then conspired together and acted to quickly disable the Plaintiffs' business and cut off its funds to try to chase the Plaintiffs from North Dakota. But Mr. Hoefer's continued reporting put a stop to it when high-level federal investigators from Washington D.C. stepped in and directed the Plaintiffs.

680.    On information and belief, discovery will reveal that one or more Defendants had found illicit means with which to monitor Plaintiffs communications, and they knew from that monitoring that Mr. Hoefer made contact with federal investigators in the nation's capital.

681.    Defendants contacted Mr. Hoefer through Tooke less than a day after Mr. Hoefer spoke with a federal D.C. investigator, at which time she seemingly apologized on their behalf.

682.    This then began in earnest the Defendants' concealment, control, forced labor, extortion, and revenge strategy that the Defendants implemented against the Plaintiffs, where the Defendants weaponized NDDF as shown above, and where the Defendants misused other State of ND agencies and resources in the manners described herein and in other ways to be proven at trial so as to further their own self-interests while depriving the Plaintiffs' rights.

683.    If Defendants had not kept information concealed from Plaintiffs and from federal authorities responding to the Plaintiffs' reports, and if Defendants had not taken steps to further and to maintain their concealment with the Plaintiffs and their misdirection of law enforcement as shown herein, other people such as agents Breijo, Brown, and Zachmeier would not have been able to mislead other authorities about the Factory, about Plaintiffs, or about the federal evidence.

### (4)(viii) – DEFENDANTS CAUSED IRREPARABLE HARM TO PLAINTIFFS LONG BEFORE CONCOCTING THEIR FALSE PUBLIC ACCUSATIONS:

684.    Besides putting Mr. Hoefer and his family in danger, and besides heaping upon Mr. Hoefer and his business the cleanup burdens and potential federal liabilities of Defendants' and their cronies' misdeeds, the active control Teigen, Akason, Garman, and Lehman assumed over

Mr. Hoefer and his business began to quickly cause other irreparable harm.

685.    Mr. Hoefer was restricted by these Defendants through their agent Tooke from articulating to third parties the causes of delay to his business, such that he lost credibility with:

      i.   National partners for a major affordable housing venture under Hoefer Group which had been planned to progress alongside the RV business;

      ii.  National RV media and some RV partners;

      iii.  Local and provincial Canadian officials in Manitoba who were setting up an important business to complement Hoefer Group's Dunseith operations to relocate an overseas operation that partnered with Hoefer Group.

686.    Later, all Defendants attacked Mr. Hoefer publicly to wreck these projects again, just as Mr. Hoefer was working to rebuild credibility with these partners.

687.    Mr. Hoefer and his family did not know what to do about Teigen's, Akason's, Garman's, and Lehman's highly secretive way in which they made the Hoefer family live.

688.    From September 2022 onwards, Mr. Hoefer and his family were frequently terrified by occurrences of new threats, stalking incidents, and electronics disruptions.

689.    On information and belief, discovery will reveal that some Defendants had a hand in some of these events, including in violation of 18 U.S.C. § 1030.

690.    Mr. Hoefer's family wondered whether Tooke was really helping them, or was some sort of 'double-agent' for these Defendants, but these Defendants kept Mr. Hoefer so isolated from third parties, and feeling legally threatened and oppressed, and under constant reassurance that following instructions and performing the forced labor and tasks Defendants desired of Plaintiffs would see Plaintiffs 'sort-of' financially reimbursed (as they still would need to repay the 'reimbursements' which Defendants through Tooke offered as additional loans) that

he felt left with no choice but to follow Tooke's direction and orders to avoid livelihood retaliation, legal process abuse, and other serious harms whose avoidance motivated compliance.

691.    This treatment made Mr. Hoefer and his family feel that they were trapped, and caused them to routinely question their own reality, until some new adverse event would remind them that the nightmare was real.

692.    These Defendants controlled the Plaintiffs' business and Mr. Hoefer's life and actions for Defendants' own self-interests, and they deprived Plaintiffs' rights.

693.    As time progressed, Defendants exposed Mr. Hoefer and his family to increased threats of harm, which safety risks Tooke confirmed as their agent as shown above.

### (4)(ix) – DEFENDANTS MADE PLAINTIFFS HIRE A CONFLICTED DC ATTORNEY:

694.    Tooke as Teigen's, Garman's, Akason's, and Lehman's agent, directed Mr. Hoefer to hire Washington D.C. attorney John G. ("Jack") Horan to prepare a federal report for Hoefer Group. Tooke gave this instruction to Mr. Hoefer as a condition of the Defendants reinstating the Plaintiffs' livelihood, and Tooke did not permit Mr. Hoefer to consider other counsel.

695.    Horan then spent weeks in late 2022 trying to convince Mr. Hoefer to destroy the Factory federal evidence with "minimal criminal liability," where Mr. Hoefer would "probably" later be indicted by federal authorities, but would "probably" avoid federal prison.

696.    Horan kept suggesting Mr. Hoefer give the U.S. Government, *in writing*, notice of what was at the Factory and of its planned destruction with too short of a window of time upon which federal authorities would realistically be expected to react, *and then destroy the evidence*.

697.    After Horan realized Mr. Hoefer *would not* destroy federal evidence, Horan told Mr. Hoefer that Horan also worked for Honeywell and that Honeywell's senior executives were "mad" at Mr. Hoefer. Horan said that he had been speaking with Honeywell, and that Honeywell

"will never admit" what Mr. Hoefer found because it faced monumental potential liability for it.

698.    Horan said that, initially, he was trying to get Honeywell into the Factory to "scrub" it.

699.    Horan then told Mr. Hoefer that the Plaintiffs had discovered the "worst aerospace fraud" Horan had ever seen, and "80% of Western aviation should be on the ground" based upon the evidence.

700.    Horan refunded two months of legal fees and abruptly withdrew as Plaintiffs' legal counsel, citing his conflict of interest, leaving Mr. Hoefer again stranded with the federal Factory evidence in December 2022. Plaintiffs sought and eventually found other counsel.

701.    One of Horan's final warnings to Mr. Hoefer was, "You *cannot* destroy the evidence" without violating federal law.

702.    Horan warned there could be criminal consequences for Mr. Hoefer should he destroy this evidence and not continue to report it to federal authorities, and Horan warned Mr. Hoefer that he might be targeted by others because of the significance of the evidence.

703.    As the Defendants named above directed Hoefer Group *to hire Horan without leaving open the possibility of hiring other counsel*, the subsequent business expense overruns due to delays in relief from Factory federal encumbrances caused by Horan's actions, and the harm to Plaintiffs by Horan's actions are proximate causes of these Defendants' acts to deprive Plaintiffs of property and liberty.

### (4)(x) – HORAN'S ACTS SENT DEFENDANTS SCRAMBLING TO GET PLAINTIFFS TO SIGN A 'GAG-ORDER':

704.    After Horan withdrew as legal counsel, Akason and Lehman – on information and belief they were assisted by Garman and Teigen as to this – conspired together and pressured Mr. Hoefer to sign a State of ND 'gag-order' or 'hush' agreement encompassing all State of ND

entities, which was disguised as a nondisclosure agreement as described above.

705.    Mr. Hoefer is a product technology expert who routinely signs nondisclosure agreements with global suppliers, mostly to protect his own technology.

706.    Mr. Hoefer recognized that the Defendants' document was a trap, and he let them know that it was completely flawed, but still Akason and Lehman threatened that Mr. Hoefer's failure to sign would slow down the relief Defendants could offer to Plaintiffs, and they did not provide their own official help as they had promised, and instead kept sending Tooke.

707.    These Defendants wanted Mr. Hoefer to be restricted from speaking with any third party or the media about the Defendants' treatment of the Plaintiffs, which their agreement would have permitted them to seek to accomplish through legal enforcement and with the weight of the State of ND against Plaintiffs.

708.    That 'gag-order' agreement was a legal threat, and it scared Mr. Hoefer.

### (4)(xi) – MR. HOEFER TRIED TO INFORM AND GO PUBLIC THROUGH NATIONAL MEDIA, BUT TOOKE THREATENED HIM TO STOP IT:

709.    Shown above, Defendants Teigen, Akason, Garman, and Lehman through their agent Tooke coerced, threatened, extorted, oppressed, and controlled Mr. Hoefer to prevent him from reporting to or informing the media about federal violations and the Factory mess.

710.    Mr. Hoefer struggled with these Defendants' instruction *not* to inform the media because of the increased targeting and financial difficulties he faced, and because of all the stress and safety risks his family was enduring.

711.    Mr. Hoefer held background discussions with a major national media outlet, who planned to break a national story about the federal evidence and crimes surrounding the Factory.

712.    Then Tooke, as these Defendants' agent, refused to allow the media team to visit the Factory in March 2023 and view federal evidence and federal violations.

713.    Tooke made clear that Mr. Hoefer should not explain to the media outlet the real reason *why* he was refusing this media outlet's visit – which reason was Defendants' desire to keep a lid on the story and to suppress Mr. Hoefer's speech rights.

714.    This refusal angered the media outlet and Mr. Hoefer lost credibility with them.

715.    Tooke said, "If you do [use media to report federal violations and compel federal relief], Teigen or Akason will freeze your [State of ND] loans and probably chase you out of North Dakota [including with legal processes]. But don't worry, because we'll [Defendants] take care of you [by reimbursing Plaintiffs' extra unwanted business expenses with a new unwanted State of ND loan] if you do what I say [as these Defendants' agent]."

### (4)(xii) – TOOKE, THE FEDERAL AGENTS, AND DEFENDANTS' CONCEALMENT:

716.    After Horan withdrew legal counsel, Tooke told Mr. Hoefer, "We [her bosses, the Defendants, and, on information and belief, Lehman] should have done more to help you."

717.    Then Tooke called Akason, after which she began to participate in federal law enforcement meetings as an agent of Teigen, Garman, and Akason (and on information and belief, also an agent of Lehman).

718.    But these Defendants sent Tooke primarily to protect their own self-interests and instructed Tooke to keep Defendants' self-interests first and Plaintiffs' rights last.

719.    Defendants, and their agent Tooke, concealed from Plaintiffs and from federal criminal law enforcement investigators the Defendants' knowledge of the Factory mess and the evidence, including of State of ND officials' at least past ties to what remained an active GG1320 Gyro fraud scheme.

720.    This active concealment by these Defendants left federal investigators guessing as to certain facts, events, and the scope of the federal violations the Plaintiffs were reporting, and

caused some Factory evidence records pertaining to the active GG1320 Gyro scheme to be more difficult to understand in terms of their nature and relevance. For example:

    i.   Factory evidence indicated direct GG1320 Gyro fraud affected at least $20 million-$100 million in unit sales.

    ii.   The Defendants concealed records which corroborated and expanded the Factory evidence, revealing (a) direct GG1320 Gyro fraud was at least $300 million-$600 million, (b) other illicit U.S. defense and aerospace activities and other federal crimes had occurred at the Factory, (c) State of ND officials and others who directly or indirectly facilitated these illicit Factory happenings had known about, but had ignored, important federal regulations governing those happenings, and (d) there was unmitigated risk to public safety, among other serious federal violations.

721.    Defendants were concealing from the Plaintiffs and from federal authorities the full scope then *known to them* of the potential federal liabilities facing the Plaintiffs from Defendants' and their cronies' misdeeds. And this exacerbated Defendants' deprivation of use of Plaintiffs' encumbered property and the burdens they placed on Plaintiffs' liberty.

## (4)(xiii) – DEFENDANTS MANIPULATED ND COMMERCE PUBLIC RECORDS TO CONCEAL THEIR FACTORY INVOLVEMENT:

722.    By March 2023, Mr. Hoefer began to suspect Lehman had a bigger-than-disclosed role in the GG1320 Gyro scheme, and Mr. Hoefer planned to make a State of ND records request.

723.    "Don't do that," Tooke instructed Mr. Hoefer as to his records request plan.

724.    Tooke, acting as an agent of Teigen, Garman, and Akason (and, on information and belief, Lehman) added that Mr. Hoefer and his business would face livelihood penalties (and legal processes) for *not* complying with her instructions. Tooke also said she had another way to

show Mr. Hoefer the State of ND's records that would obviate the need for a request.

725.    Later in March 2023, Tooke, acting under these Defendants' instructions, brought a State of ND laptop which Tooke said contained a full digitized ND Commerce records archive dating back at least 10 years, and Tooke used the set of records on the laptop to demonstrate that no Factory-related records existed after 2015. But that was a deception. Records did exist.

726.    Acting for Teigen, Akason, and Garman (and on information and belief, Lehman), Tooke concealed that the State of ND possessed hundreds or thousands of pages of records instead of the 'no records' which she showed Mr. Hoefer on this computer.

### (4)(xiv) – DEFENDANTS MADE A MESS FOR FEDERAL AUTHORITIES:

727.    Some federal agencies were secretive in managing their response to the Plaintiffs' reporting. For example, in March 2023, the U.S. State Department's Directorate of Defense Trade Controls' three enforcement division chiefs were in contact with Plaintiffs' counsel. DDTC, which regulates U.S. defense and weapons exports and manufacturing, told Plaintiffs' counsel:

> i.    The division chiefs wanted to keep the Plaintiffs' reporting "close hold."
>
> ii.    The division chiefs had assigned a "triage team" to work the case.
>
> iii.    Plaintiffs should preserve the evidence at the Factory.
>
> iv.    One division chief called this the "craziest thing I've seen in five years."

728.    But then DDTC refused to be proactive in collecting the evidence, leaving the Plaintiffs in limbo and causing them to seek help from other U.S. agencies for Site cleanup.

729.    The Defendants had created such a large mess, branching into so many risks for the United States ranging from public aviation safety to national defense issues, that even some senior federal investigators were apprehensive about what else might be lurking within the mess.

730.    For a long time, it seemed that federal officials and their federal agencies did not

want to touch the proverbial 'flaming bag of excrement' that some Defendants with help from others had 'lit' at the Factory before the Defendants ran away leaving the Plaintiffs with the mess.

731.    And the Factory-related mess was increasing. Tuttle and whoever else with whom he was still in cahoots had help from Benchmark's staff and/or others in the aerospace and defense industry and this group was transferring federally regulated aerospace and defense GG1320-related and other parts to and from Dunseith including via a local bar. This group was actively spoiling one of the world's most tightly regulated and sensitive electronics sensor supply chains. And all the while, this group harmed and framed the Plaintiffs through schemes and tricks which created a false, unauthorized paper trail against the Factory with their mess.

### (4)(xv) – IRS CI CRIMINAL AGENTS WERE DECEIVED BY FALSE REPORTS FROM NORTH DAKOTA-BASED LAW ENFORCEMENT AGENTS:

732.    In March 2023, IRS CI special agents Larson and Loughman told Mr. Hoefer and other Hoefer Group representatives and personnel that IRS CI was misled by in-state investigators from other agencies as to the true nature of the Factory evidence.

733.    Larson and Loughman were particularly incensed that ND BCI's Zachmeier – he was liaising with Akason as to Plaintiffs' reporting – and Minot Air Force Base-stationed OSI's Brown – shown above, Lehman misled Brown about Plaintiffs' reporting – had failed to tell IRS CI that there were missile parts and controlled federal materials and documentation then onsite, which Zachmeier and Brown had each viewed and then left sit there for nearly six months, while threats and stalking against Mr. Hoefer and hacking against the Plaintiffs increased.

734.    Zachmeier and Brown each had recommended that IRS CI visit the Site to collect all of the remaining federal evidence still sitting there, which Zachmeier and Brown had told them consisted of financial records which reflected prior occupants' misdeeds and reflected some sort of local financial embezzlement scheme which preceded Plaintiffs' presence there.

143

735.    IRS CI (especially Larson, who had a military background), was then shocked to learn that the Site still contained federally regulated aerospace and defense digital media, electronics defense parts, tooling, thousands of federally controlled records, and other materials.

736.    Oddly, Zachmeier and Brown had also told Loughman, falsely, that the Honeywell Ring Laser Gyro-related records and other U.S. defense and aerospace records were "fake" as to any Honeywell or other aerospace or defense work that might have occurred at the Site after 2015 as those records so clearly represented.

737.    When visiting the Site, Loughman told Mr. Hoefer – as Zachmeier stood nearby – that Zachmeier had described IRS CI's Site evidence as "fake" in relation anything that might pertain to Honeywell or other aerospace or defense work. Loughman and Larson then privately conferred, and returned with a tape recorder and sat Mr. Hoefer in a Factory conference room with Zachmeier and with Tooke present by conference call. Larson told Mr. Hoefer and Hoefer Group representatives to tell the IRS CI what was really going on and what was at the Site.

738.    An audio record exists of a conversation Zachmeier had with Mr. Hoefer just days before Loughman and Larson told Mr. Hoefer that Zachmeier and Brown had misled IRS CI, where Zachmeier recollected the Site's evidence in a different way.

739.    In speaking with Mr. Hoefer ahead of the IRS CI visit to the Factory:

   i.    Zachmeier called the lack of federal relief to Plaintiffs a result of "federal failures."

   ii.    Zachmeier said that the Honeywell Ring Laser Gyro records that he sent to IRS CI are real "Honeywell super-secret stuff" and relate to the GG1320.

   iii.    Zachmeier said he was aware that shipments continued in Dunseith and were using the Plaintiffs' Factory address.

iv. And after Mr. Hoefer told Zachmeier, "It looks to us like the [Minot Air Force] Base, our speculation is the Base may have had a close up responsibility [of the Factory] in 2015 that they goofed," Zachmeier replied: "I'd, yep, that's, you're probably right."

## (4)(xvi) – MINOT AIR FORCE BASE OFFICIALS HAVE BEEN EMBROILED IN OTHER HIGH-PROFILE SCANDALS:

740.   This would not be the first time scandals and violations have ensued from the Minot Air Force Base.

741.   Once, Base employees accidentally caused a B-52 pilot to fly an active nuclear warhead to Florida, and multiple Base officials were fired or reassigned.

742.   More recently multiple Base officials were fired or reassigned for improper protocols involving vehicle transport operations to or from the Base.

743.   The fact that nuclear electronics records along with other sensitive defense electronics weaponry parts and manufacturing data at the Factory were dropped into the care of North Dakota-based and State of ND public officials who then left that information to sit in an unsecured multi-tenant facility for many years with recurrent break-ins is also scandalous.

744.   That the Minot Air Force Base missed or contributed to such violations by lack of oversight or negligence is a serious failure, especially as the Factory is about a 90-minute drive from the Base.

745.   The U.S. Atomic Energy Act required a designated U.S. defense agency to certify closure of any facility involved in nuclear-related manufacturing, which includes electronics circuitry for nuclear applications. The Factory was one such site.

746.   This led Mr. Hoefer to speculate in conversation with ND BCI's Zachmeier, and for Zachmeier to concur, that the Minot Air Force Base was the U.S. Government's designated

entity which had failed to 'scrub' and failed to close the Factory in 2015 when Benchmark left.

747.    Zachmeier is now very angry with Mr. Hoefer, and Zachmeier has also told third parties that he is surprised Mr. Hoefer remains alive, because Zachmeier says Mr. Hoefer "pissed off so many people." Zachmeier has falsely and maliciously called Mr. Hoefer a "dirty crook."

### (4)(xvii) – BENCHMARK'S ATTORNEY 'SPILLED THE BEANS' ON SERIOUS FEDERAL FACTORY VIOLATIONS:

748.    In discussions concerning 2023 litigation between Hoefer Group and Benchmark concerning the Factory, after Benchmark's attorney learned more details of the evidence the Plaintiffs uncovered relating to the Dunseith Site aerospace scheme, the attorney sought to put distance between Benchmark and Tuttle. This attorney's new claims were no less alarming:

> Obviously if Benchmark *knew* that Tuttle was no longer, ha-, no longer had access to that [Factory] address they wouldn't be sending him things there! Obviously, Benchmark had that as the address for Chiptronics so that's the address it's sending to. And so, it's hard for us to understand how Benchmark is sort of *in league* with Tuttle, if, if as is obviously the case, it didn't, it didn't know that he moved on to a different address… There's no *need* from Benchmark's perspective for the work to be done at that location. It did not know it was being done at a different location, but there's no need for it to be done at that 100,000 square-foot industrial facility. And so that's where we really struggle with – *if we're in on this*, if Tuttle's our agent – why the heck didn't we know that he, he, he, he di- he no longer had access that address, and we-, and, and, um, you know, and, and for years we should have been sending it to a different address?

749.    Benchmark's attorney's nonsensical ramblings highlight the overt federal non-compliance involving the GG1320 program that had alarmed the Plaintiffs, especially:

i.    Loss of traceability in the supply chain for serialized aerospace components;

ii.   Failure to monitor work locations; and

iii.  Failure to determine where this work was actually being performed.

750.    All of this causes potential serious federal liabilities for parties involved in the

scheme as to False Statements and False Claims involving GG1320 and other federal contracts.

751.     These illicit practices may cause flight safety risks as the GG1320 parts *were* sent to Dunseith and *were* worked upon in unknown work locations and questionable manufacturing conditions both before and after Hoefer Group bought the Factory.

752.     Lehman and other public officials had worked closely with Benchmark on this illicit and risky scheme from 2016 and until at least 2019 or later.

**(4)(xviii) – DEFENDANTS CAUSED SUCCESSOR LIABILITY RISK TO PLAINTIFFS:**

753.     Mr. Hoefer was fearful after Horan told him that Honeywell's executives were upset with Mr. Hoefer and might act against him.

