UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Charles Hoefer and Hoefer Group, LLC,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>Josh Teigen, Shayden Akason, Richard Garman, David Lehman, and James Albrecht,<br><br>                    Defendants. | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**Case No. 1:25-cv-00207** |

[¶1]    Plaintiffs Charles Hoefer and Hoefer Group, LLC ("Plaintiffs") respond in opposition to the Motion to Dismiss (Doc. 12) and the supporting Memorandum of Law (Doc. 13) filed by Defendants Josh Teigen, Shayden Akason, Richard Garman, David Lehman, and James Albrecht ("Defendants"), as follows:

## INTRODUCTION

[¶2]    Plaintiffs brought this action seeking remedy for various harms and abuses Defendants inflicted upon them, as detailed in Plaintiffs' Complaint (Doc. 1). Defendants suggest in the first paragraph of their Motion that they "have no other relationship with Plaintiffs beyond that of being a creditor for the statutorily mandated purpose of seeking to encourage economic development in North Dakota." That is false. The State of North Dakota ("State"), operating through its political subdivisions, is Plaintiff Hoefer Group, LLC's creditor, not them (Complaint ¶ 336-337). Defendants are the State's officers, employees, and agents (Complaint ¶ 8, 39-52), each of which wielded authority granted by State law (Complaint ¶ 97-115), abusing their positions and authority to torment Plaintiffs (Complaint ¶ 86-96, 123-246). They weaponized what should have been only an ordinary arm's length financial relationship between the State and Plaintiffs into their instrumentality of oppression (Complaint ¶ 247-338). The Complaint explains how they did it,

sometimes acting individually and often acting in concert. And what they did violated clearly established law of which any reasonable person would be aware.

[¶3]    Defendants attack each of the 8 counts in Plaintiffs' Complaint with the same basic arguments, namely that (a) qualified immunity applies and (b) the Complaint lacks specific allegations as to each Defendant's individual conduct. In each instance, Defendants are wrong and the Court should deny their Motion. Plaintiffs explain why below.

### NOTE REGARDING COLLECTIVE REFERENCES TO "DEFENDANTS"

[¶4]    Plaintiffs note that their Complaint is replete with examples of the specific ways in which each individual Defendant violated Plaintiffs' rights. And the Complaint is obviously detailed to comprise many acts by each Defendant and to incorporate the facts essential to those acts. In certain instances, all Defendants acted together to violate Plaintiffs' rights, in which case there are allegations in the Complaint referencing "Defendants" or "all Defendants" acting together. The Court should note that Plaintiffs specifically defined the term "Defendants" in the Complaint for that purpose to account for that grouping and to economize on wording where possible (Complaint ¶1: "every reference herein to 'Defendants' which does not specify a subset of them is a reference to all"). Those allegations, in their context, mean precisely that – they are not "shotgun" allegations – and they should be taken literally as statements that each and every one of the Defendants individually did what is alleged. Not 'some of the group,' but rather all of them. Allegations concerning only one or a subset of the defendants are specific as to which ones when the allegation does not concern something all did.

### ADDITIONS & CORRECTIONS TO DEFENDANTS' FACTUAL BACKGROUND

[¶5]    As noted in the Complaint, Defendants are an assortment of current and former officials and appointees vested with authority and influence by the State by virtue of their positions (Complaint ¶ 8). In 2021 the State enticed the Plaintiffs to North Dakota to buy a vacant 100,000

square-foot factory in Dunseith, North Dakota (the "Site") with State sponsorship and promotion by then-Governor Doug Burgum and his subordinates, including Defendants (Complaint ¶ 10). The State provided financial support, which Defendants later weaponized into financial control to accomplish their own ends. Specifically, Defendants conspired together and acted both individually and in concert to make Mr. Hoefer and Hoefer Group their clean-up crew and scapegoat for concealed aerospace parts fraud, national security violations, ITAR and AECA violations, Espionage Act violations, and bloody violence – all arising from past illicit State projects which went awry at this Factory, and which projects, if made public, would subject Defendants to public embarrassment and potentially to criminal liability (Complaint ¶ 11, 14-16, 22-23, 26-28, 420-421, 491-493, 501-510, 753-757, 791-792). In all manner of their acts in relation to the Plaintiffs as alleged in the Complaint, Defendants acted under color of state law (Complaint ¶ 5, 9, 59, 967, 1015, 1047, 1096, 1134, 1197).

[¶6]    Portions of Defendants' factual summary are incomplete or inaccurate, including:

    a.  The Defendants' relationship to the Plaintiffs was not limited to their acts connected with the North Dakota Development Fund ("NDDF"), but also extended to other State of North Dakota agencies which individual Defendants controlled and influenced by virtue of their official roles. The Defendants also engaged with third parties and interfered with private financing and third-party relationships of Plaintiffs. These facts are indisputable and supported by public records and evidence and are detailed in the Complaint ¶ 86-93, 147-155, 264-265, 476-486, 570-573, 651-654, 679-686, 716-721, 789-790, 896-933.

    b.  Defendant Lehman is not a staff or board member of NDDF. He works for the North Dakota Department of Commerce ("ND Commerce") (Complaint ¶ 46).

3

c.   Shown above and below, Defendants uniquely inserted themselves into Plaintiffs'

decision-making and career choices, and Defendants misused public authority to

hijack, interfere in, and then punish the Plaintiffs' private business, thus eliminating

pretense and counter argument to any sort of "arm's length" relationship with

Plaintiffs that Defendants now allege was all that has ever existed (Complaint ¶

122-129, 154-174).

d.   Defendants suggest Plaintiffs should be categorized as government contractors, by

implication narrowing Plaintiffs' speech or other rights. Hoefer Group borrowed

State money and gave NDDF a promissory note. Charles Hoefer owns Hoefer

Group but is not a State borrower. Neither is a State contractor or employee. For

the allegations and relief sought in the Complaint, Plaintiffs are private citizens.

## LAW AND ARGUMENT

[¶7]   Defendants' summaries as to the legal standards applicable to the Court's consideration of

their Motion are not always correct, and are markedly incomplete, and some of the legal theory

Defendants present is developed from incorrect factual assumptions which contradict the

Plaintiffs' claims in the Complaint.

## I.    Applicable Legal Standards – Rule 12(b)(6) Motion to Dismiss

[¶8]   The Federal Rules of Civil Procedure require a pleading to contain a "short and plain

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule

12(b)(6) of the Federal Rules of Civil Procedure mandates the dismissal of a claim if there has

been a failure to state a claim upon which relief can be granted. To survive a motion to dismiss

under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state

a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937,

4

173 L. Ed. 2d 868 (2009) (quotes omitted). A plaintiff must show that success on the merits is more than a "sheer possibility." *Id.* A complaint does not need to contain detailed factual allegations, but it must contain more than labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And Plaintiffs' complaint complies with all these requirements.

[¶9]    The court must accept all factual allegations of the complaint as true, except for legal conclusions or "formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678. A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. The determination of whether a complaint states a claim upon which relief can be granted is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. Dismissal will not be granted unless it appears beyond doubt the plaintiff can prove no set of facts entitling him to relief. *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1058 (8th Cir. 2013).