754.     Shown above, in May 2023, an FAA national security incident response senior investigator told Mr. Hoefer that Honeywell had supplied the FAA with paperwork claiming that Hoefer Group – an *RV company* – was Honeywell's GG1320 Gyro supplier.

755.     This is exactly the sort of federal liability to Mr. Hoefer and his business that each Defendant had maliciously dumped upon the Plaintiffs – instead of any Defendant or their cronies owning up to what those officials had done at the Factory.

756.     It took time for Mr. Hoefer to prove to the FAA that he was duped into purchasing the Factory, and that the entity which Honeywell allegedly claimed was operating under Hoefer Group's authority at the Factory for Honeywell's Gyro work was one which had legally dissolved more than two years prior to the Plaintiffs' Factory purchase.

757.     Tooke sat passively in the room as an agent of Teigen, Akason, and Garman (and on information and belief, Lehman) during these May 2023 FAA/FBI discussions, and she never hinted that the Defendants *knew and caused* why Mr. Hoefer was being framed in a federal investigation of federal GG1320 Gyro supply chain mismanagement.

**(4)(xix) – FAA INVESTIGATOR: "THE GOVERNMENT *KILLS* TO PROTECT THIS.":**

758.    FAA Senior Aviation Safety Inspector Tim Mahoney planned to spend two days at the factory in May 2023, as part of an FAA national security incident response team flight safety investigation. An FBI agent was also present for a portion of Mahoney's visit.

759.    Mahoney was focused on investigating Plaintiffs' reports of having found fraud in the Honeywell GG1320 Gyro supply chain. Mahoney told Plaintiffs and the FBI that the GG1320 Gyro was the most important electronic part in all modern commercial Boeing aircraft.

760.    At the end of the first day onsite, upon viewing some of the guided missile circuitry, Mahoney's face became visibly pale, and he exclaimed, "The Government *kills* to protect this. I *can't believe* I'm *seeing* this."

761.    Mahoney promised to return to the site, but he did not.

762.    When Mahoney left the Factory he told Mr. Hoefer, "Everything you've said is true." Then Mahoney exclaimed about other aerospace contractors, "Okay, everybody lied! I'm going back to Honeywell."

763.    FAA remained in communication with the Plaintiffs after Mahoney's visit, and FAA requested copies of the public records for its investigation which the Plaintiffs had obtained, and which records the Defendants had been concealing from the Plaintiffs and investigators.

764.    The U.S. military eventually collected the FAA's evidence which Mahoney had asked the Plaintiffs to keep safe at the Factory, during a June 2023 visit.

765.    Tooke was at the factory with Mahoney and the FBI on May 10, 2023, and she witnessed Mahoney exclaim that the U.S. Government kills to keep secret some of what then sat at the Factory.

766.    During the FAA/FBI Site visit, Tooke was seated at a conference table with Mr. Hoefer, as Mr. Hoefer answered an FBI question about his reporting process and who he was

reporting to from among federal agencies. Mr. Hoefer stated:

> This is where I'll say Jessica [Tooke] has been asking me to just go step-by-step-by-step-by-step through the chain so that I don't just end up on *Fox News* getting decredited by the, discredited by the Government as a My Pillow guy or something like that. So, um, we've been carefully plodding away, it's been financially very, very painful, but we've been doing it.

767.    Tooke had been refusing to allow Mr. Hoefer to elevate his federal reporting or go public with it, and she made threats even as she also repeatedly promised that the Defendants would reimburse the Plaintiffs for the extra delays and expense – by providing Plaintiffs with new unwanted loans the Plaintiffs would still need to repay to the State of ND.

### (4)(xx) – FBI ASSISTED AFTER SITTING ON THE SIDELINES FOR 7+ MONTHS:

768.    After FAA's national security visit to the Site in May 2023, Mahoney told FBI special agent Reed Mesman that the FBI needed to take Mr. Hoefer's reporting seriously.

769.    Mesman then seemingly changed sides from believing or pretending to believe the false reports to FBI from Brejio and Minot Air Force Base (and, on information and belief, Zachmeier) in September 2022 and Mesman started seemingly trying to help the Plaintiffs.

770.    When Mesman personally viewed the evidence still at the Site on his second visit to the Site on May 11, 2023, he said, "Phew, I thought there'd be more," and Mesman said that the FBI *knew* the Site was full of U.S. defense detritus.

771.    The fact that there was *not* more evidence – a Factory full as Mesman said he had feared – raises all sorts of concerning questions about where that U.S. defense material has gone, as Benchmark obviously left or lost custody of such material, and as Tuttle's crew worked on recurrent overseas shipments for several years according to records and witnesses.

772.    One former military official told Mr. Hoefer that when a classified site is closed, it

presents ripe opportunity for officials with access to such a site to quietly pilfer and misuse it, and he has seen it happen before.

773.    Mesman then asked Mr. Hoefer to make a report to the media, which Mesman said would result in a federal Site cleanup "within 24 hours." Mr. Hoefer told Mesman that Tooke (who was NDDF's agent for Teigen, Akason, Garman, and, on information and belief, Lehman as to this), who Mesman met the day before, had forbidden that. Then Mesman said he would see what else the FBI could do.

774.    To assist Hoefer Group, Mesman wrote on May 12, 2023 that he was working "to talk to the appropriate people" and Mesman sought a revised summary of Site evidence from the Plaintiffs in order for the FBI to determine "who can or can't handle what is there at the facility."

775.    To assist Hoefer Group, on May 31, 2023, FBI's Mesman wrote, "The contracts from Benchmark were found to be more with the Army and/or Navy apparently from what I have heard, so waiting on emails back from what has been forwarded up the chain through an Air Force contact. You may hear from them directly hopefully."

776.    Detailed above, the U.S. Defense Department Defense Criminal Investigative Service Office of the Inspector General – which is as far "up the chain" as one can reach for a U.S. defense criminal investigation – took charge of coordinating multiple federal agencies to commence or to further federal Site investigations starting in June 2023.

777.    When Tooke attended the June 22, 2023, U.S. military multi-agency criminal law enforcement Factory evidence collection organized by the DCIS OIG, Tooke actively assisted federal agents from morning and until about 9:00 p.m. As the day wore on, Tooke insisted that the Plaintiffs and federal agents complete this collection in one day, stating, "I'm under orders from Bismarck [the Defendants] not to leave here until the evidence leaves the site."

778.    During the June 2023 Factory cleanup with U.S. military law enforcement, the DCIS OIG special agent told Mr. Hoefer that his networks, devices, and Factory were likely very deeply hacked, and even said that the U.S. Department of Defense would consider looking into it. In a later federal interview, NCIS asked Mr. Hoefer specific questioning about the local utility network provider.

779.    Before the military Site cleanup, the Factory alarm system had triggered often, at times multiple times per night, from a 'technology issue' – an issue which no longer occurs, and which was one of many issues relating to Plaintiffs' networks and communications.

780.    Also in July 2023, a security contractor reported Hoefer Group's Factory video security system had been attacked and that an unauthorized party had changed security settings in an encrypted cloud storage system. More than a month of video for the entire Site had been changed to black screen on this redundancy, but other redundancies revealed video recordings, which meant, according to consultants who reviewed the breach, that encrypted cloud data packs of recorded security video from the Factory were intercepted in real time and then wiped and uploaded about every two seconds for more than a month without detection.

781.    These issues above including delayed relief, the dangers of the evidence, and the constant hacking and communications interference – which affected Plaintiffs financially and as to safety – would not have occurred but for Defendants' acts against the Plaintiffs.

782.    On information and belief, one or more Defendants facilitated or participated in these technology breaches and other hacking incidents affecting Plaintiffs, including in manners in violation of 18 U.S.C. § 1030.

### (4)(xxi) – MR. HOEFER LIVES IN FEAR OF HSI SPECIAL AGENT BREIJO AND ND BCI SPECIAL AGENT ZACHMEIER:

783.    In May 2023, the now deceased Van Pelt (who Breijo killed) was called to full-

time Air Force duty from Minot local law enforcement. Van Pelt had been retired from Air Force, and was serving in local law enforcement, helping to train new officers in investigations. At the Minot Air Force Base, Van Pelt was assigned to a new full-time role as a federal law enforcement supervisor over nuclear security. Also as to that:

    i.  Long before she went public with allegations about Breijo, Breijo's second and surviving victim Babcock called Mr. Hoefer in late 2024, after Mr. Hoefer went public about the Dunseith Site and Defendants' retaliation. Babcock told Mr. Hoefer that a friend had tipped her to Mr. Hoefer's story, and she was certain Van Pelt had been investigating Breijo due to the Factory, because she could see no other reason why she was shot up. Babcock said Breijo was a friend with both her and Van Pelt and not in any way a love interest as some media speculate.

    ii.  Babcock began reaching out to Mr. Hoefer's North Dakota legislature and media contacts and said she feared the State of ND wanted to get her killed, and she said that Breijo laughed as he was shooting her and killing Van Pelt. Before Breijo started shooting, Babcock said that Breijo had retreated to the back of the apartment and was quiet for a while, and that when she and Van Pelt went to look for him, he was in a firing stance with gun drawn, and he started shooting.

    iii.  On information and belief, the Air Force closed down an investigation into Breijo and shipped out an OSI agent who had started to investigate Breijo for Van Pelt's murder. An informant has claimed this to Mr. Hoefer.

    iv.  On information and belief, the State of ND has threatened retaliation against

one of its top investigators for asking too many questions about Breijo and the Van Pelt murder. An informant has claimed this to Mr. Hoefer.

784.    Mr. Hoefer lives in absolute fear of Breijo and ND BCI's Zachmeier.

785.    Zachmeier lives and vacations in close proximity to Mr. Hoefer, and Mr. Hoefer fears encountering him, and their families frequent some of the same places.

786.    Others in North Dakota law enforcement have warned Mr. Hoefer that Zachmeier is one of the State of ND's best agents when Zachmeier wants to be, and that Zachmeier also "cleans up problems" for the State of ND, and it can be dangerous to cross him.

787.    News media in North Dakota had written publicly weeks before Van Pelt's murder about the Site cleanup and about Air Force's strange behavior to Mr. Hoefer. If Breijo did kill Van Pelt in retaliation because Van Pelt was beginning to investigate Breijo for making false reports about the Factory and Mr. Hoefer, then it would explain why the State of ND has never suggested a motive for Van Pelt's killing, as:

      i.   The State of ND would not wish to connect actions of Zachmeier and Brejio together in their cover-up against Mr. Hoefer.

      ii.  This may also explain why the State of ND, in an unprecedented move, did not initially oppose an effort to close the preliminary hearing of Brejio's murder charge to the media and to the public until coming under media fire.

788.    Garman and Akason made clear to Mr. Hoefer that Breijo was a 'forbidden' topic of discussion for Mr. Hoefer.

789.    When Garman and Akason wrecked a $5+ million investment (detailed above) to Hoefer Group by deceiving Plaintiffs' broker and by advancing repeated false and malicious allegations against Mr. Hoefer in witness of Plaintiffs' broker and lenders, Mr. Hoefer became

exasperated and told these Defendants that it must be nice for them not to have to worry about being threatened by a murderous agent. Both Akason and Garman gasped, and then Akason said, "We're not going there!" – in that Akason was instructing Mr. Hoefer that Mr. Hoefer was not permitted to talk about the terrifying Breijo situation which the Defendants, through their past actions to deprive Plaintiffs' rights, had created for Mr. Hoefer.

790.    Garman and Akason did not deny that Mr. Hoefer *was threatened* by a killer, they just weren't going to let him inform and report and speak about it.

791.    Because Defendants dumped theirs and their cronies' liabilities upon Plaintiffs to resolve as the Factory and its evidence, and because Lehman made false statements to HSI's Brejio and ND BCI's Zachmeier, and because Teigen, Garman, Akason, and Lehman conspired and acted to scheme against federal law enforcement agents in relation to the Factory and to Mr. Hoefer's reporting, Brejio and Zachmeier were able to target Mr. Hoefer, and the failed cover-up against Mr. Hoefer creates the frightful circumstances under which Mr. Hoefer now lives, and Defendants acts are a cause of many other deprivations.

792.    Defendants are the cause of Mr. Hoefer now having to take extra measures and precautions to protect his own life because of this crooked law enforcement agent behavior. Mr. Hoefer would never have encountered the agents had the Defendants not schemed against, and acted against, Mr. Hoefer's rights.

### (4)(xxii) – FBI'S MESMAN INTIMIDATED MR. HOEFER:

793.    The Site was a situation FBI's Mesman described to Mr. Hoefer as "complicated" in May 2023 and in July 2023.

794.    Mesman's behavior became concerning and intimidating towards Mr. Hoefer in July 2023 as Mr. Hoefer reported to the FBI another incident of stalking.

795.    Unprompted by Mr. Hoefer, Mesman said he already knew about the Site's U.S. military cleanup, but later a CID agent told Mr. Hoefer that Mesman was not supposed to know about it.

796.    One of the strange manners of Mesman's behavior towards Mr. Hoefer – after a DCIS OIG agent told Mr. Hoefer in June 2023 that national security matters were tied to the Site's evidence – was that Mesman was vocally upset as Mr. Hoefer raised the topic of national security concerns. Mesman aggressively retorted to Mr. Hoefer, "How do you *know* that?" And then Mesman told Mr. Hoefer cryptically and snidely, "The less you know, the better."

797.    Mesman told Mr. Hoefer that the FBI would not offer further assistance for a new stalking incident, which Mesman said was "concerning," but Mesman seemed almost glad that Mr. Hoefer was still facing some risks.

798.    Mesman said he would call a local police department to instruct the department to help Mr. Hoefer with a stalking report, but Mr. Hoefer had already called that department and they seemed to suggest that the FBI had steered them away from Mr. Hoefer.

799.    Later, an informant told Mr. Hoefer that the local police *were* told to stay away from Mr. Hoefer because of "national security."

800.    Some officer entry logs into a police information system had even been deleted – *multiple times* – which logs had requested increased patrols near Mr. Hoefer's residence.

801.    Mr. Hoefer learned from local police in multiple jurisdictions in North Dakota who tried to help him that they were intimidated and threatened or felt threatened for doing so.

802.    Several officers believe they were fired in retaliation for trying to help Mr. Hoefer.

803.    As many as 4 officers may have suffered career retaliation for informing to Mr. Hoefer and trying to assist him to protect his safety.

804.     As Mr. Hoefer's life became obviously endangered, the fact that local police

officers were instructed to stay away from Mr. Hoefer due to "national security," and that the FBI

refused to help with his safety because the matter was so "complicated" – essentially efforts by

crooked or conflicted law enforcement to 'leave Mr. Hoefer to the wolves' – is a direct result of

Defendants' acts to illicitly launder upon the Plaintiffs and keep Plaintiffs liable for those serious

"national security" concerns and the immensely "complicated" violations of federal law.

805.     On information and belief, Mesman was embarrassed about the failed cover-up

and that the FBI had not acted for over seven months from the start of Mr. Hoefer's reporting to

the FBI, because the FBI instead had initially accepted as true the false reporting of the Minot

Air Force Base and of HSI's Breijo, and, on information and belief, of ND BCI's Zachmeier.

## (4)(xxiii) – DEFENDANTS WERE THRILLED WITH PLAINTIFFS' BUSINESS PROGRESS IN JULY 2023:

806.     Each Defendant was impressed with Plaintiffs' progress rebuilding the Dunseith

Site and in setting it up to manufacture Mr. Hoefer's RV inventions at a July 2023 'soft opening'

event that Defendants organized under ND Commerce and compelled Plaintiffs to labor to put on,

at which event each of them attended in person.

807.     Noted above, this 'soft opening' took place as Plaintiffs could begin to open the

Dunseith Site for normal operations after federal authorities removed sensitive and encumbering

federal criminal evidence that had been shockingly discovered onsite by the Plaintiffs.

808.     At the soft opening event, the Defendants thought their problems were over, and

that State of ND and federal officials' and some Defendants' own connections to the Dunseith

Site's federal criminal evidence would never be discovered by the Plaintiffs or by the public.

809.     At the soft opening event, Teigen spoke to local North Dakota *CBS* television

affiliate *KX News* and shared how wonderful it was for the Plaintiffs to be just starting up at the

Dunseith Site. Teigen specifically highlighted that the Plaintiffs' forthcoming job creation efforts will be great for the area. Teigen made the following televised statement:

> This was a facility that was set to close, it was gonna go cold, and be very difficult to come back from that. So, uh, the city owned it, and so that means it was generating no tax revenue, so, uh, taking it from a non-generating asset to a taxpaying asset, plus all of the jobs, the economic impact, and everything that's gonna happen, its gonna be great for the area.

810.    However, just days after the soft opening event, the Plaintiffs independently obtained from a backup source over 100 pages of public records that the Defendants had been concealing from the Plaintiffs.

811.    When Defendants learned Plaintiffs had obtained public records that Defendants had been concealing about State of ND officials' sordid Factory past, they became hostile to Plaintiffs. By late August 2023, the Defendants were plotting how to silence and chase away Plaintiffs and achieve other self-serving ends in depriving Plaintiffs' rights. They quickly began acting to deprive more of the Plaintiffs' rights.

## (4)(xxiii) – ALBRECHT FOUND OUT THAT PLAINTIFFS FOUND OUT IN JULY 2023:

812.    At the Dunseith Site soft opening, Mr. Hoefer spoke with Albrecht for less than 10 minutes, which was the first time Mr. Hoefer and Albrecht had spoken since Hoefer Group's Site purchase completed, and which was the last time the two have spoken.

813.    In this July 2023 conversation, Mr. Hoefer informed Albrecht about the details of the Dunseith Site evidence cleanup after Albrecht said, smiling, "I heard you were dealing with some local issues," and then Albrecht said NDDF fully supported the Plaintiffs. Mr. Hoefer replied, "No, Jim, it was more than that." Mr. Hoefer then told Albrecht briefly about the threats, stalking, federal evidence cleanup, and an aerospace and defense fraud scheme that targeted him, and Albrecht appeared shocked. Mr. Hoefer showed Albrecht a few photos of evidence on carts

and in boxes, federal collection receipts from CID co-signed by DCIS OIG, and stalking.

814.    Albrecht's demeanor changed and he told Mr. Hoefer, "No investor *should ever* have to deal with that." Mr. Hoefer then mentioned that Benchmark was associated with the federal evidence collections and odd parcels shipments into Dunseith that had claimed the Site's address. Albrecht remarked, "I'm a supplier to Benchmark," and Albrecht told Mr. Hoefer that he had worked on Benchmark Factory projects and he was then supplying Benchmark's Minnesota Division. Then Mr. Hoefer mentioned Tuttle and Albrecht laughed and said, "Oh, so Tuttle was involved?" Mr. Hoefer replied, "No, Tuttle was a leader."

815.    When Mr. Hoefer said Tuttle was a leader of a U.S. aerospace and defense fraud scheme that was subject to federal criminal investigations, Albrecht's face sunk, and he did not want to discuss anything further. Albrecht dismissed himself from Mr. Hoefer.

816.    Albrecht has never spoken directly with Mr. Hoefer again.

817.    Albrecht never informed the Plaintiffs that Albrecht's company ComDel had been associated with State of ND grant money and the Dunseith Site and Chiptronics.

818.    Weeks later on October 3, 2023, Albrecht told State of ND Senators Kent Weston, Keith Boehm, and Bob Paulson that Mr. Hoefer 'cannot be trusted' and that 'He [Mr. Hoefer] is always threatening lawsuits' whenever Mr. Hoefer and Albrecht speak together.

819.    Mr. Hoefer and Albrecht have only spoken together once since Hoefer Group's business began to operate at the Site in North Dakota, and Mr. Hoefer never threatened a lawsuit in that one conversation.

820.    Mr. Hoefer did explain to Albrecht in that July 2023 conversation that NDDF through the other Defendants and their agent Tooke had directed that the Plaintiffs clean up the Factory with a civil lawsuit, which was then underway.

158

821.    The other Defendants had kept hidden from Albrecht up to that point that they had directed the Plaintiffs to sue Benchmark and Tuttle.

822.    Albrecht quickly became a ringleader in the Defendants' conspiracy to deprive the Plaintiffs' rights and in the retaliation efforts against the Plaintiffs.

**(4)(xxiv) – HOW PLAINTIFFS OBTAINED COPIES OF ND COMMERCE RECORDS:**

823.    On July 19, 2023, Plaintiffs independently obtained copies of over 100 pages of Dunseith Site-related public records.

824.    Those records nearly all represented meetings and minutes of Factory activities in which ND Commerce participated in or led the meetings.

825.    Those were just a small portion of public records Defendants had been actively and deceptively concealing from Plaintiffs.

826.    Days earlier, Mr. Hoefer's family had broken down in tears after the July 2023 Dunseith Site soft opening event organized by ND Commerce officials and the Defendants.

827.    Mr. Hoefer's family told him that they felt like they were being "forced" by the Defendants in how to live and that they were being "forced" to pretend everything was okay, when in reality Mr. Hoefer's family feared for their own safety.

828.    Mr. Hoefer was praying that his nightmare had ended with the known evidence then removed from the Dunseith Site. But an even worse nightmare – a prolonged campaign of gaslighting and intended financial ruin orchestrated by Defendants – was only about to begin, because these records, which the Defendants had sought to conceal, were discovered.

829.    The records were held in physical copy by an economic development agency who had participated as a meeting recorder and local community representative in the meetings.