[¶10]    Defendants argue in their Motion that "Plaintiffs' Complaint is … devoid of the specific factual allegations necessary to give fair notice to each individual Defendant of what it is that each is alleged to have done." They are wrong. Given the page limits applicable to this Response, restating all Plaintiffs' allegations from the Complaint here is impractical, but Plaintiffs provide herein summaries and citations of select allegations by individual Defendant and by Count, referencing applicable paragraph numbers of the Complaint.


## II.    Applicable Legal Standards and Arguments re: Qualified Immunity

[¶11]    Defendants contend in their Motion that Defendants are entitled to qualified immunity as to all counts of the Complaint because "Plaintiffs have not pled a constitutional or statutory violation and cannot in any event demonstrate that any proffered violation was clearly established." They are wrong, as explained below.

[¶12]   Qualified immunity is a hurdle which Plaintiffs must overcome for those of Plaintiffs'

claims which are subject to that affirmative defense to go forward. The general rule is this:

> Qualified immunity attaches when an official's conduct does not violate clearly
> established statutory or constitutional rights of which a reasonable
> person would have known. While this Court's case law does not require a case directly on point
> for a right to be clearly established, existing precedent must have placed the
> statutory or constitutional question beyond debate. In other words, immunity
> protects all but the plainly incompetent or those who knowingly violate the law.

*White v. Pauly*, 580 U.S. 73, 78-79 (2017) (citation modified).

[¶13]   The Eighth Circuit recognizes that the "clearly established" standard does not require

identical facts and circumstances:

> A plaintiff need not produce a case directly on point for us to conclude that the right
> he alleges was violated was clearly established at the time of the violation, however.
> In all cases, "[t]he dispositive question is whether the violative nature of *particular*
> conduct is clearly established . . . in light of the specific context of the case."
> (citations omitted) (internal quotation marks omitted) (emphasis in original).

*Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017), citing *Mullenix v. Luna*, 577 U.S. 7, 12

(2015) (per curiam). More recently, in *Brandy v. City of St. Louis*, 75 F.4th 908 (8th Cir. 2023),

the Eighth Circuit has noted that

> An exact match . . . is not required if the constitutional issue is "beyond
> debate." *Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 838 (8th Cir. 2021)
> (quoting *Ashcroft [v. al-Kidd]*, 563 U.S. [731] at 741). "A general constitutional
> rule already identified in the decisional law may apply with obvious clarity to the
> specific conduct in question, even though the very action in question has not
> previously been held unlawful." *Winslow v. Smith*, 696 F.3d 716, 738 (8th Cir.
> 2012) (quoting *Shekleton v. Eichenberger*, 677 F.3d 361, 367 (8th Cir. 2012)). In
> other words, "officials can still be on notice that their conduct violates established
> law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122
> S. Ct. 2508, 153 L. Ed. 2d 666 (2002).

*Brandy*, 75 F.4th at 914 (8th Cir. 2023).

[¶14]   Moreover, a "right is clearly established if 'a reasonable official would understand that

what he is doing violates that right.' *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034,

97 L. Ed. 2d 523 (1987)." *Rinne v. Camden Cty.*, 65 F.4th 378, 384 (8th Cir. 2023). In *Rinne*, a

§ 1983 claim defendant argued that he was entitled to qualified immunity because there was no specific precedent clearly establishing that a single voting member of a multi-member governing body, of which that defendant was, could be held individually liable by a § 1983 plaintiff for casting a vote in favor of a retaliatory action that body undertook against a citizen who had exercised his First Amendment rights. The Eighth Circuit, noting that it "was clearly established … that a government official may not retaliate against a citizen for the exercise of his First Amendment rights" (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006)), held that the violative nature of the particular conduct – retaliation against protected speech – was clearly established and so that defendant's qualified immunity argument failed. *Id*, at 384-385. The Eighth Circuit also reiterated the longstanding, clearly established principle that officials cannot "engage 'the punitive machinery of government' to impose 'concrete consequences' in retaliation for speaking out against the government." *Id*, at 384, citing *Garcia v. City of Trenton*, 348 F.3d 726 (8ᵗʰ Cir. 2003).

[¶15]    United States Supreme Court precedent clearly establishes that an official may not retaliate against a speaker due to that speaker's protected speech. Doing so is strictly forbidden:

> Official reprisal for protected speech "offends the Constitution [because] it threatens to inhibit exercise of the protected right," *Crawford-El* v. *Britton,* 523 U.S. 574, 588, n. 10, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998), and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out, *id.,* at 592, 118 S. Ct. 1584, 140 L. Ed. 2d 759; see also *Perry* v. *Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972) (noting that the government may not punish a person or deprive him of a benefit on the basis of his "constitutionally protected speech").

*Hartman v. Moore*, 547 U.S. 250, 256 (2006).

[¶16]    Eighth Circuit precedent also clearly establishes that retaliation against a speaker for speech concerning exposure of illegal misconduct by public officials is wrong and actionable. As the Court noted in *Noon v. City of Platte Woods*, 94 F.4th 759, 766-67 (8th Cir. 2024):

"[N]o right is more clearly established than freedom of speech [and] . . . speech alleging illegal misconduct by public officials occupies the 'highest rung of First Amendment hierarchy.'" *Hall v. Mo. Highway & Transp. Comm'n*, 235 F.3d 1065, 1068 (8th Cir. 2000) (quoting *Sexton v. Martin*, 210 F.3d 905, 913 (8th Cir. 2000)). See also *Belk [v. City of Eldon]*, 228 F.3d [872] at 882 [(8th Cir. 2000)] ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.") (quoting *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987)). Further, in *Sexton*, we held it "clearly established that the disclosure of potential illegal conduct of public officials was a matter of public concern." 210 F.3d at 911. And in *Lindsey [v. City of Orrick*, 491 F.3d 892 (8th Cir. 2007)], we held speech by a city employee was protected by the First Amendment because it "amounts to straightforward criticism of the Council's sunshine law compliance." 491 F.3d at 899. Thus, [the defendants] cannot reasonably say they did not understand terminating the [plaintiffs] for engaging in protected speech violated the [plaintiffs'] First Amendment rights. After all, "a reasonably competent public official should know the law governing his conduct." *Sexton*, 210 F.3d at 910. The [plaintiffs'] First Amendment right to be free from retaliation for protected speech was clearly established.

*Noon*, 94 F.4th at 766-67 (8th Cir. 2024).