830.    That economic development agency's past stored emails, which contained more

Factory-related records, had been lost or destroyed for an unknown reason in 2019.

### (4)(xxv) – THE FACTORY'S PREVIOUS TENANT BEFORE HOEFER GROUP LEFT UNDER SUSPICIOUS AND POSSIBLY VIOLENT CIRCUMSTANCES:

831.    As the passage of time and circumstance led Mr. Hoefer to suspect foul play, Mr. Hoefer tried unsuccessfully in July 2023 to locate one of that armored vehicle company's (noted above) shareholders whom he feared might have been gravely injured.

832.    Mr. Hoefer learned that the shareholder whom he later *could not find* was actually best friends and a father figure to the man whom Lehman and Tuttle said he allegedly fought.

833.    A close relative said that this shareholder had been out of touch for some years.

834.    Given that the potentially missing person was about 80 years old when this 'fight' occurred at the Factory and the man whom Lehman alleged that this elderly man fought with was then in his early 50s, the story begun by Tuttle and parroted by Lehman began to fall apart.

835.    Then Mr. Hoefer found another shareholder of that company who said he feared the FBI in North Dakota for other reasons relating to what was going on at the Factory.

836.    This third shareholder initially said he left the other two behind and didn't know "if they're alive or dead."

837.    This third shareholder said FBI personnel in North Dakota had made comments to a local that scared him away from the Site, and then later he told Mr. Hoefer, "Look, I'm a good government contractor and I just want to keep my Army contracts."

838.    These facts began to paint a very unsettling picture of the Factory in 2019.

839.    Mr. Hoefer also learned that at least one shareholder of that tenant knew about Tuttle's work that was then-ongoing with public officials, which this shareholder described as work on "circuit boards" for "rockets" for multiple customers making "lucrative" payments.

840.    This shareholder stated that public officials asked that Tuttle be given space for

some workers to use the back of the Factory while the tenant company's armored vehicles were being manufactured throughout the Site.

841.    A whole host of federal violations may have arisen from such arrangements as described. On information and belief: (a) an aerospace or other accident somewhere out in the world or undersea or in space involving GG1320 or other circuitry traced back to Tuttle's work triggered an onsite review by federal authorities in 2019 and horrified them; (b) or, in the alternative, a new U.S. Government federally-credentialed aerospace and defense electronics manufacturing inspector, separate from the one TMC had paid directly, visited the Site and was horrified at what was occurring; (c) or, in the alternative, the armored vehicle company, which was active in Army contracting – Lehman had falsely told Mr. Hoefer that this company had no military contracts – triggered a U.S. defense agency onsite Factory review when they activated a federal government contracting CAGE code for their business at the Site, which conflicted with a previously-registered federal contracting identifier to the same address belonging to Benchmark for electronics manufacturing.

842.    In any event, something happened at the Factory in 2019 that caused the armored vehicle group to disappear rapidly, with its shareholders abandoning deeply personal possessions (cell phones, an emptied wallet, luggage, toiletries, a briefcase, a family bible and photo album, leather cowboy boots, coats, bedding, clothing, and more) and factory assets, including an Army "showroom quality" armored vehicle, estimated at $200,000+. After they left, the public-facing activities between Tuttle and State of ND and federal officials were wound up, and a federal grant to TMC for Tuttle's work was recalled, and TMC under which Tuttle operated was involuntary dissolved, and the Army vehicle was moved onto the local Indian reservation.

843.    There was also a federal penalty against Honeywell by DDTC in 2021, which

161

cited unauthorized missile electronics export shipments, naming "China" as one destination. On information and belief, part of that federal $13 million penalty relates to some past misconduct at the Site, and it is why Horan told Mr. Hoefer that Honeywell's senior executives were "mad" at Mr. Hoefer. Honeywell was under a federal monitoring order for aerospace electronics activities due to this previous set of federal violations at the time Horan represented the Plaintiffs.

844.    After Mr. Hoefer spoke with two of the three shareholders of the previous tenant, Defendants and authorities in North Dakota discouraged Mr. Hoefer from digging deeper.

845.    Mr. Hoefer reported to federal authorities his concerns about 2019, the blood-stained room, and its possible relation to prior federal defense violations at the Factory.

846.    The Army CID agent who had removed federal evidence from the Site said, "That's a lot to take in," and promised to follow up. This CID agent then spoke with Mr. Hoefer a few weeks later and told Mr. Hoefer that his "boss" would not let him investigate any potential link to this past Factory violence, nor could he conduct a wellness check on the missing man.

847.    Then this CID agent seemed to suggest that Mr. Hoefer might still be facing some personal danger, and he offered "personal advice" and said, "Why don't you just leave [the Factory and North Dakota]?"

848.    Mr. Hoefer told this out-of-state federal CID agent that Mr. Hoefer's livelihood was tied to the Factory, and he could not just "leave" it.

849.    Then the CID agent said something slowly and peculiar, "*Do what's best* for your family."

850.    Another federal law enforcement special agent who had visited the Site told Mr. Hoefer, that "there might have been a heavy-handed cleanup" by federal agents once before at the Site, and that the Factory scene Mr. Hoefer had encountered, including the blood-stained

162

floor, was from the mess those agents left behind.

851.    Before recruiting Plaintiffs to the Factory, Lehman, Teigen, and Albrecht knew of suspicious Factory events which had occurred in 2019 and resulted in TMC's eviction from the Factory and its multiple defaults, and yet those Defendants, who were joined by all Defendants, put Plaintiffs in this dangerous situation to cover up theirs and their cronies' misdeeds.

## (4)(xxvi) – LEHMAN REFUSED TO TALK ABOUT THE FACTORY PUBLIC RECORDS AND THEN LEHMAN CUT OFF SPEAKING WITH PLAINTIFFS:

852.    In August 2023, Mr. Hoefer politely informed Lehman that the Plaintiffs had obtained public records disclosing Lehman's extensive past history with the Dunseith Site's illicit federal activities that plagued the Plaintiffs.

853.    Lehman then told Mr. Hoefer in August 2023 that he thought those illicit federal activities at the Dunseith Site, in which he confirmed he was involved, had ended in 2019.

854.    Lehman then told Mr. Hoefer that the Site was his "first" U.S. defense project.

855.    Then Lehman made an excuse for not following federal regulations at the Site, and he said, "What does one really know about [federal] qualifications?"

856.    Lehman was a former professional manufacturing engineer who spent many hours conducting diligence on the Plaintiffs' business, even asking questions relating to the process of qualifications and registrations of an RV manufacturer with the U.S. Government.

857.    Lehman knew that Plaintiffs then obviously knew that ND Commerce's Factory-related public records were missing from the State of ND laptop Tooke had previously showed to Mr. Hoefer (as noted above).

858.    Lehman told Mr. Hoefer that those public records were "probably on another server."

859.    In August 2023, Lehman knew that Mr. Hoefer might soon realize that Lehman

had deliberately laundered the Site upon the Plaintiffs.

860.    Lehman then told Mr. Hoefer that Lehman didn't think the State of ND's Attorney General Drew Wrigley would let him talk further about the Site to the Plaintiffs. On information and belief, Lehman was actually then just making up an excuse to avoid Mr. Hoefer.

861.    In this August 2023 discussion, Mr. Hoefer remained friendly and even requested Lehman to be a cooperative witness to help the Plaintiffs finish remediating the Factory.

862.    This August 2023 discussion was the last time Lehman has spoken with Mr. Hoefer or a representative of Hoefer Group.

863.    After that August 2023 discussion, Lehman joined each Defendant in an offensive strategy where the Defendants misused their powers, influence, and authority vested in them by the State of ND, acting under color of law against the Plaintiffs' federal rights.

864.    The Defendants sought to silence and blot out the Plaintiffs from North Dakota in trying to hide their own problems of their official misconduct.

### (4)(xxvii) – TOOKE PROMISED DEFENDANTS WOULD REIMBURSE PLAINTIFFS:

865.    On August 14, 2023, Mr. Hoefer disclosed to Tooke that the Plaintiffs had come into independent possession of copies of ND Commerce Factory-related public records.

866.    Tooke then backtracked about the empty post-2015 ND Commerce public records database of the Dunseith Site that she had shown the Plaintiffs.

867.    Tooke stated that what she had previously shown the Plaintiffs was just "what we [ND Commerce] had at the time."

868.    Tooke then distanced herself from the Dunseith Site-related past misconduct by State of ND officials. She told Mr. Hoefer that she wasn't involved with ND Commerce when things relating to the Dunseith Site were ongoing with ND Commerce officials.

869.     Tooke told Mr. Hoefer that Lehman had thought that Lehman's own Factory past would never "surface."

870.     On August 14, 2023, Tooke reassured Plaintiffs that Defendants would reimburse Plaintiffs for the unwanted expenses of Plaintiffs having done as told by Defendants.

871.     Tooke said getting the new reimbursement loan to Hoefer Group would not be an issue and was just a matter of scheduling time for the approval, which she said approval was already a foregone conclusion and a done deal.

872.     Tooke readily confirmed, as multiple audio records support, that she, as Teigen's and Akason's and Garman's – and on information and belief, Lehman's – agent directed more than 1,600 hours of Mr. Hoefer's time, in which these Defendants threatened serious harm and made legal threats to compel labor and services from Mr. Hoefer for which they benefited.

873.     Tooke said she knew that commercial aviation may shut down if the U.S. federal government responds appropriately to the criminal evidence from the Factory.

874.     Tooke was adamant that the Defendants would continue to help the Plaintiffs in addressing Mr. Hoefer's safety issues and in finishing cleaning up potential Factory liabilities.

875.     Tooke, whom Defendants later caused to be fired, told Mr. Hoefer then:

> Enough people that know about it at this point in time, that it's not just gonna go away. I mean, I'm gonna tell you this right now, Charles: If you and your family up and leave tomorrow, I'm sorry but I'm not gonna go, 'Oh, I guess he just gave up, and, and he decided it was done.' Like, no, there's a reason why you up and left, and that is the cause of concern, that now I have to go, 'What happened?' And now this continues to need to be looked at. Like it doesn't get dropped. I mean, unless they're going to target everyone who's ever been involved or has been involved up to this point, wh-, what are y-, and there's no way that they're ever going to be able to do that. Like, it's never gonna just end, until someone ends it, by doing the right thing.

165

## (4)(xxviii) – GARMAN ADMITTED TO MR. HOEFER THAT GARMAN HAD TARGETED THE PLAINTIFFS:

876.   Noted above, on August 25, 2023, Garman bubbled over and offloaded his guilty conscience to Mr. Hoefer on actions that Garman had been taking against Mr. Hoefer – which he took in concert with other Defendants – since September 2022. Specifically:

    i.   Garman told Mr. Hoefer that he had been organizing weekly meetings since September 2022 to coach his subordinates in how to deceive the Plaintiffs.

    ii.   Garman told Mr. Hoefer that Lehman spoke with Garman as soon as Lehman spoke with federal agents in September 2022, and Garman took an active role behind the scenes after that.

    iii.   Garman admitted that Garman knew the Plaintiffs were not suffering from simply a spate of "local issues" as he had been instructing his team to gaslight Mr. Hoefer and Mr. Hoefer's family and say to them, but rather that Plaintiffs and Mr. Hoefer's family were victims who were targeted by organized criminals.

877.   Then Garman instructed Mr. Hoefer to send the Defendants a "civil liabilities release" proposal – one through which Plaintiffs would release any potential legal claims against State of ND and its political subdivisions and officers and employees – ostensibly as a gesture of good will to facilitate moving on, but in reality so that Defendants could get off the hook from anything Mr. Hoefer might have rights to claim against them in the future.

878.   Mr. Hoefer had agreed with Garman not to threaten, and he did not threaten, bringing any lawsuit in response to his discovering these public records (noted above) and his learning of Defendants' deliberate harm to Plaintiffs. Mr. Hoefer simply wanted to move onward.

879.   Per Garman's instruction, Mr. Hoefer requested nothing in return when he

proposed this release, other than for Defendants to cause NDDF to meet its prior commitments.

880.    Garman and Mr. Hoefer agreed that the request would be structured in such a way as to be friendly and diffuse concerns Defendants may have in that they may have more to hide. To that end, Garman asked for Mr. Hoefer to make the 'civil liabilities release' a catch-all offer.

881.    At Garman's direction, Mr. Hoefer sent this 'civil liabilities release' request on August 30, 2023, which request comprised:

    i.   Asking Defendants to have NDDF fulfill promised reimbursements and to offer that those reimbursements could still be structured as repayable loans for Plaintiffs despite Defendants' many coercive, controlling, and oppressive directives as to Plaintiffs' business.

    ii.  Asking Defendants to follow through on the earlier-promised State of ND incentives which were then on hold due to Defendants' actions, including a BND-backed mortgage, corporate income tax abatement, and CDBG grant.

    iii. Asking Defendants to cause NDDF to modify non-monetary contract terms to protect Mr. Hoefer's business from further interference and conflicts of interest by Defendants.

    iv. Asking Defendants to cause NDDF to alter Hoefer Group's interest rate, reducing it to more closely match what NDDF gives to other parties, to allow Plaintiffs to fund legal work to finish cleaning up Site liabilities and continue to work towards settlement or victory of the then-pending Benchmark and Tuttle civil lawsuit. This was merely another form of reimbursement for future costs Plaintiffs would incur as a result of Defendants' acts.

    v.  Asking Defendants to cause NDDF to let go of the $2.25 million State of ND

life insurance policy on Mr. Hoefer because Plaintiffs understood Defendants had placed Mr. Hoefer's life at risk. Mr. Hoefer feared this policy could motivate aggressive or dangerous behavior by any State of ND official(s) or others who had been involved in targeting Mr. Hoefer.

vi. Asking Defendants to work cooperatively with Plaintiffs to turn over all ND Commerce public records relating to the Factory.

vii. Asking Lehman to be a cooperative witness to Plaintiffs' federal reporting and civil claims against Benchmark and Tuttle.

882.    Mr. Hoefer was afraid, and he thought that by his pleading for cooperation in the manner Garman told him to do, his life and his business could become his own to control again.

883.    When they received this email, all Defendants realized that Mr. Hoefer was going to continue federal reporting, and that Mr. Hoefer knew facts and may discover more facts which they still wanted to keep concealed. And so all Defendants coordinated mass retaliation against Mr. Hoefer – to silence him, to harass him, to 'take' from him, to ruin him, to seek to indict him, to be rid of him, so as to 'get' him.

## (4)(xxix) – DEFENDANTS WERE PLANNING MAJOR ND COMMERCE PROMOTION OF HOEFER GROUP BEFORE THEY STARTED TO RETALIATE:

884.    Publicly, after the most sensitive and encumbering parts were finally removed from the factory by federal criminal agents in June 2023, the Defendants began to promote Mr. Hoefer's RV progress in the media, which they did so in July 2023.

885.    Garman had taken it upon himself to coordinate his team to plan a new statewide media promotion of the Plaintiffs' business progress, which Garman pursued in August 2023 as Mr. Hoefer started asking the Defendants questions about the concealed Factory records.

886.    Privately, Akason, Garman, Teigen, Lehman, and Albrecht realized that Mr.

Hoefer was only just scraping the surface in his uncovering Defendants' wrongdoings, and the Defendants did not want any more discoveries by Mr. Hoefer or reports by Mr. Hoefer to federal agents or informing by Mr. Hoefer to others about all of that.

887.    Described above, starting in September 2023, all Defendants began to publish and utter false reports and false accusations against Mr. Hoefer and Hoefer Group.

888.    At a statewide conference for local economic developers in September 2023, Teigen and Garman made false, humiliating claims about Mr. Hoefer to prominent economic developers.

889.    As summarized to Mr. Hoefer by a highly regarded in-state development official, "They [Teigen and Garman] said they are never going to talk to you again, because you threatened to sue them," and "They [Teigen and Garman] have nothing good to say about you."

890.    Upon learning of this, Mr. Hoefer sent an email to Garman, Akason, and Lehman on September 27, 2023, and reminded them that Plaintiffs never made or even suggested any threat of a lawsuit towards them (or the State of ND) from Mr. Hoefer. Mr. Hoefer also wrote:

> We continue to fear retaliation (which could include promising to assist in remediation costs while directing actions that delayed remediation and spent enormous sums of cash from our business account, without any follow-through as to cost assistance) on the basis that we more recently discovered a more detailed involvement by Commerce in the scheme that operated from our site, to which we are a federal witness, and we fear more details might yet be discovered, which might position Commerce in conflict to us for its own political or legal reasons (but not owing to any threat by us). Rich [Garman] and I both concurred that there was a potential landmine of conflict areas, whereby Commerce may – based on our reporting to clear our site of civil and criminal liabilities associated with an organized crime scheme we discovered – be motivated to act contrary to the interests of our business, or may have already taken actions which caused delays, damages, or added costs to impact our business.

891.    Mr. Hoefer reminded Defendants that they had been dishonest with Mr. Hoefer and they had acted in ways that harmed the Plaintiffs greatly, and that he wanted to move on and forget it.

892.    Mr. Hoefer expressed that he feared the Defendants might retaliate against him, because his federal reporting appeared to be butting into whatever the Defendants had been wanting to hide.

893.    Defendants then immediately expanded their false statements against Mr. Hoefer, and Defendants accelerated their false reporting to third parties and to law enforcement about Mr. Hoefer to deprive Plaintiffs rights and harm the Plaintiffs.

894.    Defendants took aggressive official actions to cut off Plaintiffs' access to State of ND incentives and State of ND funding and to blackball the Plaintiffs financially so as to prevent the Plaintiffs from accessing even private financing and cause other harm.

895.    The totality of Defendants' acts was to orchestrate a 'shock and awe' campaign against the Plaintiffs' rights, to falsely brand Mr. Hoefer so as to say 'Don't look here, look over there!', to overwhelm Mr. Hoefer in retaliation for his federal reporting and for other self-serving reasons in which they sought to deprive Plaintiffs' rights, and to stop Mr. Hoefer from continuing any reporting or informing so that they could maintain their secrets.

## (4)(xxx) – OTHER AGENTS OR 'UNWITTING DUPES' THAT THE DEFENDANTS HAVE ENLISTED TO FURTHER SCHEMES AGAINST PLAINTIFFS:

### (4)(xxx)(a) – NORTH DAKOTA NEWS COOPERATIVE INVESTIGATIVE REPORTER MICHAEL STANDAERT:

896.    To further their retaliation and aggression against Plaintiffs, Defendants misled and/or pressured and/or coerced and/or enticed a North Dakota News Cooperative investigative reporter, Michael Standaert, whose job was to write and distribute in-depth media stories for the

North Dakota Newspaper Association's statewide news service, to enlist him in their cause.

897.    In November 2023, Standaert told Mr. Hoefer that "Commerce, the Governor, and the Attorney General" said that Mr. Hoefer was blackmailing ND Commerce, and then Standaert demanded Mr. Hoefer provide him with evidence to "disprove" the allegation, or Standaert said it would become this news service media headline: 'Charles Hoefer Blackmails State of North Dakota.' As to how Standaert came to hear these allegations:

  i.   Defendants had been so furiously crafting their wicked, false allegations against Mr. Hoefer and with such sense of urgency that the Defendants even compelled the State of ND's Attorney General's office and its Governor's office to believe that alerting the general public that 'Mr. Hoefer is an imminent risk to the State of ND' was the best course of action.

898.    Mr. Hoefer panicked, and he quickly provided Standaert with all the evidence that Standaert demanded. Standaert started demanding Mr. Hoefer's audio recordings of Tooke and information Mr. Hoefer had concerning HSI's Breijo. Mr. Hoefer pleaded for Standaert to agree to not make public either the Breijo information or the Tooke recordings, but Standaert would not agree to that. Mr. Hoefer warned Standaert that making public this evidence could subject Mr. Hoefer to physical danger or further extreme retaliation, as:

  i.   The Tooke recordings were not then known to Defendants. Mr. Hoefer feared the Defendants would 'lose their marbles' so to speak if they knew Mr. Hoefer possessed those recordings, and they did so when they learned of it. Defendants immediately sought to set up Mr. Hoefer in a perjury trap, demanding he sign a false acknowledgement under oath as shown above.

  ii.  The Breijo evidence Standaert obtained involved communications with ND

BCI, with Minot Air Force Base, and all interweaving together with Teigen

and Akason in ways that would infuriate state and federal agents who had

acted against Mr. Hoefer. And as news began to come forth about the Factory,

within weeks, Breijo was charged with murder.

899.    Standaert immediately realized he could not write that 'Charles Hoefer is a State

of ND blackmailer,' because it was false and defamatory. Mr. Hoefer readily had the evidence to

rubbish it.

900.    But Standaert still doctored up an article to give the Defendants what they wanted,

including withholding crucial evidence that Mr. Hoefer had provided to him so as to steer his

reporting into having some sort of basis for pushing publicly the Defendants' false narrative and

so as to paint Mr. Hoefer in a false light.

901.    Standaert published this headline to further the Defendants' cause at their behest:

"Commerce Accuses Recreational Vehicle Company of Misusing Loan Funds."

902.    Defendants congratulated themselves and patted themselves on the back – as

public records show Lehman doing – for their 'win' with Standaert, in that they used him as a

tool to unlawfully sabotage, blackball, and financially ruin the Plaintiffs' business interests

worldwide, and to unlawfully subject Mr. Hoefer to public ridicule, scorn, and humiliation.

903.    For the Defendants' benefit, Standaert still tossed in Akason's false allegation that

Mr. Hoefer had engaged in "blackmail" or "extortion" against ND Commerce.