[¶17]   The discovery by Plaintiffs of compromising, embarrassing, and illegal conduct by public officials (Complaint ¶ 11, 14, 16, 29, 125, 350-384, 386, 404, 413-414, 422-423, 425-441, 455-467, 487, 489, 577, 823-830, 936-937, 1179) and of other matters of great public and public safety concern (Complaint ¶ 11, 16, 22, 27, 413, 468, 492, 495-496, 498-510, 515-516, 543-546, 550-552, 635-641, 699, 729, 731, 748-752, 758-760), and Plaintiffs' subsequent efforts to speak out to report those things to state and federal authorities (Complaint ¶ 28, 415-419, 424, 490, 521-522, 547-550, 649-656, 661-678, 717-721, 727-728, 758-777) and to the public at large (Complaint ¶ 130, 134-135, 537-539, 551-552, 704-715) as detailed in the Complaint, is at the root of what motivated and underlies all of the Defendants' offensive conduct against the Plaintiffs (Complaint ¶ 28-30, 94-95, 146, 393, 398-402, 405, 469-477, 488, 523-536, 573, 642-648, 679-682, 812-822, 852-864, 876-895, 938-940). It is elementary, and clearly established in the law, that officials cannot use the punitive machinery of government to retaliate for such speech. No reasonable public official could possibly think otherwise. And yet Defendants did it anyway, even in the obvious

clarity that precedent and the circumstances provide demonstrating that their particular conduct was violative.

[¶18]   This is true not just in the context of retaliation for speech, but in each Defendant's other transgressions alleged in the Complaint. As to each Defendant's conduct as alleged in this matter, their violations were obvious. And their retaliatory behavior was calculated, as were their deprivations of Plaintiffs' rights and their actions to cause denials of equal protection and due process. Notably, they were not law enforcement officers facing split-second choices and needing to draw on precise factual templates prior precedent would provide as to exactly where lines should be drawn.

[¶19]   Nor are any of the Defendants unsophisticated individuals or persons otherwise devoid of reason and reasonable understanding of the law. By the very nature of their positions, they are financially and politically savvy professionals, and experienced bureaucrats. They presumably took oaths to uphold the United States and State constitutions and the law. Defendants do not appear to be among the "plainly incompetent" cohort the Supreme Court described in *White v. Pauly*, but as that case indicates, both that cohort of officials and one other – "those who knowingly violate the law" – do not get the benefit of qualified immunity protection. *White*, 580 U.S. at 78-79 (2017). Each Defendant plainly falls into the "knowingly" category.

[¶20]   It is evident from the allegations in the Complaint that each Defendant in this matter, in each instance and decision and action alleged, had time to contemplate those actions and to make considered decisions – and then they knowingly violated the clearly established law so as to violate Plaintiffs' rights. They did not act in the heat of the moment in ways which led to unfortunately regrettable consequences, but which could be construed as reasonable due to their need to comprehend or understand complex, nuanced federal law. Their transgressions were basic and

counter to clearly established law. Each Defendant behaved like a thug (Complaint ¶ 94, 405, 561-574), enjoyed unjust political protection and treated the law as if it was theirs to break (Complaint ¶ 53-59, 196-198, 394-406, 553-560, 575-598), and carefully plotted concealment strategies against the Plaintiffs (detailed above) to cover up Defendants' crimes and illicit State money getting schemes (detailed above) and then carefully plotted revenge and silencing to punish the Plaintiffs (detailed above). They also sought to compel Plaintiff Charles Hoefer to make false statements and swear a false oath in relation to a mortgage document as Defendants simultaneously pursued an unlawful taking from the Plaintiffs (Complaint ¶ 165, 189-195, 294-296, 302, 897-898).

[¶21]   None of the Defendants can reasonably contend that anyone in their positions would not know that retaliation against a speaker for First Amendment rights exercise is wrong, or that their other actions were not violations of clearly established law. The Court should not indulge the Defendants' claim that there is some reasonable debate to be had over whether denying equal protection, retaliating for speech, discrimination against a protected class, denying procedural due process, and the other transgressions described in the Complaint, are not clearly established as wrongful acts. The general constitutional rules are well established. "A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Winslow*, 696 F.3d at 738 (8th Cir. 2012)

[¶22]   Plaintiffs are unaware of, and Defendants have not cited, any U.S. Supreme Court or Eighth Circuit precedent applying qualified immunity principles to civil claims brought under 18 U.S.C. § 1595 in relation to § 1589 violations. Section 1589 violations do not raise constitutional or civil rights considerations of the sort that qualified immunity was designed to address. There is no

reason for the Court to consider Complaint Count VI, which asserts such claims, to be subject to qualified immunity.

### III.    Defendants' Arguments Fail as to Each Count of the Complaint

[¶23]    Defendants wish the Court to believe Plaintiffs' Complaint contains mere summaries and "conclusory" statements and "lacks specific factual allegations as to each individual defendant's conduct or action," and that the Complaint lacks claims sufficient to defeat qualified immunity defenses. But the Defendants' arguments fall short and fail the test of law. Defendants have also misrepresented or mischaracterized certain of Plaintiffs' allegations in their Motion.

[¶24]    Defendants also assert that, even if Plaintiffs claims are true, the Defendants could not possibly have known that their actions would arise to a level of liability risking their personal finances. The mere suggestion that each Defendant did not know that his individual actions – which actions Plaintiffs assert were steeped in willful criminal misconduct – would risk personal liability is absurd, for all reasons herein and in the Complaint.

[¶25]    As each Defendant learned that Plaintiffs knew about and were reporting serious federal crimes which tied to top public officials and linked to several Defendants (detailed above), Defendants engaged in a conspiratorial campaign of overt criminal acts against the Plaintiffs (detailed above and throughout the Complaint), where each Defendant deprived the Plaintiffs' federal rights repeatedly. Each Defendant's acts against the Plaintiffs went unchecked by North Dakota law enforcement (Complaint ¶ 403, 405-406, 576-580) as a result of the public trust each Defendant enjoyed (Complaint ¶ 98, 259-261, 653) and as each Defendant enjoyed a very close proximity to the office and reputation of the State of North Dakota ("State") Governor and the State's Attorney General and the Plaintiffs' reporting risked detonating a political grenade and other liabilities for those offices and for Minot Air Force Base's senior officials (Complaint ¶ 10,

39, 49, 52, 449-467, 553-560, 575-598, 732-747, 949-954, 956-959). Although the Plaintiffs'
situation has become one of North Dakota's most public scandals (Complaint ¶ 30, 537-539), the
Plaintiffs have no avenue for relief save for this Court (Complaint ¶ 403, 576-580, 588-597, 954-
955).

[¶26]   That each Defendant enjoys unjust political protections does not in turn afford him a free
pass to violate the Plaintiffs' federal rights, engage in federal criminal misconduct against the
Plaintiffs, to violate clearly established federal law, to cross bright lines, and to dehumanize
himself into a campaign of actions (which any ordinary person would risk federal charges and
possibly federal prison time for such things) which sought to destroy the lives and livelihood of
private citizens to further self-serving motives including concealment, revenge, and silencing.

[¶27]   Those political protections have nonetheless further engaged the machinery of the State
*against* Plaintiffs. Plaintiffs, who are the Defendants' victims in all the ways alleged in the
Complaint and were harmed by their arguably criminal acts, note the irony: Defendants are all
represented in this action by the State's chief law enforcement officer, its Attorney General, whose
duties normally include prosecution of the sort of conduct Plaintiffs have alleged and providing
protection and redress for crime victims. More of the punitive machinery of government, it seems,
deployed against Plaintiffs. And the fact that the serious allegations Plaintiffs have brought against
individual Defendants, if proven true, might put each Defendants' interests in serious conflict with
those of the State itself, its taxpayers, and its law enforcement authorities is apparently of no
consequence here.