904.    Such a media story, fueled by ND Commerce against one of its borrowers, has not

been published publicly before or since.

905.    Standaert also stopped statewide distribution of a ready-to-publish article by his

co-author that would have rebutted the Defendants' actions and allegations, and the Defendants

knew in advance that this article was not going to be sent through the news service, as public records show. The rebuttal article then ran only in his co-author's Dunseith-area local newspaper. Standaert later claimed, as to his killing distribution of the already-complete rebuttal article, that his "superiors weren't interested in me going into the situation any more and wanted me to focus on other stories, so had pushed that all to the back burner."

906.    And Standaert tossed fuel on the fire and revealed publicly that Plaintiffs were in possession of audio recordings of Tooke. He released more minor statements from the recordings so as to diminish that Plaintiffs were victims of Defendants' schemes. But what he did do was to publicly 'tip off' the Defendants that Mr. Hoefer had the 'dirt' on the Defendants.

907.    Two weeks later, Defendants directed their NDDF agents to push for Mr. Hoefer to perjure himself via the false acknowledgement they sought to compel him to sign, noted above.

(4)(xxx)(b) – DEFENDANTS AND THEIR CRONIES COERCED IN-STATE MEDIA

908.    ND Commerce has huge operating budget which is used in part by its officials, on information and belief, to buy friendly media support through preferred finance, advertising purchases, and preferred contracting deals. This is supported as to evidence:

    i.  ND Commerce's total operations budget from ordinary payroll and activities, including professional fees, was approximately $17.4 million for 2022 and 2023 combined.

    ii.  ND Commerce additionally spent an astounding approximately $46.8 million those years on "Operating Fees and Services" to support its already high operating budget.

    iii.  ND Commerce officials can influence BND financing support to media.

    iv.  Informants have told Plaintiffs that ND Commerce officials prioritize keeping

the media friendly to them through various ways and means as standard practice.

909.    North Dakota is a small state, its halls of power are limited (a) as to the voices that will generate wide views for reporters' stories, and (b) as to those who have information.

910.    ND Commerce officials can threaten to cut off reporters' and media's access to the halls of power and to important stories, or they can offer it. And:

     i.   Such a move could put a reporter or media outlet completely out of work, or it can give a reporter or media outlet a needed good break.

     ii.   Since doing Defendants' bidding to target Plaintiffs, Standaert has enjoyed preferred access to the State of ND when no one else had it, and others have noticed.

911.    Or ND Commerce officials could cause reporters or media to suffer financially because of possible inability to obtain business financing due to the BND situation, similar to what Hoefer Group experienced.

912.    Even the threat of loss of access to financing in North Dakota can scare a media outlet into being friendly to ND Commerce.

913.    An informant told Mr. Hoefer about a reporter who was fired by his media outlet for having angered some State of ND officials who then threatened the outlet with repercussions unless it, the outlet, fell back in line with public officials' expectations, and it did.

## (4)(xxx)(c) – NORTH DAKOTA'S BEK TV, DERRICK BULAWA, AND LORI HINZ:

914.    To further their retaliation and aggression against Plaintiffs, Defendants enticed and/or coerced and/or frightened BEK TV and BEK Communications CEO Derrick Bulawa, and BEK TV presenter Lori Hinz (she is a Republican Party National Committee member for North

Dakota) to target the Plaintiffs. BEK entities own multiple TV stations and broadcast towers in-state and provide cybersecurity and internet services.

915.    Initially, in September 2024, Bulawa warned Mr. Hoefer about major self-dealings by North Dakota public officials that Bulawa said Mr. Hoefer had found at the Factory:

> I understand a little bit how these guys [the Defendants and their State of ND cronies] do business and why they do business. This is big enough and far enough that it is at the top. For any of our senior [U.S.] Senators, Governor, and people of that level would only be involved in this [what Plaintiffs' found at the Dunseith Site], unless there were dollars involved in hundreds of millions. And that's got nothing to do with commercial airlines, that's got nothing to do with scrap, it's got to do with black market arms and military technology sale, either with the consent or without the consent of our [federal] government.

916.    But Bulawa and Hinz then tried to convince Mr. Hoefer to agree to allowing BEK, Bulawa, and Hinz to extort U.S. Senator Kevin Cramer on Mr. Hoefer's behalf. Mr. Hoefer was adamant that he wanted no part in their scheme and they should stop, even writing so in an email, but Hinz kept calling Mr. Hoefer to tell him she was in contact with Cramer about it.

917.    Hinz told Mr. Hoefer that Cramer *knew* Mr. Hoefer's life was in real danger and that Cramer wanted to know how much money Mr. Hoefer wanted from the State of ND to make up for what the Defendants had done to him so as to keep Cramer's name out of the media as to any connection with the Factory.

918.    And when Mr. Hoefer asked Hinz to just publish the Factory story and stop the shenanigans, she told him, "I have to do this first."

919.    Mr. Hoefer has never asked BEK, Hinz, or Bulawa to help him get State of ND money. He expressly told them not to do that.

920.    Bulawa claimed to Mr. Hoefer that extorting a public official with embarrassing

ties to the Factory was the "only way" for Mr. Hoefer to "build RVs again."

921.    Bulawa said that this path of Defendants' destruction of Mr. Hoefer's business could be avoided if Mr. Hoefer resorted to extortion, something Bulawa suggested that he had done previously with successful outcomes for himself and his business.

922.    Bulawa described the Defendants as "bad guys" and asserted "the bad guys are gonna get away."

923.    Mr. Hoefer was stunned by the suggestions Hinz and Bulawa were making, and he feared that either:

     i.   Bulawa and Hinz were working for the Defendants and trying to get Mr. Hoefer hauled off in handcuffs on an extortion charge to protect the Defendants and State Insiders; or

     ii.   In the alternative, Mr. Hoefer's Factory reporting was a bigger problem than he thought, and Hinz and Bulawa were so scared of what the Defendants might to do to them and BEK, that this powerful media group felt they could not touch the Plaintiffs' story, and instead perhaps in some really twisted or dim-witted way Hinz sought to extort Cramer with good-hearted intentions to help the Plaintiffs overcome the Defendants' harm.

924.    Bulawa later warned Mr. Hoefer and State of ND legislators that the Defendants would misuse their State of ND positions, authority, and influence to "destroy" Mr. Hoefer's business, if Mr. Hoefer went public with his claims about the Defendants and the Factory.

925.    Bulawa told Mr. Hoefer and State of ND legislators, in an email, that he/BEK would also take retaliation if they went public with Mr. Hoefer to expose the Defendants. He understood that Plaintiffs might achieve some "short-term safety" in going public, but at great

cost. He said BEK would face "the same type of criticism, antagonism, and isolation … from the same political figures and the administration, that trouble you today" and warned "you will certainly destroy your business."

926.    Hinz' and Bulawa's actions are pertinent to this Complaint, because BEK operates a television station that built up its reputation in recent years within North Dakota by helping expose a national scandal involving Fufeng's Chinese ownership of land and its plans to build a factory near the Grand Forks Air Force Base, where sensitive U.S. military assets are tested.

927.    That Hinz and Bulawa appeared intimidated by the Plaintiffs' story *but not* Fufeng (or, in the alternative they had agreed to be complicit in trying to help Defendants rid the State of ND of Mr. Hoefer), shows Defendants' powers, influence, and entanglements with officials and State Insiders – it shows that Defendants had created such a mess dumping the Factory upon the Plaintiffs that even North Dakota's top TV outlet would not dare to wade into the matter.

928.    In late 2024, Bulawa told an influential North Dakota political figure – who then relayed this to Mr. Hoefer in order to warn Mr. Hoefer – that any reporting BEK does on Mr. Hoefer was likely to get Mr. Hoefer killed.

929.    In late 2024, multiple informants warned Mr. Hoefer that Bulawa was falsely alleging absurd slander: that Mr. Hoefer "might be a double-agent" sent to clean up an Air Force mess and blame it on North Dakota's 'innocent' public officials, and that Bulawa was saying other false things about Mr. Hoefer and his Factory.

930.    In late 2024, an informant warned Mr. Hoefer that one or more Defendants were scheming up to falsely allege through the media that Mr. Hoefer had a personal bankruptcy. This warning was credible enough that a national media outlet reported aspects of it, and the outlet also published some of Mr. Hoefer's recordings of Bulawa and Hinz speaking with Mr. Hoefer

about Hinz's and Bulawa's independent plans and efforts to extort U.S. Senator Cramer, which caused an in-state media and social media 'firestorm' in North Dakota. Mr. Hoefer released the recordings to protect himself.

931.    Eventually, in March 2025 *BEK TV* began a months-long reporting series about the Plaintiffs and Dunseith and several City of Minot-based crimes, which they called "Dunseith Declassified," but which seems to be little more than a smokescreen to protect the Defendants and State Insiders – a view expressed to Mr. Hoefer by very upset third parties who had helped with BEK TV's Fufeng investigations and reporting.

932.    In these episodes:

i.    BEK has never mentioned ND Commerce or Defendants in relation to the Factory or to Mr. Hoefer in any of its "Dunseith Declassified" episodes.

ii.    BEK aired many clips and inflammatory statements which seemed designed so as to seek to incite crooked or conflicted law enforcement agents to target Mr. Hoefer with violence.

iii.    No one from BEK reached out to Mr. Hoefer before their stories about him and his Factory began, but BEK repeatedly clipped and republished selective video from third-party media podcasts where Mr. Hoefer was a guest.

iv.    BEK's initial run of the weekly series began to defame Mr. Hoefer, including that BEK falsely alleged he had a personal bankruptcy – which Mr. Hoefer was warned the Defendants were working with their cronies to cook up the allegation. BEK had to retract this.

v.    BEK had been releasing episodes on a weekly basis until May 2025, but then it paused the series for 12 weeks after Mr. Hoefer notified BEK it had severely

defamed him, and right as the episodes were about to require a segue into the Plaintiffs' allegations that the Defendants caused the Factory mess and were harming the Plaintiffs and retaliating against them.

vi. When BEK picked up the series with one new episode as of this filing, Mr. Hoefer and his Factory were briefly mentioned in that BEK said it intended to talk about them, but the episode was instead focused on HSI Breijo's Minot murder guilty plea.

933.    On information and belief, Defendants used their great state powers and influence, or caused others to do so, so as to frighten and/or coerce and/or entice BEK in structuring the "Dunseith Declassified" episode content, laying the ground rules for what could and could not be disclosed publicly by BEK, and to promote the false bankruptcy claim against Mr. Hoefer, thereby keeping the focus off of Defendants' schemes, and so as to chill the Plaintiffs' speech and leave the Plaintiffs in 'administrative limbo' with NDDF and suffering financially.

### (4)(xxxi) – CLASS-OF-ONE TREATMENT: THE 'HOEFER STANDARD':

934.    State of ND officials have refused in the past to disclose individual financial contracts, arrangements, terms, and repayment performance for BND, ND Commerce, and NDDF-related disbursements to private parties, citing the State of ND's banking privacy laws.

935.    For example, when *InForum* reporter Rob Port tried in 2024 to obtain even basic loan information from the LIFT agreements with a company that associated with Teigen and/or Teigen's father, ND Commerce's Kim Schmidt refused to provide Port with information, citing, as Port himself described, "Schmidt declined to provide details on the status of the loans, citing state law prohibiting the disclosure of banking information."

936.    Defendants, State of ND officials, State Insiders, and their cronies collectively

benefit from hundreds of millions or billions of dollars doled out from BND, ND Commerce, ND Commerce sub-entities including NDDF, and other State of ND agencies. For example:

      i.   Even BND's "principal officers, directors and their affiliates" had benefited from $47+ million in loans outstanding (buried on page 72 of BND's 2024 Annual Report), or an amount equivalent to over 0.77% of BND's entire approximately $6.14 billion private lending portfolio as of December 31, 2024.

     ii.   NDDF's 8-person board has $7.7+ million in loans receivable outstanding to companies in which board members have an ownership interest (this according to NDDF's 2024 annual report), and over 60% of that money was reflected on books with an impairment.

   iii.   LIFT loans, which historically have been awarded without business collateral or personal guarantee requirements, have seen $44+ million doled out since 2019, with sizable amounts being reserved for State Insiders.

   iv.   Albrecht's ComDel snapped up over 10% of a nearly $5 million grant fund for automation that NDDF awarded and disclosed in its 2024 annual report.

    v.   Most of BND's $6.14 billion loan recipients as of 2024, and many NDDF disbursement recipients, and many other ND Commerce program recipients, remain a mystery to the public as to '*Who got* the money?'

937.    To keep up the insider scheme, the actual amount of State of ND taxpayer-funded cash distributions to State Insiders is a carefully curated State of ND secret. Only a small scope of the schemes are in public view, and those are only visible to those who know how to look.

938.    Mr. Hoefer's Dunseith Site reporting – necessary to clean up what the Defendants dumped upon the Plaintiffs – risked exposing some State Insiders' practices that would enrage

the general public if the public knew, and then those practices would end.

939.   By vilifying Mr. Hoefer, wrecking his business, and then blaming him for it, the Defendants can steer the public lens away from their truly "sketchy" behavior above.

940.   Defendants were supposed to promote and facilitate the Plaintiffs' RV business bringing new manufacturing industry to North Dakota, but instead each Defendant to preserve his own self-interest and conceal his own mounting misconduct, sought to silence and ruin the Plaintiffs and disable new industry in direct opposition to ND Commerce's mandate.

941.   During committee testimony for SB 2396 in 2025, State of ND Auditor Gallion cited a need to keep protected from public disclosure the specific loan arrangements and funds disbursed to private parties through NDDF, so as to not expose those private parties.

942.   Yet Plaintiffs' NDDF loan agreement documents were released to a media requester at the direction of Defendants with almost no redactions, and were assembled in a highly deceptive manner, being mixed among false unsigned contract documents that were never presented to the Plaintiffs during Plaintiffs' NDDF loan origination.

943.   Other confidential information of the Plaintiffs, including but not limited to trade secrets, has been released by the Defendants to third parties, always to harm Plaintiffs.

944.   To-date, public records that a third-party would overtly view as incriminating to Defendants remain withheld from public release, or destroyed, or are blacked out upon release.

945.   Defendants operate ND Commerce and NDDF with two standards: there is the 'Hoefer Standard,' and the 'Everyone Else Standard.'

946.   There has not been another citizen in North Dakota who has been turned into a State of ND officials' hostage and forced laborer as Defendants have done to the Plaintiffs.

947.   The fear other third parties have in wading into the situation to scream for relief

for the Plaintiffs – those parties report that they will experience some of the same retaliation the Defendants subjected the Plaintiffs to – shows Defendants have too much state power, and that this power has turned the Defendants completely tyrannical.

948.    Even acts which on their own stand out as extraordinary, such as Defendants' repeated efforts to compel/coerce Mr. Hoefer into perjuring himself in part so that Defendants could then seek an indictment of Mr. Hoefer and in part to take the Factory to bury the Plaintiffs' business, and other acts such as the 'gag-order' effort by multiple Defendants – these illegal, crazy acts seem to just 'fall over the waterfall' of the never-ending 'class-of-one' discriminatory surprises that come with the 'Hoefer Standard.'

## (4)(xxxii) – STATE OF ND ATTORNEY GENERAL JUST WANTS PEOPLE TO STOP ASKING QUESTIONS:

949.    State of ND Attorney General Drew Wrigley continued to wear his 'happy hat of ignorance' whenever he was asked about the Dunseith Site into late 2024.

950.    At one point Wrigley told a prominent public figure who confronted him – this individual asked Wrigley to state his position as to Plaintiffs, as to the Factory, and as to the Defendants' acts against the Plaintiffs – that he 'doesn't know anything' about Dunseith.

951.    Shortly after that, Wrigley told several State of ND legislators, who were pressing him after learning more facts about the Plaintiffs' suffering and mistreatment caused by the Defendants, that, "There's more I cannot tell you," – whatever that means.

952.    Wrigley just wanted to get those pesky elected State of ND officials to stop asking Wrigley more meddling questions about the Plaintiffs and the Plaintiffs' reports, or else:

  i.    Some in the media might dig and start asking why Wrigley used his post at the Industrial Commission to award $17 million to Packet Digital in 2024 when Packet Digital's prior Dunseith Site-related Industrial Commission grant

applications contained false statements yet were also awarded and funded.

    ii.   And Wrigley might not have a good answer.

    iii.   And Wrigley might get asked more questions and he may have more 'not good answers' that raise more questions he doesn't want to answer.

    iv.   And Wrigley might have to start explaining why North Dakota's Attorney General keeps law and order and runs a bank that doles out billions in a 'loosey-goosey' way.

953.    So Wrigley has strong incentives to join 'team government' and choose to believe whatever it is the Defendants tell him about the Plaintiffs.

954.    The Defendants have also gone to great lengths to ensure Wrigley remains very misinformed about the Plaintiffs, and he remains so.

955.    The Plaintiffs have no place in North Dakota to seek relief, and no place to go so that Defendants will stop harming the Plaintiffs and their RV business.

### (4)(xxxiii) – GOVERNOR'S OFFICE CHALLENGED PLAINTIFFS TO BRING SUIT:

956.    More recently, Chris Joseph, who is the General Counsel for the Governor's office and is employed by the State of ND's Attorney General's office has suggested to a State of ND legislator that Mr. Hoefer should bring a suit against the Defendants as a solution to this mess.

957.    Joseph told a State of ND legislator that the Governor will not hear anything Mr. Hoefer has to say, because the Governor believes the Defendants.

958.    Joseph told a State of ND legislator that the Defendants' word is the final word.

959.    Defendants have used their influence and connections and abused the high trust in their positions, and have acted under color of law, to persuade and convince even the Governor to take the side of 'team government' – notwithstanding the facts and reality.

960.    The Plaintiffs pray this court finds otherwise.

## NATURE OF DAMAGES AND HARM:

961.    Plaintiffs have suffered financial damages in at least the following amounts, in addition to other damages still to be determined, the basis for which Plaintiffs will prove at trial:

  i.    Lost 2023-2030 wages and income, Mr. Hoefer: $18 million.

  ii.   Lost 2023-2030 net income, Hoefer Group: $153 million.

  iii.  Direct business financing damages, Hoefer Group: $39 million.

  iv.   Lost equity exit in Hoefer Group, Mr. Hoefer: $500 million.

  v.    Sabotage of industrial complex developments (factories and housing) in Turtle Mountains, lost Canada partnership, both Plaintiffs: $30 million.

  vi.   Worldwide reputational harm, Mr. Hoefer: $300 million.

  vii.  Worldwide reputational harm, Hoefer Group: $300 million.

  viii. Worldwide public humiliation harm, Mr. Hoefer: $200 million.

  ix.   Worldwide public humiliation harm, Hoefer Group: $200 million.

  x.    Emotional distress, Mr. Hoefer: $150 million.

962.    By way of comparison, three of Mr. Hoefer's RV industry peers from Indiana who did not themselves face reputation harms, harassment, abuse, or financial sabotage from any of the Defendants or from any other public officials like them, and all who started their RV production within a year or two of Hoefer Group's organization, have since created about 1,500 new jobs. And their RVs are not as differentiated in the marketplace as Hoefer Group's are.

963.    Plaintiffs' project was one of the few national startups nationally promoted by RVIA, the RV industry's national trade group. But for Defendants' interference and bad acts as alleged within this complaint, Plaintiffs would already have soared to success in the marketplace.

184

964.    Plaintiffs' RV project contained multiple essential project components, including a cross-border Canadian partnership, which Defendants have caused to be ruined.

965.    Plaintiffs also note that Defendants, acting under color of law as officials who are supposed to have the best interests of North Dakotans at heart, have instead through their actions set back job growth and economic expansion prospects in the Turtle Mountain Region as a side effect of their mistreatment, oppression, and torment of Plaintiffs. That damage, while unrecoverable by Plaintiffs or any of Defendants' numerous local victims, is vast and difficult to quantify or estimate, and the remedy for it lies in the political realm rather than in this court.

## COUNT I – VIOLATION OF RIGHTS UNDER 42 U.S.C. § 1983

**(Violation of Fourteenth Amendment Equal Protection Clause through Spiteful and Arbitrary 'Class-of-One' Treatment to Deprive Property and Liberty Rights)**

**Brought by Both Plaintiffs Against All Defendants**

966.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

967.    At all times relevant to the claims in this Count, all Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

968.    The Fourteenth Amendment to the United States Constitution guarantees that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

969.    The Equal Protection Clause protects against arbitrary and irrational government action, even where the Plaintiffs do not allege membership in a protected class or group, under the "class-of-one" theory of equal protection.

970.    Under the class-of-one theory, a Plaintiff may maintain an equal protection claim by alleging that the Plaintiff has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.

971.    Defendants, conspiring together and assisting one another to further their acts herein, deprived Plaintiffs' Fourteenth Amendment Equal Protection Clause property and liberty rights.

972.    In so doing, all Defendants violated clearly established federal law protecting Plaintiffs' property and liberty rights in manners clearly defined by the Fourteenth Amendment to the United States Constitution and by controlling federal court precedent. Their conduct was objectively unreasonable and violated clearly established constitutional rights of which reasonable officials would have known. Defendants are not entitled to qualified immunity because their conduct violated clearly established law that a reasonable official would have known.

973.    Plaintiffs were similarly situated to other North Dakotans, including without limitation those doing business with ND Commerce and NDDF in the State of North Dakota.