### A.    Count I – Equal Protection "Class of One" Claim

[¶28]   Defendants misstate the nature of Plaintiffs' claims and of the applicable class examination
the Court must undertake. Plaintiffs do not claim to be members of a class of "property owners"

who were differentially treated in the manner Defendants suggest, which 'class' would essentially include all North Dakotans who own anything. Rather, the applicable class consideration before the Court is far narrower: Plaintiffs are among those entities and persons who do business with the State and its political subdivisions, specifically within the purview of its Department of Commerce ("ND Commerce") and the North Dakota Development Fund ("NDDF") (Complaint ¶ 973) and those private citizens and entities reliant upon the State's machinery within that purview for the financing and support of their livelihood (Complaint ¶ 86-122, 925, 934-948), including those who are recipients of State financial incentives and borrowers under State-provided and State-facilitated loans and grants administered or influenced by ND Commerce and NDDF.

[¶29]  Plaintiffs' contention is not that "everyone else in the State of North Dakota was treated differently" – it is that each and every other recipient of the largesse doled out under each Defendant's authority and supervision via ND Commerce's and NDDF's activities has been and continues to be treated in a markedly different manner (Complaint ¶ 247-266, 934-948, 974-996). Every other recipient got generous and gracious treatment by Defendants and the State authorities Defendants staff and control, and even loan forgiveness in some instances (Complaint ¶ 116-122). ND Commerce and NDDF have never accused any other State largesse recipient of financial misconduct or misuse of funds. Plaintiffs, in contrast, were subjected spiteful and arbitrary treatment (detailed herein and throughout the Complaint) and to declarations to the public, to State legislators, and to Plaintiffs' third-party private financiers by Defendants that Plaintiffs had engaged in misuse of funds – fraud and criminality, in other words – and that a State audit was going to be undertaken to prove it, which audit the State then never completed or concluded because the Defendants had rigged the process, leaving Plaintiffs in limbo with no remedial process available (Complaint ¶ 146-161, 205-212, 250-257). Yet other State largesse recipients

have, as a result of Defendants' actions and under their supervision, seen millions of dollars in incentives and loans they received and burned through forgiven, and had losses and waste obscured without any consequences (Complaint ¶ 117-119, 255). Defendant Tiegen himself and his father are such beneficiaries (Complaint ¶ 42, 255, 934-935). Plaintiffs were among NDDF's best performing borrowers when the Defendants caused these spiteful and arbitrary measures to be taken against them (Complaint ¶ 250).

[¶30]   Those largesse recipients, typically startups similarly situated to Plaintiffs, frequently receive loans and grants on 'forever-yours' terms (Complaint ¶ 116-120) and then quietly crash and burn without so much as a raised eyebrow from the State or the agencies Defendants control. Those recipients' defaulted or delinquent loans are treated as still open, active, and current on State ledgers to maintain a façade of success (Complaint ¶ 357-367), while Plaintiffs' business enterprise, which continues to prosper and to attend to financial responsibilities despite the tremendous burdens Defendants have imposed upon them, was publicly declared a pariah by Defendants and subjected to a forever audit and with State financing then placed in an unending technical default (Complaint ¶ 199-204, 210, 250, 996, 999, 1006, 1010, 1033).

[¶31]   Defendants sought to put Plaintiffs out of business in retaliation for Plaintiffs' exercise of their First Amendment rights and Plaintiffs' reporting of matters of grave public concern and apparent public corruption. Plaintiffs have been subject to repeated spiteful and arbitrary treatment Defendants wanted to "get" Plaintiffs to punish them and to chill their continued speech. Their protestation that the Complaint lacks specific allegations in support of this claim and against each Defendant is preposterous.

[¶32]   The 'broad discretion/multitude of factors' scenarios Defendants offer to attack Plaintiffs' class of one theory claim are unavailing. Plaintiffs are not State employees, nor are they State

contractors, and they are not criminal defendants or prosecution targets. Rather, Plaintiffs' circumstances seem to represent the only instance of ND Commerce and NDDF ever even gently criticizing a recipient of the State largesse they control, and as to the many other things Defendants did spitefully and arbitrarily to the Plaintiffs, there is no prior precedent or justification

### i.    Qualified Immunity Does Not Apply

[¶33]   For the reasons noted above at length in Section II of this Memorandum, qualified immunity does not apply to this claim.

### ii.    Specificity of Allegations

[¶34]   Plaintiffs' Complaint is replete with specific allegations against each Defendant as to this Count. For this Court's ease of reference, see the concise summary of Count I claims in Complaint ¶¶ 973-1010 which are specific to each Defendant.

### B.    Count II – First and Fourteenth Amendment Rights

[¶35]   Defendants lead their attack on Count II of Plaintiffs' Complaint with a reference to speech by public employees, suggesting that only speech of "public concern" is relevant to the Court's consideration of their Motion to Dismiss. But Plaintiffs are not State employees. They are not State contractors. The extent of the Plaintiffs' relationship with the State is that Plaintiff Hoefer Group, LLC is a State borrower and a recipient of State-provided largesse from NDDF and ND Commerce. Plaintiffs are not State suppliers, vendors, contractors, or anything of the like.Nothing about Plaintiffs' relationship with the State restricts the Plaintiffs' free speech rights.

[¶36]   Nonetheless, it is obvious from the allegations in the Complaint that Plaintiffs' speech activities did relate to matters of public concern, public safety, and national security. As noted in the Complaint and detailed above, Plaintiffs discovered serious aviation supply chain irregularities, fraud, and particular crimes which had been occurring at and in relation to the Dunseith Site, and

15

a grave risk to commercial and military aviation safety. Plaintiffs discovered that public officials, including certain Defendants, had been involved in those activities (detailed above). Plaintiffs reported those things to various state, federal, and U.S. military authorities (detailed above). And Defendants, individually and in concert, sought to prevent Plaintiffs from speaking publicly about it and then retaliated for Plaintiffs' speech in the manners detailed in the Complaint (detailed above).

[¶37]   The recent Eighth Circuit decision in *McNeally v. HomeTown Bank*, 155 F.4th 1000 (8th Cir. 2025), is instructive. (That decision reverses in part a 2024 district court decision in the case at 725 F.Supp.3d 934 which Defendants cited in their Memorandum at its ¶29.) In McNeally, the Eight Circuit addressed First Amendment retaliation claims brought by an employee of a bank which occupied space within a public-school building. The employee alleged she was fired by the private bank at the direction and instigation of school officials, who had banned her from the school property that was her worksite in retaliation for her protected speech regarding school policy. The school system contended she was an employee of a government contractor and that her speech rights were limited, but the Court held that she was a private citizen, not a government contractor, because the bank's relationship with the school was transactional (rent for leased space). The Court then noted the relevant factors a plaintiff must establish to succeed with a First Amendment retaliation claim:

> "To establish a First Amendment retaliation claim, [she] must show that '(1) [s]he engaged in a protected activity, (2) the government official took adverse action against [her] that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity.'" *Rinne v. Camden County*, 65 F.4th 378, 383 (8th Cir. 2023) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). As an ordinary citizen, there is no dispute that McNeally engaged in protected speech.