974.    Despite being similarly situated, Defendants intentionally treated Plaintiffs differently from others similarly situated and there was no rational basis for the difference in treatment.

975.    Each Defendant singled out the Plaintiffs for discriminatory treatment on an irrational and wholly arbitrary and capricious basis.

976.    Defendants' conduct was motivated by a spiteful effort to retaliate and punish the Plaintiffs for reasons wholly unrelated to any legitimate state objective.

977.    All others similarly situated to Plaintiffs were treated more favorably.

978.    Defendants had no rational basis or legitimate or proper government purpose in subjecting the Plaintiffs to this treatment.

979.    Defendants acted to silence, oppress, coerce, and control the Plaintiffs to conceal

their and their cronies' schemes and official misconduct, which Plaintiffs' federal reporting and process of necessary federal remediation actions relating to the Factory inadvertently butted into and revealed.

980.    Defendants have created and applied the 'Hoefer Standard' designed by them for Plaintiffs to suffer spiteful and arbitrary treatment, which:

      i.   Began in 2021 when the Defendants began work to launder the Factory upon the Plaintiffs; and then

      ii.   Escalated in 2022 when the Defendants began to control Mr. Hoefer's life, and

      iii.   Escalated again in 2023 when Defendants began a bombardment of hostile acts against the Plaintiffs, a 'shock-and-awe' retaliation campaign, and

      iv.   Reached new lows – even for Defendants – in 2024 when Defendants sought, through deceit and scheming, to sabotage Plaintiffs' third-party private financial transactions – repeatedly – while putting up a public false front of cooperation, and then

      v.   Sunk deeper into the abyss in 2025 as Defendants produced doctored public records about the Plaintiffs for media and 'called the cops' on Mr. Hoefer to get investigators from an out-of-state prosecutor sent to intimidate Mr. Hoefer's family, and as Defendants riled up or enticed or frightened BEK TV into publishing false financial information about Mr. Hoefer.

981.    Despite Plaintiffs being similarly situated to others within North Dakota over whom Defendants had authority and influence, Defendants intentionally violated the Equal Protection Clause and deprived Plaintiffs' property and liberty rights in all manners detailed above and others, including without limitation in the specific separate acts in each numbered

paragraph which immediately follows:

FACTORY DUMPING SCHEME:

982.    Defendants Albrecht, Teigen, and Lehman knowingly transferred the Factory – a property tainted by concealed federal crimes, national security violations, violence, and ongoing illicit use – to Plaintiffs, seeking to frame them for successor liability and other federal violations.

983.    Those Defendants deceived Plaintiffs about the Factory's history then hedged their bets that he might be killed, causing NDDF to take a multi-million dollar life insurance policy on Mr. Hoefer to top up NDDF's coffers for more State Insider deals if Mr. Hoefer failed to survive, and then Lehman set up for Hoefer Group to employ a complicit individual – Lehman's cohort in past Factory crime.

984.    This offloaded risks and crimes onto Plaintiffs which Plaintiffs *had to resolve* with federal authorities (some evidence Plaintiffs could not remove or destroy themselves under federal law), put Mr. Hoefer and his family in physical danger, made the property unsuitable to Plaintiffs' business and unsuited to foreign nationals and the general public – which Plaintiffs' business required open Factory access for those individuals – and caused immense financial damages to Plaintiffs' business in violation of Plaintiffs' equal rights.

985.    When the Defendants recruit other NDDF borrowers they do so to try and create jobs and opportunity.

986.    Albrecht, Teigen, and Lehman baited Plaintiffs through NDDF to bury State of ND officials' past sins and to launder away official misconduct, and in so doing Defendants also violated 18 U.S.C. § 1512(b)(2)(B).

987.    The Plaintiffs were targeted by Albrecht, Teigen and Lehman as their 'mark' to be the 'fall guy' and 'scapegoat' for State of ND officials' Factory-related misconduct. In causing

transfer of this facility to Plaintiffs, these Defendants knowingly violated 18 U.S.C. § 371 in

attempting to cause or to further others' violations of 18 U.S.C. § 793(e) and other violations,

including violations of the ITAR, AECA, and 18 U.S.C. § 38, and to attempt to frame the

Plaintiffs for potential liability as to some of that.

988.    When Lehman told Mr. Hoefer, "Be careful what you wish for," immediately after

Hoefer Group closed on the Factory purchase, Lehman *knew* he had just uniquely succeeded in

offloading his and others' federal criminal past against that property onto the Plaintiffs.

989.    Such actions constitute shocking spiteful and arbitrary treatment so as to 'get' a

borrower.

<u>THE FACTORY CONCEALMENT SCHEME:</u>

990.    Upon learning that the Plaintiffs discovered and were reporting that the Factory

had issues, Defendants Teigen, Garman, Akason, and Lehman conspired together in the ways and

manners above and others and acted to conceal Factory-related State of ND public records,

parties, and their own knowledge from the Plaintiffs that were essential to Plaintiffs' federal

reporting and relief and safety.

991.    To keep their concealment plan together, these Defendants needed to *keep* Mr.

Hoefer under their thumbs. Things almost blew up for Defendants as Mr. Hoefer found federal

help in D.C., and their first plan to violate 18 U.S.C. § 1513(e) and 18 U.S.C. § 1512(b)(2)(B)

and simply silence Mr. Hoefer, blackball him financially, terrify him into destroying evidence,

and induce him to leave North Dakota needed a rethink.

992.    These Defendants began to treat the Plaintiffs in an unprecedented and spiteful

and arbitrary manner, oppressing, coercing, threatening, and controlling Plaintiffs so as to have

their way and to seek to keep Plaintiffs liable for State of ND officials' past mess. Some of the

more notably spiteful and arbitrary 'class-of-one' treatments they subjected Plaintiffs to during this time period included, without limitation:

    i.   Repeatedly directing Plaintiffs' business and affairs;

    ii.   Repeatedly controlling Mr. Hoefer's speech – whom he could and could not speak with and about what;

    iii.   Making false reports to, and concealing, covering up, and hiding material facts from, law enforcement, and other interference to deprive Plaintiffs of relief and cause other harm;

    iv.   Keeping Plaintiffs' Factory property encumbered with: material subject to 18 U.S.C. § 793(e), a federal crime scene, and other federal evidence.

    v.   Stopping a private mortgage to keep oppressive control of Plaintiffs;

    vi.  Directing Plaintiffs to hire a conflicted lawyer who caused Plaintiffs harm;

    vii.  Retaliating against Mr. Hoefer for not signing away his rights in a 'gag-order;'

    viii.   Stopping Plaintiffs from informing media of federal crimes and from other informing;

    ix.  Forcing Mr. Hoefer to report crimes slowly and in limited scope while he and his family remained in danger and were being stalked, threatened, and hacked;

    x.   Repeatedly knowingly obtaining Mr. Hoefer's forced labor while promising to 'sort-of' reimburse him and his business with new loans which never came;

    xi.  Misleading and deceiving Plaintiffs and authorities as to the existence of ND Commerce Factory-related public records.

    xii. Directing Hoefer Group and Mr. Hoefer to discretely file a civil lawsuit against Benchmark and Tuttle to compel federal Site relief and seek damages

instead of reporting to media as Mr. Hoefer wanted, even tried, but was

threatened he could not;

xiii.    Shutting down the nationally promoted RV training program that Mr.

Hoefer and his industry had agreed to bring to North Dakota;

xiv.    As a means to their ends in depriving Plaintiffs' constitutionally protected

federal rights, Defendants as shown above and in other ways violated many

federal laws when committing the acts listed in the sub-paragraphs above,

including without limitation these: 18 U.S.C. § 1001, 18 U.S.C. § 1030, 18

U.S.C. § 1505, 18 U.S.C. § 1512(b)(3), 18 U.S.C. § 1513(e), 18 U.S.C. § 1519,

18 U.S.C. § 1589, and attempted to cause violations of 18 U.S.C. § 793(e),

AECA, ITAR, and 18 U.S.C. § 38.

993.    After the missile parts left the Site in the custody of federal criminal investigators who had not discovered State of ND officials' associations to all of that, all Defendants 'high-fived' each other and celebrated with an ND Commerce Factory media event which Plaintiffs did not want to host and which Plaintiffs' own business partners said would be bad for business – to promote the Factory over a year after purchase and following prior national press coverage without a public explanation of delays – prior to revealing production lines.

994.    The financial, professional, and reputation damages Plaintiffs incurred during this period while under Defendants' oppressive thumbs and control was in ways irreparable. But Defendants only cared about getting themselves away unscathed from the Factory mess.

THE REVENGE AND RETALIATION SCHEME:

995.    Upon learning of Plaintiffs' access to incriminating copies of ND Commerce public records which Defendants unsuccessfully tried to keep concealed, and of Plaintiffs'

cooperation with federal enforcement authorities about that and more, all Defendants conspired and acted against the Plaintiffs to retaliate, to silence the Plaintiffs, to seek revenge, and for other self-serving purposes:

996.    Some of the more shocking acts Defendants in the manners specified above and others were engaged in against the Plaintiffs as to this include, in close chronology, and without limitation:

> i.   Cutting off Plaintiffs' communications with ND Commerce and NDDF;
>
> ii.  Cutting off Plaintiffs' access to third-party (non-Defendant) NDDF board members;
>
> iii. Inventing and spreading false allegations against Mr. Hoefer to spoil perception of the Plaintiffs in the eyes of others;
>
> iv.  Cutting off Plaintiffs' access to State of ND finance, benefits, and incentives – including without limitation the promised 'reimbursement loans' and funds under Plaintiffs' existing NDDF contract;
>
> v.   Falsely alleging to third parties and to NDDF's third-party (non-Defendant) board members that Mr. Hoefer was threatening to sue ND Commerce when he was not;
>
> vi.  Repeatedly acting in many ways and using many means to chill and to retaliate against Plaintiffs' First Amendment free speech rights – including to harass and intimidate the Plaintiffs in order to hinder, delay, prevent, and dissuade Plaintiffs from further federal reporting;
>
> vii. Putting the Plaintiffs under investigation in part as immediate retaliation after Mr. Hoefer tried to petition the State of ND Attorney General for help;

viii.    Repeatedly seeking for law enforcement to investigate and indict Mr.
Hoefer;

ix.    Opening an indefinite, unfair administrative investigation against Plaintiffs,
which was begun under pretext of Defendants' false and made-up criminal
misconduct allegations;

x.    Making false statements to influence lending to stop Plaintiffs' private
financing;

xi.    Threatening and influencing banks to stop financing to Plaintiffs;

xii.    Spreading false criminal misconduct allegations against Plaintiffs worldwide;

xiii.    Repeatedly attempting – through use of wire fraud – to compel Mr. Hoefer
to perjure himself;

xiv.    Repeatedly attempting, using unlawful means, to 'take' the Factory and
shut down Plaintiffs' business;

xv.    Asking Plaintiffs' third-party lenders if they supported Defendants making a
criminal "misuse" of State of ND funds allegation against Mr. Hoefer;

xvi.    Telling third parties that an administrative investigation found criminal
misconduct by Mr. Hoefer, when the 'investigation' was in fact abandoned
and there was never a report, finding, or conclusion, and when Defendants
concealed exculpatory evidence, and when Plaintiffs were deprived of the
opportunity to be heard;

xvii.    Arbitrarily defaulting Plaintiffs' 5-year expected NDDF contract benefit at
2 years so as to create yet another mechanism by which to stop private third-
party financing to Plaintiffs;

xviii.   Creating a trail of false public records showing Defendants' support of Plaintiffs, so as to conceal Defendants' sabotage of Plaintiffs;

xix.    Repeatedly making deceitful promises and misrepresentations and 'moving goal posts' to sabotage and stop private third-party financing to Plaintiffs;

xx. Controlling the message with North Dakota politicians and law enforcement and making false and misleading statements about the Plaintiffs to stop help from coming to Plaintiffs;

xxi.    Seeking to incite a third-party (non-Defendant) involved in Factory schemes to violence against Mr. Hoefer or his family;

xxii.   Misappropriating Plaintiffs' protected trade secrets to cause Plaintiffs' harm;

xxiii.  Presenting public records about the Plaintiffs in a false and misleading light;

xxiv.   Influencing or enticing media to spread damaging, false information about Mr. Hoefer, including that he had a personal bankruptcy when he never did;

xxv.    As a means to their ends in depriving Plaintiffs' constitutionally protected federal rights, Defendants as shown above and in other ways violated many federal laws when committing the acts listed in the sub-paragraphs above, including without limitation these: 18 U.S.C. § 1014, 18 U.S.C. § 1343, 18 U.S.C. § 1512(b)(3), 18 U.S.C. § 1512(d)(2), 18 U.S.C. § 1513(e), 18 U.S.C. § 1589, 18 U.S.C. § 1832, and attempted violation of 18 U.S.C. § 1622.

## HARM:

997.  Defendants have repeatedly sabotaged Plaintiffs' private financial transactions,

diminished or ruined Plaintiffs' business relationships, harmed Plaintiffs' business operations, ruined partnerships, caused – through their public and private aggression and hostilities – personal and professional acquaintances to be leery of Mr. Hoefer or stay away, harmed Plaintiffs' business reputation with the RV industry, media, and consumers, and caused an environment of life-altering emotional distress, fear, and real danger for Mr. Hoefer and his family.

998.    Defendants' multiple malicious acts scared third parties and even frightened the general public away from the Plaintiffs and spurred public scorn and ridicule against Plaintiffs, and Defendants without cause other than spiteful and arbitrary treatment to further their own self-interests, made the Plaintiffs out to be North Dakota's 'lepers.' Many third parties remain afraid to engage Plaintiffs for fear that Defendants might send retaliation their way.

999.    Defendants' same acts – the lies they spread about Mr. Hoefer and his business – which have irreparably harmed Plaintiffs' reputations worldwide have also tangibly altered Plaintiffs' legal rights and status and caused Plaintiffs financial loss in ways which include but are not limited to:

> i.   Causing the NDDF board to withdraw its support from Hoefer Group, to freeze and then default Plaintiffs' State of ND benefit – the NDDF contract, which was one of many financing transaction cancellations or losses caused by Defendants' acts and involving both public and private financial deals comprising State of ND and non-State of ND deals affecting both protected property interests and tangible interests.
>
> ii.  Causing BND's CEO Don Morgan to refuse BND to follow through with the earlier-promised BND mortgage co-participation, *even after a lead private bank had underwritten a $4 million mortgage and requested co-participation*

*from BND.* Morgan told a banker and a State of ND legislator that Defendants' hostilities to Plaintiffs through ND Commerce were stopping the deal, which was otherwise good, and BND refused the transaction, which then caused the private bank to be unable to complete the transaction. This occurred in other forms with other lenders and deprived Plaintiffs of a variety of liberty rights and protected property interests and tangible interests.

iii. One potential partner to Plaintiffs' business backed out of a $10+ million deal fearing that the State of ND's public hostility to Plaintiffs – which hostility the Defendants, for their own self-serving reasons, maliciously caused the State of ND to express – was going to get Mr. Hoefer killed, and that this alone made the deal too risky. A representative of that partner later called Mr. Hoefer and told him the deal would have proceeded if not for the Defendants' public allegations. Other deals also fell apart over the public allegations, and thus Defendants repeatedly deprived Plaintiffs' protected property interests.

1000. The stigma Defendants caused to be attached to Plaintiffs prevented Plaintiffs from obtaining relief from other State of ND authorities as to liberty rights infringements.

1001. Defendants made up many allegations against the Plaintiffs simply to vilify Mr. Hoefer and Hoefer Group and to stigmatize them to fail their business, to cause lasting career harm, to endanger Mr. Hoefer and his family, and so that no one would realize Plaintiffs were the Defendants' victims.

1002. Because of Defendants' acts, including without limitation Defendants' scheme to mislead law enforcement about the Plaintiffs' reporting:

i.   Mr. Hoefer was terrorized/threatened by a federal agent who is now a
confessed and incarcerated murderer.

ii.  Mr. Hoefer was at times warned by others – even warned by law enforcement
– not to travel, and that he must change all of his life and family habits, and to
constantly watch his back to avoid risk of physical harm or death by an
assailant or plot against his life because of who he crossed and who he outed
to get his name cleared and disentangled from the federal criminal mess of
others.

iii. A State of ND law enforcement special agent, who had misled federal
authorities about the federal offenses Mr. Hoefer reported, later said he is
shocked Mr. Hoefer remains alive because Mr. Hoefer's truthful reporting has
"pissed off so many people."

iv.  Mr. Hoefer has traveled out of North Dakota, and while out-of-state he has
been approached by a stranger and told not to return to North Dakota. Mr.
Hoefer and his family have been followed and stalked on multiple occasions,
including while far from home at a hotel. At another hotel, Mr. Hoefer
received a phone call which purported to be from maintenance, but then the
voice turned aggressive, and that day others tried to get him to leave his room.

v.   As many as four law enforcement officers have suffered career retaliation for
trying to help Mr. Hoefer and his family stay safe and obtain relief.

1003.  New professional engagements relating to Plaintiffs' finance, investments, and
partnerships are tainted, as Plaintiffs are almost always asked to defend against the Defendants'
preposterously false public allegations which remain online, and then Plaintiffs are required to

197

explain other manners of Defendants' targeting the Plaintiffs have suffered. Many potential partners, frightened or overwhelmed at Defendants' acts, did not proceed and/or will not in the future proceed to engage, partner, or transact with Plaintiffs because of Defendants.

1004.   Because of Defendants' many acts, Mr. Hoefer is now treated like a zoo animal by many professionals and others – someone they look at but stay away from.

1005.   Third-parties to whom Mr. Hoefer formerly enjoyed close access to or for whom Mr. Hoefer could formerly obtain their time and/or resources and/or professional engagements and/or partnerships if he sought them are now, in many cases, frightened or leery to engage with him or they stay away altogether.

1006.   Defendants have never provided an avenue of relief for the Plaintiffs to become absolved of the false allegations, and Defendants maintain these allegations as well as keeping on 'lock up' or defaulted all of the Plaintiffs' State of ND financing and incentives, forever.

1007.   In the manners shown above and others, Defendants in intentionally violating Plaintiffs' Fourteenth Amendment equal protection rights, also deprived Plaintiffs of a variety of Plaintiffs' property rights, including without limitation: Plaintiffs' (a) real property rights, (b) personal property rights, (c) contract rights, (d) property rights arising from benefits and business expectancy, and (e) other property rights.

1008.   In the manners shown above and others, and in intentionally violating Plaintiffs' Fourteenth Amendment equal protection rights, the Defendants deprived a variety of Plaintiffs' liberty rights – in a manner which caused tangible alterations of legal rights and status – including without limitation: Plaintiffs' (a) reputation rights, (b) autonomy rights, (c) rights to be free from being arbitrarily and spitefully subjected to public scorn and humiliation and ridicule, and (d) other liberty rights.

1009.   When Albrecht, Garman, Akason, and Lehman met in December 2024 with State of ND legislators, including with the State Senate Majority Leader, Akason openly admitted that the Defendants *knew* their false and unprecedented public allegations of criminal misconduct against the Plaintiffs had caused continuing worldwide financial and other harm to Plaintiffs.

1010.   Akason said, "And I understand the, the consequences that [publicizing a baseless, spiteful, unproven, knowingly false, arbitrary 'misuse' of State of ND funds allegation against Plaintiffs] can have, um, with respect to the [third-party] financial partners, which is why we're [Defendants through NDDF] not collecting [on Plaintiffs' NDDF contract which Defendants spitefully and arbitrarily caused to be defaulted]."

<u>DAMAGES:</u>

1011.   Each act above constitutes a separate and independent violation and basis for recovery for which relief is warranted.

1012.   As a direct and proximate result of Defendants' unconstitutional actions, Plaintiffs have suffered damages to their property interests and to their liberty interests, which harm and damages are detailed more fully in the Nature of Damages and Harm section and elsewhere above and throughout this complaint. Plaintiffs are also entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

1013.   An award of punitive damages is appropriate to the fullest extent permitted by law, because (a) Defendants acted with evil motive or demonstrated reckless indifference to the constitutional rights of the Plaintiffs; (b) Defendants evidenced malicious or evil intent in callous disregard of the Plaintiffs' federally protected rights; and (c) Defendants' conduct was oppressive and each Defendant misused authority or exploited the Plaintiffs' weakness.

## COUNT II – VIOLATION OF RIGHTS UNDER 42 U.S.C. § 1983

**(Violation of First and Fourteenth Amendment Rights – Retaliation, Suppression, and 'Chilling' of Exercise of Protected Free Speech Rights, and of Exercise of Protected Right to Petition)**

**Brought by Both Plaintiffs Against All Defendants**

1014.   Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

1015.   At all times relevant to the claims in this Count, all Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

1016.   The First Amendment to the United States Constitution – incorporated through the Fourteenth Amendment to the United States Constitution as to its applicability to states – guarantees that no state shall abridge the Plaintiffs' "freedom of speech" or the right "to petition the Government for a redress of grievances."

1017.   The Plaintiffs' reporting to, cooperating with, and informing federal authorities – including law enforcement and civil/administrative officials – and others about, the commission or possible commission of crime are protected speech activities under the First Amendment.

1018.   The Plaintiffs' petitioning the government – including without limitation federal, local, and state law enforcement and civil/administrative authorities – for a redress of grievances over the Defendants' and others' crime and misconduct, including misconduct by state actors, are protected petitioning activities under the First Amendment.