*McNeally*, 155 F.4th at 1007 (8th Cir. 2025). The Court, noting that using "'the punitive machinery of government' to impose 'concrete consequences' in retaliation for speaking out against the

government" chills speech," held that the school system's building ban punishment was a "concrete consequence that would objectively chill a person of ordinary firmness" from speaking freely. *Id*, at 1007.

[¶38]    The McNeally court also addressed the school system's qualified immunity defense, noting that it did not matter that there was no specific precedent addressing similar facts as to whether a school superintendent could institute such a ban, because the overarching no-retaliation rule was clearly established:

> … it was clearly established that a government official may not retaliate against a citizen for the exercise of her First Amendment rights. *Pendleton v. St. Louis County*, 178 F.3d 1007, 1011 (8th Cir. 1999); *see also Waddell v. Forney*, 108 F.3d 889, 894 (8th Cir. 1997) (considering a Fifth Amendment due process claim and stating that since "1989, the right to be free from government interference with an employment relation was clearly established" (citing *Chernin v. Lyng*, 874 F.2d 501 (8th Cir. 1989))). We have also held that a government official may not ban someone from government property in retaliation for speech. *Rinne*, 65 F.4th at 385; *see Hartman v. Moore*, 547 U.S. 250, 256, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006) (explaining that while some official actions "might well be unexceptional if taken on other grounds," such adverse action cannot be taken in retaliation for speech). And when [superintendent] Redmond allegedly conspired with the Bank, it was clearly established that a government official could not engage in "conduct in furtherance of a conspiracy to retaliate against Plaintiffs for exercising their First Amendment rights." *Pendleton*, 178 F.3d at 1011. So Redmond was "on notice" that his alleged retaliatory conduct was unlawful. *See Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).

*McNeally*, 155 F.4th at 1008 (8th Cir. 2025).

### i.    Qualified Immunity Does Not Apply

[¶39]    For the reasons noted above at length in Section II of this Memorandum (and above as to *McNeally*), qualified immunity does not apply to this claim.

### ii.    Specificity of Allegations

[¶40]    Plaintiffs' Complaint is replete with specific allegations against each Defendant as to this Count. For this Court's ease of reference, see the concise summary of Count II claims in Complaint ¶¶ 1017-1042 which are specific to each Defendant.

**C.    Count III – Discriminatory Treatment of Protected Witness Class**

[¶41]   Defendants brush off Plaintiffs' assertion that Plaintiffs are part of a protected class, noting that typically courts require those who might claim such status to have immutable characteristics and to be part of a discrete and insular minority. And they suggest that Plaintiffs are claiming there is a private right of action under 18 U.S.C. § 1513(e), but that is not what Plaintiffs in fact claim. Rather, Plaintiffs ask this Court to consider two things: (1) Plaintiffs claim that federal statutes including 18 U.S.C. § 1513 and 18 U.S.C. § 1512 reflects the carving out, by Congress, of a protected class, of which Plaintiffs are members, and that Defendants deprived Plaintiffs of Equal Protection of the laws by discriminating against them as members of that class, in violation of 42 U.S.C. § 1983. "Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). 18 U.S.C. § 1513 and § 1512are part of the Victim and Witness Protection Act. And (2) Plaintiffs claim that 18 U.S.C. § 1513(e) implies rights creating language that specifically protects members of this protected class from retaliatory interference in their livelihood owing to their protected speech.

[¶42]   Witnesses, victims, and informants are a discrete and insular population as to which Congress created special protective rights because they are especially vulnerable to aggression, threats, retaliation, and violence. Congress has thus made it clear that witnesses, victims, and informants – who provide truthful information relating to the commission or possible commission of a federal offense to law enforcement, and who share information necessary to the prosecution of corrupt officials and other persons – are protected in a variety of ways both individually and as a class or group, to be free from retaliation, interference, harm, harassment, intimidation, coercion, and other misconduct by others relating to their truthful reporting or testimony. Congress has

determined that such class of persons requires special protection concerning their civil rights and has enacted those protections, including within the provisions of 18 U.S.C. § 1513(e) and related statutes. And as a defined class under federal law, claims under § 1983 as to Equal Protection should apply.

[¶43]   Defendants are correct that this is a novel theory as to which there is no Eight Circuit precedent on this topic. Plaintiffs ask the Court to allow this claim to proceed, and to consider the analogous scenario presented by *Health & Hosp. Corp. v. Talevski*, 599 U.S. 166 (2023). In *Talevski*, the United States Supreme Court reiterated that § 1983 provides a remedy where Congress has unambiguously conferred individual rights upon a class of beneficiaries to which a plaintiff belongs, when the enabling legislation is "phrased in terms of the persons benefited and contains rights-creating, individual-centric language with an unmistakable focus on the benefited class." *Talevski*, 599 U.S. 166, 168 (2023) (cleaned up). Statutory rights within that category "are presumptively enforceable under §1983." *Id*.

[¶44]   In *Talevski*, the Court determined that Medicaid beneficiaries can sue under § 1983 to enforce certain rights under the Federal Nursing Home Reform Act (FNHRA) when states violate those rights, including rights related to chemical restraints and involuntary transfer or discharge from nursing homes. The Court recognized that a defendant may defeat the § 1983 enforceability presumption by showing that Congress explicitly indicated within the statute that it did not intend for § 1983 to apply, or that Congress did so implicitly by creating a comprehensive regulatory scheme incompatible with individual enforcement. *Id*. But the Court found no "sign of incompatibility in the FNHRA, which lacks a private judicial right of action, a private federal administrative remedy, or any careful congressional tailoring." *Id.*, at 169 (cleaned up).

[¶45]  As with the FNHRA, § 1513 and § 1512 protects a class (witnesses, victims, and informants) but, as Defendants concede, it does not itself provide a private enforcement mechanism for damages suffered due to violations by those acting under color of law concerning the rights created. The Court should hold in this instance, and in light of the lack of clear contrary precedent, that Congress intended to identify and protect a vulnerable class by its enacting § 1513 and § 1512 legislation, allowing Plaintiffs to proceed as members of the clearly defined protected class who have been denied equal protection of the laws.

[¶46]  Defendants, as alleged within the complaint, sought to chill, squelch, silence, and retaliate for Plaintiffs' truthful reporting of serious allegations of the commission of federal criminal offenses by individual Defendants and others. Defendants knew that Plaintiffs were informing to federal authorities, knew that Plaintiffs had become members of a vulnerable and protected class, and then Defendants concealed (until Plaintiffs' independent discovery) that Defendants were an adverse and hostile party to Plaintiffs' reporting and whistleblowing. Plaintiffs' remedy for that falls within § 1983. As a member of the protected class, Plaintiffs were reporting to federal authorities as to things involving each of the individual Defendants and their State agencies. Defendants, the very people Congress sought to protect this vulnerable class from, were acting under color of law to insert themselves into hostile control of the Plaintiffs' operations and finances to oppress Plaintiffs' whistleblowing and reporting and to interfere with Plaintiffs' livelihoods. Defendants knew Plaintiffs, members of that protected class, were engaged in protected activities and Defendants enacted punishment and revenge, even forcing Mr. Hoefer's labor and services to their own benefit and subjecting Mr. Hoefer to threats of physical harm. Thus, each Defendant discriminated against Plaintiffs while Plaintiffs engaged in protected speech, despite Plaintiffs' protected class status, and specifically because Plaintiffs were members of that class.