1019.   Defendants conspired together and they assisted one another to further their acts herein, and they sought to silence, suppress, and chill, and to retaliate against, Plaintiffs' First Amendment protected activities including Plaintiffs' speech and petitioning rights.

1020.   In so doing, all Defendants violated clearly established federal law protecting Plaintiffs' speech and petitioning rights in manners clearly defined by the First Amendment to

200

the United States Constitution – as incorporated through the Fourteenth Amendment – and by controlling federal court precedent. Their conduct was objectively unreasonable and violated clearly established constitutional rights of which reasonable officials would have known. Defendants are not entitled to qualified immunity because their conduct violated clearly established law that a reasonable official would have known.

1021.   The Plaintiffs' speech and conduct in the manners described above and shown herein and in other manners was protected under the First Amendment.

1022.   Defendants were subjectively motivated to take adverse actions against the Plaintiffs because of Plaintiffs' protected First Amendment speech and petitioning activities.

1023.   The Plaintiffs' protected activities were a substantial and motivating factor in the Defendants' conduct.

1024.   The Defendants' actions against the Plaintiffs would chill a person of ordinary firmness from continuing to engage in the protected activities.

1025.   The Defendants' actions against the Plaintiffs would likely deter a similarly situated reasonable person from continuing to engage in the protected activities.

1026.   Defendants have also threatened others with retaliation for their plans to engage in First Amendment protected activities to help the Plaintiffs obtain relief, and those others *were* deterred and did not engage in the protected activities, or did so in ways which were controlled or influenced by Defendants – and ways which pleased and suited the Defendants.

1027.   The Defendants intended to interfere with Plaintiffs' First Amendment rights and Plaintiffs suffered injury as a result.

1028.   Defendants' retaliatory conduct adversely affected the Plaintiffs' protected First Amendment rights.

1029.    Defendants acted against Plaintiffs' First Amendment rights to silence, oppress, coerce, control, and retaliate against the Plaintiffs, and for other self-serving reasons, to conceal Defendants' and their cronies' schemes and official misconduct, which Plaintiffs' federal reporting and process of necessary federal remediation actions relating to the Factory inadvertently butted into and revealed.

1030.    Defendants intentionally violated Plaintiffs' First Amendment Rights and deprived Plaintiffs' rights to protected speech and to protected petitioning in all manners detailed above and others – to control and chill speech, squelch it at times, and retaliate for speech which had already occurred at other times – including without limitation in the specific separate acts in each numbered paragraph which immediately follows:

    i.    Teigen, Akason, and on information and belief, Garman and Lehman, took threatening and retaliatory actions against the Plaintiffs' federal reporting to 'chill' that reporting, and to suppress and stop it, and to retaliate for reporting that had already occurred when they acted against the Plaintiffs' business in September 2022 in the manners detailed above and in Count I.

    ii.    Beginning October 2022 and into mid-2023, Teigen, Akason, Garman, and on information and belief, Lehman repeatedly controlled Mr. Hoefer's speech – using legal threats and threats of serious harm and other coercive means – telling him whom he could and could not speak with and about what;

    iii.    Teigen, Akason, Garman, and on information and belief, Lehman repeatedly – through the threats and means available to them as shown above – stopped Plaintiffs from informing to third-parties, including to Plaintiffs' business associates and lenders and others close to Mr. Hoefer, about the Defendants'

engagements with the Plaintiffs in relation to the Factory and about the federal Factory mess and state and federal crimes to which Plaintiffs were victims, and about Plaintiffs' cooperation with and reporting to law enforcement.

iv. Teigen, Akason, Garman, and on information and belief, Lehman repeatedly – through the threats and means available to them as shown above – stopped Plaintiffs from informing to media about the Defendants' engagements with the Plaintiffs in relation to the Factory and about the federal Factory mess and state and federal crimes to which Plaintiffs were victims, and about Plaintiffs' cooperation with and reporting to law enforcement.

v. Teigen, Akason, Garman, and on information and belief, Lehman repeatedly – through the threats and means available to them as shown above – caused Mr. Hoefer to report crimes slowly and in limited scope while he and his family remained in danger and were being stalked, threatened, and hacked.

vi. Teigen, Akason, Garman, and on information and belief, Lehman through their agent threatened Plaintiffs for seeking to make an ND Commerce public records request, and threatened that Plaintiffs must not do so. Plaintiffs feared greatly this threat of retaliation, did not request the records, and instead did as the Defendants through Akason, Garman, and their agent told Plaintiffs to do.

vii. To further deprive Plaintiffs of their First Amendment rights, Teigen, Akason, Garman, and on information and belief, Lehman deceptively conspired to situate a private viewing for the Plaintiffs of what their agent said amounted to 'all ND Commerce Factory-related records after 2015' which this agent said

included a total of 'no records' when there were in fact hundreds or thousands

of pages of such records then existing and known to Defendants.

1031.   Then, in July 2023, Mr. Hoefer independently uncovered copies of ND Commerce

public records which the Defendants had been actively, maliciously, and deceptively concealing

from the Plaintiffs, doing so in harmful ways which deprived Plaintiffs' property and liberty

rights, and which kept the Plaintiffs' Factory encumbered and which kept Mr. Hoefer in danger.

1032.   Then Defendants began to retaliate aggressively against Plaintiffs' protected First

Amendment activities, realizing that Plaintiffs were cooperating with requests from federal law

enforcement and other federal investigators and were reporting these records and their meaning

and contents to assist in both civil and criminal federal proceedings and investigations.

1033.   After Plaintiffs uncovered copies of the ND Commerce public records Defendants

had been concealing from them – and concealing from federal law enforcement authorities who

were investigating what Plaintiffs found at the Factory and what had been occurring there which

did not relate to Plaintiffs, but which was in ways unlawfully framing Plaintiffs – Defendants

also intentionally violated Plaintiffs' First Amendment Rights and deprived Plaintiffs' rights to

protected speech and to protected petitioning in all manners detailed above and others – to

control and chill speech, squelch it at times, and retaliate for speech which had already occurred

at other times – including without limitation in the specific separate acts in each numbered

paragraph which immediately follows:

> i.   All Defendants in September 2023 cut off Plaintiffs' communications with ND
>
> Commerce and NDDF;
>
> ii.   All Defendants in September 2023 cut off Plaintiffs' access to third-party
>
> (non-Defendant) NDDF board members, which continues.

iii.  All Defendants invented and spread false allegations against Mr. Hoefer;

iv.  All Defendants cut off Plaintiffs' access to State of ND finance, benefits, and incentives;

v.  All Defendants falsely alleged to third parties and to NDDF's third-party (non-Defendant) board members that Mr. Hoefer was threatening to sue ND Commerce when he was not;

vi.  All Defendants put the Plaintiffs under investigation in part as immediate retaliation after Mr. Hoefer tried to petition the State of ND Attorney General for help;

vii. All Defendants repeatedly sought law enforcement to investigate and indict Mr. Hoefer;

viii.    All Defendants opened an indefinite administrative investigation against Plaintiffs, which was begun under pretext of Defendants' false and made-up criminal misconduct allegations;

ix.  All Defendants made or caused false statements to be made to influence lending to stop Plaintiffs' private financing;

x.  All Defendants threatened and influenced banks to stop financing to Plaintiffs;

xi.  Akason, in conspiracy with and acting in cooperation with all Defendants, spread false criminal misconduct allegations against Plaintiffs worldwide;

xii. Garman and Akason, and on information and belief, all Defendants repeatedly attempted, through the use of wire fraud, to compel Mr. Hoefer to perjure himself;

xiii.    Garman and Akason, and on information and belief, all Defendants repeatedly attempted, using unlawful means, to 'take' the Factory and shut down Plaintiffs' business;

xiv.    Akason, and on information and belief, all Defendants conspired to direct their agent to ask Plaintiffs' third-party lenders if they support Defendants making a criminal "misuse" of State of ND funds allegation against Mr. Hoefer – this act had the chilling effect of making Mr. Hoefer aware that the Defendants would recruit others to manufacture allegations against Plaintiffs if Plaintiffs continued to exercise their protected First Amendment rights;

xv. Akason and Garman, and on information and belief, all Defendants told third parties that an administrative investigation found criminal misconduct by Mr. Hoefer, when it was in fact abandoned and there was never a report, finding, or conclusion, when Defendants concealed exculpatory evidence, and when Plaintiffs were never given opportunity to be heard;

xvi.    All Defendants acted to cause the spiteful, retaliatory, and arbitrary default of Plaintiffs' 5-year expected NDDF contract benefit at 2 years so as to create yet another mechanism by which to stop private third-party financing to Plaintiffs;

xvii.    All Defendants made false reports about the Plaintiffs to North Dakota politicians and law enforcement to frighten the Plaintiffs into staying silent.

xviii.   All Defendants caused misappropriation of Plaintiffs' protected trade secrets to cause Plaintiffs' harm, and to make Plaintiffs fear that their business will not be safe if they continue to exercise First Amendment rights.

xix.   All Defendants disclosed and/or caused to be disclosed – and/or they themselves presented – public records about the Plaintiffs in a false and misleading light, which showed the Plaintiffs that the Defendants were willing to paint the Plaintiffs in a false and misleading light if Plaintiffs would not give up exercising Plaintiffs' protected First Amendment rights.

xx. All Defendants influenced or enticed media on multiple occasions to spread damaging, false information about Mr. Hoefer, including Defendants' false allegations that Mr. Hoefer was engaged in criminal activity when he never was and that he had a personal bankruptcy when he never did.

### HARM:

1034.   Even a resolute – and not an ordinary – person of extraordinary – and not an ordinary – firmness would be 'chilled' or silenced under the circumstances above.

1035.   The Defendants harassed and terrified the Plaintiffs so as to deprive Plaintiffs' protected First Amendment speech and petitioning rights.

1036.   Because of the Defendants' acts, Mr. Hoefer was in many instances shown above and others afraid to speak out, and the Plaintiffs in many instances stayed silent instead, or did as the Defendants told them to do.

1037.   By late 2023 and until late 2024, the Defendants' barrage of retaliatory, unlawful attacks against the Plaintiffs' First Amendment rights had largely chilled Plaintiffs' speech and petitioning, and even stopped Plaintiffs from asking for the completion of law enforcement relief they so desperately needed. Plaintiffs made only a few essential reports between September 2023 and June 2024, until the pressure of Defendants' relentless retaliation became too much for Mr. Hoefer to bear, and then he prepared to go public with the help of State of ND legislators.

1038.   The Defendants wanted Mr. Hoefer and his business gone from North Dakota and the Defendants tried to send the Plaintiffs away, and did so in substantial part in retaliation for Plaintiffs' exercise of their First Amendment rights. Mr. Hoefer and Hoefer Group wanted to stay in North Dakota.

1039.   Defendants' same acts in intentionally abusing Plaintiffs' First Amendment rights – including the lies they spread about Mr. Hoefer and his business, and the legal processes and State of ND agencies they abused to silence him – have irreparably harmed Plaintiffs' reputations worldwide have also tangibly altered Plaintiffs' legal rights and status and caused Plaintiffs financial loss.

1040.   The stigma Defendants caused to be attached to Plaintiffs in intentionally abusing Plaintiffs' First Amendment rights prevented Plaintiffs from obtaining relief from other State of ND authorities as to liberty rights infringements, in part as Defendants' acts brought the Plaintiffs into submission to them, and kept Plaintiffs silent.

1041.   In the manners shown above and others, Defendants in intentionally abusing Plaintiffs' First Amendment rights, also deprived Plaintiffs of a variety of Plaintiffs' property rights, including without limitation: Plaintiffs' (a) real property rights, (b) personal property rights, (c) contract rights, (d) property rights arising from benefits and business expectancy, and (e) other property rights including rights to seek relief from crime.

1042.   In the manners shown above and others, and in intentionally abusing Plaintiffs' First Amendment rights, the Defendants deprived a variety of Plaintiffs' liberty rights – in a manner which caused tangible alterations of legal rights and status – including without limitation: Plaintiffs' (a) reputation rights, (b) autonomy rights, (c) rights to be free from being arbitrarily and spitefully subjected to public scorn and humiliation and ridicule, and (d) other liberty rights

208

including rights to seek relief from crime.

DAMAGES:

1043.   Each act above constitutes a separate and independent violation and basis for recovery for which relief is warranted.

1044.   As a direct and proximate result of Defendants' unconstitutional actions, Plaintiffs have suffered damages to their property interests and to their liberty interests, which harm and damages are detailed more fully in the Nature of Damages and Harm section and elsewhere above and throughout this complaint. Plaintiffs are also entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

1045.   An award of punitive damages is appropriate to the fullest extent permitted by law, because (a) Defendants acted with evil motive or demonstrated reckless indifference to the constitutional rights of the Plaintiffs; (b) Defendants evidenced malicious or evil intent in callous disregard of the Plaintiffs' federally protected rights; and (c) Defendants' conduct was oppressive and each Defendant misused authority or exploited the Plaintiffs' weakness.

**COUNT III – VIOLATION OF RIGHTS UNDER 42 U.S.C. § 1983**

**(Violation of Fourteenth Amendment Equal Protection Clause through Discriminatory Treatment of Member of a Protected Class)**

**Brought by Both Plaintiffs Against All Defendants**

1046.   Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

1047.   At all times relevant to the claims in this Count, all Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

1048.   The Fourteenth Amendment to the United States Constitution guarantees that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

209

1049.   The Equal Protection Clause protects against discriminatory treatment against a person who is a member of a protected class or group, who was treated differently than another similarly situation person who was not a member of that class.

1050.   Plaintiffs are members of a protected class or group of witnesses, victims, and informants who have provided information to law enforcement for federal investigations.

1051.   Multiple federal laws identify and ascribe protections to this class or group of individuals, including 18 U.S.C. § 1513(e) which protect members of this class or group from retaliation and harm by nature of their cooperation with law enforcement.

1052.   18 U.S.C. § 1513(e) prohibits any person from "knowingly, with the intent to retaliate" taking "any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of a federal offense."

1053.   Congress has made it clear that witnesses, victims, and informants – who provide truthful information relating to the commission or possible commission of a federal offense to law enforcement – are protected in a variety of ways both individually and as a class or group, to be free from retaliation, interference, harm, harassment, intimidation, coercion, and other misconduct by others relating to their truthful reporting or testimony. Congress has determined that such class of persons requires special protection concerning their civil rights and has enacted those protections, including within the provisions of 18 U.S.C. § 1513(e) and related statutes.

1054.   Defendants made a mockery of the protections Congress has offered to this protected class or group of persons by infringing upon Plaintiffs' Fourteenth Amendment Equal Protection rights, in the manners and for the reasons alleged throughout this complaint.

1055.   Plaintiffs have been actively involved in federal law enforcement and federal

regulatory agency investigations as informants, witnesses, and victims, wherein Plaintiffs have provided truthful information to special agents from FBI, DCIS OIG, CID's Major Fraud Unit, NCIS, OSI, IRS CI, and HSI, and to investigatory authorities from DDTC and FAA, concerning false claims and aerospace fraud (believed to exceed $300 million) in regards to national security and flight safety concerns. Plaintiffs are not the target of these investigations.

1056.   Plaintiffs have provided to those federal authorities shown above and to other federal authorities truthful information relating to the commission or possible commission of federal offenses.

1057.   Lehman is implicated by information Plaintiffs have been providing to federal law enforcement.

1058.   All Defendants have been concerned information Plaintiffs have been providing to federal law enforcement is potentially incriminating and certainly unflattering as to them.

1059.   Defendants have singled out Plaintiffs from among this protected class or group of federal informants and witnesses.

1060.   Defendants have treated Plaintiffs differently from other similarly situated persons who are not members of this class or group.

1061.   Defendants subjected Plaintiffs to a difference in treatment because of Plaintiffs' membership in this protected class or group of federal witnesses, victims, and informants.

1062.   Defendants acted against Plaintiffs with a discriminatory purpose and intent and treated the Plaintiffs differently because of, not merely in spite of, Plaintiffs' membership in this protected class or group of federal witnesses, victims, and informants.

1063.   Each Defendant singled out the Plaintiffs for discriminatory treatment.

1064.   Defendants, each and in conspiracy with each other, retaliated against Plaintiffs

because Plaintiffs were telling federal law enforcement truthful things about the commission or possible commission of federal offenses that the Defendants did not want Plaintiffs to say.

1065.   Defendants retaliated against Plaintiffs because Defendants also sought to stop Plaintiffs from continuing to report truthfully to federal law enforcement about the commission or possible commission of federal offenses.

1066.   Plaintiffs truthfully reported to federal law enforcement about the commission or possible commission of federal offenses as part of a federal reporting process necessary to accomplish federal remedial actions relating to the Factory, which inadvertently butted into and then revealed what the Defendants had been trying to keep concealed.

1067.   Defendants, conspiring together and assisting one another to further their acts herein, deprived Plaintiffs' Fourteenth Amendment Equal Protection Clause rights by subjecting Plaintiffs to discriminatory and harmful treatment as described throughout this complaint due to Plaintiffs' membership in a protected class or group.

1068.   In so doing, all Defendants violated clearly established federal law protecting Plaintiffs' property and liberty rights in manners clearly defined by the Fourteenth Amendment to the United States Constitution and by controlling federal court precedent. Their conduct was objectively unreasonable and violated clearly established constitutional and legal rights of which reasonable officials would have known. Defendants are not entitled to qualified immunity because their conduct violated clearly established law that a reasonable official would have known.

1069.   Plaintiffs were similarly situated to other North Dakotans, including without limitation those doing business with ND Commerce and NDDF in the State of North Dakota.

1070.   Despite being similarly situated, Defendants intentionally treated Plaintiffs

differently from others similarly situated and there was no rational basis for the difference in treatment.

1071.   Defendants' conduct was motivated by a spiteful, discriminatory effort to retaliate and punish the Plaintiffs for reasons wholly unrelated to any legitimate state objective.

1072.   All others similarly situated to Plaintiffs were treated more favorably.

1073.   Defendants had no rational basis or legitimate or proper government purpose in subjecting the Plaintiffs to this treatment.

1074.   Despite Plaintiffs being similarly situated to others within North Dakota over whom Defendants had authority and influence, Defendants intentionally violated the Equal Protection Clause and deprived Plaintiffs' property and liberty rights in all manners detailed above and others, including without limitation in the specific separate acts in each numbered paragraph which immediately follows:

<u>THE FACTORY CONCEALMENT SCHEME:</u>

1075.   Upon learning that the Plaintiffs discovered and were reporting that the Factory had issues, Defendants Teigen, Garman, Akason, and Lehman conspired together in the ways and manners above and others and acted to conceal Factory-related State of ND public records, parties, and their own knowledge from the Plaintiffs that were essential to Plaintiffs' federal reporting and relief and safety. Knowing Plaintiffs had become federal witnesses and informants, Defendants acted against Plaintiffs for that.

1076.   To keep their concealment plan together, these Defendants needed to *keep* Mr. Hoefer under their thumbs. Before Mr. Hoefer found federal help in D.C., Defendants violated 18 U.S.C. § 1513(e) and 18 U.S.C. § 1512(b)(2)(B) and sought to silence Mr. Hoefer, blackball him financially, terrify him into destroying evidence, and induce him to leave North Dakota.

1077.   Then Teigen, Akason, Garman, and Lehman began to treat the Plaintiffs in an unprecedented discriminatory manner, oppressing, coercing, threatening, and controlling Plaintiffs so as to have their way. Some of the more notably spiteful, arbitrary, and harmful discriminatory treatments they subjected Plaintiffs to during this time period included without limitation all those acts shown above in Count I.

1078.   The financial, professional, and reputation damages Plaintiffs incurred during this period while under Defendants' oppressive thumbs and control was in ways irreparable. But Defendants only cared about getting themselves away unscathed from the Factory mess.

1079.   Defendants had singled out Plaintiffs because Plaintiffs were members of a protected class or group of federal witnesses, victims, and informants who were giving truthful information to federal law enforcement – information whose disclosure Defendants sought to prevent through their misuse and abuse of their official positions against the Plaintiffs.

<u>HARM AND RETALIATION AFTER PLAINTIFFS FOUND THE PUBLIC RECORDS:</u>

1080.   Upon learning of Plaintiffs' access to incriminating copies of ND Commerce public records which Defendants unsuccessfully tried to keep concealed, and of Plaintiffs' cooperation with federal enforcement authorities about that and more, all Defendants conspired and acted to retaliate, to silence the Plaintiffs, and to seek revenge.

1081.   Plaintiffs pleaded with Defendants Garman, Akason, and Lehman on September 27, 2023 for them to come to reason and stop mistreating Plaintiffs, and Mr. Hoefer expressed fears of retaliation from Defendants, because Plaintiffs had provided – and would continue to provide – truthful information to federal law enforcement regarding the commission or possible commission of federal offenses relating to the necessary federal Factory remediation.

1082.   Then all Defendants, knowing the Plaintiffs had found out what Teigen, Garman,

Akason, and Lehman had spent nearly a year concealing, and which Albrecht also sought to

conceal, and that Plaintiffs had reported and would continue to report truthfully to federal law

enforcement about it all, weaponized all the state powers, authority, and influence available to

them to target the Plaintiffs, so that no others – especially federal law enforcement – would

believe the Plaintiffs.

1083.   Plaintiffs had been Defendants' mark all along, and there was still much more

Defendants were concealing.