[¶47]   18 U.S.C. § 1513(e), a part of the Victim and Witness Protection Act, prohibits any person from "knowingly, with the intent to retaliate" taking "any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of a federal offense." Plaintiffs fall into the class of persons subject to such protection. Separately, this Court should consider that § 1513(e), through its definition of offenses relating to Defendants' retaliations against the livelihood of the Plaintiffs, implies rights-creating language specific to § 1983, for which Plaintiffs, as members of this protected class of victims, witnesses, and informants, are entitled to the protection of their livelihood free from retaliation for their reporting. Each Defendant retaliated against the Plaintiffs' livelihood, and Plaintiffs deserve recognition that a federal right conferred to them in federal law was in turn deprived.

### i.    Qualified Immunity Does Not Apply

[¶48]   For the reasons noted above at length in Section II of this Memorandum, qualified immunity does not apply to this claim. One cannot retaliate against First Amendment speech. And one cannot retaliate against a witness.

### ii.    Specificity of Allegations

[¶49]   Plaintiffs' Complaint is replete with specific allegations against each Defendant as to this Count. For this Court's ease of reference, see the concise summary of Count III claims in Complaint ¶¶ 1050-1091 which are specific to each Defendant.

### D.    Count IV – Section 1983 and Procedural Due Process Rights

[¶50]   Defendants argue that Plaintiffs cannot make out a procedural due process claim without first availing themselves of available state remedies. And to borrow from the Bard, there's the rub.

[¶51]  Defendants ensured that there is a rigged, predetermined, unending process with no path for Plaintiffs to raise objections and no remedy. As Plaintiffs allege in the Complaint, Defendants, through their individual actions and sometimes working together or through agents, and acting under color of law, privately and then publicly accused Plaintiffs of blackmail, extortion, and misuse of funds, all the while knowing these things to be false. They threatened Plaintiffs with consequences and gave notice of and then began a rigged remedial process of sorts, supposedly to allow examination of the accusations and potential exoneration: an overburdening audit whose processes were designed to overwhelm a small business. Plaintiffs nonetheless submitted everything asked of them into that audit process. And then Defendants, Teigen, Akason, Albrecht and Garman in particular, with Lehman's assistance, caused the State entities they controlled and directed to leave Plaintiffs in limbo for a period of time, while still proclaiming publicly and to state legislators and Plaintiffs' private financiers that Plaintiffs were wrongdoers, before ultimately effectively abandoning the audit with no conclusion, no findings, and no opportunity for Plaintiffs to clear their good names, nor any notice to Plaintiffs as to the audit's status or timetable, and all the while repeating their allegations to third parties whenever it suited them and had a detrimental effect on the Plaintiffs' business. Plaintiffs detail all of this in the Complaint, particularly in ¶¶146-311 and in summary form in ¶1110 and its subparts.

[¶52]  What is obvious from the Complaint's detailed allegations is that Defendants knowingly and maliciously used the authority of their State positions to publicly blackball Plaintiffs in retaliation for Plaintiffs' speech activities and because Plaintiffs were reporting to authorities on matters of substantial and grave public concern which implicated the named Defendants. Each leveraged the 'punitive machinery' of government to defame and poison the Plaintiffs' reputations, and to send a message to North Dakota's financial sector and other citizens that partnering with,

or assisting, or financing the Plaintiffs would cause them to be punished as well. Further, the Defendants aimed to and succeeded in scaring off financiers and partners of the Plaintiffs who did not want associations with parties accused of criminal misconduct. This abuse of Plaintiffs' rights had real consequences, causing them actual deprivations of property and liberty, and immediately poisoning and severing Plaintiffs' relationships with its third-party lenders and financiers.

[¶53]    Defendants argue in their Motion that Plaintiffs do not allege losing any legitimate entitlement to property taken pursuant to constitutionally inadequate process, which is both inaccurate and misleading, given that the audit process never ended but the deprivations nonetheless occurred in advance of any real opportunity to be heard. Plaintiffs suffered losses and changes in protected legal status. Among their losses: Defendants in September 2023 together caused NDDF to terminate Plaintiffs' access to what was supposed to be a 5-year expectancy credit line, to new promised credit, and shortly after interfered to threaten punishment to a private bank should it lend to the Plaintiffs, and then in February 2024, Defendants Akason and Garman scuttled a $5.475 million third-party financing deal Hoefer Group had arranged by repeating their "misuse" of State of ND funds allegation. Complaint, ¶1110(iii, xxiii). In conjunction with that, on February 29, 2024, Garman and Akason told the Plaintiffs and third parties with existing and proposed financial relationships to Plaintiffs that the 'forever audit' Defendants had caused NDDF to instigate had a predetermined outcome: "Misuse." Complaint ¶309. (Akason later told a state legislator who asked him why he wouldn't retract the misuse allegation that he couldn't because he feared Plaintiffs would then sue him. Complaint ¶311.) And in December 2024 Akason, while holding a meeting with State legislators and Defendants Garmin, Lehman, and Albrecht to discuss the Defendants' actions concerning Plaintiffs, conceded that the Defendants and particularly he

had deliberately deprived Plaintiffs of access to private third party financing without remedy (Complaint ¶ 262-265).

[¶54]   Defendants caused NDDF to deprive Plaintiffs of a pre-deprivation hearing or name-clearing opportunity, thereby depriving Plaintiffs of their right to Procedural Due Process. Plaintiffs have suffered stigma, real deprivations of liberty, and injury to tangible property interests. And there is no adequate post-deprivation remedy available under State law. The only remedies available now lie through this Court, under Section 1983.

### i.      Qualified Immunity Does Not Apply

[¶55]   For the reasons noted above at length in Section II of this Memorandum, qualified immunity does not apply to this claim.

### ii.      Specificity of Allegations

[¶56]   Plaintiffs' Complaint is replete with specific allegations against each Defendant as to this Count. For this Court's ease of reference, see the concise summary of Count IV claims in Complaint ¶¶ 1100-1129 which are specific to each Defendant.


### E.      Count V – Substantive Due Process / Liberty Rights

[¶57]   As Defendants correctly note in their Motion, to state a substantive due process/liberty deprivation claim, Plaintiffs must allege acts which shock the judicial conscience and that those shocking acts resulted in a deprivation of a life, liberty, or property interest protected by the due process clause. U.S. Supreme Court precedent provides that historically, the guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property, as opposed to mere negligence or recklessness. *Daniels v. Williams*, 474 U.S. 327, 331 (1986).