1084.   Defendants sought to turn their victims into infamous pariahs in North Dakota.

1085.   After Plaintiffs' July 2023 public records discovery, and Plaintiffs August and

September 2023 pleadings with Defendants to come to reason and *not* retaliate for Plaintiffs'

truthful federal reporting to law enforcement of the commission or possible commission of

federal offenses, some of the more shocking acts Defendants – in the manners specified above

and others – were engaged in against the Plaintiffs as to this include, in close chronology, and

without limitation all those acts shown above in Count I.

<u>HARM:</u>

1086.   Defendants incorporate all harm shown above in Count I and Count II, including

as to deprivations of numerous protected property interests, tangible interests, and liberty rights.

1087.   Discriminating against Plaintiffs because of their membership in a protected class

or group, and retaliating against Plaintiffs for federal informing to law enforcement of the

commission or possible commission of federal offenses, and targeting Plaintiffs for being victims

of federal crime which includes of crimes committed by Defendants, Defendants have repeatedly

sabotaged Plaintiffs' private financial transactions, diminished or ruined Plaintiffs' existing and

prospective business relationships, harmed Plaintiffs' business operations, ruined partnerships,

caused – through their malicious acts – personal and professional acquaintances to be leery of Mr. Hoefer or stay away, harmed Plaintiffs' business reputation with the RV industry, media, consumers, and the general public, and caused an environment of life-altering emotional distress, fear, and real danger for Mr. Hoefer and his family.

1088.   The stigma Defendants caused to be attached to Plaintiffs prevented Plaintiffs from obtaining relief from other State of ND authorities as to liberty rights infringements.

1089.   Defendants made up many allegations against the Plaintiffs designed to vilify Mr. Hoefer and Hoefer Group and to stigmatize them to fail their business, to cause lasting career harm, and so that no one would realize Plaintiffs were the Defendants' victims.

1090.   In the manners shown above and others, Defendants in intentionally violating Plaintiffs' Fourteenth Amendment equal protection rights, also deprived Plaintiffs of a variety of Plaintiffs' property rights, including without limitation: Plaintiffs' (a) real property rights, (b) personal property rights, (c) contract rights, (d) property rights arising from benefits and business expectancy, and (e) other property rights.

1091.   In the manners shown above and others, and in intentionally violating Plaintiffs' Fourteenth Amendment equal protection rights, the Defendants deprived a variety of Plaintiffs' liberty rights – in a manner which caused tangible alterations of legal rights and status – including without limitation: Plaintiffs' (a) reputation rights, (b) autonomy rights, (c) rights to be free from being arbitrarily and spitefully subjected to public scorn and humiliation and ridicule, and (d) other liberty rights.

<u>DAMAGES:</u>

1092.   Each act above constitutes a separate and independent violation and basis for recovery for which relief is warranted.

1093.   As a direct and proximate result of Defendants' unconstitutional actions, Plaintiffs have suffered damages to their property interests and to their liberty interests, which harm and damages are detailed more fully in the Nature of Damages and Harm section and elsewhere above and throughout this complaint. Plaintiffs are also entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

1094.   An award of punitive damages is appropriate to the fullest extent permitted by law, because (a) Defendants acted with evil motive or demonstrated reckless indifference to the constitutional rights of the Plaintiffs; (b) Defendants evidenced malicious or evil intent in callous disregard of the Plaintiffs' federally protected rights; and (c) Defendants' conduct was oppressive and each Defendant misused authority or exploited the Plaintiffs' weakness.

## COUNT IV – VIOLATION OF RIGHTS UNDER 42 U.S.C. § 1983

**(Violation of Fourteenth Amendment Procedural Due Process Rights Depriving Property and Liberty Rights)**

**Brought by Both Plaintiffs Against All Defendants**

1095.   Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

1096.   At all times relevant to the claims in this Count, all Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

1097.   The Fourteenth Amendment to the United States Constitution guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law."

1098.   The Fourteenth Amendment's procedural due process clause limits the state's arbitrary exercise of its powers, and prohibits the deprivation of Plaintiffs' liberty or property without fair procedure.

1099.   Procedural due process refers to constitutional requirements, that when a state acts

in such a manner that denies Plaintiffs of a liberty or property interest, Plaintiffs must be given notice, the opportunity to be heard, and a decision by a neutral decision-maker.

1100.   Defendants conspired together and they assisted one another to further their acts herein, and they deprived Plaintiffs' procedural due process rights and in so doing they deprived Plaintiffs' liberty rights, tangible interests, and protected property interests.

1101.   Plaintiffs independently obtained copies of ND Commerce Factory-related public records from 2016-2019 – which revealed outrageous federal violations when viewed with Factory evidence discoveries. Plaintiffs took the brave, ethical, moral, and prudent business step to provide these records to requesting federal criminal law enforcement investigators – and federal civil enforcement investigators – in large part so as to piece together the missing parts of the 'how,' 'what,' and 'who' relating to the potential serious federal Factory liabilities that were heaped upon Plaintiffs to resolve, and so the Plaintiffs could enjoy their Factory property free of liabilities. Defendants went 'bonkers' upon learning of this.

1102.   For all reasons above and others, Defendants were angry at the Plaintiffs and in September 2023 they commenced a 'We'll call him a crook, we just need to figure out how,' scheme, in which they began promoting to third parties that 'Mr. Hoefer is bad – stay away.'

1103.   And then, in North Dakota's political, business, banking, and media circles, and publicly, all Defendants executed a scheme whereby they accused Plaintiffs of serious crimes in manners that caused great reputation harm and liberty deprivations occurring in conjunction with deprivations of tangible interests and protected property interests.

1104.   Defendants stigmatized Plaintiffs with *knowingly* false accusations of criminal misconduct by Plaintiffs, including "blackmail," "extortion," and "misuse" of State of ND monies, and they made these allegations to many third parties. Akason broadcast these three false

218

allegations worldwide with the assistance and coordination of each Defendant.

1105.  Defendants financially 'blackballed' and publicly humiliated Plaintiffs quickly and aggressively, expecting Plaintiffs to be deprived of resources and the will to seek rights to procedural due process and a name-clearing hearing – an opportunity to clear Plaintiffs' good name and reputation.

1106.  For Defendants, a 'bad person' is someone with evidence of State Insider dealings who they cannot control and keep in line, as this jeopardizes insider schemes. The Plaintiffs' resolve to follow the law in remediating the Factory and its potential federal liabilities and to cooperate with and to report to federal authorities and criminal law enforcement investigators infuriated Defendants and endangered their positions, status, and finances.

1107.  The Dunseith Site was, for years after 2015, a key mechanism for moving about State of ND and federal money to create tangible and tangential benefits for State Insiders. A closer inspection of public activities at the Site after 2015 by media would reveal the names of a number of insiders, some who have been very successful public money getters. For Defendants, The Dunseith Site was a bellwether and its exposure a risk.

1108.  In the plainest illustration, referencing the iconic 1999 science fiction movie *The Matrix*, Plaintiffs chose the 'red pill,' and awakened to a harsh, unsettling, life-changing, but truthful reality as Mr. Hoefer worked to clear his name and his business from potential federal liabilities, having been a 'mark' Defendants dumped their mess upon, and having realized the mechanisms that caused the mess. Once awakened, Mr. Hoefer faced a battle against the many machinations Defendants turned against him, while North Dakotans remained blissfully ignorant to facts and reality with the 'blue pill,' until Mr. Hoefer went public in late 2024 and began to expose Defendants' misconduct which caused a public 'firestorm.'

1109.  One of Defendants' most powerful machinations against the Plaintiffs has been their making repeated false criminal allegations as leaders of the State of ND's investments and business division – without affording the Plaintiffs a name-clearing process or hearing.

1110.  The specific manners in which Defendants acted to deprive Plaintiffs' due process rights are shown above, and the Defendants deprived Plaintiffs' due process rights in other ways which discovery will reveal. A summary chronology of major events shown above follows:

i.  July 19, 2023: Plaintiffs obtained ND Commerce Factory-related records.

ii.  August 25, 2023: Garman confessed to Mr. Hoefer a pattern of deceit by Garman and Defendants against Plaintiffs.

iii.  September 2023: All Defendants began their sabotage campaign against the Plaintiffs, to ruin Mr. Hoefer's business, life, and reputation. Defendants also cut Plaintiffs' access to NDDF credit line draws, reneged on promised NDDF reimbursements, and locked out Plaintiffs from State of ND benefits.

iv.  September 27, 2023: Mr. Hoefer pleaded with Defendants for cooperation and told Defendants he feared their retaliation due to their Factory conflicts.

v.  October 2023 or earlier: All Defendants falsely conspired and falsely accused Mr. Hoefer of criminal misconduct – of "blackmailing" and "extorting" them and ND Commerce and "misusing" State of ND funds – to the State of ND Attorney General, the Governor, Auditor, to media, and to third parties.

vi.  October 2, 2023: Defendants directed their agent to notify Mr. Hoefer that they had opened an administrative investigation into Plaintiffs.

vii.  October 3, 2023: Albrecht, Garman, and Akason told State of ND legislators their investigation *would find* misuse funds by Plaintiffs.

viii.    October 6, 2023: Mr. Hoefer emailed exculpatory public records to Akason which cleared Plaintiffs' names, but Defendants ignored this.

ix.    October 13, 2023: Akason refused to confirm to Plaintiffs and legislators the authenticity of many public records between ND Commerce and Plaintiffs.

x.    November 3, 2023: Akason and Garman accused Mr. Hoefer of misusing NDDF loan funds in an email and threatened to 'send the lawyers' through automatic presumption of Plaintiffs' guilt.

xi.    November 7, 2023: Defendants caused worldwide broadcast of false criminal allegations of "blackmail," "extortion," and "misuse" of State of ND funds against Mr. Hoefer and his business Hoefer Group.

xii.    November 10-13, 2023: Plaintiffs answered Defendants' extraordinary and deliberately burdensome 'audit' requests.

xiii.    November 12, 2023: Plaintiffs emailed Garman and Akason exculpatory evidence, including audio recordings, which Defendants then concealed from others.

xiv.    November 14, 2025: Akason, with Teigen on email copy, wrote to State of ND Senator Paulson and these Defendants devised a new 'misuse' attack which they tested upon the senator based upon false facts.

xv.    November 20, 2023: Defendants directed Mr. Hoefer to commit perjury.

xvi.    November 21, 2023: Plaintiffs' third-party lenders wrote to NDDF asking politely for the Defendants' hostilities to stop.

xvii.    November 22, 2023: Defendants again directed Mr. Hoefer to commit perjury.

xviii.   Early December 2023: Defendants spread false and misleading narratives about Plaintiffs' financial dealings to State of ND legislators and others.

xix.    December 15, 2023: Mr. Hoefer told Akason/Garman that the Defendants' backdated mortgage effort was unlawful, and they should visit the Factory.

xx. December 18, 2023: Akason refused to visit the Factory and Defendants then indefinitely abandoned their open 'audit' witch-hunt.

xxi.    December 21, 2023: Akason instructed Tooke to dig up dirt on Plaintiffs.

xxii.   January 2024: Defendants sought allied voices from Plaintiffs' third-party lenders in alleging "misuse" of State of ND funds against the Plaintiffs.

xxiii.   February 29, 2024: Akason and Garman, on information and belief acting in coordination with each Defendant, wrecked a $5.475 million financing deal for Hoefer Group. Defendants did so by renewing their "misuse" of State of ND funds allegation, which Akason and Garman informed Mr. Hoefer that the Plaintiffs could not be part of the process because this re-alleged "misuse" of State of ND funds by Plaintiffs was already "final" and "decided."

xxiv.   Mid-2024: Akason told a State of ND legislator Akason cannot retract the Defendants' "misuse" allegations or Mr. Hoefer will sue Akason.

1111.   These acts above and others show a gross malicious abuse of procedural due process by Defendants against Plaintiffs. A verbally predetermined investigatory outcome to serve Defendants' aims on the one hand, and which investigation technically remains 'forever,' so as to serve Defendants' aims on the other hand, can never be fair.

1112.   Plaintiffs have never been provided with a name-clearing hearing or procedure to restore their good reputation from Defendants' "blackmail" allegation against them.

1113.   Plaintiffs have submitted exculpatory evidence to Defendants' false "blackmail" allegation. Defendants have suppressed and concealed that evidence.

1114.   This "blackmail" allegation has deprived Plaintiffs repeatedly of liberty rights, protected property interests, and tangible interests in manners shown above and others to be proven at trial.

1115.   Plaintiffs have never been provided with a name-clearing hearing or procedure to restore their good reputation from Defendants' "extortion" allegation against them.

1116.   Plaintiffs have submitted exculpatory evidence to Defendants' false "extortion" allegation. Defendants have suppressed and concealed that evidence.

1117.   This "extortion" allegation has deprived Plaintiffs repeatedly of liberty rights, protected property interests, and tangible interests in manners shown above and others to be proven at trial.

1118.   Plaintiffs were subjected to a predetermined and unfair procedure concerning the Defendants' "misuse" allegations against them, which was initiated on baseless and unreasonable false allegations, was rigged and unfair from the start, and which Defendants abandoned without there ever being a written finding, report, or conclusion or remedy.

1119.   Plaintiffs have submitted exculpatory evidence to the Defendants' false "misuse" allegations. Defendants have suppressed and concealed that evidence.

1120.   The 'investigation' into Plaintiffs' alleged "misuse" of State of ND funds was a mechanism of cover under which Defendants made repeated and relentless "misuse" allegations against the Plaintiffs to harass, intimidate, endanger, and ruin them.

1121.   This "misuse" 'investigation' technically remains open, seemingly 'forever,' and there never was evidence to support the factual basis with which Defendants devoted and wasted

extensive State of ND resources in trying to make the Plaintiffs criminals, and not them.

1122.   These "misuse" allegations have deprived Plaintiffs repeatedly of liberty rights, protected property interests, and tangible interests in manners shown above and others to be proven at trial.

1123.   In so doing these things, all Defendants violated clearly established federal law protecting Plaintiffs' liberty and property deprivation procedural due process rights in manners clearly defined by the Fourteenth Amendment to the United States Constitution and by controlling federal court precedent. Their conduct was objectively unreasonable and violated clearly established constitutional rights of which reasonable officials would have known. Defendants are not entitled to qualified immunity because their conduct violated clearly established law that a reasonable official would have known.

<u>HARM:</u>

1124.   Defendants incorporate all harm shown above including as to deprivations of numerous protected property interests, tangible interests, and liberty rights.

1125.   By making allegations of serious criminal misconduct against Plaintiffs without a name-clearing hearing or fair procedure to restore Plaintiffs' good reputation, Defendants have repeatedly sabotaged Plaintiffs' private financial transactions, diminished or ruined Plaintiffs' existing and prospective business relationships, harmed Plaintiffs' business operations, ruined partnerships, caused personal and professional acquaintances to be leery of Mr. Hoefer or stay away, harmed Plaintiffs' business reputation with the RV industry, media, consumers, and the general public, and caused an environment of life-altering emotional distress, fear, and real danger for Mr. Hoefer and his family, and more.

1126.   The stigma Defendants caused to be attached to Plaintiffs prevented Plaintiffs

from obtaining relief from other State of ND authorities as to both liberty and property rights infringements, and changed Mr. Hoefer's life and Plaintiffs' business forever.

1127.   Defendants made up many allegations against the Plaintiffs simply to vilify Mr. Hoefer and Hoefer Group and to stigmatize them to fail their business, to cause lasting career harm, and so that no one would realize Plaintiffs were the Defendants' victims.

1128.   In the manners shown above and others, Defendants in intentionally violating Plaintiffs' Fourteenth Amendment procedural due process rights, also deprived Plaintiffs of a variety of Plaintiffs' property rights, including without limitation: Plaintiffs' (a) real property rights, (b) personal property rights, (c) contract rights, (d) property rights arising from benefits and business expectancy, and (e) other property rights.

1129.   In the manners shown above and others, and in intentionally violating Plaintiffs' Fourteenth Amendment procedural due process rights, the Defendants deprived a variety of Plaintiffs' liberty rights – in a manner which caused tangible alterations of legal rights and status – including without limitation: Plaintiffs' (a) reputation rights, (b) autonomy rights, (c) rights to be free from being arbitrarily and spitefully subjected to public scorn and humiliation and ridicule, and (d) other liberty rights.

<u>DAMAGES:</u>

1130.   Each act above constitutes a separate and independent violation and basis for recovery for which relief is warranted.

1131.   As a direct and proximate result of Defendants' unconstitutional actions, Plaintiffs have suffered damages to their property interests and to their liberty interests, which harm and damages are detailed more fully in the Nature of Damages and Harm section and elsewhere above and throughout this complaint. Plaintiffs are also entitled to reasonable attorneys' fees and

225

costs pursuant to 42 U.S.C. § 1988.

1132.   An award of punitive damages is appropriate to the fullest extent permitted by law, because (a) Defendants acted with evil motive or demonstrated reckless indifference to the constitutional rights of the Plaintiffs; (b) Defendants evidenced malicious or evil intent in callous disregard of the Plaintiffs' federally protected rights; and (c) Defendants' conduct was oppressive and each Defendant misused authority or exploited the Plaintiffs' weakness.

## COUNT V – VIOLATION OF RIGHTS UNDER 42 U.S.C. § 1983

### (Violation of Fourteenth Amendment Substantive Due Process Rights Depriving Liberty Rights)

### Brought by Mr. Hoefer Against All Defendants

1133.   Mr. Hoefer repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

1134.   At all times relevant to the claims in this Count, all Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

1135.   The Fourteenth Amendment to the United States Constitution guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law."

1136.   The Fourteenth Amendment's substantive due process protections prevent state actors from undertaking action that is arbitrary, irrational, or offends a fundamental right.

1137.   Mr. Hoefer has a constitutionally protected right to be free from state government actors' arbitrary and offensive interference in his liberty and property rights.

1138.   Substantive due process bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them.

1139.   Substantive due process affords Mr. Hoefer personal liberty rights protection against especially egregious, arbitrary state government action.

1140.   Defendants acted against Mr. Hoefer under color of law in violation of his substantive due process rights and deprived him of personal liberty rights.

1141.   Defendants have acted with malicious intent against Mr. Hoefer.

1142.   Defendants' actions against Mr. Hoefer shock the judicial conscience.

1143.   Defendants Albrecht, Teigen, and Lehman knowingly transferred the Factory – a property tainted by concealed federal crimes, national security violations, violence, and ongoing illicit use – to Mr. Hoefer, seeking to frame him for successor liability and other federal violations.

1144.   Those Defendants deceived Mr. Hoefer about the Factory's history then hedged their bets that he might be killed, causing NDDF to take a multi-million dollar life insurance policy on Mr. Hoefer to top up NDDF's coffers for more State Insider deals if Mr. Hoefer failed to survive, and then Lehman set up for Mr. Hoefer to hire a complicit individual – Lehman's cohort in past Factory crime.

1145.   This offloaded risks and crimes onto Mr. Hoefer which Mr. Hoefer *had to resolve* with federal authorities (some evidence Mr. Hoefer could not remove or destroy himself under federal law), put Mr. Hoefer and his family in physical danger.

1146.   When the Defendants recruit others to borrow from NDDF they do so to try and create jobs and opportunity.

1147.   Albrecht, Teigen, and Lehman baited Mr. Hoefer through NDDF to bury State of ND officials' past sins and to launder away official misconduct, and in so doing Defendants also violated 18 U.S.C. § 1512(b)(2)(B).

1148.   Mr. Hoefer was targeted by Albrecht, Teigen and Lehman as their 'mark' to be the 'fall guy' and 'scapegoat' for State of ND officials' Factory-related misconduct that even the

transfer of this facility was in violation of 18 U.S.C. § 371 in attempting to cause or to further

others' violations of 18 U.S.C. § 793(e) and other violations, including violations of the ITAR,

AECA, and 18 U.S.C. § 38, and to attempt to frame Mr. Hoefer for potential liability as to some

of that.

1149.   When Lehman told Mr. Hoefer, "Be careful what you wish for," immediately after

Hoefer Group closed on the Factory purchase, Lehman *knew* he had just uniquely succeeded in

offloading his and others' federal criminal past against that property onto the Plaintiffs.

1150.   Such actions constitute shocking spiteful and arbitrary treatment so as to 'get' a

borrower.

1151.   As each Defendant became fully aware of what the other Defendants had done to

Mr. Hoefer, all Defendants joined up as a team and conspired together and acted to keep Mr.

Hoefer personally federally liable for their own laundered criminal mess.

1152.   Defendants conspired together and they assisted one another to further their acts

herein, and they deprived Plaintiffs' substantive due process rights and in so doing they deprived

Plaintiffs' liberty rights.

1153.   Mr. Hoefer had to endure all the risks and safety implications that came with that.

1154.   Mr. Hoefer was terrorized/threatened by a federal agent who is now a confessed

and incarcerated murderer.

1155.   Mr. Hoefer was at times warned by others – even warned by law enforcement –

not to travel, and that he must change all of his life and family habits, and to constantly watch his

back to avoid risk of physical harm or death by an assailant or plot against his life because of

who he crossed and who he outed to get his name cleared and disentangled from the federal

criminal mess of others.

1156.   A State of ND law enforcement special agent, who had misled federal authorities about the federal offenses Mr. Hoefer reported, later said he is shocked Mr. Hoefer remains alive because Mr. Hoefer's truthful reporting has "pissed off so many people."