[¶58]   The conduct of each Defendant as alleged by Plaintiffs in the Complaint is deliberate and should shock the conscience of this Court. Defendants are government actors with influence and control over tremendous State financial resources. Plaintiffs are not alleging that Defendants are simply middling bureaucrats who performed their jobs negligently, but rather that Defendants engaged in embarrassing and apparently criminal activity which endangered the global aviation supply chain, got caught by Plaintiffs, and then set out to cover their crimes at Plaintiffs' expense and to the detriment of Plaintiff's liberty and property by framing Plaintiffs for their crimes. They took a federally encumbered asset, the Dunseith Site, and heaped and sought to launder the liability and aviation successor liability for their illicit activities there to be dumped upon Plaintiffs, by virtue of their positions and their authority. There was no remedy available to Plaintiffs once they took possession of the site. Once Plaintiffs took possession of the encumbered property, they misused their public positions to put Mr. Hoefer and his family in grave physical danger and sought to frame Plaintiffs for their crimes. Their actions – framing the Plaintiffs and dumping their federal criminal liabilities – are shocking to the judicial conscience and lack specific remedies under the law. It amounts to a crime ring doing the things crime rings do, which sometimes are so novel and creative that it is difficult to figure out how to apply the law to it. The Court should find that novel, shocking, and worthy of remedy under this theory.

### i.    Qualified Immunity Does Not Apply

[¶59]   For the reasons noted above at length in Section II of this Memorandum, qualified immunity does not apply to this claim.

### ii.    Specificity of Allegations

[¶60]   Plaintiffs' Complaint is replete with specific allegations against each Defendant as to this Count. For this Court's ease of reference, see the concise summary of Count V claims in Complaint ¶¶ 1140-1165 which are specific to each Defendant.

### F.    Count VI – Forced Labor

[¶61]    Defendants contend that 18 U.S.C. § 1589, part of the Trafficking Victims Protection Act of 2000 ("TVPA"), is "intended to prevent the exploitation of workers, and … Plaintiffs [n]ever worked or were employed by any of the individual Defendants." Thus, they deem Count VI to be "a misapplication of the statute" and an attempt to make a Thirteenth Amendment claim of some sort. They cite no Supreme Court or Eighth Circuit precedent and expend very little ink in response to that claim. See Defendant's Motion, ¶¶58-60.

[¶62]    Defendants ignore the statute's plain language, which applies to all persons; Congress did not limit the reach to victims of sex trafficking, exploited employees, or the enslaved. § 1589(a) makes it a federal offense for a Defendant to "knowingly... obtain the labor or services of a person by any one of, or by a combination of, the following means," including via "serious harm or threats of serious harm to that person" and via "any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm." § 1589(b) also makes it a federal offense for a Defendant who "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the... obtaining of labor or services by any of the means described" in the statute while "knowing or in reckless disregard of the fact that such venture has engaged in the… obtaining of labor or services by any of such means." See 18 U.S.C. § 1589. And Congress provided a civil remedy within 18 U.S.C. § 1595 for individuals who are victims of the offenses described in § 1589.

[¶63]    Although the Eighth Circuit has not addressed the breadth of TVPA § 1589 in this context, other Circuits have, including the Eleventh in *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269. That

26

case, which concerned allegations that a private contractor which owned a federal immigration detention center violated § 1589 by coercing alien detainees to perform labor, is instructive.

[¶64]    In *Barrientos*, the Court examined § 1589 and found its language to be "plain and unambiguous," noting that:

> The use of the general terms "[w]hoever" and "person" evinces no intent on the part of Congress to restrict the application of the statute to particular actors or particular victims. Instead, the clear and unambiguous language of the statute limits liability only by reference to the actions taken by a would-be violator: it applies to anyone who knowingly "obtains the labor or services of a person" through one of the four illegal coercive means explicitly listed in the statute. No other limiting principle is evident from the plain text.

*Barrientos*, 951 F.3d 1269, 1276-1277. The Eleventh Circuit specifically refused to read a limiting principle into § 1589 to reflect intent, holding that there was no reason to look beyond the unambiguous text to legislative history or to Congressional statements of intent:

> Just because Congress may have had in mind a particular narrow objective—here, combatting human trafficking—does not on its own justify a departure from the principle that we should give general terms their general meaning. *See* Scalia & Garner, *supra*, at 103-04 ("The argument most frequently made against giving general terms their general meaning is the one made (and rejected) in the *Slaughter-House* cases—that those who adopted the provision had in mind a particular narrow objective (equal protection for blacks) though they expressed a more general one (equal protection for 'any person')."). As the Supreme Court has remarked, "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) (cleaned up).

*Barrientos*, 951 F.3d 1269, 1279.

[¶65]    The *Barrientos* Court noted other Circuits had also adopted similar readings of § 1589, citing cases from the Second, Sixth, and Tenth. *Id.*, at 1279-1280. Since then, the Fourth Circuit has done the same, in *United States v. Chaudhri*, 134 F.4th 166 (4th Cir. 2025) (holding that the broad language of § 1589 applies to domestic labor compelled through threats, coercion, or abuse within a family setting; and that TVRA did not define labor or service so common dictionary

definitions apply, meaning labor is "expenditure of physical or mental effort" and service is "performance of work commanded or paid for by another.").

[¶66]   There is no reasonable reading of § 1589 which indicates that it does not apply to the circumstances Mr. Hoefer alleges in the Complaint, including ¶ 57(v), 125-140, 245-246, 266-275, 474-486, 679-682, 690-693, 704-708, 865-875, 945-947. Those allegations detail how specifically identified Defendants and agents they directed compelled Mr. Hoefer to provide over 1,600 hours of uncompensated labor and services for their benefit under threat of serious harm. See Complaint at ¶¶135, 872, 1174-1190. And § 1595(a) provides a civil remedy for those harms, allowing a victim to sue the perpetrator, those who knowingly benefit from the offenses, co-conspirators, and those who attempt to benefit, so as to recover damages and reasonable attorneys fees. Plaintiffs have stated a legally and factually sufficient claim in that regard and this Court should allow it to proceed.

### i.     Qualified Immunity Does Not Apply to TVPA Claims

[¶67]   As noted above, Plaintiffs are unaware of, and Defendants have not cited, any U.S. Supreme Court or Eighth Circuit precedent applying qualified immunity principles to civil claims brought under 18 U.S.C. § 1595 in relation to § 1589 violations. TVPA violations do not raise constitutional or civil rights considerations of the sort that qualified immunity was designed to address. There is no reason for the Court to consider qualified immunity as to Complaint Count VI, which asserts such claims, nor have Defendants asserted such a defense as to such Count.

### ii.     Specificity of Allegations

[¶68]   Plaintiffs' Complaint is replete with specific allegations against each Defendant as to this Count. For this Court's ease of reference, see the concise summary of Count VI claims in Complaint ¶¶ 1174-1192 which are specific to each Defendant.

### G.    Count VII – § 1983 Claims re: Unconstitutional Takings and Seizures

[¶69]   Defendants mischaracterize, and appear to misunderstand, Plaintiffs' claims in Count VII, which is a Section 1983 claim against them, not a Fifth Amendment Takings claim or a Fourth Amendment claim. Defendants are not the government. They merely act under its authority.