1157.   Mr. Hoefer has traveled out of North Dakota, and while out-of-state he has been approached by a stranger and told not to return to North Dakota. Mr. Hoefer and his family have been followed and stalked on multiple occasions, including while far from home at a hotel. At another hotel, Mr. Hoefer received a phone call which purported to be from maintenance, but then the voice turned aggressive, and that day others tried to get him to leave his room.

1158.   As many as four law enforcement officers have suffered career retaliation for trying to help Mr. Hoefer and his family stay safe and obtain relief.

1159.   Mr. Hoefer did not want to become a federal witness, victim, and informant – as membership in that class carries inherent life changes and safety risks – but now is he one, and the Defendants' acts herein deliberately caused him to be so.

1160.   Defendants used Mr. Hoefer as their state-government garbage can, and threw their federal crimes and messes *off* the state government's officials and *upon* him.

1161.   The Defendants *chose* Mr. Hoefer to be the conduit by which state government officials' federal liabilities would be transferred to finalize a 2019 partial Factory cover-up.

1162.   In so doing these things, all Defendants violated clearly established federal law protecting Mr. Hoefer's liberty deprivation substantive due process rights in manners clearly defined by the Fourteenth Amendment to the United States Constitution and by controlling federal court precedent. Their conduct was objectively unreasonable and violated clearly established constitutional rights of which reasonable officials would have known. Defendants are not entitled to qualified immunity because their conduct violated clearly established law that a

reasonable official would have known.

HARM:

1163.   In the manners shown above and others, Defendants deprived Mr. Hoefer's

personal liberties and sought to diminish Mr. Hoefer as a person.

1164.   Defendants cause Mr. Hoefer to become endangered, to live in fear of criminal

liability and serious federal civil liability, and to become responsible for the unfinished cleanup

of a serious federal crime scene. That set of circumstances altered Mr. Hoefer's life, and – due to

safety risks and threats that these circumstances and liabilities created for him – changed the

course of his personal actions, and his profession, forever.

1165.   In the manners shown above and others, and in intentionally violating Mr.

Hoefer's Fourteenth Amendment substantive due process rights, the Defendants deprived a

variety of Mr. Hoefer's liberty rights including without limitation: Mr. Hoefer's autonomy rights

other liberty rights.

DAMAGES:

1166.   Each act above constitutes a separate and independent violation and basis for

recovery for which relief is warranted.

1167.   As a direct and proximate result of Defendants' unconstitutional actions, Mr.

Hoefer has suffered damages to his liberty interests, which harm and damages are detailed more

fully in the Nature of Damages and Harm section and elsewhere above and throughout this

complaint. Mr. Hoefer is also entitled to reasonable attorneys' fees and costs pursuant to 42

U.S.C. § 1988.

1168.   An award of punitive damages is appropriate to the fullest extent permitted by law,

because (a) Defendants acted with evil motive or demonstrated reckless indifference to the

230

constitutional rights of the Plaintiff; (b) Defendants evidenced malicious or evil intent in callous disregard of the Plaintiff's federally protected rights; and (c) Defendants' conduct was oppressive and each Defendant misused authority or exploited the Plaintiff's weakness.

## COUNT VI – 18 U.S.C. § 1595 CIVIL REMEDY FOR VIOLATION OF 18 U.S.C. § 1589

### (Civil Remedy for Violation of Federal Forced Labor Law)

### Brought by Mr. Hoefer Against All Defendants

1169.    Mr. Hoefer repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

1170.    In all manner of their acts herein, Defendants acted under color of law. In addition, they acted at all times herein to protect their personal interests.

1171.    18 U.S.C. § 1589 makes it a federal offense for a Defendant to "knowingly... obtain the labor or services of a person by any one of, or by a combination of, the following means" including these:

    i.    By means of serious harm or threats of serious harm to that person;

    ii.   By means of abuse or threatened abuse of law or legal process; or

    iii.  By means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm.

1172.    18 U.S.C. § 1589 also makes it a federal offense for a Defendant who "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the... obtaining of labor or services by any of the means described" in the immediately above paragraph "knowing or in reckless disregard of the fact that such venture has engaged in the… obtaining of labor or services by any of such means."

231

1173.  Congress provided a civil remedy within 18 U.S.C. § 1595 for individuals who are victims of the offenses described in 18 U.S.C. § 1589.

1174.  As shown in the manners above and others, and supported by evidence, Teigen, Akason, Garman, and on information and belief, Lehman conspired together and together and individually they directed their agent to obtain for them more than 1,600 hours of Mr. Hoefer's time in labor and services to serve their personal interests to clean up the Factory mess and its liabilities which Teigen, Albrecht, and Lehman had previously deceptively dumped upon Mr. Hoefer.

1175.  Mr. Hoefer performed these services against his will and under protest, because these Defendants abused and threatened abuse of law and legal processes and threatened serious harm against him. Defendants caused Mr. Hoefer to perform and not perform labor and services that also endangered his life and his family, and causing great disruption, harm, and financial damage to his business.

1176.  These Defendants, through their agent, repeatedly threatened Mr. Hoefer that they would cause far more and substantially worse serious harm and abuse of law and legal process against Mr. Hoefer and his family, which would harm him even more should he not continue to do as told by these Defendants.

1177.  In all these manners immediately above, these Defendants were knowingly benefiting from Mr. Hoefer's labor and services as defined under 18 U.S.C. § 1589 and they operated a scheme devised against Mr. Hoefer to violate 18 U.S.C. § 1589.

1178.  Shown above, these Defendants directed that Mr. Hoefer be threatened – repeatedly – with serious harm and with threats that these Defendants would abuse the law or legal process against him, should he not do as told and perform the forced labor and services, or

in other instances should he not avoid performing labor or services as these Defendants knowingly through their agent demanded.

1179.   These defendants benefited greatly from the forced labor and services they obtained from Mr. Hoefer, and from the forced labor and services they caused Mr. Hoefer not to perform, because these Defendants were using Mr. Hoefer to clean up a federal crime scene containing Factory-related federal civil and criminal liabilities embarrassing and potentially incriminating to the Defendants, in which the Defendants did not want their names or their cronies' names associated with that serious and physically dangerous federal mess and they did not want those associations known to federal authorities, despite that each Defendant had been associated with either furthering and/or covering up that mess.

1180.   Serious harm as defined in 18 U.S.C. § 1589 "means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."

1181.   The "abuse or threatened abuse of law or legal process" as defined in 18 U.S.C. § 1589 "means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."

1182.   Mr. Hoefer discovered the Defendants' concealment scheme *after* he performed these 1,600 hours of forced labor, and *after* he refrained from performing other labor or services, for Teigen's, Akason's, Garman's, and on information and belief, Lehman's personal benefit.

1183.   And then, when all Defendants realized that Mr. Hoefer had discovered their concealment scheme, all Defendants conspired and cooperated together and acted together and with individual acts to weaponize a rigged state 'audit' procedure against Mr. Hoefer – under legal threats and in a manner for which the law was not designed. Defendants threatened that the State of ND's lawyers would be sent after Mr. Hoefer and Mr. Hoefer would be financially ruined after 7 days, if Mr. Hoefer should fail to change his business accounting system in order to respond to Defendants' outrageous forced labor demands.

1184.   These demands were for labor and services which the Defendants had no right to cause NDDF to demand of Mr. Hoefer under NDDF's contract.

1185.   Mr. Hoefer and others were forced to provide labor to meet the demands of this rigged 'audit' including changing Mr. Hoefer's entire business accounting system, by working day and night for over four days in order to avoid realizing the Defendants' threats.

1186.   Mr. Hoefer complied in order to avoid serious harm and legal threats.

1187.   That serious harm as threatened and as implemented by Defendants and as feared by Mr. Hoefer was harm that was sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

1188.   All Defendants did these things and caused these demands by themselves and their instruments, NDDF and Tooke, against Mr. Hoefer for personal motives and personal gain, at first so that Mr. Hoefer might dispose of things at the Factory which concerned them, and then later in retaliation so that others and the public might believe that Mr. Hoefer was the 'real' criminal and the aggressor and not them.

1189.   All Defendants did these things to exert pressure on Mr. Hoefer to cause him to

act and to not act in ways suited to their will.

1190.   All Defendants also did these things for personal motives and personal gain, so as to conceal that Mr. Hoefer was in fact their victim from their prior schemes.

<u>HARM:</u>

1191.   In the manners shown above and others, Defendants deprived Mr. Hoefer's personal liberties and caused him to incur extraordinary financial damages and business losses and Defendants sought to diminish Mr. Hoefer as a person, by their completely disregarding his own safety and the threats that he and his family endured to comply with their unlawful forced labor demands.

1192.   Defendants caused Mr. Hoefer to become endangered, to live in fear of criminal liability and serious federal civil liability, and to become responsible for the unfinished cleanup of a serious federal crime scene. That set of circumstances altered Mr. Hoefer's life, and – due to safety risks and threats that these circumstances and liabilities created for him – changed the course of his personal actions, and his profession, forever.

<u>DAMAGES:</u>

1193.   Each act above constitutes a separate and independent violation and basis for recovery for which relief is warranted.

1194.   As a direct and proximate result of Defendants' violations of forced labor law, Mr. Hoefer has suffered damages, which harm and damages are detailed more fully in the Nature of Damages and Harm section and elsewhere above and throughout this complaint. Mr. Hoefer is also entitled to reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1595(a).

1195.   An award of punitive damages is appropriate to the fullest extent permitted by law, because (a) Defendants acted with evil motive or demonstrated reckless indifference to the

constitutional rights of the Plaintiff; (b) Defendants evidenced malicious or evil intent in callous

disregard of the Plaintiff's federally protected rights; and (c) Defendants' conduct was oppressive

and each Defendant misused authority or exploited the Plaintiff's weakness.

## COUNT VII – VIOLATION OF RIGHTS UNDER 42 U.S.C. § 1983

### (Unconstitutional Taking in Violation of Fifth, Fourth, and Fourteenth Amendments)
### Brought by Plaintiffs Against All Defendants

1196.   Plaintiffs repeat and reallege each and every allegation contained in the preceding

paragraphs as if fully set forth herein.

1197.   At all times relevant to the claims in this Count, all Defendants acted under color

of state law within the meaning of 42 U.S.C. § 1983.

1198.   The Fifth Amendment to the United States Constitution, as applied to the states

through the Fourteenth Amendment, prohibits the taking of private property for public use

without just compensation.

1199.   Further, the Fourth Amendment, as applied to the states through the Fourteenth

Amendment, prohibits unreasonable seizures.

1200.   As shown above, Plaintiffs suffered a variety of electronics disruptions and

sophisticated hacking incidents at the Factory and in regard to computers and electronics at other

locations after discovering the illicit materials and history at the Factory and in the course of

reporting to federal authorities. Those incidents violated Plaintiffs' privacy, facilitated the

disruption of Plaintiffs' business and furthered the oppression from which Plaintiffs suffered, and

also caused data corruption, data losses, loss of emails and portions of other electronic

communications records, and financial harm and mitigation remediation costs.

1201.   A cybersecurity contractor serving North Dakota informed Plaintiffs that State of

ND officials have in the past engaged professionals to hack and disrupt electronics and computers owned by state residents. The contractor opined to Mr. Hoefer that the incidents Mr. Hoefer described to him had all the hallmarks of the things he was aware state officials had caused to be performed in the past.

1202.  On information and belief, and as Plaintiffs reasonably believe discovery will reveal, one or more Defendants, acting in their individual capacities under color of state law, intentionally engaged or caused their agents to engage in computer hacking that resulted in the taking and partial destruction of Plaintiffs' property, specifically computer data, emails, surveillance footage, and other documents and data, without just compensation and without reasonable cause or due process, and invading Plaintiffs' privacy.

1203.  These disruptions and hacking and data theft and destruction constituted an unconstitutional taking of Plaintiffs' property without due process or just compensation.

1204.  These disruptions and hacking and data theft and destruction constituted an unconstitutional seizure of Plaintiffs' property and private materials without due process, a warrant, or probable cause.

1205.  Defendants' actions lacked a legitimate public purpose or, alternatively, were not rationally related to any public purpose sufficient to justify the taking or seizure.

1206.  As a direct and proximate result of Defendants' actions, Plaintiff has suffered a permanent deprivation of constitutionally protected property rights, resulting in damages including but not limited to economic loss and costs of mitigation, in amounts to be proven.

1207.  Defendants are not entitled to qualified immunity, as their actions violated clearly established constitutional rights under the Takings Clause and under the Fourth Amendment, of which a reasonable official would have known at the time of the violation.

<u>DAMAGES:</u>

1208.   Each such hacking event or activity constitutes a separate and independent violation and basis for recovery for which relief is warranted.

1209.   As a direct and proximate result of such hacking activities, Plaintiffs have suffered damages in amounts to be proven. Plaintiffs are also entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

1210.   An award of punitive damages is appropriate to the fullest extent permitted by law, because (a) Defendants acted with evil motive or demonstrated reckless indifference to the constitutional rights of the Plaintiff; (b) Defendants evidenced malicious or evil intent in callous disregard of the Plaintiff's federally protected rights; and (c) Defendants' conduct was oppressive and each Defendant misused authority or exploited the Plaintiff's weakness.

**<u>COUNT VIII – CONSPIRACY TO DEPRIVE RIGHTS UNDER 42 U.S.C. § 1985</u>**

**(Conspiracy to violate First, Fourth, Fifth, and Fourteenth Amendment Rights)**

**Brought by Both Plaintiffs Against All Defendants**

1211.   Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

1212.   Plaintiffs by incorporation herein restate and reassert their First, Fourth, Fifth, and Fourteenth Amendment constitutional rights and protections, and the federal court precedents and laws that further protect those rights, and the Defendants' obligations to not violate those rights, as shown in the counts above.

1213.   Defendants violate 42 U.S.C. § 1985(2) when two or more of them "conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws,

or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws," or "for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws."

1214.   In any case of conspiracy set forth under 42 U.S.C. § 1985, "if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

1215.   Defendants also violate 42 U.S.C. § 1985(3) when they conspire "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws."

1216.   As alleged above in detail in Count III, Plaintiffs are members of a protected class or group of witnesses, victims, and informants who have provided information to law enforcement for federal investigations. Congress has legislated to protect such persons as a class.

1217.   Plaintiffs have been singled out for mistreatment, oppression, and torment by Defendants by virtue of their membership in that class and their actions in seeking to lawfully enforce their rights to equal protection of the laws. Defendants conspired to deprive Plaintiffs of their equal protection rights and have acted to hinder State authorities from providing Plaintiffs with equal protection of the laws.

1218.   Akason, Lehman, and on information and belief Garman and Teigen, engaged in conspiracy to seek to cause Mr. Hoefer to sign a 'gag-order' covering the entire State of ND and its agencies, in order to silence Plaintiffs, violate Plaintiffs' First Amendment rights, to effect in the shadows other 'takings' from Plaintiffs while legally preventing Plaintiffs from speaking to others about it, and to violate Plaintiffs' rights to procedural due process and equal protection.

1219.   Akason and Lehman took steps to further this conspiracy by seeking to compel Mr. Hoefer to sign this 'gag-order,' and by deceiving Mr. Hoefer as to its nature and meaning.

1220.   These Defendants threatened and then caused additional difficulties and financial hardship for Mr. Hoefer, for Plaintiffs, and for Plaintiffs' business because Mr. Hoefer would not sign this document.

1221.   These Defendants' purpose was to finish cleanup of the Factory at Plaintiffs' harm and expense and while further endangering Mr. Hoefer and without anyone outside their circle of cronies ever knowing, and to dispense of the Plaintiffs using unlawful ways and means without anyone outside their circle of cronies ever knowing.

1222.   All Defendants later conspired together to seek to effect a 'taking' of Plaintiffs' Factory, which was insured at approximately $10 million replacement cost. There were no rights in any State of ND contract to effect this taking in the manner Defendants pursued.

1223.   The Factory taking effort was put to action when Garman and Akason, and on information and belief with the cooperation and actions of each Defendant, instruct through Defendants' agents multiple times for Mr. Hoefer to simultaneously perjure himself while helping Defendants to effect this Factory taking.

1224.   The brazenness of Defendants' unlawful acts shocked Plaintiffs and terrified Mr. Hoefer.

1225.   Defendants bombarded Plaintiffs with deprivations of liberty and property rights in retaliation, and deprived them of equal protection of the law, because Mr. Hoefer refused to help Defendants effect this taking and he refused to permit Defendants to cause him to incriminate himself with perjury.

1226.   Defendants wanted only to be rid of Mr. Hoefer. They acted as if the Plaintiffs' constitutional rights were of no concern or consequence to them, and they punished Plaintiffs for not helping Defendants in the Defendants' cause of further punishing Plaintiffs.

1227.   In so doing, all Defendants conspired to violate clearly established federal law protecting Plaintiffs' property and liberty rights in manners clearly defined by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and by controlling federal court precedent. Their conduct was objectively unreasonable, and Defendants took actions to violate Plaintiffs' clearly established constitutional rights of which reasonable officials would have known. Defendants are not entitled to qualified immunity because their conduct violated clearly established law that a reasonable official would have known.

1228.   Each Defendant singled out the Plaintiffs for discriminatory treatment on an irrational and wholly arbitrary and capricious basis.

1229.   Defendants' conduct was motivated by a spiteful effort to retaliate and punish the Plaintiffs for reasons wholly unrelated to any legitimate state objective.

1230.   All others similarly situated to Plaintiffs were treated more favorably.

1231.   Defendants had no rational basis or legitimate or proper government purpose in subjecting the Plaintiffs to this treatment.

1232.   Defendants acted to silence, oppress, coerce, and control the Plaintiffs to conceal their and their cronies' schemes and official misconduct, which Plaintiffs' federal reporting and

process of necessary federal remediation actions relating to the Factory inadvertently butted into and revealed.

1233.   Discovery will reveal other 42 U.S.C. § 1985 violations by Defendants.

HARM:

1234.   Defendants retaliated in substantial part because Plaintiffs' refused to put this 'gag-order' into effect by Mr. Hoefer's signing it, and Plaintiffs fought back against a taking of Plaintiffs' Factory by Mr. Hoefer refusing to perjure himself, and Defendants then repeatedly sabotaged Plaintiffs' private financial transactions, diminished or ruined Plaintiffs' business relationships, harmed Plaintiffs' business operations, ruined partnerships, caused personal acquaintances to be leery of Mr. Hoefer or stay away, harmed Plaintiffs' business reputation with the RV industry, media, and consumers, and caused an environment of life-altering emotional distress, fear, and real danger for Mr. Hoefer's family, among other harm.

1235.   In the manners shown above and others, Defendants in intentionally conspiring to violate Plaintiffs' First, Fourth, Fifth, and Fourteenth Amendment rights, also deprived Plaintiffs of a variety of Plaintiffs' property rights, including without limitation: Plaintiffs' (a) real property rights, (b) personal property rights, (c) contract rights, (d) property rights arising from benefits and business expectancy, and (e) other property rights.

1236.   In the manners shown above and others, in intentionally conspiring to violate Plaintiffs' First, Fourth, Fifth, and Fourteenth Amendment rights, the Defendants deprived a variety of Plaintiffs' liberty rights – in a manner which caused tangible alterations of legal rights and status – including without limitation: Plaintiffs' (a) reputation rights, (b) autonomy rights, (c) rights to be free from being arbitrarily and spitefully subjected to public scorn and humiliation and ridicule, and (d) other liberty rights.

<u>DAMAGES:</u>

1237.   Each act above constitutes a separate and independent violation and basis for recovery for which relief is warranted.

1238.   As a direct and proximate result of Defendants' unconstitutional actions, Plaintiffs have suffered damages to their property interests and to their liberty interests, which harm and damages are detailed more fully in the Nature of Damages and Harm section and elsewhere above and throughout this complaint. Plaintiffs are also entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

1239.   An award of punitive damages is appropriate to the fullest extent permitted by law, because (a) Defendants acted with evil motive or demonstrated reckless indifference to the constitutional rights of the Plaintiffs; (b) Defendants evidenced malicious or evil intent in callous disregard of the Plaintiffs' federally protected rights; and (c) Defendants' conduct was oppressive and each Defendant misused authority or exploited the Plaintiffs' weakness.

**PRAYER FOR RELIEF:**

WHEREFORE, Plaintiffs Hoefer Group, LLC and Charles Hoefer do hereby seek an award of money damages, including without limitation general and compensatory damages and special damages, for the harms Plaintiffs sustained as a direct and proximate result of Defendants' misconduct, in at least the amounts and for the reasons as alleged herein and to be proven at trial, plus punitive damages assessed against Defendants in their individual capacities in an amount sufficient to punish each Defendant for his egregious conduct and to deter similar misconduct in the future, plus attorney's fees and costs as permitted by law, including without limitation under 42 U.S.C. § 1988 and 18 U.S.C. § 1595(a), as applicable, plus pre-judgment and post-judgment interest and all other appropriate relief available to Plaintiffs against the Defendants Joshua Teigen, Shayden Akason, Richard Garman, David Lehman, and James Albrecht.

**JURY DEMAND**

Plaintiffs, Hoefer Group, LLC and Charles D. Hoefer, Jr., hereby demand trial by jury of all claims so triable by a jury.

Dated this 26th day of August 2025.

Respectfully submitted,

*/s/ Thomas C. James, Jr.*
Thomas C. James, Jr. (ND# 006235)
Attorney for Plaintiff
Sanders & Associates, LPA
8040 Hosbrook Road, Suite 202
Cincinnati, Ohio 45236
Phone (513) 229-8080
TomJames@SandersLPA.com