[¶70]   What Plaintiffs allege in the Complaint is that one or more Defendants, acting under color of state law and through State agents, weaponized State resources to cause the State to take actions which violated Plaintiffs' constitutional rights under the Fourth and Fifth Amendments. They intentionally caused the hacking of, and substantial disruption and damage to, Plaintiffs' computer equipment and electronics. Plaintiffs believe that discovery will show Defendants engaged the resources of the State and the 'punitive machinery' of government to accomplish that, to destroy evidence, to cover up things that had occurred at Plaintiffs' factory site which involved them, and to retaliate against and surveille Plaintiffs. Those acts resulted in the taking and partial destruction of Plaintiffs' property, specifically computer data, emails, surveillance footage, and other documents and data. By Defendants' actions in causing this to occur, they caused the State to effect an unconstitutional taking of Plaintiffs' property without due process or just compensation, and to effect an unconstitutional seizure of Plaintiffs' property and private materials without due process, a warrant, or probable cause. See Complaint, ¶¶ 733, 778-782, 992, 1030, 1200-1202.

### i.    Qualified Immunity Does Not Apply

[¶71]   For the reasons noted above at length in Section II of this Memorandum, qualified immunity does not apply to this claim. Defendants acted to retaliate against Plaintiffs and to cover up their own complicity in illicit conduct which had been occurring at the Dunseith Site. Plaintiffs were engaged in protected speech about matters of grave public and national concern and about Defendants' illicit and seemingly criminal behavior. Defendants cannot reasonably contend they were unaware of the illegality of their conduct and should not be shielded from responsibility.

### ii.    Specificity of Allegations

[¶72]  Plaintiffs' Complaint is replete with specific allegations against each Defendant as to this Count. For this Court's ease of reference, see the concise summary of Count VII claims in Complaint ¶¶ 1200-1207 which are specific to each Defendant.

### H.    Count VIII – Conspiracy / 42 USC § 1985

[¶73]  The focus of Defendants' attack on Plaintiffs' § 1985 civil conspiracy claim is their repeated argument that the Complaint lacks specificity as to allegations concerning individual Defendants' activities and concerning allegations about any form of a meeting of the minds to support a conspiracy claim.

[¶74]  The Complaint is replete with detail regarding each Defendant's actions and activities, including as to all Defendants' actions undertaken in concert and in coordination to deprive Plaintiffs of their rights in the manners previously discussed herein. Among the conspiracy allegations in the Complaint are these:

> ¶11: "Defendants conspired together and acted both individually and in concert to make Mr. Hoefer and Hoefer Group their clean-up crew and scapegoat …"

> ¶23: "… Teigen, Akason, Garman, and Lehman conspired together and acted immediately – and then for a prolonged time including with Albrecht – to protect themselves and to deprive the Plaintiffs' federal rights."

> ¶55: "Defendants united against the Plaintiffs' rights under a conspiratorial objective when the Defendants violated clearly established federal laws in depriving the Plaintiffs' rights."

> ¶147: "… all Defendants conspired and took collective action to falsely accuse Mr. Hoefer of criminal misconduct … to the State of ND Attorney General, the Governor, Auditor, to media, and to third parties."

> ¶156: "… Akason, in conspiracy and in cooperation with Teigen, Garman, and Albrecht, repeatedly blocked Plaintiffs' requests to attend NDDF board meetings. They did this to prevent the Plaintiffs from informing the full board about the Defendants' illicit behavior in relation to the Dunseith Site and as to the Defendants' acts against Plaintiffs."

¶524: "… the Defendants conspired together and cooperated together to further their conspiracy …"

¶548: "… Teigen, Garman, Akason, and Lehman, conspiring together and assisting one another, had directed Tooke to meet with federal agents multiple times to "assist" as the Plaintiffs sought relief, but these Defendants were actively scheming to deceive federal authorities and to conceal facts critical to Plaintiffs' relief and essential to the federal Factory liability cleanup."

¶600: "Each Defendant acted in conspiracy and coordinated his actions with the other."

¶822: "Albrecht quickly became a ringleader in the Defendants' conspiracy…"

¶971: "Defendants, conspiring together and assisting one another to further their acts herein, …"

¶1019: "Defendants conspired together and they assisted one another to further their acts herein, and they sought to silence, suppress, and chill, and to retaliate against, Plaintiffs' First Amendment protected activities including Plaintiffs' speech and petitioning rights."

¶1033 (xi.): "Akason, in conspiracy with and acting in cooperation with all Defendants, spread false criminal misconduct allegations …"

¶1100: "Defendants conspired together and they assisted one another to further their acts herein, and they deprived Plaintiffs' procedural due process rights …"

¶1151: "As each Defendant became fully aware of what the other Defendants had done to Mr. Hoefer, all Defendants joined up as a team and conspired together and acted to keep Mr. Hoefer personally federally liable for their own laundered criminal mess."

¶1174: "… Teigen, Akason, Garman, and on information and belief, Lehman conspired together and together and individually they directed their agent to obtain for them more than 1,600 hours of Mr. Hoefer's time in labor and services to serve their personal interests to clean up the Factory mess and its liabilities which Teigen, Albrecht, and Lehman had previously deceptively dumped upon Mr. Hoefer."

¶1183: "… all Defendants conspired and cooperated together and acted together and with individual acts to weaponize a rigged state 'audit' procedure …"

[¶75]  Plaintiffs believe that the allegations as to the existence and nature of the Defendants' conspiracy are sufficient to put Defendants on notice as to the same. However, Plaintiffs acknowledge that the Complaint does not explicitly allege that a "meeting of the minds" occurred

among the alleged conspirators by use of such phrase, although Plaintiffs believe such to have occurred. If the Court determines the Complaint to be deficient in that regard, Plaintiffs respectfully request that the Court grant leave to amend the Complaint to correct such deficiency, either now or following the opportunity for discovery.

### i.    Qualified Immunity Does Not Apply

[¶76]   For the reasons noted above at length in Section II of this Memorandum, qualified immunity does not apply to this claim.

### ii.    Specificity of Allegations

[¶77]   Plaintiffs' Complaint is replete with specific allegations against each Defendant as to this Count. For this Court's ease of reference, see the concise summary of Count VIII claims in Complaint ¶¶ 1216-1236 which are specific to each Defendant.

## IV.    Conclusion

[¶78]   For the foregoing reasons, this Court should deny Defendants' Motion in its entirety. However, if the Court should determine that any portion of Plaintiffs' Complaint is deficient in some form which is curable through amendment, Plaintiffs request that the Court provide leave to so amend and a reasonable time in which to do so.

Respectfully submitted and dated this 9th day of January 2026.

By:  _/s/  Thomas C. James, Jr._
Thomas C. James, Jr. (ND# 006235)
Sanders & Associates, LPA
8040 Hosbrook Road, Suite 202
Cincinnati, Ohio 45236
Phone (513) 229-8080
TomJames@SandersLPA.com

ATTORNEY FOR PLAINTIFFS